# EXHIBIT 31

AMERICAN ARBITRATION ASSOCIATION
CONSTRUCTION INDUSTRY ARBITRATION RULES

| | |
|---|---|
| LEEWARD CONSTRUCTION COMPANY, Ltd.<br><br>                              Claimant,<br><br>v.<br><br>AMERICAN UNIVERSITY OF ANTIGUA COLLEGE OF MEDICINE C/O GCLR, LLC,<br><br>                              Respondent. | Case No. 50 110 T 00075 11<br><br><br><br>**WITNESS STATEMENT<br>OF A.S. NAGESH** |

I, A.S. NAGESH, state as follows:

1.      I am a civil engineer currently employed by Sundaram Architects Pvt. Ltd. ("SAPL"), in Bangalore, India.

2.      I submit this statement on behalf of American University of Antigua ("AUA") in defense of the Claims asserted by Leeward Construction Company, Ltd. ("Leeward").

3.      SAPL was retained as the Architect for the construction of the new medical school campus of American University of Antigua ("AUA") (the "Project").  When the Project started in 2008, I was offered to represent SAPL and I took over as the Architect's representative to coordinate the Project.

4.      I was appointed to serve as the Architect's representative for the Project in 2008 and was present on the construction site on a daily basis.  As the Architect's representative, I was responsible for, among other things:  overseeing the construction of the New Campus; transmitting and coordinating the architectural designs and design changes; addressing design issues; making decisions on design changes in light of site conditions and issuing instructions with respect to those changes; inspecting and verifying the work performed by Leeward and

1

others, including work performed in connection with design changes; certifying payment applications; and adjudicating Claims.

5.     In addition, I was responsible for assuring the quality of the Project and the work of the contractors.  For example, it was my decision to require Leeward to rebuild the defective columns it erected early in the Project, which became the root cause of its delay in completing the Project on time, as explained in Paragraphs 90 to 93 of Col. Antony's Witness Statement.  I also inspected Leeward's work at the end of the Project before certifying its final payment application for payment.

## MY EDUCATIONAL AND PROFESSIONAL BACKGROUND

6.     I received a graduate degree in Civil Engineering from Bangalore University, India, in 1989.  Immediately thereafter I started my professional career.

7.     From 1989 to 1996, I worked for Bangalore-based survey and engineering project consultants throughout India.  During this period of time, I worked as a project engineer/coordinator in connection with building construction, irrigation projects, road projects, and pipeline projects.

8.     In July 1996, I joined SAPL and worked there as a project coordinator for the next 10 years.  During this tenure I was involved in a variety of projects, including projects on college campuses in southern India.

9.     In 2002-2003, I was appointed by SAPL as a project co-coordinator for developing an Information Technology park in Muscat, Sultanate of Oman.  In 2006, I worked for a brief period as coordinator towards developing a sports complex in Muscat.

10.     In 2007, I left SAPL and joined Jurong Consultants (India) Pvt. Ltd., a multi-national project management company, as senior project coordinator for developing Information Technology parks in Bangalore, India.

11.     I rejoined SAPL in 2008 to serve as the Architect's representative on the Project.

12.     After the completion of the Project in March 2010, I was assigned by SAPL to work as project coordinator for the Manipal Group's engineering college campus in Dubai, United Arab Emirates.  SAPL successfully completed that project in January 2012, at which time I returned to working for SAPL in Bangalore, India.

## THE INFORMAL CHANGE ORDER PROCESS

13.     One of my responsibilities as the Architect's representative on the Project was to work with representatives of Leeward and AUA to document changes to the Contract Sum resulting from changes in the original scope of work.  However, the formal process for Change Orders and Change Directives set forth in the Contract Documents was not used.  Rather, the parties implemented a less formal, but equally effective, way to track and record additions and deductions to the Contract Sum resulting from changes in the scope of work.

14.     Specifically, as discussed in Paragraphs 17 to 26 of  Lt. Col. Roche Antony's Witness Statement, the Contract Sum identified in the Contract Documents was based upon several components, including the Bill of Quantities ("BOQ") prepared by SAPL and negotiated (with respect to the unit rates charged for each item) by AUA and Leeward.  The BOQ represented the design drawings that existed at the time the parties executed the Contract Documents, and formed the basis for the "Measured Works" portion of the Contract Sum.  As is common on large construction projects, however, the designs were subject to change and, in this case, they did change.

