EXHIBIT 32

AMERICAN ARBITRATION ASSOCIATION
CONSTRUCTION INDUSTRY ARBITRATION RULES

| | |
|---|---|
| LEEWARD CONSTRUCTION COMPANY, Ltd. | Case No. 50 110 T 00075 11 |
| Claimant, | |
| v. | WITNESS STATEMENT OF LT. COL. ROCHE ANTONY |
| AMERICAN UNIVERSITY OF ANTIGUA COLLEGE OF MEDICINE C/O GCLR, LLC, | |
| Respondent. | |

I, LT. COL. ROCHE ANTONY, state as follows:

1.      I served as General Manager on behalf of the owner, American University of Antigua ("AUA"), for the construction project that is at issue in this arbitration. I was appointed to this position by my former employer, Manipal Group ("Manipal"), which holds a controlling interest in AUA. I currently work as a consultant and am managing a construction project in Mangalore, India.

2.      I submit this statement in support of AUA's defense to the Claims asserted by Leeward Construction Company, Ltd. ("Leeward").

3.      Before I provide the substance of my testimony, I am compelled to address the vituperative nature of the witness statements submitted by Leeward. These statements contain numerous instances of personal attacks on me and speculation regarding matters, such as my motives or intentions, about which Leeward's witnesses cannot possibly have any personal knowledge. I will not respond in kind, and will limit my testimony to the facts.

1

I.   MY EDUCATIONAL AND PROFESSIONAL BACKGROUND

4.      In 1973, I attained a degree as an Engineering Graduate (B.E., Mech. Engr., M.I.E.), First Class, from the University of Mysore in India. Subsequently, I joined the Indian Army and graduated from the Indian Military Academy in June 1975. I then joined the Corps of Engineers (Sappers) and served in the Corps of Engineers for 27 years, until 2001. During this long period of time, I held several appointments, including that of Garrison Engineer, and was actively involved in the constructing of residential and non-residential accommodations for officers and troops in forward areas. In addition, I was responsible for the supply of power and water to the entire Garrison comprising over 10,000 troops and non-combatants. Apart from commanding troops, I was also posted in the planning and execution of water supply power and sewage disposal in various Cantonments. During my service in the Armed Forces, I have been awarded the Sena Medal for Gallantry by the President of India and have received the Army Chief's Commendation and the Air Officer Commander-in-Chief's Commendation for my services. By the time I voluntarily retired from the military in 2001, I had achieved the rank of Lieutenant Colonel.

5.      After retiring from the military, I joined Manipal to take up Projects and Maintenance of the Mangalore campus as Deputy Director General Services. From 2001 through 2006, among the projects I managed was construction of the Dr. TMA Pai International Convention Centre designed by Sundaram Architects Pvt., Ltd., which consisted of a unique twin shell structure of 180,000 square feet that is described as the largest in Asia. I also managed the construction of the Dental College (approximately 100,000 square feet) and was further involved in the maintenance of the Campus, consisting of a Medical College Campus, 2 hospitals with a combined bed strength of 1,500 patients, 9 hostels accommodating the medical and dental college students, and staff quarters for 120 professors and assistant professors.

2

6.     In 2006, I became the General Manager of Manipal Servicecorp Facility Management, and was given the responsibility of taking care of all the facilities at Manipal and the surrounding areas to include the infrastructure maintenance, minor works, one multi-specialty hospital of 1,500 beds, hostels, and campus development.

7.     From there, I was assigned to manage the construction of AUA's new medical school campus in Antigua.  After the successful completion of this project, I returned to India and, soon thereafter, resigned from Manipal.  I have since worked as a consultant, as indicated above.[1]

## II.     MY ROLE IN THE PROJECT

8.     This dispute arises out of the construction of AUA's new medical school campus (the "New Campus") in Antigua (the "Project").  AUA retained Leeward to construct the structural works for the New Campus, which involved constructing the following buildings: (i) the Classroom and Laboratory Building; (ii) the Library; (iii) the Service Block; and (iv) an outdoor Amphitheater.  Neil Dickinson was Leeward's Project Manager.

9.     Sundaram Architects Pvt., Ltd. (the "Architect") was retained by AUA to prepare the design drawings and oversee the construction of the campus.  A.S. Nagesh served as the Architect's representative on the Project.

10.     Beginning in mid-2008, I was appointed by my then-employer, Manipal, to serve as AUA's representative on the Project.  AUA was seeking to have the New Campus built so that it could be opened for the Fall 2009 semester.

---

[1]   Mr. Dickinson states that "after returning to India the Colonel was relieved of his position."  (Paragraph 59).  This statement is false.  After spending so much time in Antigua, I chose upon my return to take a few month's break, and thereafter to leave Manipal's employ to start my private consultancy and contracting business in India.  I remain on good terms with Manipal, as reflected by its request that I serve as its representative to answer Leeward's charges in this arbitration.

3

11.     I was present at the construction site on a daily basis and worked each day to help bring the Project to completion.  As discussed below, despite my efforts to facilitate the timely completion of the Project, Leeward's failure to provide adequate resources and its inability to keep to its project schedule delayed the Project, causing AUA to push back the opening of the New Campus until January 2010.  After AUA opened the New Campus, my work was done.  I left Antigua in February 2010, and returned to my home in India.

12.     When I arrived on the Project site, Leeward was working without a contract.  One of my first duties, therefore, was to negotiate the terms of a contract with Leeward.  The parties agreed to retain Peter McLeod, a Quantity Surveyor with DHP Associates, to act as a liaison to provide historical data regarding Caribbean construction costs, mobilization costs, and Preliminaries.  Mr. McLeod's experience aided the parties in reaching agreement on the Preliminaries to be paid for setting up and maintaining the construction site and on the unit rates to be paid for each item of work Leeward was to perform.

13.     Mr. McLeod also facilitated the parties in negotiating the Contract Documents.  Mr. McLeod prepared the initial draft of the contract (AUA Ex. 31) in July 2008, and, with Mr. McLeod's assistance, the parties thereafter negotiated those proposed terms.  I was heavily involved in this process and dealt directly with Mr. Dickinson in negotiating the specific terms.

14.     The parties executed the Contract Documents on September 25, 2008.  I was authorized to and signed on behalf of AUA, Mr. Dickinson signed on behalf of Leeward, and we both initialed each page.  (AUA Ex. 1).  The Contract Documents, which were assembled as the Project Manual, consisted of the following documents: (i) AIA Document A101-1997 – Standard Form of Agreement Between Owner and Contractor where the basis of payment is a STIPULATED SUM (the "Contract"); (ii) AIA Document A201-1997 – General Conditions for

the Contract for Construction (the "General Conditions"); (iii) the Bill of Quantities ("BOQ");
(iv) the Drawings and (v) the Division One Specifications (the "Specifications") (AUA Ex. 1).

15.     Leeward's work under the Contract Documents was to commence on May 1,
2008 and be completed in 364 days thereafter.  Contract §§ 3.1 and 3.3 (AUA Ex. 1 at AUA
000006).  Substantial Completion for each of the four parts of the Project was to be achieved
between January 29, 2009 and April 30, 2009.  Contract § 3.3.

III.    **LEEWARD WAS PAID THE FULL CONTRACT SUM, AS REVISED BY THE**
        **PARTIES TO ADJUST FOR "ADDITIONS AND DEDUCTIONS".**

16.     Based upon my review of Leeward's Amended Demand for Arbitration and the
witness statements of Andy Green and Neil Dickinson, Leeward claims that the Contract
Documents provide it with the guaranteed right to be paid a flat fee of EC $27,436,824 (which
Mr. Green calls the "Original Contract Amount" in Paragraph 51 of his witness statement), plus
any additional charges earned for additional work.  Leeward's position represents a fundamental
misapplication of the Contract Documents and stands in direct conflict with how the parties
administered the Project.

A.      <u>Additions and Deductions to the Contract Sum</u>

17.     The Contract Sum is a defined term in the Contract Documents.  Section 9.1.1 of
the General Conditions provides that the "Contract Sum . . . <u>including authorized adjustments</u>, is
the total amount payable by the Owner to the Contractor for performance of the Work under the
Contract Documents." (AUA Ex. 1 at AUA 000041) (emphasis added).  When the parties
executed the Contract Documents, that amount was EC $27,436,824 "<u>subject to additions and
deductions</u> as provided in the Contract Documents."  Contract, § 4.1 (AUA Ex. 1 at AUA
000006) (emphasis added).

5

18.     The parties arrived at the initial amount of EC $27,436,824 by valuing three components of compensation: (i) Preliminaries/General Conditions; (ii) Cash Allowances; and (iii) Measured Works. These components were detailed in the Contract Documents on a single-page called "Statement of Contract Sum." (AUA Ex. 1 at AUA 000071).

### 1.     Preliminaries/General Conditions

19.     First, AUA agreed to pay Leeward "Preliminaries," which generally refer to the overhead costs incurred in setting up the construction site, maintaining the site, and managing/supervising the work performed by Leeward's employees. The parties estimated the amount of Preliminaries and site set-up costs that would be expended over the negotiated 52 week construction period to construct the structural works of the New Campus based upon a set of assumptions (AUA Ex. 1 at AUA 000062 to AUA 000063), and incorporated that estimate (EC $3,906,146) in the Contract Sum.

20.     Given that the actual cost of Preliminaries would change, the Contract provided that "Time related recurring, setup and Management Costs are to be based on actuals provided these are approved one week in advance by the Owner." Contract § 4.3 (AUA Ex. 1 at AUA 000007) and Statement of Contract Sum (AUA Ex. 1 at AUA 000071). As detailed herein, AUA actually paid EC $4,936,303.60 in Preliminaries over the 52 week schedule, which is EC $1,030,157.60 more than the parties had estimated.

