# EXHIBIT 33

Page 1

1      AMERICAN ARBITRATION ASSOCIATION

2      CONSTRUCTION INDUSTRY ARBITRATION RULES

3      ------------------------------------------

4      LEEWARD CONSTRUCTION COMPANY,

5      LTD.

6                  Claimant

7        -v-             Case No. 50 110 T 00075 11

8      AMERICAN UNIVERSITY OF ANTIGUA

9      COLLEGE OF MEDICINE c/o

10     GCLR, LLC

11                 Respondent

12     ------------------------------------------

13              ARBITRATION PROCEEDINGS

14

15     VOLUME 1 OF 5                    Pages 1 - 209

16

17

18             Monday, March 5, 2012

19             9:51 A.M. TO 3:03 P.M.

20

21                   held at

22                 Boardroom 1

23             The Courtyard Marriott

24            Isla Verde Beach Resort

25             San Juan, Puerto Rico

Page 2

1            BEFORE ARBITRATION PANEL
2
3    JORGE JIMENEZ
4            CHAIRMAN OF ARBITRATION PANEL
5
6    HECTOR M. VARELA
7            ARBITRATOR
8
9    JOSE R. CAPO
10           ARBITRATOR
11
12                    * * *

                                                              Page 3

1                       APPEARANCES
2
3    ON BEHALF OF CLAIMANT LEEWARD CONSTRUCTION
4    COMPANY:
5      J. SCOTT GREER, ESQUIRE
6      MELINDA BENANTI, PARALEGAL
7      Lewis & Greer, P.C.
8      510 Haight Avenue
9      Suite 202
10     Poughkeepsie, New York   12603
11        PHONE 845-454-1200
12        FAX 845-454-3315
13        E-MAIL mbenanti@lewisgreer.com
14
15   ALSO PRESENT WITH COUNSEL FOR CLAIMANT:
16     ERIC R. LINDE
17        Director
18     ANDY GREEN
19        Managing Director
20     Leeward Construction Company Limited
21     Nine Collan Park
22     Honesdale, Pennsylvania   18431-9655
23     PHONE   570-253-4090
24     FAX   570-253-4346
25     E-MAIL klinde@leewardconstruction.com

Page 4

| | |
|---|---|
| 1 | APPEARANCES, CONTINUING |
| 2 | |
| 3 | ALSO PRESENT ON BEHALF OF CLAIMANT |
| 4 | LEEWARD CONSTRUCTION COMPANY: |
| 5 | PRESENT VIA SKYPE AND SPEAKERPHONE |
| 6 | WITH WITNESS NEIL DICKINSON |
| 7 | PAGES 75 TO 125 |
| 8 | VERONICA A. McMILLAN, ESQUIRE |
| 9 | Lewis & Greer, P.C. |
| 10 | 510 Haight Avenue |
| 11 | Suite 202 |
| 12 | PHONE 845-454-1200 |
| 13 | FAX 845-454-3315 |
| 14 | E-MAIL vamcmillan@lewisgreer.com |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

```
                                                      Page 5
 1              APPEARANCES, CONTINUING
 2
 3   ON BEHALF OF RESPONDENT AMERICAN UNIVERSITY OF
 4   ANTIGUA:
 5     MARK S. OLINSKY, ESQUIRE
 6     JONATHAN JEMISON, ESQUIRE
 7     BRIAN BIGLIN, ESQUIRE
 8     Sills Cummis & Gross, P.C.
 9     30 Rockefeller Plaza
10     New York, New York  10112
11        PHONE 212-654-7000 OR 973-643-5402
12        FAX 212-654-6500
13        E-MAIL molinsky@sillscummis.com
14        E-MAIL jjemison@sillscummis.com
15        E-MAIL bbiglin@sillscummis.com
16
17
18                   ALSO PRESENT
19
20   COURT REPORTER:  Lori Byrd Buckner
21                    RPR, CRR, CLR, CA-CSR 13023
22
23                      * * *
24        Table of Contents at End of Transcript
25                      * * *
```