15.     The Contract Sum stated in the Contract Documents was "subject to additions and deductions."  Rather than use formal change orders to document these adjustments, here the parties communicated changes verbally and in writing (using emails or Leeward's Request for

3

Information forms), and then used the monthly payment process to track and confirm all changes to Leeward's scope of work, and in turn, the Contract Sum.

16.     Specifically, each month Leeward would submit to me Applications for Payment ("Payment Applications") based on the actual work it performed since its last Payment Application. The Payment Applications provided detailed back-up documentation, including an interim version of the BOQ reflecting the initial quantity or measurement, the actual measurement of the work performed to date, the unit rate, and the amount due for each line item based upon the actual measurements. Leeward would also provide the actual measurements taken. (*E.g.*, AUA Ex. 8 at AUA 000813-855). This process was followed up to and including Leeward's final Payment Application, submitted at the completion of the Work.

17.     Upon receipt of each Payment Application, I (or one of my colleagues) would inspect the work and check the measurements provided with a Leeward representative (usually Paul Webster) to verify that the Measured Works for which Leeward sought payment accurately reflected the quantity of the Measured Works Leeward actually performed. Mr. Webster and I would then reach agreement on the correct measurements and revise the BOQ submitted by Leeward as appropriate.

18.     Mr. Webster understood that the process of confirming the measured works was not merely to issue interim progress payments. Mr. Webster knew and understood that Leeward was only going to be paid for what it actually built, and that any discrepancies between the original BOQ and the "as built" BOQ would serve to increase or decrease the Contract Sum as appropriate.

19.     I would also review with Col. Antony the "Preliminaries," "Change Orders," and "Claims" sought by Leeward in each Payment Application.  We would modify Leeward's claims as necessary and review the changes with Mr. Webster.

20.     Finally, I would work with Col. Antony to make the appropriate revisions to the "Collections Page" to ensure that all the amounts agreed upon for each component of the Payment Application accurately reflected the work done.  Col. Anthony revised and calculated the amount due Leeward for the Payment Application, taking into consideration, among other things, monies withheld as retainage and monies paid for ABST.  Once all parties agreed on the payment amount, I would certify the Payment Application for payment.  (*E.g.*, AUA Exs. 8 to 21).

21.     Contrary to Mr. Dickinson's contentions in Paragraphs 52-57 of his Statement, at no time did Col. Antony prevent me from doing my job or otherwise impede my work.  Col. Antony also did not override my decisions with respect to Payment Applications or otherwise, and I frankly do not understand where Mr. Dickinson got that impression.  Pursuant to Section 5.1.3 of the Contract, AUA had to agree with the amount of all Payment Applications before I could certify them for payment.  (AUA Ex. 1 at AUA 000007).  In other words, Col. Antony had to be involved in processing Payment Applications.  That said, it was my duty to ensure that each Payment Application reflected the proper amount to be paid to Leeward, and that is what I did before certifying each Payment Application.

22.     This process continued through and included Leeward's submission of its Draft Final Account, which represented the final measurements for the Measured Works performed by Leeward.  The initial Draft Final Account delivered by Leeward on October 9, 2009 was modified through this verification process.  (AUA Ex. 30).  On October 19, 2009, Paul Webster

5

emailed me a revised version of the Draft Final Account that incorporated our agreed-upon revisions (except, for this particular example, Leeward's claim for "Preliminaries"). (AUA Exe. 21).

23.     All of the revisions made during the monthly payment process served to document all "additions and deductions" to the Contract Sum. These changes are detailed in Paragraphs 17 to 68 of Col. Antony's witness statement.

## THE DESIGN ISSUES ASSERTED BY LEEWARD

24.     I understand from reviewing Mr. Dickinson's witness statements that Leeward now claims the design drawings were incomplete, that Leeward received design changes late, and that this prevented Leeward from completing its work within the 52 week construction scheduled provided for in the Contract Documents. Leeward's claims are not only inaccurate, but this is the first I have heard of them.

25.     SAPL provided Leeward with a complete set of design drawings prior to the execution of the Contract Documents. (LC 77). The drawings were annexed to the Contract Documents (AUA Ex. 1 at AUA 000059) and SAPL derived the BOQ included in the Contract Documents from them. Leeward did not claim that the design drawing were incomplete at that time.