### 2.     Cash Allowance

21.     Another component of the Contract Sum is an EC $1,000,000 Cash Allowance. This consisted of an EC $1,000,000 contingency that was to be expended in accordance with AUA's directions. General Conditions, § 3.8.1 (AUA Ex. 1 at AUA 000029). Approved charges for overtime, scaffolding, craneage and other contingent costs were to be adjusted against this contingency. (AUA Ex. 1 at AUA 000071). The Contract Sum was to be adjusted

upwards if the approved costs exceeded the Cash Allowance, and downwards if Leeward did not exhaust the entire EC $1,000,000 Cash Allowance. Contract Supplementary Conditions, § 3.8.2 (AUA Ex. 1 at AUA 000111); Specifications, § 1.2(C) (AUA Ex. 1 at AUA 000111). As discussed below, Leeward exceeded the EC $1,000,000 Cash Allowance, and the amount by which it exceeded this allowance increased the Contract Sum.

### 3.    Measured Works

22.    Finally, the largest component of the Contract Sum is the "Measured Works."

Prior to finalizing the Contract Documents, the Architect worked on preparing the design drawings and the BOQ. The BOQ set forth in detail the tasks to be performed by Leeward to build the structural works designed. It represented Leeward's scope of work. With Mr. McLeod's assistance, the parties negotiated the unit rates for each specific line item of work to be performed as set forth in the BOQ.

23.    By the time the parties executed the Contract Documents on September 25, 2008, the architectural designs were sufficiently complete that the parties had agreed upon a fixed BOQ (AUA Ex. 1 at AUA 000072 to AUA 000103), which provided the amount Leeward would be paid for the "Measured Works" in the event that the Project was built exactly as reflected in the designs and BOQ at that time, including all provisional items.

24.    While the BOQ reflected the scope of Leeward's work, it also contained some provisional items that AUA might or might not need to build, depending on site conditions. The parties agreed to the unit rates for these provisional items and included them in the BOQ and the Contract Sum so there would be no need to negotiate the price if Leeward performed the task. Similarly, by including provisional items in the BOQ, it was easy to calculate the deduction(s) to the Contract Sum if AUA or the Architect determined a provisional item need not be performed.

25.     In addition, the parties were unable to agree upon the unit rates for the Doors and Windows Work at the time they executed the Contract Documents because AUA had not yet settled on what it wanted to install.  The unit rates in the BOQ for these items were listed as "PC Sum Rates," which means "provisional contract sum rates."  (*E.g.*, AUA Ex. 1 at AUA 000076) ("All Door and Window Rates are inserted as a PC Sum rates").  Thus, it was understood that the actual amounts that would be paid to Leeward for the Doors and Windows Work would differ from the BOQ.

26.     The Statement of Contract Sum estimated the Measured Works performed by Leeward would total EC $22,530,678, broken down as follows: (i) Classroom and Laboratory Building (EC $5,060,075); (ii) Service Block (EC $1,471,074); (iii) Library Block (EC $14,975,517) and (iv) Amphitheater (EC $1,024,012).  (AUA Ex. 1 at AUA 000071).  The amounts were based entirely on the BOQ at the time the parties executed the Contract Documents.

27.     As the Project progressed, however, changes were made to Leeward's scope of work, whether due to design changes, site conditions, the removal of provisional or other items from Leeward's scope, or otherwise, so that the scope of work Leeward actually performed differed from what was reflected in the initial BOQ.  As provided in the Contract Documents, the Contract Sum was adjusted to account for these "additions and deductions" to Leeward's scope of work, and Leeward was only paid for the work it actually performed.  The unit rates negotiated and compiled in the fixed BOQ were used to value additions and deductions to the "Measured Works," as contemplated by the Contract Documents.

28.     Although the parties did not use formal change orders in the manner set forth in the Contract, the parties maintained detailed records of what work was and was not performed by

8

Leeward, and as a result there was no dispute on the amount Leeward was to be paid for the "Measured Works" portion of the Contract at the time Leeward completed its work.

29.     Design changes and other project modifications were conveyed to Leeward verbally and/or in writing, often via e-mail. One way that Leeward used to communicate and keep track of these changes was to prepare Requests For Information ("RFI"). (LC 90).

30.     In addition to contemporaneous emails and RFIs, the parties kept track of all changes to Leeward's scope of work (including additions, deductions and modifications) through Leeward's submission of monthly Applications for Payment (the "Payment Applications"). The Payment Applications submitted after the parties executed the Contract Documents can be found at AUA Exs. 8 to 21. As Mr. Dickinson admits in Paragraphs 47 and 55 of his Statement, the monthly true-up was done for two purposes: (i) to verify the amount due for each monthly payment; and (ii) to measure changes to the scope of work given that design changes occurred.

31.     Accordingly, Leeward would submit Payment Applications based on the actual work it performed since its last Payment Application, with supporting documentation. In so doing, Leeward submitted the BOQ to reflect the amount of Measured Works performed over the billing period. Each interim version of the BOQ would reflect the initial quantity or measurement, the actual measurement of the work performed, the unit rate, and the amount due for each line item based upon the actual measurements. Leeward would also provide the back-up documentation for the actual measurements taken. *E.g.*, AUA Exhibit 8 at AUA 000813-855. The parties followed this process through Leeward's final Payment Application, submitted at the completion of the Work.

32.     Upon receipt of each Payment Application, a representative of the Architect (usually Nagesh) and a Leeward representative (usually Paul Webster) would check all of the

9

measurements to verify that the Measured Works Leeward claimed accurately reflected the quantity of the Measured Works Leeward actually performed and to make corrections as appropriate. The Architect's representative would reach agreement with Leeward as to the revised measurements, and then make revisions to the Payment Application accordingly. Nagesh would review those changes with me and I would provide AUA's approval to the revisions.

33.    Nagesh and I also reviewed and approved (or rejected) the "Preliminaries," "Change Orders," and "Claims" sought by Leeward in each Payment Application. I then revised the "Collections Page" to ensure that all the amounts agreed upon for each component of the Payment Application accurately reflected the work done, and calculated the amount due Leeward for the Payment Application, taking into consideration, among other things, monies withheld as retainage and monies paid for Antigua and Barbuda Sales Tax ("ABST"). Once all parties agreed on the payment amount, the Architect would certify the Payment Application for payment and I would counter-sign with my authorization.

34.    By means of the monthly true-up process, which the parties followed through and including the submission of the Draft Final Account, numerous adjustments were made to the Contract Sum by virtue of the site requirements or design changes and other events that altered the scope of Leeward's Work. With three exceptions (discussed in Paragraphs 69 to 70), Leeward acknowledged and accepted all of these adjustments as the Project moved along, and submitted its Draft Final Account in October 2009 only for what it actually built. (AUA Ex. 21). The "additions and deductions" to the Contract Sum based on Measured Works consisted of omitted work, deleted work, and modified work, as described below.

    a.    <u>**Omitted Work**</u>

35.    In many instances, design changes or site conditions resulted in omitting items from the BOQ, including items that were only provisional at the time the parties executed the

Contract Documents.   When an item was omitted (i.e., not performed), it reduced Leeward's scope of work, and in turn, the Contract Sum, to the extent of the item.   Because Leeward was only to be paid for works "as built" (by adjusting the Contract Sum upwards or downwards to reflect any "additions and deductions"), Leeward properly did not include any of the omitted work in its Payment Applications, despite the lack of a formal change order.

36.   For example, during the Project, Leeward asked Nagesh to confirm whether it should build a chain link fence around the Service Block, which was a line item in the BOQ.   It did so by submitting an RFI on November 18, 2008 specifically referencing that line item.   (LC 90 at LC003212-3213).   AUA decided it did not need to build the fence that had initially been contemplated, and so advised Leeward.   Accordingly, Leeward did not build the fence.

37.   Since the fence was omitted from Leeward's scope of the work, Leeward did not seek payment for it.   The BOQ indicated Leeward was to be paid EC $55,848 for this item, but in the Draft Final Account, and every monthly payment application before then, Leeward sought EC $0.00 for the fence.   (E.g., AUA Ex. 21 at AUA 002915).   This is demonstrated with the excerpt from AUA Ex. 25 below.   AUA Exhibit 25 is a comparison between the amount listed in the BOQ (had the items been built at the expected quantity) and the amount Leeward sought in its Draft Final Account.   The "BOQ Amount" column represents the amount listed in the initial BOQ and the "DFA Amount" is the amount sought in the Draft Final Account.

| Sl. No. | Description Of Item | Qty | Measure | Unit | Rate | BOQ Amount | DFA Amount |
|---|---|---|---|---|---|---|---|
| XII | MISCELLANEOUS | | | | | | |
| 1 | Providing and spraying chemical emulsion pre-constructional antitermite treatment creating a chemical barrier under and around the column, wall trenches, excavation, top surface of plinth filling junction of wall and floor, along the perimeter of building, expansion joint, surroundings of pipes and conduits etc., complete. (plinth area) | 833.00 | 390.38 | Sy | 8.12 | $340.00 | 3,174.76 |
| 2 | Providing and fixing of chain link mesh fencing with pole at equal distance as per the schedule; | 560.00 | 0.00 | RFT | 54.94 | 55848.00 | 0.00 |
| 3 | Providing expand/chemical labs in the chases made in the wall and rendering the chase with cement mortar 1:3,1" thick applied in two coats with top coat finished smooth to receive other finishes | 300.00 | 0.00 | Rft | 6.21 | 1862.00 | 0.00 |
| | 4.5mm thick Floor Slab Damp Proof Membrane | 500.00 | 390.58 | SY | 6.48 | 3,240.00 | 2,531.55 |

38.    Similarly, many items on the initial BOQ were provisional.  The parties agreed upon the unit rates to be paid if Leeward was required to perform the task, but in many instances, the provisional items were deemed unnecessary and were not performed.