Page 66

1  amount.
2          The next one is about 20,000 --
3          CHAIRMAN JIMENEZ:  When you refer to
4  "they reach agreements," signed agreements?
5          MR. OLINSKY:  No, what I mean is
6  through the process of going through the
7  draft final account, measuring what was
8  actually built, and then Leeward, through
9  Paul Webster --
10         CHAIRMAN JIMENEZ:  It doesn't
11 argument, they reach an agreement?
12         MR. OLINSKY:  No, I think that's
13 factual.  But what they did when they were
14 measuring it, they reached an agreement as to
15 what the measures were.
16         CHAIRMAN JIMENEZ:  If it was 1.4 or
17 1.2, is that agreed-upon and signed, or is
18 just a difference of opinion between them?
19 Which is what?
20         MR. OLINSKY:  They never explained
21 this 200,000.  We've derived that figure.
22 I'm not saying they have gone over that
23 figure.  They're probably seeing it for the
24 first time because I don't think they're that
25 precise in their math.

1  Nagesh and Paul Webster measured what
2  was actually built, they changed the draft
3  final account that was provided by Paul
4  Webster on October 8th. And on
5  October 19th, 2009, Paul Webster e-mailed
6  to AUA a revised draft final account that
7  made all the changes that they had
8  agreed-upon in doing the measurement.
9  Now, the next item is what we call
10 "the claims delta."
11 Mr. Greer and Leeward say in their
12 papers that $181,000 Eastern Caribbean, only
13 talking Eastern Caribbean, of additional
14 claims of various kinds, were not paid.
15 They're just wrong on the math. We've
16 explained it in our papers. All of those
17 claims, 162,000 of them, were actually paid.
18 They're in the paperwork, you can see it.
19 There's one item that wasn't paid,
20 that is about this $20,000 figure. It's
21 called -- it's for the Whitsuntide holiday,
22 is according to the papers, it was beyond the
23 period of the contract and therefore they
24 weren't entitled to payment on it. That was
25 one of the items that Mr. Green listed in his

1   October 26 letter as one of the issues in
2   dispute.  That's one of the things that was
3   still there on October 26 but we don't
4   think -- it hasn't been paid but we don't
5   think they're entitled to be paid.
6          The next item is really a "double
7   count."  The contract provided for a cash
8   allowance for various items such as overtime,
9   scaffolding and cranage.  And the actual
10  amounts that were billed in our papers
11  against that cash allowance were not a
12  million.  They were 2,232,000, or so.  And by
13  asking -- by starting at the top number of
14  the 27 million figure here, and just working
15  down against what was paid, they're
16  essentially double counting the million
17  dollars.  They've been paid that already.
18  They don't get to collect it again.  We think
19  that comes off.
20         "Overhead and profits."  Move this
21  up.  The number is different, and from
22  Mr. Green's October 26 letter, but it was an
23  item that's in there.  They were claiming
24  overhead and profit on works that were
25  removed.  The problem with that, it's a

Page 69

1  combination of a substantive and procedural
2  reason, for part of it they're simply double
3  counting.
4          When they first made the claim for
5  overhead and profit on work that was removed
6  from the contract, it included doors and
7  windows. But the doors and windows were
8  awarded to them on a separate contract. They
9  got paid for that already. If you were to
10 add it back in, given the methodology they're
11 using for how to collect, they would get paid
12 twice.
13         And the rest of it, we believe that
14 they have not made a timely claim for, to the
15 extent that it's not the doors and windows.
16 We don't think that they're entitled to that.
17         Okay. The 9th item, "Separate
18 contracts." They say that there is about
19 $200,000 that is -- we didn't pay on the
20 separate contracts. This is one of the
21 issues that we have raised on a preliminary
22 basis. We don't think those should be in
23 this arbitration.
24         But the answer to that is it's not a
25 $200,000 difference. We ran the numbers,

Page 70

1  it's in our witness statements, the
2  difference is about 60,000EC.
3       So it's about a $60,000 difference
4  between what they -- what those contracts,
5  what they say they should have been paid and
6  how much they actually were paid. So in
7  dollars it's a very small item. We think
8  they were paid exactly what they were
9  supposed to be paid under the separate
10 contracts.
11      We also don't think they should be
12 permitted to pursue it in this proceeding,
13 but if they are, it's not a $200,000
14 difference. It's really a $60,000
15 difference. We don't think they're entitled
16 to that.
17      Brings me to the last two pieces.
18      Number 10 is the "retainage."
19      As of October 2009, half of the
20 5 percent retainers was released, that same
21 amount, 590,000. That left 2 and a half
22 percent was left. At that point AUA had paid
23 Leeward 97 and a half percent of the total
24 that was due. They retained half of the
25 retainage, this amount. They still have it.