26.     The fact that an architect provides revised design drawings does not mean that the drawings are incomplete. As Mr. Dickinson acknowledges, it is not uncommon for there to be design changes as a project gets built, whether due to voluntary changes in design or changes necessitated by site conditions. Similarly uncommon is the need for design clarifications or other information. While Mr. Dickinson claims that the number of design revisions were excessive and indicate that the original design drawings were incomplete, based on my years of

experience working as a project coordinator on large-scale projects such as this one, I found the number of design revisions to be well within the normal range.

27.     Typically, design changes or questions about a particular design element do not arise until that portion of the project is about to be built.  For example, Leeward was not asking questions about where a door would be installed on the third floor when it was still pouring concrete on the ground floor.  It is for this reason that someone cannot simply infer from the date SAPL transmitted a design drawing that the drawing was not ready until that time.  To the contrary, SAPL would not send revisions or issue new detailed drawings unless prompted to do so by a recent change or question from Leeward.

28.     Here, nearly all of the drawings issued after April 1, 2009 had to do with the Library Block.  (LC 90 at LC003111 to LC003121).  Leeward was months behind on the Library Block, as is confirmed by the monthly project meeting minutes.  (LC 44 to LC 50).  That is why Leeward was receiving design revisions as late as June 2009.  Until Leeward reached a certain point in its progress on the Library, no one was in a position to assess whether design changes were necessary, and Leeward was certainly not in a position to ask detailed questions about the structure it was building.

29.     Therefore, it would be inaccurate to conclude that the timing of revised design drawings evidences that the drawings were not prepared or available earlier.  Rather, the timing of these transmissions evidences that Leeward's work was delayed, which, as stated in Paragraphs 90-93 of Col. Antony's Witness Statement, was Leeward's fault.

30.     To create the impression that there were significant design issues, Leeward identifies a few minor issues, but Leeward fails to show that any impacted the critical path.  And

for all of these, to the extent they caused Leeward to perform extra work, Leeward admits it was compensated.

31.     Mr. Dickinson claims in Paragraph 67 of his statement that Leeward had to "partially destroy what [it] had just built to install missing components that were overlooked in the design process." While Mr. Dickinson does not specify what work Leeward allegedly had to "destroy," I believe he is referring to the placement of electrical conduits in the classroom walls, both in the exterior concrete block work and the internal partitions. AUA intended to have had its electrical contractor install electrical conduits in both the exterior and interior walls, but AUA's electrical contractor was not yet ready to commence work. Therefore, AUA decided to give all this electrical conduit work to Leeward (and paid Leeward extra for it).

32.     Mr. Dickinson's complaint appears to stem from the fact that Leeward had prepared the walls to accept electrical conduits in certain areas, and those locations changed, requiring remedial work. This should not have been a surprise to Leeward. With the exception of conduits in the roof slab, the location of conduits in walls and floors are always subject to change due to site conditions or the owner's requirements, and, in practice, often do change. Here, nothing was "destroy[ed]," as Mr. Dickinson claims. Leeward simply had to cut some chases to accommodate the conduits in the walls.

33.     I also do not understand why Leeward chose to raise this issue to make its point about design delays. Leeward acknowledged in an e-mail dated May 4, 2009 project meeting that it had already substantially completed the classroom building and that the work AUA requested would not be a problem or require an extension of time because it was not on the critical path of Leeward's work. (LC 50).

8

34.     Mr. Dickinson also makes much of the number of Requests for Information Leeward submitted.  Again, I do not see the significance.  Leeward issued RFIs when it wanted to confirm verbal instructions or seek clarification on a design element.  It is common practice for contractors to ask questions and Leeward's RFI form is similar to those used in the industry.  The number of RFIs, however, does not speak, one way or another, to the adequacy of the design drawings.

35.     With respect to Leeward's complaints about the timeliness of the MEP designs, this too is a non-issue.  The MEP Work was not within Leeward's scope of work and Leeward did not need access to all of the MEP details before it performed the structural works.  Indeed, given that the interior design of electrical conduits, plumbing fixtures, and the like are frequently subject to design changes by an owner, and given that these changes often come late in a project, it is not uncommon to cut chases in walls or to chisel concrete to effectuate these changes.

36.     As Mr. Dickinson conceded in Paragraph 74 of his Statements, AUA did not actually delay Leeward in performing its work on account of any supposedly late MEP design drawings.  Leeward was told to proceed with the pours without the designs.  If building things in this order caused AUA to incur additional costs after the fact, it was AUA, not Leeward, that had to deal with the issue.  As for Leeward's claim that it was delayed by performing the remedial work, as stated in Paragraphs 31-33 above, Leeward performed that work after it achieved substantial completion and admitted that the work was not on the critical path and did not require an extension of time.  (LC 49 and LC 50).