39.    A comparison between the BOQ included in the Contract Documents and the BOQ attached to the Draft Final Account reflects 78 line items that were simply not performed (by Leeward or anyone else) because AUA, for one reason or another, decided against building the Project in that manner.  A compilation of all of the Omitted Work items from the BOQ is reproduced as AUA Ex. 25.

40.    In total, EC $1,604,617 of work enumerated in the BOQ was removed from the scope of the work and not performed by Leeward or anyone else.  When Leeward submitted each Payment Application, through and including its Draft Final Account in October 2009, it did not seek to be paid for the chain link fence or any of the other Omitted Work items, despite the lack of any formal change orders.  (AUA Exs. 8 to 21).  Now, more than two years later, Leeward seeks to paid in full for the chain link fence that it did not build, and Leeward seeks payment as well for all of the other Omitted Work, which it did not perform and for which it did not seek payment at the time.

b.    Deleted Work

41.    In addition to the EC $1,604,617 in work omitted from the Project due to design changes, AUA removed, with a few isolated exceptions, all finishing works from Leeward's scope of work because AUA had fallen far behind schedule on completing the structural works.  The finishing works removed, totaling EC $3,667,711, generally fell into three categories:  (i) Doors and Windows Work (EC $191,090) (AUA Ex. 29); (ii) Flooring Work (EC $1,741,032) (AUA Ex. 27); and (iii) Painting Work (EC $1,735,589) (AUA Ex. 28).  As with the Omitted Work, Leeward did not seek payment for the Deleted Work in any of the Payment Applications.

(AUA Exs. 8 to 21). Leeward also did not seek payment for the Deleted Work when it submitted its Draft Final Account. Thus, for just about every single line item in the BOQ under the headings "Doors and Windows," "Flooring" and "Painting and Finishes," the "Measure" column is either blank or says "0.00" and the "Amount" due column says either "— " or "0.00." Below is an example of the "Painting and Finishes" section from the Library Block-Amphitheatre BOQ that Leeward provided as part of its Draft Final Account:

| Sl.No. | Description Of Item | Qty | Measure | Unit | Rate | Amount |
|---|---|---|---|---|---|---|
| IX | PAINTING AND FINISHES | | | | | |
| 1 | Providing and painting external surface with trowellex including feature bands/grooves etc., of approved colour all as per manufacturers instructions and directions including scaffolding etc., complete at all levels. | 378 | | SY | 74.95 | 0.00 |
| 2 | Preparing surface and painting with Traveltex fine grade internally Plastic emulsion paint of approved colour including providing and removing scaffolding, finishing etc, complete | 800.00 | | SY | 74.95 | 0.00 |
| 3 | Preparing surface and painting with 2 coats of latex emulsion of approved colour and make over a coat of primer for ceiling internal surfaces as per directions including providing and removing scaffolding, finishing etc., complete in all floors. (may not be required for full area due to false ceiling) | 750.00 | | SY | 19.94 | 0.00 |

(AUA Ex. 21 at AUA002913). A comparison between the amounts set forth in the BOQ and the amounts sought in the Draft Final Account for all of the Deleted Work items is reproduced as AUA Exhibit 26.

42.    Unlike the Omitted Work, Leeward appears to understand that it is not entitled to be paid for the Deleted Work. Based upon my review of Leeward's Amended Demand and the witness statement of Andy Green, Leeward concedes that the Contract Sum was reduced by the Doors and Windows Work and Painting Work "removed" from Leeward's scope of work, despite the lack of a formal change order. However, Leeward neglected to exclude the EC $1,741,032 in Flooring Work that was removed from Leeward's scope of work under the

Contract Documents. By failing to do so, Leeward now seeks to be paid in full for this Deleted Work, even though its Draft Final Account submitted in October 2009 sought $0.00 for that work.

43.    Leeward's current claim for the Flooring Work suffers from another problem in addition to its proper failure to have billed for this item of Deleted Work previously. After AUA removed the Flooring Work from Leeward's scope of work under the Contract Documents, AUA put the job out for competitive bidding. Leeward submitted the most competitive bid and was awarded the work. Leeward entered into a separate contract with AUA for this work (LLC 229), and was paid for the work based upon the rates agreed in that separate contract. Leeward's oversight in neglecting to reduce the Contract Sum by an additional EC $1,741,032 for Flooring Work in its claim here means it is looking to be paid twice for the same work, *i.e.*, under both the original Contract and the separate contract.

c.    Modified Work

44.    Much of Mr. Dickinson's witness statement focuses on Leeward's position that for the Measured Works it actually performed, its payment amount for each line item in the BOQ should be based upon the quantity of work provided in the initial BOQ, and not the amount measured and submitted for payment in the interim Payment Applications and Draft Final Account. Leeward's position is in direct conflict with Leeward's Payment Applications and the monthly true-up process the parties painstakingly undertook.

45.    The parties agreed and understood that Leeward was only to be paid for the work it actually performed. In many instances the quantity of items changed as a result of design alterations. Leeward built the Project based upon the altered designs and submitted Payment Applications each month seeking payment based upon the changed scope, despite the absence of formal change orders. When the measurement was <u>greater</u> than the quantity reflected in the

14

initial BOQ, Leeward sought and was paid a greater amount, based on the actual measurement.

For example, in the following item on the Library Block –Amphitheatre BOQ, the BOQ quantity called for 3 cubic yards for a cost to AUA of EC $251.00. The actual measurement was 120.74 cubic yards. Leeward did not seek a mere $251.00. It sought and was paid $10,121.63 based upon the actual measurement. This is reflected in the excerpt below of the comparison between the BOQ and the Draft Final Account. (AUA Ex. 24).

| SI.No. | Description Of Item | Qty | Measure | Unit | Rate | BOQ Amount | DFA Amount |
|---|---|---|---|---|---|---|---|
| 3 | Selected hardcore material back filling to the sides /pockets of foundation and under floors in layers of 6" including watering, tamping & consolidation to get required 95% proctor density etc. complete. | 3.00 | 120.74 | Cy | 83.83 | 251.00 | 10,121.63 |

46.     Similarly, when the measurement was less than the quantity reflected in the initial BOQ, Leeward sought and was paid a lesser amount, also based on the actual measurement. For example, in the Classroom and Lab Block BOQ, the original quantity for the concrete pour was 295 square yards. The actual measurement of the pour was much less – 137.02 square yards. Leeward sought payment and was paid based on the actual measurement.

| SI. No. | Description Of Item | Qty | Measure | Unit | Rate | BOQ Amount | DFA Amount |
|---|---|---|---|---|---|---|---|
| 1 | PLAIN CEMENT CONCRETE | | | | | | |
| 1 | Providing & laying 2000 PSI grade cement concrete 2" thick Bolding for grade beam with 3/4" size aggregates well compacted including machine mixing, tamping, curing, etc. complete. | 295.00 | 137.02 | SY | 33.04 | 9,748 | 4,527 |

47.     The parties followed this practice through the monthly true-up process from the time they signed the Contract Documents through and including the Draft Final Account.

Indeed, the practice was consistent with the Contract Documents, which provided, in the Specifications, that Leeward was responsible to verify the accuracy of the measurements, that any errors and omissions were subject to adjustment by change order (which the parties did by the monthly true-up process), and that the adjustments were to be measured and valued in

accordance with the unit rates in the BOQ. Thus, Sections 1.5(E) and (F) of the Specifications

(AUA Ex. 1 at AUA 000114) provide:

E.     Quantity Surveyors and other staff shall be provided by the
contractor in connection with the works, in measuring any changes
and in preparing other records reasonably requested by the
Architect or Owner. Contractor is to verify accuracy of quantities
and any errors/or omissions are subject to adjustment via Change
Order.

F.     All changes arising out of the performance of the work and
any errors and/or omissions in the Bills of Quantities shall be
measured and valued in accordance with the methods adopted in
the unit rates.

48.     Leeward's use of actual measurements as a basis for its Draft Final Account was
not a mere oversight. Leeward's Draft Final Account was maintained in an Excel file. Leeward
kept separate worksheets for different sets of measurements from the work it performed and
linked the data from those measurement worksheets to the worksheets containing the BOQ. In
other words, the BOQ Leeward submitted with its Draft Final Account literally pulled raw data
from other workbooks containing calculations of actual measurements.

49.     AUA Exhibit 24 contains all of the BOQ items performed by Leeward where the
amount due in the BOQ based on the original design differed from the amount paid in the Draft
Final Account based on what Leeward actually built. Had the Project been built as originally
designed, Leeward would have been paid EC $16,551,326 for these items. However, based on
the quantities built, Leeward was paid EC $16,565,620 for this work. In the aggregate, changes
in these quantities resulted in AUA paying Leeward EC $14,294 more than AUA planned to pay
under the original BOQ. (AUA Ex. 24).