Page 71

1    It ultimately, certainly is Leeward's
2    money. The problem with it is that they
3    haven't submitted the paperwork that they're
4    required to submit in order to get it.
5    The contract calls, in particular,
6    for an affidavit to be submitted that they've
7    paid all their workers and so forth. That
8    affidavit has never been submitted as
9    required by section 9.10.2, I believe, of the
10   contract.
11   I get confused which section, which
12   is the contract front part and which is the
13   supplement and so forth. But it's 9.10.2.
14   That affidavit has not been submitted. When
15   they submit all the necessary paperwork, we
16   can then release that money. There's no
17   question that's their money.
18   No one's trying to keep their money,
19   but it shouldn't be part of an award in
20   arbitration that said we did something wrong.
21   It shouldn't be part of an award where
22   they're seeking attorneys' fees and interest,
23   where the amount of money that we're holding
24   belongs to them but they haven't submitted
25   the paperwork to get it.

Page 72

1    So that isn't something that should
2 be awarded in this proceeding, but it does go
3 to what the 6.2 million consists of.
4    Now, the last one is something we
5 figured out. I don't think they're aware of
6 it. This is an error in their favor. When
7 we looked at the different applications, we
8 found that there was ABST. That was money
9 that was -- it was an $83,000 that was
10 accounted for as being due as ABST, but was
11 really due to them.
12    We just found this out in going
13 through these numbers and trying to
14 deconstruct their claims for 6.7 that they
15 didn't fully explain. That money is due to
16 them, it's no question. It was a mutual
17 mistake by both sides. They just put it in
18 the tax column and it was supposed to be due
19 to them.
20    I don't think anybody realized it
21 until we discovered it in preparing. I doubt
22 any of the principals here are even aware of
23 it. It's just a matter of arithmetic that we
24 figured out in the applications. Are they
25 entitled to that money? Yeah, but not as a

Page 73

1  reward in arbitration.  That can be
2  straightened out separately.
3       They're not entitled to attorneys'
4  fees based upon a mistake by the parties in
5  allocating something for tax that wasn't, or
6  interest.
7       So that's where it comes down to,
8  that's what their claim is.
9       CHAIRMAN JIMENEZ:  Due to part of
10 your briefing sections of your memoranda, why
11 those claims, meaning number 11 and
12 number ... and number --
13      MR. OLINSKY:  10?
14      CHAIRMAN JIMENEZ:  Yeah, retainage --
15 should that be part of an award?
16      MR. OLINSKY:  I think given the --
17      CHAIRMAN JIMENEZ:  Just make a note
18 as to --
19      (SIMULTANEOUS SPEAKING)
20      MR. OLINSKY:  I'm sorry.  I know I've
21 taken a long time.  I wanted to go through
22 some of these key documents.  I just want to
23 finish by going back to where I started,
24 which is, when you come down to it, what this
25 case is mostly about, is that Leeward comes

Page 74

1  here today, seeking to be paid for things
2  that weren't built.
3          The things that were really in
4  dispute remain what's really in dispute.  The
5  things that were in dispute in September and
6  October of 2009, things like the additional
7  preliminaries, the Whitsuntide holiday, and
8  their claim for additional overhead and
9  profit on contracts that were taken away from
10 them and awarded either to them or to others.
11         All of the rest of this stuff is them
12 trying to get paid for work that they did not
13 do.  Thank you.
14         CHAIRMAN JIMENEZ:  No break, unless
15 you want to --
16         MR. OLINSKY:  I have been on my feet
17 for an hour, I would like to take a couple
18 minutes if I could.
19         CHAIRMAN JIMENEZ:  Can we start
20 the ...
21    (RECESS TAKEN 11:13 TO 11:20 A.M.)
22         CHAIRMAN JIMENEZ:  Are you ready?
23         (OFF RECORD DISCUSSION)
24 (SKYPE VIDEO CONNECTION FROM ARBITRATION
25    ROOM WITH WITNESS NEIL DICKINSON,