37.     Similarly, while I disagree with Leeward that cutting chases in interior walls and floors compromises the integrity of the structure, that too was not Leeward's concern.  Leeward

was not hired to design the New Campus; it was hired to build it in accordance with the designs provided by the Architect and the specifications required by AUA.

38.     With respect to the Toilet Block, Mr. Dickinson again raises a non-issue. First, Mr. Dickinson's contention that "[t]here were no provisions in the design for the layout of the toilet blocks" is simply not true. As I confirmed to Leeward at the October 21, 2008 project meeting (LC 41), revised designs for the Toilet Block were transmitted to Leeward in October 2008. (LC 88 at LC003085). These drawings revealed the layout. (AUA Exs. 37-40). An example, Library Block/PS-05 (AUA Ex. 37), is on the next page.



39.     The fact that AUA altered the layout thereafter was not Leeward's concern. Again, this kind of change happens frequently and it is accepted practice to chisel out concrete to install plumbing fixtures to implement such changes.

40.     That is what occurred here.  In fact, in September 2009 Leeward was awarded a separate contract to install the plumbing fixtures and perform all alterations required to do so. (LC 235).  Leeward was paid for this work.  Moreover, because this work occurred after Leeward achieved Substantial Completion on the original contract, it did not impact the critical path and, therefore, could not possibly have caused a delay.

41.     With respect to the Library Block, Mr. Dickinson claims that Leeward had to do extra work dismantling and reconfiguring walls because of the lack of design information, but admits it was compensated for that small amount of work through a "change order."  Clearly, this small item was not the root cause that resulted in Leeward being three months late in completing the Library Block.

42.     Also unavailing is Leeward's contention, in Paragraph 19 of Robert Winwood's Witness Statement, that the lack of MEP designs that resulted in remedial work caused delay because Leeward had to divert resources.  First, as I state above in Paragraphs 31-36, the remedial work at issue involved the Classroom Block.  Leeward performed this work after it achieved substantial completion in this area of the Project and, by its own admission, the work did not impact the critical path.  (LC 50).  Second, Leeward was not obligated to assume this remedial work.  If accepting the assignment meant it would have to divert manpower from performing work on the critical path in order to perform non-critical remedial work, Leeward should have declined the offer and left AUA to find someone else to do the remedial work,

which AUA would have done.  Having accepted the offer, however, Leeward should not now be permitted to claim the work caused delay and blame AUA for creating the problem.

43.     Finally, with respect to the allegations in Paragraph 20 of Mr. Winwood's Witness Statement that other trades were impeding Leeward's work, Leeward's delay is to blame.  First, most of the instances cited took place after the Contract Time, when Leeward should have been done with its work.  For those few instances noted that occurred within the Contract Time (LC 178 to LC 181), Leeward only encountered problems because, as described in Paragraphs 90 to 93 of Col. Antony's Witness Statement, Leeward was already months behind schedule before the end of 2008.  This delay resulted in scheduling conflicts that would have been avoided had Leeward kept to its schedule.

44.     Second, the few isolated instances cited involve conflicts with contractors performing minor, but critical, work in a defined area.  This specific work, such as the steel frame work being performed by Linton Mark (LC 178), had to be performed before Leeward could proceed with the task it had planned to perform.  But, unlike Linton Mark, Leeward had a much broader scope of work and was in the position to relocate resources to another part of the Project while it waited for the specialized contractors to complete their job.  From the perspective of the Project as a whole, no specific instance of conflict resulted in a delay to Leeward's work, and Leeward does not even attempt to show that it did so.

## SEPARATE CONTRACTS

45.     Leeward was awarded a number of separate contracts in connection with the Project, which are listed in Paragraph 80 of Mr. Dickinson's Witness Statement.  These were not flat fee contracts.  Each of these contracts was to be paid based upon actual measurements, and Leeward was paid in that manner, without, until now, objection.  In some instances, Leeward

13

was paid more than the proposed amount, and in other instances less, but in all instances based on the actual work performed.

46.     Leeward's payment applications under the separate contracts were not without issue. For example, Leeward sought payment for more expensive materials than it had actually used. This discrepancy was verified and the amounts paid to Leeward reduced as a result. (*E.g.*, LC 236).