*     *     *     *

50.     The painting work Leeward performed in the Service Block encapsulates how the Contract worked. (AUA Ex. 23 at AUA003147-3148). The original BOQ had four painting tasks for the Service Block. AUA decided only one of the four tasks was necessary. Leeward performed that work, and was paid based on the actual quantity of work performed for that task, which exceeded the amount in the original BOQ. Neither Leeward (nor anyone else) performed the other tasks, and thus Leeward did not seek any payment for that Omitted Work, nor did Leeward include these tasks as part of its claim for overhead and profits on the grounds that AUA deleted it from Leeward's scope of work in favor of someone else.

| Sr. No. IX | Description Of Item PAINTING AND FINISHES | Qty | Measure | Unit | Rate | BOQ Amount | DFA Amount |
|---|---|---|---|---|---|---|---|
| 1 | Providing and painting external surface with trowellex including feature bands/grooves etc., of approved colour all as per manufacturer instructions and directions including scaffolding etc., complete at all levels. | 760.00 | 0.00 | sy | 74.55 | 56,961.00 | 0.00 |
| 2 | Preparing surface and painting with Travellex fine grade internally Plastic emulsion paint of approved colour including providing and removing scaffolding, finishing etc., complete | | | | | | |
| | i) Ground floor | 346.00 | 0.00 | sy | 74.55 | 25,857.00 | 0.00 |
| | ii) First floor | 352.00 | 0.00 | sy | 74.55 | 26,382.00 | 0.00 |
| 3 | Preparing surface and painting with 2 coats of latex emulsion of approved colour and make over a coat of primer for ceiling internal surfaces as per directions including providing and removing scaffolding finishing etc., complete in all floors. (may not be required for full area due to false ceiling) | 1,270.00 | 2,855.05 | sy | 19.94 | 25324.00 | 55,593.94 |

51.     As exemplified by the painting work except above, Leeward's Draft Final Account adjusted for the work it had performed and the work it had not: Leeward sought, the Architect certified, and AUA paid a total of EC $17,727,635.37 in Measured Works, meaning the Contract Sum was reduced by a total of EC $5,258,042.63 for the Measured Works portion of the Contract based upon "additions and deductions" to the original BOQ.

52.     This is precisely what Leeward's Senior Quantity Surveyor Robert Winwood understood was to happen when he wrote an abstract of the Contract Documents at the time they were executed:

Measured works in the BOQ will be as built. A change Order will be required when the final measure differs from the Contract BOQ. Rates for doors and windows are provisional.

(LC 84 at LC003034) (AUA Ex. 69) (metadata confirming creation of this document on September 25, 2008). Mr. Winwood was correct that the parties intended, and the Contract provided, that the project was to be valued and AUA was to pay for the project "as built" and in accordance with the "final measure". But rather than adjusting the Contract Sum to "as built" form through formal change orders, the parties did so by means of the monthly true-up process and the "final measure" set forth in the Draft Final Account.

B.    **Preliminaries/General Conditions, "Change Orders" and "Claims"**

53.    Each monthly Payment Application included a running total of the Preliminaries sought and approved by AUA. Leeward included charges for scaffolding, craneage, and concrete testing in its "Preliminaries," along with its claim for EC $955,554.08 in "Additional Preliminaries" for providing supervisory staff after the Contract Time. As explained in Paragraphs 75 to 119, Leeward is not entitled to any of the "Additional Preliminaries" sought. AUA did pay a significant amount of increased site management costs separate and apart from the amount in dispute.

54.    The Draft Final Account as approved and paid by AUA included a total of EC $4,936,303.60 in Preliminaries and Site Setup costs actually incurred by Leeward during the same 52 week schedule. (AUA Ex. 22 at AUA 002855). Accordingly, Leeward was paid an additional EC $1,030,157.60 for Preliminaries, resulting in an increase in the Contract Sum, despite the absence of formal change orders.

55.    Each Payment Application also contained Leeward's running tally of what it called "Change Orders." (E.g., AUA Ex. 9 at AUA 000897-900). This enumerated list tracked all the additional work Leeward was asked to perform that was not included in the BOQ. It also

18

included overtime approved by AUA. Finally, Leeward's Change Order list also tracked monetary "Claims" in a separate column. These included compensation sought for time lost due to, among other things, adverse weather and holidays. In its Draft Final Account, after reviewing its application with Nagesh and me, Leeward ultimately sought to be paid for a total of EC $1,232,008.91 in "Change Orders" and EC $162,372.12 in "Claims." (AUA Ex. 21 at AUA002896).

56.     Leeward's itemization of Preliminaries and Change Orders included all the contingent expenses that were to be drawn against the EC $1,000,000 Cash Allowance. Here, the extra Preliminaries and Change Orders approved by AUA totaled EC $2,262,166.51. The first EC $1,000,000 drew down the Cash Allowance included in the initial Contract Sum. The additional contingencies increased the Contract Sum by EC $1,262,166.51.

C.     **Explanation of the Draft Final Account and AUA's Payment**

57.     Leeward completed its work under the Contract Documents on September 23, 2009. (LC 197). On October 8, 2009, Leeward submitted the first version of its Draft Final Account (AUA Ex. 30), which included the final work completed by Leeward since its September 2009 Payment Application. I did not expect to receive any further invoices from Leeward for the Measured Works performed under the Contract Documents, and Leeward did not submit any.

58.     As with the prior Payment Applications, Leeward's Draft Final Account was reviewed for accuracy by Nagesh and me. With respect to the Measured Works, Nagesh and Paul Webster of Leeward went over in detail the quantities of all the measured works, and reached agreement on the quantities actually built. All agreed that Leeward was entitled to a total compensation of EC $17,727,635.37 in Measured Works.

19

59.    Nagesh and I reviewed the Preliminaries, Change Orders and Claims sought by Leeward as well. With respect to Preliminaries, we reverted to the amount passed for payment in the prior Payment Application (AUA Ex. 19 at AUA 000372), as the only difference was Leeward's attempt, once again, to request payment for EC $955,554.08 in "Additional Preliminaries" to which it was not entitled. With respect to "Change Orders," Nagesh and I reviewed the list of "Change Orders" claimed and adjusted the amount claimed downward to EC $1,232,008.91. (AUA Ex. 30 at AUA 000297-307). As for Claims, we adjusted the amount claimed to the $162,372.12 approved, excluding only Leeward's claim for overhead and profits and its claim with respect to the Whitsuntide Holiday.

60.    After the parties reached agreement on the specific adjustments to be made to the Draft Final Account, Leeward made changes to the Draft Final Account and emailed the Excel file to Nagesh on October 19, 2009. (AUA Ex. 21).

61.    That version incorporated the Measured Works, Change Order and Claims amounts agreed to by AUA. (AUA Ex. 21 at AUA002896). However, Leeward still sought to be paid EC $5,891,857.68 in Preliminaries, and not the EC $4,936,303.60 agreed to by AUA. As a result, the Draft Final Account Collection Page submitted by Leeward, which is reproduced on the next page of my witness statement, was inaccurate.

| Sl. No | Description Of Item | Qty | Unit | Rate | Amount |
|---|---|---|---|---|---|
| **PROJECT:** AMERICAN UNIVERSITY OF ANTIGUA - COLLEGE OF MEDICINE | **ARCHITECTS:** SUNDARAM ARCHITECTS PVT.LTD., NO.19,KUMARA KRUPA ROAD BANGALORE - 560 001. | **CLIENT:** AMERICAN UNIVERSITY OF MEDICAL & ALLIED HEALTH SCIENCES IN ANTIGUA | | | |
| | DRAFT FINAL ACCOUNT | | | | |
| | COLLECTION PAGE | | | | |
| | MOBILISATION RETENTION | | | | 0 |
| | PRELIMINARIES/GENERAL CONDITIONS | | | | 5,891,857.68 |
| | CLASSROOM AND LABORATORY BUILDING | | | | 3,393,169.12 |
| | SERVICE BLOCK | | | | 1,197,242.34 |
| | LIBRARY BLOCK (inc. Tower) | | | | 12,075,689.50 |
| | LIBRARY BLOCK - AMPHITHEATER | | | | 606,534.41 |
| | CHANGE ORDERS | | | | 1,232,008.91 |
| | CLAIMS | | | | 162,372.12 |
| | MATERIALS ON SITE | | | | 0.00 |
| | SUB TOTAL | | | | 24,558,874.07 |
| | RETENTION (MAXIMUM EC$ 1,371841.20) | | | 5% | 1,227,943.70 |
| | PREVIOUS PAYMENTS | | | | 22,908,374.09 |
| | SUB TOTAL | | | | 422,556.28 |
| | RETENTION RELEASE | | | | 613,971.85 |
| | TOTAL PAYMENT | | | | 1,036,528.13 |
| | ABST | | | 15% | 155,479.22 |
| | **TOTAL PAYMENT** | | | | **1,192,007.35** |
| | **PAYMENT DUE NO LATER THAN 22ND OF THE MONTH** | | | | |

62.     I revised the Draft Final Account Collection page to reflect the correct amount of

Preliminaries to be paid, thereby reducing the total amount earned by Leeward to EC

$23,603,320.00.  The corrected Collection Page confirmed that Leeward earned EC $23,603,320

for the Work performed under the Contract Documents as follows:

21

| | |
|---|---|
| Preliminaries/General Conditions: | EC $ 4,936,303.60 |
| Measured Works:  Classroom and Lab Building | EC $ 3,393,169.12 |
| Measured Works:  Service Block | EC $ 1,197,242.34 |
| Measured Works:  Library Block | EC $12,075,689.50 |
| Measured Works:  Amphitheater | EC $    606,534.41 |
| "Change Orders" | EC $ 1,232,088.91 |
| Claims | EC $    162,372.12 |
| | |
| TOTAL | EC $23,603,320.00 |

AUA Ex. 22 at AUA 002855, a copy of which is reproduced on the next page.