47.     Mr. Green claims, in Paragraph 51 of his Witness Statement, that Leeward was supposed to be paid EC $1,561,979.30 in total on these contracts, but was only paid EC $1,359,035.40. A review of the relevant documents confirms that Mr. Green is wrong on both the amount allegedly due and the amount paid. The contracts submitted by Leeward (LC 228 to LC 241) reflect proposed payments totaling EC $1,513,106.20. The final payment requisitions for each of these contracts, however, confirm that based upon the actual work performed, Leeward sought, and AUA paid, a total of EC $1,452,261.32 as follows:

| Contract | Contract Amount | Exhibit | Paid Amount | Exhibit |
|---|---|---|---|---|
| Doors & Windows | EC $   419,932.68 | LC 228 | EC $   424,106.83 | AUA Ex. 41 |
| Tile Work | EC $   610,206.58 | LC 229 | EC $   557,435.77 | AUA Ex. 42 |
| Screed Work on Terrace | EC $     48,020.00 | LC 230 | EC $     46,795.00 | AUA Ex. 43 |
| A/C Compressors Concrete Pads | EC $     40,462.50 | LC 231 | EC $     37,771.80 | AUA Ex. 44 |
| Glazing | EC $     48,770.00 | LC 232 | EC $     56,170.00 | AUA Ex. 45 |
| Civil Works in Data Centre | EC $     27,250.00 | LC 233 | EC $     27,250.00 | AUA Ex. 46 |
| Concrete Band | EC $     36,463.13 | LC 234 | EC $     32,816.82 | AUA Ex. 47 |

| Toilet Fixtures | EC $ 130,523.75 | LC 235 | EC $ 124,494.00 | AUA Ex. 48 |
|---|---|---|---|---|
| Screed Work Blocks A, B and C | EC $ 74,751.10 | LC 236 | EC $ 74,751.10 | AUA Ex. 49 |
| Plyboard | EC $ 3,350.00 | LC 237 | EC $ 3,350.00 | AUA Ex. 50 |
| Additional Plastering | EC $ 22,870.00 | LC 238 | EC $ 22,870.00 | AUA Ex. 51 |
| Downpipes | EC $ 12,464.46 | LC 239 | EC $ 10,000.00 | AUA Ex. 52 |
| Porch Pavers | EC $ 28,792.00 | AUA Ex. 53 | EC $ 25,200.00 | AUA Ex. 53 |
| PVC Pipes | EC $ 9,250.00 | AUA Ex. 54 | EC $ 9,250.00 | AUA Ex. 54 |
| **TOTAL** | EC $1,513,106.20 | | EC $1,452,261.32 | |

48.     One remaining issue regarding the separate contracts is Leeward's contention that that AUA wrongfully hired and paid certain of Leeward's subcontractors -- namely Danny's Tiling and Monty Daniels -- as stated in Paragraph 39 of Mr. Green's Witness Statement.

49.     Mr. Green's accusations are not accurate.  As noted above, Leeward completed its Work under the original contract and was paid its Draft Final Account in October 2009. However, Leeward had been awarded a number of separate contracts to do some additional work to finish the construction of the New Campus, many of which were still on-going in late 2009. Unfortunately, Leeward had removed much of the supervisory staff with which AUA had been communicating, leaving little direction to those workers and subcontractors still on site.  Neil Dickinson and Robert Winwood were no longer on site, and Andy Green was rarely available or present and had not been responsive to AUA's request that Leeward take responsibility to finish its work under the separate contracts.

50.     The specific issue identified by Mr. Green pertains to AUA hiring two contractors to finish work that Leeward neglected to complete.  Specifically, as I explained in a February 15,

15

2010 email (LC 222 at LC003767), Leeward was supposed to do the tiling works in the Toilet

Block pursuant to one of its separate contracts, but it had told its subcontractors to only perform

the work on the first floor (and not proceed to the second floor). Moreover, over 1,000 square

feet of tiles that AUA had previously purchased for this week was missing from the site,

requiring AUA to order new materials.

51. Given that Leeward was not fulfilling its responsibilities, no responsible Leeward

representative was on site, and Leeward's subcontractors were available and able to complete the

work, Col. Antony and I agreed that AUA should hire these contractors to complete the work and

AUA paid them accordingly. AUA hired these contractors in December 2009 to perform the

work, and paid them for it in December 2009 and January 2010. (LC 243). Frankly, given the

pressure AUA was under to get the New Campus complete so it could open for the January 2010

semester, we were left with no other feasible option.

52. Because Leeward did not perform this work or supervise the subcontractors that

did, AUA rightly refused to pay Leeward for any of this work.