22

AMERICAN UNIVERSITY OF ANTIGUA

D3.A27 /6NAL ACCOUNT

| PROJECT: AMERICAN UNIVERSITY OF ANTIGUA - COLLEGE OF MEDICINE | ARCHITECTS: SUNDARAM ARCHITECTS PVT. LTD., NO.135, KUMARA KRUPA ROAD, BANGALORE - 560 001 | CLIENT: AMERICAN UNIVERSITY OF MEDICAL & ALLIED HEALTH SCIENCES IN ANTIGUA |
|---|---|---|

| Sl. No | Description Of Item | QTY | Unit | Rate | Amount |
|---|---|---|---|---|---|
| | DRAFT FINAL ACCOUNT | | | | |
| | COLLECTION PAGE | | | | |
| | MOBILISATION RETENTION | | | | 0 |
| | PRELIMINARIES/ GENERAL CONDITIONS | | | | 4,336,303.60 |
| | CLASSROOM AND LABORATORY BUILDING | | | | 3,393,169.12 |
| | SERVICE BLOCK | | | | 1,197,572.34 |
| | LIBRARY BLOCK (Inc. Tower) | | | | 12,075,689.59 |
| | LIBRARY BLOCK - AMPHITHEATER | | | | 605,556.41 |
| | CHANGE ORDERS | | | | 1,232,008.91 |
| | CLAIMS | | | | 162,372.12 |
| | MATERIALS ON SITE | | | | 0.00 |
| | SUB TOTAL | | | | 23,803,520.00 |
| | RETENTION (MAXIMUM ECf 1.371841.20) | | | 5% | 1,180,166.70 |
| | SUB TOTAL | | | | 22,508,374.09 |
| | PREVIOUS PAYMENTS | | | | 485,220.09 |
| | SUB TOTAL | | | | 980,083.00 |
| | RETENTION RELEASE | | | | 104,863.91 |
| | TOTAL PAYMENT | | | | 15,225.44 |
| | ABST | | | -5% | |
| | TOTAL PAYMENT | | | | 130,592.34 |
| | TOTAL PAYMENT | | | | |
| | PAYMENT DUE NO LATER THAN 22ND OF THE MONTH | | | | 120,592.34 |

Passed for payment Eef 120,592. 34 only

" . Approved by Eef Osa,640.60 Released in full in this application.

Leeward Construction Company Ltd.

AUA 003366

---

63.    After making this adjustment, I calculated the amount due and owing to Leeward, following the same method employed by Leeward.

23

64.     In re-calculating how much AUA owed Leeward, as Leeward did in the Collection Page it submitted on October 19, 2009 (AUA Ex. 21 at AUA002896), I took into consideration the prior payments made (including an EC $500,000 advance) and the amount of retainage AUA was required to retain (5% of the earned amount) and release (1/2 of the retained amount). Those calculations resulted in a payment of EC $104,862.91 (exclusive of ABST), as follows:

| | |
|---|---|
| Amount Earned to At Completion | EC $23,603,320.00 |
| *Less* Retention (5%) | EC $ 1,180,166.00 |
| Subtotal Due | EC $22,423,154.00 |
| *Less* Prior Payments | EC $22,908,374.09 |
| Subtotal (Negative) | - EC $ 485,220.09 |
| *Plus* ½ Retainage Release | EC $ 590,083.00 |
| **Total Amount Due** (Positive) | EC $ 104,862.91 |

65.     Leeward makes much of the fact that its Payment Application was reduced from EC $1,322,022.79 to EC $104,462.91, Green Witness Statement ¶ 49, but ignores the fact that, in the process of verifying the amounts due and owing on the Draft Final Account, Leeward reduced the amount it sought from EC $1,322,022.70 to EC $1,036,528.13. As shown above, the difference between what Leeward sought on October 19, 2009 and what AUA approved for payment is due to the fact that Leeward's Payment Application included the additional $955,554.08 in Additional Preliminaries in dispute and AUA's calculations did not.

66.     AUA kept the remaining EC $590,083 in retainage out of the final EC $23,603,320 earned by Leeward to be paid in accordance with the Contract Documents, which require, among other things, submission of the documentation set forth in Section 9.10.2 of the General Conditions. (AUA Ex. 1 at AUA 000045).

67.     Once I calculated the correct amount due Leeward, I indicated my approval for payment of the amount due on the Collections Page, prepared a Check Request Form, and had

24

our local Antiguan office send the Payment Application to Prabhu Marudheri for final approval and processing. (AUA Ex. 22). Mr. Dickinson and Mr. Webster were copied on this email, and thus Leeward was well aware, as of October 22, 2009, what it was going to be paid for the Draft Final Account. They were also copied on a follow-up email from Mr. Marudheri attaching the wire confirmation of the payment made on October 26, 2009.

68. In total, the Contract Sum was adjusted for "additions and deductions" as follows:

\* \* \*

| | |
|---|---|
| Contract Sum as of September 2008 | EC $ 27,436,824.00 |
| *Less* Reduced Measured Works | (EC $ 5,258,042.63) |
| *Plus* Additional Preliminaries | EC $ 1,030,157.60 |
| *Plus* "Change Orders" Above EC $1 million | EC $ 232,008.91 |
| *Plus* Claims | EC $ 162,372.12 |
| **Revised Contract Sum as of October 2009** | **EC $ 23,603,320.00** |

IV.     **THE CLAIMS ASSERTED IN LEEWARD'S OCTOBER 26, 2009 LETTER**

69. The same day, October 26, 2009, that AUA made payment to Leeward, Andy Green sent me a letter with respect to the three disputed items in Leeward's Draft Final Account that were not accounted for in what AUA paid. Specifically, Leeward sought payment for "Additional Preliminaries" (EC $955,554.08), a claim for time lost due to the Whitsuntide Holiday (EC $19,457.40), and a claim for overhead and profits (EC $97,064.40). (AUA Ex. 32). Leeward indicated its intention to commence arbitration "immediately" for EC $1,072,093.88 in aggregate on these three items.

70. These claims correspond with specific differences between the Draft Final Account initially submitted by Leeward, and the Draft Final Account approved by AUA.

Leeward sought Preliminaries of EC $5,891,857.68, but AUA only approved and paid EC $4,936,303.60. The difference between the two is EC $955,554.08. Leeward also sought EC $278,911.92 in Claims, but AUA only approved and paid EC $162,372.12. The EC $116,539.80 difference is precisely the aggregate of Leeward's Whitsuntide Holiday claim and its Overhead and Profits Claim (EC $19,475.40 + EC $97,064.40 = EC $116,539.80).

71.     In November 2009, I met with representatives of Leeward, including Andy Green, in an effort to resolve these three remaining issues and avoid arbitration. During those meetings, Leeward only sought to recover monies based on the three claims identified in Mr. Green's letter. Leeward never claimed it was owed anything else under the Contract Documents, nor did it indicate that it was entitled to be paid the balance of the initial Contract Sum, as it now claims.

72.     Unfortunately, we were unable to reach an amicable resolution. I advised Mr. Green in a November 19, 2009 email that the claims would not be resolved without resorting to arbitration. (AUA Ex. 65). Mr. Green responded the next day, indicating that he already contacted his counsel, and advised that I should expect to "hear from them shortly." (AUA Ex. 65). I did not "hear from [counsel]" at all, even though I continued to deal with Leeward with respect to the work it was performing on the separate contracts. I left Antigua at the end of February 2010, assuming that Leeward had decided to forgo its pursuit of EC $1,072,093.88 on the three claims Andy Green asserted in his October 26, 2009 letter.

73.     When I reviewed Leeward's Trial Exhibits in preparation for my testimony, I saw LC 221. According to this email, Mr. Green did not forward his November 20, 2009 threat of arbitration to his counsel, J. Scott Greer, until May 2010, six months after we met and three months after I left Antigua.

74.     In March 2011, I learned Leeward had finally decided to file arbitration. When I heard this, I assumed that Leeward was seeking to recover the three claims identified in Mr. Green's October 26, 2009 letter -- (i) Additional Preliminaries (EC $955,554.08); (ii) Whitsuntide Holiday (EC $19,475.40); and (iii) Loss of Overhead and Profits for Finishing Works (EC $97,064.40) -- totaling EC $1,072,093.88. (AUA Ex. 32). I was shocked to hear Leeward suddenly claimed it was entitled to EC $13,161,136.88, especially given that the only claims that were left unresolved of those made by Leeward when it worked on the Project were the three set forth in Mr. Green's October 26, 2009 letter. (AUA Ex. 32). These three claims are addressed below.

A.     Additional Preliminaries/Extension of Time/Delay

75.     Leeward seeks to recover the EC $955,554.08 in Additional Preliminaries sought in its Draft Final Account, but rejected by AUA. While Leeward's Amended Demand lists "Additional Preliminaries" as $1,985,711.68, that number merely represents the difference between the total amount of Preliminaries/General Conditions sought by Leeward in its Draft Final Account (EC $5,891,857.68) (AUA Ex. 28 at AUA002896) and the amount of Preliminaries/General Conditions on the Summary of Contract Sum page included in the Contract Documents (EC $3,906,146) (AUA Ex. 1 at AUA000071).

|          |    |                |
|----------|----|----------------|
|          | EC $ | 5,891,857.68 |
| *Less*   | EC $ | 3,906,146.00 |
|          | EC $ | 1,985,711.68 |

The corrected Collection Page from the Draft Final Account that served as the basis for AUA's final payment to Leeward confirms that AUA paid Leeward a total of EC $4,936,303.60 in Preliminaries, which is $1,030,157.60 more than the amount used to calculate the initial Contract Sum, as I explained in Paragraph 54 of this Statement. While some of this increase was

27

attributable to scaffolding and craneage costs itemized as "Preliminaries" by Leeward, the time related "Preliminaries" for site supervisory staff also increased, even though Leeward's scope of work decreased.

76.     Leeward's claim for Additional Preliminaries is rooted in its belief that it should have been granted an extension of time to complete its work because AUA, or other events outside of Leeward's control, prevented it from achieving the Substantial Completion deadlines in the Contract Documents.  However, the factual bases for Leeward's claim for Additional Preliminaries asserted in its witness statements (over two years after Leeward completed its work under the Contract Documents) far exceed the reasons asserted in the Claims made by Leeward during the Project.  As discussed below, and confirmed in the May 29, 2009 Claim attached to Mr. Green's October 26, 2009 Letter (AUA Exs. 32 and 33), Leeward only sought time extensions for disputes over overtime, weather delays, and holidays.  Leeward never sought an extension of time, or Additional Preliminaries, on account of design changes, Customs delays, or scheduling problems.  As explained below and in the Witness Statement submitted by A.S. Nagesh, none of Leeward's claims, whether asserted contemporaneously or more than two years after the fact, warrant paying Leeward any amount of Additional Preliminaries.