## THE NOTICE OF CLAIM PROCEDURES

53. One of my responsibilities as the Architect's representative was to administer

Claims asserted by the parties in accordance with the procedures set forth in Section 4 of the

General Conditions to the Contract.

54. The Contract Documents define a "Claim" as a "demand or assertion by one of

the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment

of money, extension of time or other relief with respect to the terms of the Contract." General

Conditions, § 4.3.1 (AUA Ex. 1 at AUA 000034). "Claims" also included other disputes or

matters between the parties arising out of or relating to the Contract. General Conditions, § 8.3.1

(AUA Ex. 1 at AUA 000041).

55.     Claims must be initiated promptly.  Section 4.3.2 of the General Conditions provides:

> Time Limits on Claims:  Claims by either party must be initiated with 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, which is later. Claims must be initiated by written notice to the Architect and the other party.

56.     Pursuant to Section 13.3 of the General Conditions, "[w]ritten notice shall be deemed to have been duly served if delivered in person to the individual or a member of the firm or entity or to an officer of the corporation for which it was intended, or if delivered at or sent by registered or certified mail to the last business address known to the party giving notice."

57.     Finally, Claims were to be substantiated by the party asserting the Claim.  General Conditions, § 4.3.1.  (AUA Ex. 1 at AUA 000034).

58.     Taken together, to effectively initiate a Claim, Leeward had to personally deliver a writing (or by certified mail or registered mail) to both me, as the Architect's representative, and AUA, setting forth in detail the basis of the Claim within 21 days of a Claim's accrual.

59.     Once initiated, it was my responsibility to adjudicate the Claim.  The Contract provided me with 10 days to take action, whether it be to grant or deny a Claim, suggest a compromise, or seek additional information.  If I denied a Claim or if 30 days passed without my rendering a decision, the Claim became subject to arbitration.  General Conditions § 4.6.2 (AUA Ex. 1 at AUA 000036).  Arbitration was to be commenced "within a reasonable time after the Claim has arisen."  General Conditions § 4.6.3.

60.     Leeward understood how to properly initiate a claim.  For example, on April 21, 2009, AUA advised Leeward that it was removing the finishing works from Leeward's scope of work.  On May 12 2009, exactly 21 days later, Leeward hand delivered to my office (and

emailed AUA) a letter initiating a Claim for overhead and profits with respect to the removal of this work. (LC 213).

61.     Similarly, on June 2, 2009, Leeward sent me a letter for an extension of time and compensation with respect to the June 1, 2009 Whitsuntide Holiday. (LC 216).

62.     Despite knowing how to properly assert a Claim, Leeward failed to timely initiate Claims under the Contract Documents for most of what forms the basis of its claims in this arbitration. For example, Leeward's claim for Additional Preliminaries is based on its May 11, 2009 "Claim for Extension of Time for Completion of the Works due to restriction of working hours." (LC 211). Leeward knew long before May 11, 2009 -- and certainly more than 21 days before -- that AUA had denied the overtime applications that serve as the factual basis for this claim.

63.     Other claims were asserted for this first time in December 2010 (14 months after AUA paid the Draft Final Account). Leeward knew, or should have known, as of the October 2009 Draft Final Account, that AUA was only paying Leeward based on the "as built" BOQ. Leeward's December 17, 2010 Claim seeking payment for, among other things, items in the original BOQ that it did not build, such as the chain link fence referenced in Col. Antony's Witness Statement, came far too late.

64.     Finally, Leeward never initiated a Claim, whether for an extension of time or otherwise, with respect to the following issues it now raises for the first time:

- Incomplete design drawings
- Late transmission of design drawings
- Lack of MEP design drawings
- Lack of a "project-wide" schedule
- Denials of specific overtime applications

- Delays on account of Customs issues

- Delays on account of other contractors

- Failure to pay separate contracts in full.

65.     For those few claims Leeward did assert timely (and even those it did not),

Leeward failed to commence arbitration in a "reasonable amount of time." For example,

Leeward has known about its claim for overhead and profits and its claim for an extension of

time (and the preliminaries associated therewith) since at least May 2009, yet Leeward did not

commence this arbitration until February 2011, some 21 months later. Leeward waited this long

despite threatening, since May 2009, to commence arbitration. (LC 214, LC 215).

## ATTESTATION

I attest that the foregoing is true and correct to the best of my knowledge and belief.

Executed on:   February 24, 2012
              Bangalore, India

A.S. NAGESH