        1.     Overtime/Leeward's Delay

77.     The parties negotiated the length of the Project and ultimately agreed upon a 52 week construction period, commencing as of May 1, 2008 and ending on April 30, 2009 (the "Contract Time").  While Leeward initially sought a longer construction schedule, it ultimately agreed that the 52 week schedule was appropriate after AUA removed the MEP (Mechanical, Electrical and Plumbing) works from Leeward's proposed scope of work.

78.     Leeward's work under the Contract Documents was to commence on May 1, 2008 and be completed in 364 days thereafter.  Contract §§ 3.1 and 3.3 (AUA Ex. 1 at AUA

000006). Substantial Completion for each of the four parts of the Project was to be achieved between January 29, 2009 and April 30, 2009. Contract § 3.3. That deadline was extended two weeks, until May 14, 2009, in settlement of certain disputes that led Leeward to shut down the construction site for two weeks in October 2008 (the "October 2008 Shutdown"). (AUA Ex. 56). The October 2008 Shutdown is addressed in more detail in Paragraphs 133 to 137.

79.   Leeward agreed that the time limits in the Contract Documents "are of the essence of the Contract." General Conditions, § 8.2.1 (AUA Ex. 1 at AUA 000041). Further, Leeward agreed that "[b]y executing the Agreement the Contractor confirms that the Contract Time is a reasonable period for performing the Work."

80.   Despite this agreement, as discussed in Paragraphs 90 to 93 below, throughout the duration of the Project, Leeward was behind schedule and failed to take the necessary steps to complete the Project on time. As the Project neared the expiration of the Contract Time, it was evident that Leeward would not be able to complete its Work on time.

81.   As a result of Leeward's delay in performing the Work, in late April 2009, AUA decided to remove certain of the finishing works from Leeward's scope of Work, including the Doors and Windows Work, the Flooring Work, and the Painting Work. Leeward was informed of this decision during the April 21, 2009 project meeting. (LC 48).

82.   Despite the reduction in the scope of work to be performed under the Contract Documents, on May 11, 2009, three days before the extended deadline for Substantial Completion, Leeward submitted a "Claim for Extension of Time for Completion of the Works due to restriction of working hours." (LC 211). Leeward sought to extend the Contract Time by 15 weeks "together with reimbursement of costs expended." This Claim was emailed by Mr.

29

Dickinson to Nagesh. I, among others, was copied on the transmission. According to Mr. Dickinson's email, a hard copy of this Claim was hand delivered to Nagesh as well.

83.     The sole basis for Leeward's claim to extend the Contract Time by 15 weeks was its contention that EC $500,000 was set aside for Non-Productive Overtime costs in the Contract Documents "necessary to reduce the construction period by 16 weeks" from 68 weeks to 52 weeks. Leeward claimed that it was denied access to this money, and that Nagesh only approved EC $36,511.68 in overtime, which it equated to be 1.2 weeks out of the 16 weeks of time this alleged fund was supposed to compensate. Leeward claimed that the lack of access to these funds denied it "the ability to finish the Works on time, and [ ] created a delay to the construction programme in the order of 14.8 weeks."

84.     Leeward's Claim was properly rejected. The Contract Documents do not contain an EC $500,000 dedicated fund for Non-Productive Overtime. I do recall Mr. Dickinson requesting that such a fund be included in the "Preliminaries" section of the Contract Sum the week before the parties signed the Contract (AUA Ex. 34), but AUA rejected that request.

85.     I informed Mr. Dickinson of AUA's position in a September 20, 2008 email, and explained that the contract already provided a mechanism for overtime applications. (AUA Ex. 35). Specifically, overtime was one of the contingencies that could be claimed against the EC $1,000,000 Cash Allowance provided in the Contract Sum, subject to AUA's approval based upon Leeward demonstrating that the circumstances warranted overtime. My email (reproduced on the next page) also confirmed that the parties had already agreed to a 52 week construction period, without any reference to needing overtime, to achieve timely completion given that MEP works would not be included in Leeward's scope of work.

30

**From:** Roche, Antony [mailto:colantony@auamed.net]
**Sent:** Saturday, September 20, 2008 3:00 AM
**To:** Neil Dickinson
**Cc:** Corey Greenberg; Lt. Col P S Shetti [MEMG]; Peter McLeod; Sundaram Architects
**Subject:** RE: American University of Antigua College of Medicine - Structural works Contract.

Dear Sir,

Please refer to the proposed contract document, page 1 of 1 of the Statement of Contract Sum ('15 September 2008) Collection Page, wherein against item 3, Cash allowances:- 3.1, 3.2, 3.3 & 3.4 have been introduced to include, concrete testing, scaffolding, overtime, craneage and any other item to a sum of EC $ 1,000,000.00.

You will appreciate, there has been no refusal to allow these items. In the past and in the recent payment applications we have made cash allowances towards scaffolding and testing of concrete. We have no reservations on admitting overtime if the situation warrants it.

It is also brought to your notice that during our final negotiation meeting of 15th August, 2008 you have agreed to a 52 weeks completion period starting 01 May 2008 to 30 April 2009 without any overtime pre-conditions. 52 weeks completion time was debated in detail to agree upon it. In view of the reduced scope of shell and core structure only.

I have requested you to submit a detailed schedule listing all the activities and showing a critical path. The approved schedule for 52 weeks can be monitored on a regular basis and slippages if any will be given due consideration and adjustments will be made as per contract provisions.

In the light of above clarifications, may I request you to proceed in the matter of putting the contract agreement in place and accepting the same at the earliest.

Thanking you with best regards,

Lt Col Roche Antony
General Manager- Project
AUA, College of Medicine
email: colantony@auamed.net
Tel: 268 481-8918
Mobile: 268 764-4915
Fax: 268 481-8924

86.    Mr. Dickinson reiterated his request in a letter dated September 23, 2009. (AUA

Ex. 36). Yet, the parties signed the Contract Documents two days later without a provision for

EC $500,000 in Non-Productive Overtime in the contract Preliminaries or any reference to the

need for overtime to meet the 52 week schedule. On the contrary, the Contract Documents

provided that "[b]y executing the Agreement the Contractor confirms that the [52 week] Contract

Time is a reasonable period for performing the Work." General Conditions § 8.2.1 (AUA 1 at

AUA 000041).

31

87.    Mr. Dickinson's contention that the EC $1,000,000 Cash Allowance was dedicated to overtime is also not accurate, as my email above reflects. My email is consistent with Section 1200, Part 1.2 of the Specifications, which provides:

A.    Include in the Contract, a stipulated sum of EC $1,000,000 for use upon Owner's instruction. Contingency to cover Changes during course of the works and any authorized overtime, scaffolding and craneage costs approved in advance by the Owner.

B.    Funds will be drawn from Contingency Allowance on by Change Order.

C.    At closeout of Contract, funds remaining in Contingency Allowance will be credited to Owner by Change Order.

88.    Unfortunately, far too often I observed that Leeward was not adequately mobilizing manpower and other resources to keep the Project on schedule. Leeward was constructing four separate campus buildings (145,000 square feet in total) spread out over seven acres of land. A good depiction of the construction site, in mid-construction, can be seen at LC 224.

89.    While Leeward agreed that it would "proceed expeditiously with adequate forces and shall achieve Substantial Completion within the Contract Time," General Conditions, § 8.2.3 (AUA Ex. 1 at AUA 000041), it failed to do so.  In order to complete the work as designed on schedule, Leeward needed to be producing work at a rate that would equate to about EC $3,000,000 per month from November 2008 through April 2009. Leeward fell far short of this output, demonstrating that, by and large, the lack of overtime did not explain Leeward's failure to meet Project deadlines.

90.    Before the parties executed the Contract Documents, Leeward was already behind schedule.  Leeward was supposed to pour the concrete slab for the Classroom Block in August 2008. However, the supporting columns Leeward had constructed for that concrete slab were

32

defective and had to be dismantled and rebuilt. (LC 31). This was the state of works when Leeward agreed to the 52 week construction schedule in September 2008 and issued a schedule to complete its work by April 30, 2009.

91.     Upon signing the Contract in September 2008, Leeward was well aware that the columns it had built defectively had set it back. Leeward submitted a 52 week schedule that staggered the construction of the Classroom and Laboratory buildings.  While AUA preferred Leeward to proceed with the construction of both buildings simultaneously, we were willing to proceed on Leeward's staggered schedule provided Leeward was able to keep on that schedule. Unfortunately, Leeward did not.

92.     Leeward planned to commence the concrete work on the Classroom Building by the end of October 2008. (LC 40).  LC did not pour concrete for the Classroom slab until November 22, 2008. (LC 43).  LC planned to proceed with pouring concrete for the Laboratory building after it finished the Classroom building.  (LC 44).  Given the delays getting the Classroom building done, that work was pushed back to early January, and further delays pushed the work back to January 31, 2008. (LC 47).  This delay carried through to the rest of the Project, and Leeward never caught up, despite my repeated urging that Leeward speed up its work by mobilizing the necessary manpower and material resources.

93.     When Leeward began to fall behind schedule, it should have been in a position to increase its manpower and work on the Classroom Block and Laboratory Block simultaneously (the buildings were structurally identical) so as to keep on schedule.  Leeward was unable to do so, however, because it failed to obtain adequate scaffolding by that time.  When I first arrived on site, I even authorized paying Leeward EC $150,000 as a mobilization advance, as requested by Leeward, before the parties executed a contract, to assist Leeward in obtaining scaffolding

from the United Kingdom. Leeward delayed, however, in ordering sufficient scaffolding and this delay was exacerbated by predictable delays in Customs that Leeward should have taken into account.

94.     Leeward did make overtime applications during the Project, some of which were accepted and others of which were not. The purpose of overtime was to compensate Leeward for having to expend time outside regular business hours in order to complete tasks that went beyond the regular work day. Seeking extra hours to complete the Project by the contractually agreed deadlines did not justify overtime. Leeward needed to show that extra hours (during nights and weekends) were required because the particular work being performed could not be completed during regular hours and that the need for overtime was not due to Leeward's own delay, including its failure to mobilize adequate manpower or resources. In other words, overtime would be acceptable if Leeward was unable to complete a specific task on the critical path timely, despite expending adequate resources to get it completed during normal working hours.

95.     For example, on November 12, 2008, Leeward sought overtime in order to ensure it could pour a single monolithic concrete slab as required by the designs. Leeward indicated that it needed to conduct the pour on a Saturday over an estimated 14 hour period to achieve this objective. Nagesh approved the application. (AUA Ex. 70).

96.     Similarly, on January 12, 2009, Leeward sought overtime because certain materials (timber, plywood and steel) were delayed in Customs, and the delay was impacting work on the site in critical areas. (AUA Ex. 71). Nagesh granted Leeward's request for EC $3,091.20 in overtime. (AUA Ex. 71).

97.     Mr. Dickinson claims, in Paragraph 49 of this Statement, that "Leeward incurred approximate[ly] EC $2,000,000 in overtime costs as a result of the delays on the Project that

were outside of Leeward's control." However, Mr. Dickinson fails to specify what overtime applications he is referencing, or what "delays" were at issue. Leeward also has not detailed any of the overtime applications it claims to have been wrongfully denied so as to allow Nagesh or me to provide a meaningful response to a particularized claim.

98.     Leeward also fails to demonstrate that any of the overtime it claims to have been wrongfully denied impacted the critical path such that it actually prevented Leeward from completing its work within the Contract Time.

99.     In any event, because AUA removed the finishing works from Leeward's scope of work, Leeward effectively was provided with an extension of time to complete its work because Leeward suddenly had EC $3,667,711 less of work to perform, but still the same 52 week Contract Time in which to perform it.

## 2.     Scheduling

100.    Leeward was hired to construct the structural works of the New Campus.  While it had been contemplated that Leeward would also perform (itself or through subcontractors it controlled) the MEP Works as well, it was determined before the Contract Documents were signed that the MEP Works would not be given to Leeward, and that AUA would hire contractors for that work directly.  This was made clear in Section 1100, Part 1.3A of the Specifications (AUA Ex. 1 at AUA 000109), which provides:

The Owner may award contract for supply of Furniture, Fixtures and Equipment; selective material procurement and Mechanical and Electrical.

101.    I did not, as Leeward claims, assume the role of "General Contractor."  Under the Contract Documents, Leeward was responsible under the Contract Documents to maintain its own construction schedule and sequence its work appropriately showing the critical path of the activities identified.  For the most part, Leeward did not need to worry about integrating other

35

trades into its schedule because nearly all of the structural work needed to be completed before other trades could do their work. By and large, the only items impacted by the completion of work performed by others, such as the MEP work, were the finishing works Leeward was supposed to perform. However, Leeward had not even gotten to that point in the Project when AUA removed the finishing works from the scope of its work in April 2009. Perhaps this is why I never received a complaint from Leeward that it needed an extension of time based upon its inability to prepare an accurate schedule, or adhere to one, because it did not know, nor did it need to know, what work the other trades were supposed to perform and when.

102.    With Leeward having gone beyond the contractual deadline for substantial completion, AUA could no longer wait for Leeward to finish the Library Block before handing it over to others to do the MEP Works and other interior work. Due to Leeward's delay in completing the structural work, Leeward and the MEP contractors now had to work in unison. That said, I made it perfectly clear to Leeward that getting its work completed was a priority, and thus I made sure the MEP works did not get in the way. If that meant, for example, that Leeward had to pour concrete in the toilet block before knowing where the plumbing was to be located, I told Leeward to proceed, and AUA took on the responsibility (and costs) to drill the appropriate holes after the fact. It was not Leeward's place to question AUA's methods, or use its disagreement as a basis to delay completion of the structural works.

### 3.    Design Changes

103.    Leeward claims that it could not possibly complete its work within the Contract Time because it received design changes as late as July 2009. Dickinson Statement, ¶ 66. As with the newly-asserted scheduling issues, this is the first time I have heard Leeward to claim

36

that incomplete designs delayed its progress and warranted granting it an extension of time or additional preliminaries.

104.    Leeward confirmed before it executed the Contract Documents that it had received all the design drawings. (LC 40). Leeward did not complain then that the drawings were incomplete.

105.    It is not uncommon for construction projects to have design changes, or for contractors to seek additional information regarding the designs they have. Usually, however, design changes or questions do not arise until the construction reaches a point where the particular design element itself is about to be built.

106.    A review of the design transmittal letters reflects that nearly all of the design drawing issues after April 2009 involved the Library Block. (LC 88 at LC003111-3121). According to Section 3.3 of the Contract, Leeward was supposed to substantially complete the Library Block, including the finishing work, by April 30, 2009. (AUA Ex. 1 at AUA 000006). However, Leeward was well behind schedule. By way of example, at the April 28, 2009 progress meeting (two weeks before the extended Contract Time), Leeward advised it planned to have the second floor concreting in Wing B done on May 30, 2009. (LC 49). At the next meeting it pushed the date back to mid-June. (LC 51). Indeed, Leeward was still concreting areas of the Library Block at the end of June 2009. (LC 57).

107.    Given these facts, it makes perfect sense that Leeward received design revisions to the Library Block into June 2009, and thus the inference suggested by Leeward that the date of the transmission of these drawings means Leeward could not have built the Library sooner is not a reasonable one.

37

108.    In fact, the delayed state of the Library Block was repeatedly addressed at the weekly progress meetings. (LC 44 to LC 52). Yet, Leeward did not once blame the absence of design drawings or assert a Claim for an extension of time due to the supposed late submission of design drawings.

109.    With respect to any specific responses to the alleged design changes, I refer to Paragraphs 24 to 41 of the Witness Statement of A.S. Nagesh.

### 4.    Customs

110.    Leeward claims that it was delayed because of problems getting materials from Customs, and seeks to put the blame on me and AUA for its own inability to get materials needed for the construction through Customs in a timely manner.  Under the Contract Documents, however, Leeward was the party responsible to obtain clearance from Customs for the materials and equipment, and to handle or move these items to the construction site.  Contract Supplementary Conditions, §§ 3.6.3 and 3.6.4.  (AUA Ex. 1 at AUA 000010).

111.    Putting aside that clearing Customs was Leeward's contractual duty, not AUA's, Leeward's current version is inconsistent with what occurred during the Project.  Whatever problems Leeward may have had with Customs, it never made a Claim for an extension of time on this basis, or even attempt to demonstrate what specific work was delayed as a result.  To the contrary, Leeward sent an email to Nagesh (copying me) in April 2009 detailing all of its problems with Customs and seeking monetary compensation as a result.  (LC 106).  Leeward did not seek an extension of time in this email.

112.    Leeward also acts as if it has never performed construction jobs in Antigua and is not accustomed to Customs delays.  The Witness Statements of Eric Linde and Andy Green indicate otherwise.  Given its experience dealing with Customs in Antigua, Leeward should have taken Customs delays into account when ordering materials from abroad.

113.    Because the New Campus was being built in a Free Trade Zone, AUA did not have to pay duty for the shipment of materials into Antigua.  AUA also had preferred status with Customs, meaning Customs would process our shipment ahead of others.  AUA had to be involved in the Customs process to avail ourselves of these opportunities, but I did not delay in signing or processing paperwork as Mr. Dickinson contends.  I also have no recollection of a crane sitting in Customs for two months, nor can I locate any reference to this issue in the supporting documents supplied by Leeward (LC 105 and LC 106).

114.    What these documents do reveal, however, is that Leeward was ordering materials as part of single shipments for both the Project and work it was doing for a different owner. (E.g., LC 105 at LC003564-003567).  If AUA really had been causing unnecessary delays in getting items through Customs, then it is very difficult to believe that Leeward would have combined the materials for AUA's Project with materials for other jobs into single shipments.

115.    Moreover, while Leeward sought and AUA granted an overtime application on account of one Customs delay (AUA Ex. 71), I do not recall receiving any application relating to a crane, or for any other specific Customs-related delay, for that matter.  Rather, Leeward only sought monetary compensation as a result of Customs issues.  (LC 215).  Ultimately, AUA agreed to compensate Leeward for EC $33,943.10 in claims for storage charges to settle the dispute regarding Customs.  (AUA Ex. 61).

## 5.    Adverse Weather

116.    Leeward had previously sought an extension of time of 11 days and EC $145,516.54 based upon days lost due to adverse weather.  (LC 215)  This claim was properly denied.  The most significant reason for denying the claim was the fact that most of the weather delays asserted pre-dated the execution of the Contract Documents.  (LC 214 at LC003742).

39

Presumably, Leeward accounted for that lost time when it agreed to the 52 week construction schedule, and if Leeward failed to do so, it was improper to seek more money and time from AUA after the fact.

117.   In any event, Mr. Green's October 26, 2009 Letter confirmed that this claim was resolved.

6.      **Holidays**

118.   Leeward sought minor time extensions and monetary compensation for certain time lost due to holidays. These claims were resolved, as confirmed by Mr. Green's October 26, 2009 Letter.

\*      \*      \*

119.   In sum, Leeward agreed to complete its work within a 52 week construction schedule without the aid of overtime. AUA reduced Leeward's scope of work, yet maintained the 52 week schedule. AUA authorized overtime where Leeward demonstrated it was appropriate, but by and large Leeward was to blame for its own delay. Had issues such as project scheduling, design changes, or Customs delays prevented Leeward from completing its work within the Contract Time, Leeward could and should have asserted a Claim for an extension of time in accordance with the Contract Documents while the Project was ongoing. It did not do so, and instead raised these delay issues for the first time over two years later. I was correct to reject Leeward's claim for Additional Preliminaries.

B.      **Whitsuntide Holiday/Unpaid Claims**

120.   Leeward claims that AUA failed to pay EC $181,847.52 in Claims Leeward has asserted for the following items:

40

| | |
|---|---|
| Hurricane Omar Site Preparation | EC $ 23,682.00 |
| Site Shutdown | EC $ 24,681.82 |
| Customs Storage Charges | EC $ 33,943.10 |
| Election Close Down Costs | EC $ 30,294.86 |
| Labour Day Close Down Costs | EC $ 24,642.84 |
| Adverse Weather | EC $ 25,127.50 |
| Whitsuntide Public Holiday | EC $ 19,475.40 |
| TOTAL | EC $181,847.52 |

Leeward's assertion is plainly wrong.

121.   As the Draft Final Account confirms, Leeward paid all of the Claims at issue with the exception of the Whitsuntide Holiday claim in the amount of EC $19,475.40. This one claim accounts for the difference between the $181,847.52 in Claims sought versus the $162,372.12 in Claims paid. In fact, AUA reflected $162,372.12 in Claims being paid on the September 2009 Payment Application. (AUA Ex. 19 at AUA 0000371).

122.   AUA correctly rejected Leeward's Claim for the Whitsuntide Holiday, however, because the holiday fell in June 2009, after the expiration of the Contract Time. Having failed to complete its Work on time, Leeward is not entitled to be paid extra money for a holiday that never should have impacted the contract schedule.

C.   **Overhead and Profits for Finishing Works**

123.   The third claim in Mr. Green's October 26, 2009 Letter involved Leeward's claim for overhead and profits. As I said earlier, when it became abundantly clear that Leeward was not going to complete its work within the Contract Time, AUA decided to remove the finishing

41

works from Leeward's scope of work. AUA's hope was that Leeward would be able to focus its resources on completing the structural works, and not concern itself with completing doors, windows, floors, and painting within the Contract Time.

124.    On April 21, 2009, AUA removed these finishing works and decided to bid them out as separate contracts. Leeward promptly served a Claim on May 12, 2009 seeking its overhead and profits for the Doors and Windows Work and Painting Work removed from Leeward's scope of work. (LC 213). The claim was properly rejected.

125.    First, the work was removed because Leeward was well behind schedule already and AUA could not afford to allow the situation to worsen.

126.    Second, AUA actually did Leeward a favor by removing these works. Had those works remained as part of the original contract, Leeward would have been assessed Liquidated Damages at the rate of US $1,500 per day until it completed the finishing works, which ultimately were not completed until December 2009. That would have added at least another 125 days of Liquidated Damages to the amount AUA currently seeks to recover, or another US $187,500, which exceeds Leeward's claim for overhead and profits attributable to this work.

127.    Third, Leeward submitted proposals to do the Doors and Windows Work and Flooring Work under separate contracts and AUA awarded them that work on July 13, 2009 (LC 228 and LC 229). By that time, Leeward was nearing Substantial Completion on the structural works being performed pursuant to the Contract Documents, which it achieved on July 31, 2009.

128.    Leeward earned profits under these agreements, and waived the right to seek compensation under the Contract Documents in so doing. Leeward would be paid profits twice were it now awarded overhead and profit on this work under the original Contract.

129.    Leeward's contention that it could not substantially complete the works under the Contract Documents due to delays with the Doors and Windows Work is untrue. The Doors and Windows Work was removed from Leeward's scope of work and was not part of the critical path of any work that remained to be done by Leeward under the Contract Documents.

130.    Leeward also is not entitled to overhead for any of the finishing works removed from Leeward's scope of work. Leeward was paid Preliminaries for the agreed-upon 52 week construction period based upon at a rate that assumed Leeward was performing the finishing works. Leeward was paid these Preliminaries in full, but did not perform all the contemplated work.

131.    Finally, the only finishing works taken away from Leeward that it did not earn back is the Painting Work. Leeward's claim for overhead and profits, if one were viable, should be limited to the lost profits for this work, which is no more than 13% of the BOQ amount for this work. That equals EC $225,626.57.

## V.    MISCELLANEOUS ISSUES

132.    Although not relevant to any claim asserted by Leeward, I am compelled to take a moment to address a few additional misstatements in Leeward's witness statements.

### A.    October 2008 Shutdown

133.    Soon after signing the Contract Documents, disputes arose over the payment of monies. Specifically, Leeward and AUA had a dispute over one of the Payment Applications and a dispute with respect to the payment of Mobilisation advances.

134.    In light of these disputes, Leeward walked-off the construction site in October 2008 for a period of two weeks. Leeward returned to the Project after two weeks, on or about November 5, 2009, while the parties worked to resolve the dispute.

43

135.   On December 15, 2008, Leeward submitted a claim to the Architect relating to the

October 2008 Shutdown, both with respect to the disputes that led to the shutdown as well as the

losses incurred during the two weeks Leeward was not working. (AUA Ex. 66)  Specifically,

Leeward claimed:

    1.     Release of the outstanding balance of Mobilisation
Advance Payment, plus compensation in respect of financing costs
and lost interest, plus any Extension of Time for completion of the
Works deemed to be attributable to non-availability of cash
resources to facilitate purchase of materials and/or equipment
necessary for the timely execution of said Works; and

    2.     An extension of Time of fourteen days for completion of
the Works, plus costs in respect of the shut-down, delay, and start-
up of the Works, plus interest subsequent to non-payment by the
Owner of monies due with the prescribed timescales.

136.   Leeward threatened to commence an arbitration as provided by the Contract

Documents if not awarded the relief claimed.

137.   On January 13, 2009, I met with Eric Linde, and we agreed to settle the claims set

forth in Leeward's December 15, 2008 claim, and thereby avoid arbitration.  As part of that

settlement, AUA agreed that Leeward could extend the Project two weeks, from April 30, 2009

to May 14, 2009, without costs, meaning Leeward would not be paid Preliminaries for those two

weeks and AUA would not seek Liquidated Damages for those two weeks.  AUA also agreed to

pay Leeward EC $24,681.82 towards the costs Leeward incurred for shutting down the site.

(AUA Ex. 56)  Finally, AUA agreed to extend the time in which it would credit monies due

Leeward against the prior Mobilisation advances, so as to provide Leeward with greater cash

flow for a longer period of time.

**B.**    **Separate Contracts**

138.   Leeward was awarded a number of separate contracts outside the original

contract, including the Doors and Window Work and Flooring Work, which were performed

between July and December 2009. That Leeward bid for and took on these works is inconsistent with Leeward's contention now that I was grossly mismanaging the Project. If that were true, it stands to reason that Leeward would not have agreed to take on any more work under my supervision than it was already obligated to perform.

139.    The separate contracts were not flat fee contracts, as Leeward now contends. Each of these contracts was to be paid based upon actual measurements, and Leeward was paid in that manner, without, until now, objection. In some instances, Leeward was paid more than the proposed amount, and in other instances, less.

140.    The separate contracts did not contain any agreement to arbitrate, and AUA disputes that resolving any payment claims regarding those contracts is within the jurisdiction of the Tribunal.

141.    In any event, as detailed in Paragraph 47 of Nagesh's Witness Statement, Leeward is also wrong in its accounting of what monies it was paid. Leeward was properly paid a total of EC $1,452,261.32, and is owed no more.

## VI.    NOTICE OF CLAIM PROCEDURES

142.    Paragraphs 53 to 65 of Nagesh's Witness Statement set forth the proper procedure to initiate a timely Claim. Leeward has demonstrated that it knows how to do so. For example, within 21 days of being advised that AUA was removing the Doors and Windows Work and Painting Work from Leeward's scope of work, Leeward hand-delivered a written Claim for overhead and profits to Nagesh. Leeward did the same with respect to its Claim on the Whitsuntide Holiday.

143.    The same cannot be said for Leeward's claim for a 15 week extension of time based on the denial of overtime. Leeward knew long before May 11, 2009 that it was being

denied overtime. Likewise, if Leeward believed it was entitled to be paid something more for its

work under the Contract Documents other than what was enumerated in Mr. Green's October 26,

2009 Letter, it should have done so then, and not in December 2010.

## VII.   CONCLUSION

144.   The main issue in this case is whether the Tribunal should accept or reject the

position that Leeward formulated for this arbitration – *i.e.*, that it is entitled to be paid not just for

the work that it did perform, but also for work that it did not. As shown above, Leeward's

position is at war with the Contract provisions and the practice of the parties in carrying out the

Contract. It is also inconsistent with the Contract summary prepared by Leeward's own Senior

Quantity Surveyor, who stated, correctly and contemporaneously, that "[m]easured works in the

BOQ will be as built" in accordance with the "final measure." For this reason, and the others

described above and in the accompanying Witness Statements of Peter J. McLeod and A.S.

Nagesh, I respectfully request that the Tribunal deny Leeward's claim.

46

## ATTESTATION

I attest that the foregoing is true and correct to the best of my knowledge and belief.

LT. COL. ROCHE ANTONY

Executed on:  February 24, 2012
Bangalore, India