# EXHIBIT AA

AMERICAN ARBITRATION ASSOCIATION
CONSTRUCTION INDUSTRY ARBITRATION RULES
-------------------------------------------------------------------x
LEEWARD CONSTRUCTION COMPANY, LTD.,

                                   Claimant,

                                                      **CLAIMANT'S REPLY**
                                                      **PROPOSED FINDINGS**
                                                      **OF FACTS AND**
          -against-                                   **CONCLUSIONS OF LAW**

AMERICAN UNIVERSITY OF ANTIGUA
COLLEGE OF MEDICINE C/O GCLR, LLC,                    Case No. 50 110 T 00075 11

                                   Respondent.
-------------------------------------------------------------------x

       Claimant, Leeward Construction Company, Ltd. ("Claimant" or "Leeward") submits this

Reply Proposed Findings of Facts and Conclusions and Law in accordance with the Tribunal's

Resolution, dated March 2, 2012, and directive at the conclusion of the evidentiary hearing held

on March 5 - 9, 2012.

                              **INTRODUCTION**

       1.     The purpose of this "Reply" is not to address each and every statement in the

Proposed Findings of Fact and Conclusions of Law submitted by the Respondent, American

University of Antigua — College of Medicine ("Respondent" and/or "AUA").[1]  The Tribunal has

reviewed the Witness Statements and exhibits, heard the live testimony of the witnesses, and

observed the demeanor of the witnesses at the hearing.  We trust the Tribunal's ability in reading

the post-hearing submissions to separate fact from fiction and half-truths, and to give appropriate

weight to the evidence.

       2.     Just because Leeward does not address a particular statement in the RFOF or

---

[1] The Respondent's Proposed Findings of Fact and Conclusions of Law, dated April 20, 2012, are cited herein as
follows: Respondent's Findings of Fact — "RFOF"; Respondent's Conclusions of Law — "RCOL." Leeward's
Proposed Findings of Fact and Conclusion of Law, dated April 20, 2012, are cited herein as follows: Leeward's
Findings of Fact — "LFOF"; Leeward's Conclusions of Law — "LCOL."

RCOL, does not mean that Leeward concedes the alleged fact or legal argument. Rather, the respective positions of the parties are evident from the witness statements, testimony, and exhibits and Leeward's intent is not to retry the case in the post-hearing submissions.

3.     Leeward objects to the AUA's submission of excerpts from the "unofficial" stenographic transcript of the evidentiary hearing with its Proposed Findings of Fact and Conclusions of Law. The Tribunal has already ruled by Resolution, dated March 13, 2012, that the Tribunal's notes are the official record of the evidentiary hearing. By cutting and pasting parts of the stenographic transcript into its post-hearing submission, the AUA has effectively circumvented the Tribunal's ruling by making parts of the unofficial transcript an official part of the record of this proceeding in the event the AUA appeals the Tribunal's decision through the judicial system.  If Leeward submits parts of the transcript in response to the AUA's submissions, then the "unofficial" stenographic record effectively becomes the "official" record of the evidentiary hearing – which is exactly what the AUA requested and the Tribunal denied by resolution, dated March 13, 2012. If Leeward does not submit excerpts from the "unofficial" stenographic transcript, then the self-serving and out-of-context excerpts that the AUA has submitted will stand un-rebutted to the disadvantage of Leeward should the AUA continue to litigate this dispute in the court system.  In the interest of fundamental fairness and equity, Leeward respectfully requests that the Tribunal strike the unofficial stenographic transcript from the AUA's post-hearing submissions so that the "unofficial" stenographic transcript does not become an official part of the record.

## REPLY FINDINGS OF FACT

a.    **Overhead and Profit on Changes of the Scope of Work**

4.    In RFOF ¶ 14, the AUA selectively emphasizes Contract §4.3 in concluding that the negotiated unit prices, inclusive of overhead and profit, are used to determine additions or deductions to the stipulated contract sum as a result of changes to the scope of work. The AUA ignores the last sentence of the quoted provision of Contract §4.3, which states that the use of unit prices in determining additions and deductions are "subject to the provisions of Article 7 of the General Conditions of the Contract." (LC 1, p. LC000007)

5.    Article 7.3.7 of the General Conditions reads in relevant part that the "amount of credit to be allowed by the Contractor to the Owner for a deletion or change which results in a net decrease in the contract sum shall be *actual net cost* as confirmed by the Architect. [emphasis added]." (LC1, p. LC000040)  According to the Official AIA Commentaries to the General Conditions (AIA A201-1997), the phrase "actual net costs" means that "[w]here a change results in a credit [to the Owner], the amount of the credit is determined by the cost that would have incurred in executing the change by the Contractor *without decreasing the Contractor's overhead and profit* [emphasis added]." (Official AIA Commentary, p. 58-59) (A copy of the relevant portions of the Official AIA Commentaries are submitted herewith as Appendix E.)[2]

6.    Contract §4.3, read in harmony with the General Conditions Article 7.3.7, provides that the unit rates and other prices in the Project Manual, excluding that part of the unit rate or price that constitutes the contractor's overhead and profit, shall be used to determine the value of changes to the scope of work that result in a decrease in the stipulated contract sum.

---

[2] Appendix A-D are submitted as part of Leeward's Proposed Findings of Facts and Conclusions of Law, dated April 20, 2012.

7.     The agreed overhead and profit on Leeward's work is 18% (LC 1, p. LC000072) and therefore, the AUA's credit on the changes to the scope of the contract work that resulted in a decrease in the stipulated contract sum is the unit rate or other price in the Project Manual for the items of work at issue, less 18% overhead and profit.

8.     While the AUA contends that Leeward never sought payment for overhead and profit on the deleted works (RFOF ¶ 57), its statement is patently false.   In a letter to the Architect, dated May 12, 2009, Leeward requested payment for overhead and profit on the doors, windows, and painting work removed from the Contract (LC 213, p. LC003732).   The AUA admits Leeward made this claim (RFOF ¶ 124).   Moreover, overhead and profit on deleted or omitted work is something the parties should have addressed in negotiating and processing change orders, except that the AUA and its Architect failed and refused to issue change orders as required by the contract documents.

**b.     The Stipulated Contract Sum is Subject to Additions and Deductions by Change Order**

9.     The AUA repeatedly cites to provisions in the Contract that state that the stipulated contract sum is "subject to additions and deductions," but in doing so, the AUA repeatedly deemphasizes the operative language "as provided in the Contract Documents." (*See e.g.,* RFOF ¶ 16, 18, and 19)   In RFOF ¶ 16, for example, the AUA selectively quotes Contract §4.1, stating that the contract sum payable to Leeward is "subject to additions and deductions," when in fact, §4.1 provides that the contract sum is "subject to additions and deductions as provided in the Contract Documents." (LC 1, p. LC000006)   After selectively and deceptively quoting Contract §4.1, the AUA then has the audacity to state "Leeward agrees" with the AUA's mischaracterization of the Contract and even mis-cites the Dickinson Witness Statement ¶ 21 in support of its position.   In fact, Mr. Dickinson states in paragraph 21 of his witness statement that

4

the fixed contract sum is "subject to additions and deduction **by change order** [emphasis added]."

10.     Similarly, the AUA misquotes Robert Winwood's summary of the contract terms (LC 84, p. LC003034) in claiming that Mr. Winwood "acknowledged that the total payment for the Measured Works was to be 'as built' and in accordance with the 'final measure'." (RFOF ¶ 23, 68)  What Mr. Winwood actually stated in his summary of the contract terms is that a "change order will be required when the final measure differs from the Contract BOQ." (LC 1, p. LC003034)

11.     Leeward repeatedly requested Nagesh, as the Project Architect, to issue change orders as provided in the contract documents with respect to additions, deletions, and modifications to the contract work, but Nagesh, on his own or at the direction of the AUA's representative, Lt. Colonel Antony ignored Leeward's request and refused to issue even a single change order notwithstanding literally dozens of changes to the scope of the contract work. (Dickinson Witness Statement, ¶ 47-48; Green Witness Statement, ¶ 33-34; Winwood Witness Statement, ¶ 17)

**c.     The AUA Unilaterally Changed the Contractually Agreed Method for Documenting Additions and Deductions to the Stipulated Sum Contract**

12.     The AUA contends that the "*parties* did not use formal change orders in the manner set forth in the Article 7 of the General Conditions to document 'additions and deductions' to the contract sum [emphasis added]." (RFOF   ¶ 40)  The AUA has misstated throughout its post-hearing submission that the parties mutually agreed to dispense with the formal change order process for documenting changes to the scope of work and the contract sum in favor of the informal "true-up" process that the AUA describes in its witness statements and post-hearing submission. (RFOF ¶ 16-34, 40-48; 64-65, 68-69, 91; RCOC ¶ 18-19, 29-44)

5

13.     The undisputed fact is that the AUA did not use formal or informal change orders in the manner set forth in Article 7 of the General Conditions.  The AUA submitted no evidence whatsoever establishing that this informal "true-up" process was a mutually agreed upon modification to the Contract in accordance with the requirements set forth in General Conditions §1.1.1 (LC 1, p. LC000025) or that Leeward knowingly, intentionally, and unequivocally waived the use of change orders in favor of the true-up process notwithstanding the "no waiver clause" in General Conditions §13.4.2 (LC1, p. 000051).  (*See* ¶ 41-45, herein)

14.     Both Lt. Colonel Antony and Nagesh acknowledged during the hearing that they had no prior experience with AIA contract documents, such as the Contract (AIA A101-1997) and the General Conditions (AIA A201-1997).  (Lt. Col. Antony Testimony, March 7, 2012; Nagesh Testimony, March 9, 2012)  The concept of change orders seemed completely foreign to them. (Dickinson Witness Statement, ¶ 47-48; Green Witness Statement, ¶ 33; Winwood Witness Statement, ¶ 17)  Nagesh and Lt. Colonel Antony ignored Leeward's repeated requests for change orders and they decided on their own, without Leeward's consent, to use the so called "true-up" process instead of contractually mandated change orders.  Even Peter McLeod, who assisted the parties in negotiating the Contract, acknowledged that the Contract requires the AUA/Architect to issue change orders for changes to the contract work. (McLeod Testimony, March 5, 2012)

15.     The AUA selectively quotes from Dickinson Witness Statement ¶ 47 as evidence that Leeward agreed to the "true-up" process.  (RFOF ¶ 41)  Read in its entirety, Dickinson Witness Statement ¶ 47 unequivocally demonstrates that the decision to use the informal "true-up" process instead of change orders was a decision that Lt. Colonel Antony and/or Nagesh made and forced upon Leeward.  Leeward did not agree to modify or waive the contract terms

6

with respect to change orders.  Rather, if it wanted to get paid for the contract work, it had no choice but to submit to the so-called "true-up" process in accordance with the "Golden Rule."[3]

16.     The AUA states in RFOF ¶ 45 that in reviewing the monthly requisitions, Nagesh would first reach agreement with Leeward and then review the revised payment requisition again with Lt. Colonel Antony to obtain the AUA's consent to the revised payment application.  What really happened is that after Nagesh and Leeward came to terms on the payment requisitions, Lt. Colonel Antony would make additional changes to the payment requisitions without Leeward's consent and without even discussing the changes with Leeward, and then Nagesh would rubber-stamp Lt. Colonel Antony's changes, rather than exercise his contractual obligation to objectively review and certify the monthly requisitions.  (LC 1, p. LC000032-34)  Leeward was at the mercy of Lt. Colonel Antony in terms of what it would be paid on a monthly basis. (Dickinson Witness Statement, ¶ 56-58; LC 73)

17.     In making changes to Leeward's monthly payment requisitions, Lt. Colonel Antony ignored the unit prices in the Contract and changed the quantities that Leeward and Nagesh had agreed upon even though Lt. Colonel Antony acknowledged during cross-examination that he has no training or experience as a quantities surveyor.  (Lt. Col. Antony Testimony, March 8, 2012)

18.     The same is true with regard to the October, 2009 Draft Final Account. (AUA 30) Throughout the RFOF, the AUA alleges that Leeward agreed to the October 2009 Draft Final Account as paid (AUA 22) and that it represents the AUA's final payment on the Project. (RFOF ¶ 94-97, 129-133)  Leeward complained about the AUA's last payment following its receipt. (AUA 33)  Leeward did not, as the AUA contends, limit its claim to those items listed in

---

[3] According to the Golden Rule, "he who has the gold, makes the rules." In this case, the AUA had the gold and it made the rules. If Leeward wanted to get paid, then it had no choice but to acquiesce to this so-called "true-up" process given the AUA's failure and refusal to issue change orders.

its October 26, 2009 correspondence. (AUA 33)  In fact, in its July 7, 2010 correspondence to

the AUA, Leeward indicated that its final application for payment would be submitted in due

course. (Green Witness Statement, ¶ 49-50; LC 200)

19.    Citing Robert Windwood's cross-examination testimony at the hearing, the

Respondent states at RFOF ¶ 106, that "Leeward understood that if a Claim was not asserted

properly, it *would* be waived [emphasis added]."  According to the AUA's excerpts from the

unofficial stenographic transcript of the hearing, Mr. Winwood testified as follows:

Page 242

14        Q. And it was important that you -- the
15    people administering the contract abide by the
16    21-day time period. Correct?
17        A. Absolutely. It's written in the contract.
18        Q. And if they didn't abide by it, Leeward
19    *might* waive their claim. Correct?
20        A. Either party *might*. As you say, it
21    applies to the contractors and the owner.
22        Q. Well, if we could turn back to 4.3.7.1,
23    that's referring to a contractor claim. Correct?
24        A. Yes.
25        Q. Okay. So my question is, it was important

Page 243
1    to remind people to assert their claims within 21
2    days, because if not, Leeward *might* waive that
3    claim.

(Winwood Transcript 242:14-243:4 [emphasis added])  The AUA has changed Mr. Winwood's

testimony from the mere possibility that a claim *might* be waived to an absolute certainty that the

claim *would* be waived.  Regardless, as explained in ¶ 29, herein, what constitutes a proper

notice of claim is a question of law for the Tribunal to decide, not a question of fact for a witness

to opine.

**d.     The AUA Has Not Demonstrated That Leeward Delayed The Project**

20.     In RFOF ¶ 117, the Respondent incorrectly states that "Leeward also failed to rebut at trial the evidence provided by AUA that Leeward was responsible for such delay." The only testimony the AUA has presented with respect to delays allegedly attributable to Leeward is in Lt. Colonel Antony's witness statement ¶ 90-91, where he claims that the "supporting columns Leeward had constructed for the concrete slab were defective and had to be dismantled and rebuilt." (Lt. Col. Antony Witness Statement ¶ 90) The AUA failed to present any evidence whatsoever identifying the nature and location of the alleged defect and whether the defect was a result of design errors, construction errors, weather, earthquake, or other factors attributable to the AUA, the Project Architect, the structural engineer, Nagesh, Lt. Colonel Antony, Leeward, or anyone else.   The AUA failed to submit any evidence establishing that the alleged, but unidentified defects delayed Leeward in the performance of its contract work.  The AUA failed to proffer any evidence establishing the length of the alleged delay resulting from the defect or whether the alleged defect had any impact upon Leeward's schedule.   Indeed, the Tribunal cannot determine from Lt. Colonel Antony's Witness Statement whether the delay, if any, resulting from the alleged defect lasted a minute, an hour, a day, a week, or a month, or whether the alleged defect had any impact upon Leeward's schedule at all.

21.     The only documentary evidence that the AUA cites in support of its claim that the alleged defect in the supporting columns delayed Leeward's performance of the contract work is "LC 31," which is an email, dated July 21, 2008, from Lt. Colonel Antony concerning the Project meeting held on July 19, 2008.  This email is as benign and uninformative as Lt. Colonel Antony's Witness Statement in that it contains only a vague reference to the "concrete strength at the column that had failed," without even using the word "defect" or blaming Leeward or anyone

9

else for the alleged failure. (LC 31, p. LC 002819, ¶ 6)  What Lt. Colonel Antony's email does show, however, is that as early as July 19, 2008, Leeward expressed concern about the lack of design information and details for "doors, windows, finishing items, MEP, etc.," and that Lt. Colonel Antony responded that "all outstanding items will be resolved during the progress of the project…" (LC 31, p. LC002819, ¶ 5; *see also* LC 31, p. LC002820, ¶ e)  As Nagesh testified during cross-examination, the AUA did not even start shopping for windows and doors until October 2008, and did not place the order for the windows and doors until "January, February, or March 2009," and the windows and doors were not delivered to the Project until July, 2009, approximately two months after the substantial completion date set forth in the Contract. (Nagesh Testimony, March 9, 2012; *see also* Dickinson Witness Statement, ¶ 81-86; LC 139-174)  The evidence also establishes that the flooring that Lt. Colonel Antony and the AUA ordered did not arrive at the Project until July, 2009, and that the AUA was still designing the MEP works in June, 2009, all of which occurred after the May 15, 2009,  the substantial completion date in the Contract, as extended by the AUA.  (Dickinson Witness Statement, ¶ 73-74, 87-90; Winwood Witness Statement, ¶ 19)

22.    In RFOF ¶ 118, the AUA continues to claim that Leeward was responsible for delays on the Project because it was not working at an adequate pace.  In support of this claim, the AUA offers the non-sensical contention that Leeward should have been producing at least EC $3,000,000.00 per month in work between November, 2008 and April, 2009.  Its only support for this contention is Lt. Colonel Antony's Witness Statement, ¶ 89.  However, the AUA's claim makes no sense in light of its own statement that the total value of all work Leeward performed under the Contract throughout the Project was less than EC $18,000,000.00.  (AUA 23)  Moreover, the Project's records are replete with examples of what slowed Leeward's pace on the

Project: The AUA's ineffective and incompetent administration of the Contract.

e.    **The AUA's Opening Statement and Off-Color Comments are Not Evidence**

23.    In RFOF ¶ 140-144, the AUA references the "detailed chart breaking down the components of Leeward's claim" that AUA's lawyer presented to the Tribunal during his opening statement and asserts that "Leeward did not dispute this breakdown at trial." Opening statements are not evidence and do not prove anything. Leeward had absolutely no obligation during the hearing or in its post-hearing submissions to respond to counsel's opening statement because AUA's counsel was not a witness and his opening statement has no probative value whatsoever.

24.    The AUA states in its conclusions of law that at the time Leeward submitted the Draft Final Account in October 2009, "Leeward did not seek to be paid for the work it did not perform, nor did Leeward assert that it was entitled to such payment on the theory that AUA failed to comply with the formalities of Article 7. It was not until December 2010, (fourteen months later *and after engaging counsel*) that Leeward belatedly sought to be paid for work it did not perform and to enforce the contractual formalities through change orders." (RCOL ¶ 41 [emphasis added]) The obvious implication is that Leeward revised its claim upward on the advice of counsel. The AUA's counsel made similar comments in his opening statement and at other times during the hearing, and quite frankly, Leeward and its counsel were as offended then as they are now by these unwarranted, irrelevant and inflammatory remarks. As the AUA's counsel ought to know, Leeward cannot respond to this accusation without violating the attorney-client privilege. If AUA's counsel had made the comment in his opening statement before a jury in a United Stated District Court, there is a good chance that the Court would have declared a mistrial and sanctioned counsel for misconduct.

11

25.     The bottom line is that Leeward has never demanded payment for work it did not perform; rather, Leeward has requested payment of the stipulated contract sum "subject to additions and deductions as provided in the Contract documents." (LC 1, p. LC000006) Change orders, as provided in Article 7 of the General Conditions, Section 1200, Part I, Section 1.7 of the Specifications, and other provisions in the Contract Documents (LC 1, p. LC000039 - LC000040, LC000113-LC000118), are the only agreed upon method in the Contract for increasing or decreasing the stipulated contract sum, and since the AUA and its Project Architect knowingly and intentionally failed and refused to issue change orders, Leeward has every right to the payment of the stipulated contract sum.   Moreover, Leeward is not required to forfeit upward adjustments to the contract price as a result of extra work that Leeward performed at the AUA's request simply because the AUA and the Project Architect refused to issue change orders as required under the Contract.   Nor should Leeward be required to accept downward adjustments in the contract price as a result of modifications and deletions to the contract work without a formal change order that properly credits Leeward for overhead and profit on deleted works as required under Article 7.3.7 of the General Conditions, given the undisputed fact that the AUA is the party that breached the Contract by failing to issue change orders.   Indeed, to do so would effectively punish Leeward for the AUA's errors and omissions.[4]

f.     **Leeward Accounted for All Deleted Work in its Damage Calculation**

26.     At RFOF ¶ 60, the AUA complains that Leeward failed to completely reduce the

---

[4] An argument could be made that as a result of the AUA's failure and refusal to issue formal change orders in accordance with the Contract documents, the stipulated Contract Sum should not be adjusted upward or downward from the original fixed price in the amount of US $10,162,599.61/EC $27,436,824.00.   If the Tribunal accepts this argument, then Leeward is entitled to the unadjusted Contract price, less payments received, including interest on the balance due, as follows:

| | | |
|---|---|---|
| | US $10,162,599.61/ EC $27,436,824.00 | (original contract sum, LFOF ¶ 41) |
| - | US $  8,493,337.37/ EC $22,930,176.49 | (contract payments, LFOF ¶ 60, 62) |
| | US $  1,669,262.24/ EC $  4,506,647.51 | |
| + | US $     431,226.09/ EC $  1,164,217.30 | (interest @ 10%/yr. from October 23, 2009 |
| = | US $  2,100,488.33/ EC $  5,670,864.81 | through May 31, 2012) |

contract sum by all deleted work by omitting the flooring work. The Tribunal should note that Leeward addressed this oversight in its post-hearing submissions at LFOF ¶ 130, 131, and 133. Leeward has included deductions for all deleted work, including flooring work. AUA 26 is a compilation of deleted work on the Project. The total from that exhibit, US $1,358,520.15/EC $3,667,711.00, is the amount deducted for deleted work in each of Leeward's general damages calculations.

g.   **Leeward's Claim For The Balance Due And Owing on The Additional Works Contracts is Not a New Claim**

27.   At RFOF ¶ 139, the AUA claims that Leeward did not "reveal" that it was seeking payment for the balance due and owing on the additional works contracts until it filed its Witness Statements in this matter. However, Paragraph "23" of Leeward's Amended Demand for Arbitration contained a summary of Leeward's claim. The seventh line of the summary referred to "Additional Work (Revised Statement of Claim and BS 258-282)" and set forth the amount due and owing. Paragraph "27" of the Amended Demand for Arbitration also defined the phrase "Additional Work" as follows:

> "Additional Work" refers to work that was included in the original contract, that the AUA removed from the Contract then awarded the work back to Leeward in a separate contract. A summary of the Contract work that the AUA removed from the Contract and then awarded back to Leeward in a separate contract is set forth at Revised Statement of Claim, annexed hereto, and at BS 258-282.

In addition, annexed to the Amended Demand for Arbitration was a document entitled "Revised Statement of Claim." The fourth page of that document laid out Leeward's claim for "Additional Work" and specifically references the contracts for additional work set forth at BS 258-282 of that document. The dollar amount of that part of the claim correlated with the amount as set

13

forth in Paragraph "23" of the Amended Demand for Arbitration.  Thus, Leeward has made clear that its claim included the unpaid balance on the additional works contracts since the beginning of this proceeding.

## REPLY CONCLUSIONS OF LAW

a.     **Leeward Complied With The Notice of Claim Provisions in The Contract And Timely Commenced This Arbitration**

28.     In RCOL ¶ 1-28, the AUA argues that Leeward's claims herein are barred because it did not comply with the notice of claim provision in the Contract and it failed to timely commence this arbitration.  The AUA is wrong on both counts.  Leeward has satisfied the requirements of the notice of claim provision and this proceeding was timely commenced.

i.     **Leeward Complied With The Contract's Notice of Claim Provision**

29.     RCOL ¶ 8-19 are devoted to the AUA's argument that Leeward did not comply with the Contract's notice of claim provision.  Initially, we note that the interpretation of the Contract is a question of law, which the Contract specifies must be decided under Antigua law. (LC1, p. LC000051) Conversely, whether the notice of claim provision, as interpreted under Antiguan law, was properly followed is a question of fact, to be decided by the Tribunal.  While the Tribunal must interpret this provision in accordance with Antigua law, the AUA has curiously neglected to cite Antiguan law in support of its argument.  Moreover, Mr. Winwood's testimony in this matter was solely factual in nature.  He was not an expert witness and his testimony, however misconstrued by the AUA, is not dispositive. (*See* ¶ 19 herein)

30.     Instead, the AUA relies on *Kingsley Arms v. Sano Rubin*, 16 A.D.3d 813, 814 (N.Y. App. Div. 2005).  However, in addition to being New York law and not binding on the Tribunal, the AUA's description of the holding in *Kingsley* is extremely misleading.  In *Kingsley*, the court held that the failure to comply with the notice provision was a waiver of

14

claim because the Plaintiff, a subcontractor suing for breach of contract, could not produce any evidence, that the general contractor had been provided written notice of the subcontractor's claims. The only evidence of a timely claim was the subcontractor's self-serving assertion that it had "orally" notified the general contractor of its claims. So too in *American Nat'l Elec. Corp. v. Poythress Comm. Contractors Inc.*, 604 S.E.2d 315, 317 (N.C. Ct. App. 2004), a North Carolina case on which the AUA relies. In *American Nat'l Elec. Corp.*, the contractor provided oral notice of a claim and then followed it up with written notice months later. *See Id.* In the case at hand, Leeward provided the AUA with written notices as claims arose during the Project. *See* LC 201-222. Therefore, this case is clearly distinguishable.

31. In relying on inapplicable precedent to argue that a "formal notice" is required under the Contract (RCOL ¶ 13), the AUA ignores the Official AIA Commentaries to the General Conditions (AIA A201-1997), which make clear that a notice of claim under General Conditions §4.3.2 *need not* contain all the information pertaining to the claim. *See* Official AIA Commentary, page 38 (Appendix E). The purpose is simply to put the other side on notice. In so doing, the AUA ignores the 22 exhibits Leeward admitted into evidence all of which constitute notices of claim because they gave the AUA notice of a variety of issues encountered on the Project contemporaneously with the occurrence of those events. (Green Witness Statement, ¶ 46; LC 201-222) This includes Leeward's claim for additional Preliminaries. As the AUA admits, Leeward had been sending it emails since January 2009 regarding its need for additional Preliminaries. (RCOL ¶ 15) Thus, Leeward put the AUA on notice of its claim for additional Preliminaries contemporaneously with the occurrence giving rise to the claim.

32. LC 206 is an example of the AUA's knowledge of problems on the Project. LC 206 is a chain of emails in which Leeward notified the AUA about issues impacting the Project's

progress such as concrete supply issues, customs problems, and delivery of necessary materials like windows and doors.  These items were not within Leeward's control, but adversely affected its work on the Project. (LC 206)  Even after LC 206 was written, Leeward continued to notify the AUA of the same issues (LC 211) as the Project continued and the AUA failed to resolve the issues.

33.     The AUA also argues that Leeward's October 26, 2009 correspondence was its only notice of claim and as such, it is limited by what was contained in that correspondence. (RCOL ¶11)   However, Official AIA Commentaries to the General Conditions indicate otherwise. *See* Official AIA Commentary, page 38 (Appendix E).   Under the Contract, the October 26, 2009 communication served as a notice of the fact that Leeward had claims arising from the payment of the Draft Final Account, regardless of whether they were specifically identified or not.  In addition, during the pendency of the 21 day time period after the payment of the Draft Final Account, Leeward and the AUA exchanged multiple emails where Leeward notified the AUA and the Architect's representative of other claims that it had, including those arising as a result of the AUA's payment of the Draft Final Account.  (AUA 64, 65, 66)

34.     The timing of Leeward's December 2010 claim does not alter the fact that the AUA was already on notice of the issues on the Project by virtues of Leeward's timely notices of claim.  Leeward's December 2010 claim document amplified previous, timely notices.  Nothing in the Contract prohibits an amplification of notice, even after the time limit for the notice has passed.

ii.     **The Arbitration Was Timely Commenced**

35.     In RCOL ¶ 20-28, the AUA argues that Leeward failed to commence this arbitration within a "reasonable" period of time.  Section 4.6.3 of the General Conditions states:

> [a] demand for arbitration shall be made within the time limits specified in Subparagraphs 4.4.6 and 4.6.1 as applicable, and in other cases within a reasonable time after the Claim has arisen, and **in no event shall it be made after the date when institution of legal or equitable proceedings based on such Claim would be barred by the applicable statute of limitations** as determined pursuant to Paragraph 13.7.

(LC 1, p. LC 000036, emphasis added).  Neither the Contract nor the Commentaries define the term "reasonable."  However, according to the Contract's terms, the demand for arbitration could not have been made after the expiration of the applicable statute of limitations.  According to the Antigua and Barbuda Limitation Act 1997, §§7 and 33, the statute of limitations is six years.  (A copy of The Antigua and Barbuda Limitation Act 1997 is submitted herewith as Appendix F.)  Thus, Leeward's demand for arbitration is timely under the terms of the Contract since it was made within six years of the AUA's breach.

36.     In contrast, the AUA claims that a "reasonable" period of time to commence this arbitration was six months. *See* RCOL ¶ 22.  As support for its argument, the AUA selectively and disingenuously quotes the Contract language regarding the demand for arbitration to conveniently omit the language setting the end limit for the demand to be filed at the expiration of the applicable statute of limitations. *See* RCOL ¶ 21.  When the clause is read as a whole, the AUA's argument holds no merit as the applicable statute of limitations for breach of contract under Antigua law is six years. *See* Antigua and Barbuda Limitation Act 1997, §§7, 33 (Appendix F).

37.     The AUA's conclusion that a "reasonable" time to commence the arbitration would be six months is inconceivable when, without the arbitration clause, Leeward would have had six years to commence a litigation for the same claim.  Moreover, were Leeward to follow the procedure the AUA advocates as proper, Leeward would have had to commence multiple

17

arbitrations throughout the course of the Contract. This would have been extremely burdensome and would have affected the critical path of the work. It was more prudent and, indeed, proper under the Contract, to wait to commence arbitration until Leeward had completed the Project and could adjudicate all of its timely claims against the AUA within a single arbitration. The AUA was not prejudiced in any way by the timing of Leeward's commencement of arbitration. Indeed, the AUA was aided by the fact that all timely claims were adjudicated under a single arbitration. As a result, the timing of Leeward's commencement of arbitration was certainly reasonable.

38.     In addition, the AUA's citations in support of its contention that six months is the "reasonable" time limit to commence arbitration (RCOL ¶ 22) should not be considered by the Tribunal for two reasons. First, the cases are not binding precedent within this Arbitration. The Contract provides that Antigua law governs the interpretation of the Contract, including the arbitration provision. LC1, p. LC000051. None of the cases the AUA cites are based on Antigua law.

39.     Second and most importantly, the cases the AUA cites are easily distinguished from the present case. In *Bickerstaff v. Frazier*, 232 So.2d 190, 191 (Fla. Dist. Ct. App. 1st 1970), a breach of contract lawsuit was filed by the complaining party prior to filing a demand for arbitration. As a result of the five (5) month delay created by filing of the lawsuit, the court found the demand for arbitration to be untimely.

40.     In *Lyons v. Krathen*, 368 So.2d 906, 908 (Fla. Dist. Ct. App. 3d 1979), the claim at issue was submitted to the architect, who made a decision on the claim, and the subject demand for arbitration was filed four (4) months **after** the architect's decision. In *Riggi v. Wade Lupe Constr. Co.*, 176 A.D.2d 1177 (App. Div. 1991), the court specifically found the owner's

18 .

argument that the demand for arbitration was untimely to be "meritless" due to the fact that "the architect's decision [did] not state '(1) that the decision is final but subject to appeal, and (2) that any demand for arbitration must be made within thirty days after the date on which the party making the demand receives the written decision.'" Riggi, *supra*, at 1179.  In the instant matter, Nagesh, the Project Architect, never made a decision on many of Leeward's claims.  Where Nagesh arguably made a decision, the decision did not state, as required by the Contract that (1) the decision was final and subject to appeal, and (2) a demand for arbitration must be made within 30 days. (*See* LC1, p. LC 000036)  Therefore, Leeward was certainly reasonable to commence its arbitration when it did.

b.     **Leeward Never Waived its Contractual Right to Change Orders to Affect Additions and Deductions to the Contract Price**

41.    The AUA argues at RCOL ¶ 29-44 that the parties waived the use of change orders as provided in the Contract and opted instead to use monthly requisitions to document additions and deductions to the contract sum.  The AUA's argument conflicts with the plain and unequivocal language in the Contract.  General Condition §13.4.2 reads as follows:

> No action or failure to act by the Owner, Architect or Contractor shall constitute a waiver of a right or duty afforded them under the Contract, nor shall such action or failure to act constitute approval of or acquiescence in a breach thereunder, except as may be specifically agreed in writing.

(LC 1, p. LC000051)  Similarly, General Conditions §1.1.1 provides that the Contract may not be modified except by (a) written amendment to the Contract signed by both parties, (b) a Change Order, (c) a Construction Change Directive or (d) a written order for a minor change in the Work issued by the Architect.  (LC 1, p. LC000025)  Thus, under the terms of the Contract, Leeward could not have waived or modified its contractual right to receive change orders for additions, modifications, or deletions to the Contract work — particularly when the change results

19

in an addition or deductions to the stipulated Contract price -- unless the waiver is specifically

agreed to in writing (General Conditions §13.4.2) or the modification is in a written amendment

to the Contract that is signed by both parties (General Conditions §1.1.1).

    42.    With two exceptions, none of the authorities that the AUA cites in support of its

waiver argument address the effects of the no waiver/no modification clause in the Contract.

The two exceptions are the AUA's citation to the treatises Wilken and Villiers: The Law of

Waiver, Variation and Estoppel 2d ("Wilken"), §19.13 and Chitty on Contracts ("Chitty"), §22-

045.  (The relevant portion of Chitty and Willken are set forth in the Proposed Findings of Fact

and Conclusions of Law at Tabs 26 and 27 respectively.)  Specifically, Wilken, §19.13 states that

"[i]n considering waiver... care must be taken as it is common for standard form construction

contracts to contain express provisions as to when and in what circumstances a party will be

taken to have waived its rights."  Chitty, §22-040 is even more to the point:

> **Contracting out of waiver.** It would appear that there is no
> general principle of law that parties to a contract cannot restrict the
> operation of the doctrine of waiver by the terms of their contract.

The AUA does not address the impact of the no modification/no waiver clauses in the Contract

or their effect upon the AUA's waiver argument.  The obvious reason for the AUA's omission is

that the no modification/no waiver provisions in the Contract do not support the AUA's theory of

the case.

    43.    In many of the cases that the AUA cites in support of its waiver argument, the

Court found that the owner of the project waived the right to insist upon a change order as a

prerequisite for the payment of extra work, because the owner was responsible, under the

contract, for issuing change orders for the extra work that the owner requested and accepted.

*See, e.g., Moore Constr. Co. Inc. v. Clarksville Dep't of Elec.,* 707 S.W.2d 1 (Tenn. Ct. App.

1985); *Circle Y Constr. Inc. v. WRH Realty Serv.*, 721 F. Supp. 1272 (N.D. Ga. 2010).  In other words, having failed to issue a change order for extra work that it requested and accepted, the owner cannot deny payment for the extra work because of its failure to issue a change order.  If these cases are at all relevant, then it is because they show that the AUA waived the right to withhold payment for extra work because of its own failure to issue change orders.  The cases do not support the AUA's waiver argument with respect to Leeward.

44.    Under the cases and treatises that the Respondent cites, a person can only waive contractual right by words or conduct that are knowing, intentional, and unequivocal.  *See generally, Moore Constr. Co. Inc., supra; Bremer Handelsgesellschaft v. C. Mackprang Jr.,* 1 Lloyd's Rep 221 (Court of Appeal 1979); *Circle Y Constr. Inc., supra.*; Wilken, §3.15.  Here, the overwhelming evidence shows that Leeward repeatedly demanded change orders as provided in the Contract, but the AUA and its Architect repeatedly ignored Leeward's requests.  (Dickinson Witness Statement, ¶ 47-48; Green Witness Statement, ¶ 33-34; Winwood Witness Statement, ¶ 17)  Leeward's clear intent was not to waive the right to change orders, but to enforce the right to change orders.

45.    Most importantly, the AUA failed to raise a defense of waiver in its Answering Statement and Counterclaim to the Amended Demand for Arbitration, dated November 30, 2011, and we respectfully submit that the AUA should not be allowed to raise a waiver defense for the very first time after the evidentiary hearing.

c.    **Leeward is Entitled to Its Unpaid Change Orders and Unpaid Claims and Has Not Double-Counted**

46.    In RCOL ¶45-47, AUA argues that Leeward is not entitled to recover the amount of its unpaid change orders because the amounts were not listed in its October 26, 2009 correspondence.  Further, in RCOL ¶61-62 the AUA claims that Leeward is not entitled to

21

recover for its unpaid claims, including the Whitsuntide Holiday because the AUA paid and/or denied in the Draft Final Account. As Leeward has already extensively explained in ¶ 18 and 33 herein as well as in its Proposed Findings of Fact and Conclusions of Law, Leeward's claims are not limited to the items contained in its October 26, 2009 correspondence or by how the AUA chose to fashion the last payment paid on the Project. Throughout this proceeding, Leeward has continuously disputed the method by which the AUA calculated its last payment on the Project. Regardless of how the AUA chooses to characterize it, Leeward has not been paid for these items. As such, Leeward is entitled to recover for its unpaid change orders and unpaid claims as asserted herein, including the Whitsuntide Holiday.

47.     In RCOL ¶ 48-49, AUA claims that Leeward has somehow double-counted in its claim for damages.    Without explanation for its conclusion, AUA claims that the EC $1,000,000.00 contingency in the Contract was drawn down in full and Leeward "was actually paid an additional EC $1,262,166.51 for these contingent costs." (RCOL ¶ 48)  The AUA offers no support for this conclusion. (RCOL ¶ 76) Leeward has not double-counted in its damages calculation and is entitled to all that it has requested.

**d.     Leeward is Entitled to Additional Preliminaries as a Result of Project Delays**

48.     The AUA contends in RCOL ¶ 50-61 that Leeward is not entitled to additional Preliminaries for the nineteen week period of running from the May 15, 2009 substantial completion date in the Contract, as extended by the AUA, through the completion of the Project on or about September 18, 2009, because Leeward did not offer expert testimony at trial to establish "drawing by drawing, beam by beam, column by column, gutter by gutter" how a specific event delayed a particular item of work.  (RCOL ¶ 54)  The case authorities that the AUA cites in support of its position are easily distinguished from the present controversy in that

22

none of the cases involved an arbitration where the tribunal consisted of professional engineers and lawyers who are experts in the field and fully familiar with claims for extension of time. Indeed, one of the reasons that parties to a construction contract agree to arbitrate disputes through the American Arbitration Association ("AAA") pursuant to its Construction Industry Rules is because of the AAA's ability to assign arbitrators who have extensive knowledge and experience as arbitrators and as practicing professionals in the construction industry with respect to construction related issues and disputes such as claims for extension of time. Parties to an arbitration should not be compelled to spend a hundred thousand dollars or more on expert witnesses to explain to the arbitrators what they already know and understand and are capable of analyzing on their own. This is particularly true in the present case where Leeward's claim for additional Preliminaries as a result of project delays is relatively small. Indeed, under Rule 702 of the Federal Rules of Evidence, expert testimony is neither required not admissible where the trior of fact is capable of comprehending the evidence and drawing the correct conclusions. *See Pfeifer v. Lewis County*, 308 F.Supp.2d 88, 95-96 (N.D.N.Y. 2004) (Appendix G); F.R.E. Rule 702 (text of Rule 702 is quoted in *Pfeifer*, 308 F.Supp.2d at 96)

49.   In addition, the case authorities that the AUA cites involve claims that were significantly larger and more complicated than the claims at issue in the present case. *See, e.g., McAlpine Humberoak Ltd. V. McDermott Int'l Inc.*, 58 Build LR 1 (Eng. Ct. of App. 1992) (Plaintiff made delay claim with respect to construction of an offshore oil rig for $5,740,688.98/£3,548,848, and alleged that the revision of more than 60 drawings, the failure of defendants to promptly answer over 45 technical queries, and the issuance of over 83 changes orders caused their delay. The trial lasted 92 days and over 37,000 pages of documents were entered into evidence.). Leeward respectfully submits that expert testimony is not required to

23

establish its claim for additional Preliminaries when the AUA, as the owner of the Project failed to provide the design details, information, and specifications that the contractor required to substantially complete the Project on time until several weeks and months after the Substantial Completion date. (Dickinson Witness Statement, ¶ 66-77; Winwood Witness Statement, ¶ 23-26)

**e.     The AUA is Not Entitled to Liquidated Damages**

50.     The AUA claims liquidated damages in the amount US $117,000.00. (RCOL ¶ 63-67)   The AUA is not entitled to liquidated damages because the credible evidence overwhelmingly establishes that the AUA was responsible for the project delays.

51.     In addition, the AUA failed to establish at the hearing or even allege compliance with the notice of claim provisions in Article 4.3.2 of the Contract, which apply equally to the AUA. (LC1, p. 000034)

52.     The AUA also failed to meet its own standards for establishing delay claims (RCOL ¶ 50-62)  by the use of expert testimony to link cause and effect on a drawing by drawing, beam by beam, column by column and gutter by gutter basis.

**f.     Leeward is Entitled to Retainage**

53.     The AUA contends that Leeward is not yet entitled to the Contract retainage in the amount of US $218,566.74/EC $590,083.00 because Leeward has yet to comply with General Conditions §9.10.2. (RCOL ¶ 981-83) The AUA is wrong for two reasons.

54.     First, the obligations under General Conditions §9.10.2 do not even come into play until the Architect certifies the project as substantially complete and issues a certificate of substantial completion as required under General Conditions §9.8.4. (LC 1, p. LC000044) As of this date, the AUA's Architect has yet to issue a Certificate of Substantial Completion

24

notwithstanding Leeward's repeated demands.  (Dickinson Witness Statement, ¶ 63-64; Green Witness Statement, ¶ 40, 50)

55.     Second, the AUA presented no evidence establishing that it has ever requested Leeward to submit documents identified in General Conditions §9.10.2 or that they are even applicable to this particular Project.  For example, Antigua does not appear to have a lien law that would encumber the AUA's property in the event Leeward failed to pay a indebtedness connected with the work; nothing in the Contract requires Leeward to maintain insurance after final payment; and there was no surety with respect to Leeward's work.  If the AUA had concerns about the applicability of General Conditions §9.10.2, then Lt. Colonel Antony or Nagesh could have simply sent Leeward an email or walked the short distance across the Project site to Leeward's office and discuss the close out documentation.  They did not because the AUA had no intent of paying Leeward the Contract retainage.

**g.     Leeward is Entitled to Overhead and Profit for the Doors and Windows, Painting and Flooring Work deleted from the Contract**

56.     In RCOL ¶ 68-71 of the RCOL, the AUA argues that Leeward is not entitled to overhead and profit on the painting work or the doors and windows works deleted from the Contract.  Despite the AUA's contention that the deleted flooring work should be included in Leeward's calculation (RFDF ¶ 60), it has not addressed the flooring work in its argument concerning Leeward's entitlement to overhead and profit for deleted work.  Leeward regards this omission as the AUA's admission that Leeward is entitled to overhead and profit on the deleted flooring work pursuant to Section 7.3.7 of the General Conditions.

57.     The AUA claims that Leeward is not entitled to overhead and profit on the doors and windows work deleted from the scope of its work because these items were provisional sums.  However, Section 7.3.7 of the General Conditions provides that Leeward will be

compensated for its overhead and profit on items deleted from the scope of work. (LC 1, p. LC 000040)  The doors and window items deleted from the BOQ were for labor to be provided for the installation of the doors and windows.  The items were added into the fixed price sum for the Contract.  Consequently, if they are deducted from the fixed price sum of the Contract, Leeward should be awarded overhead and profit on the items.

58.     The fact that Leeward installed the doors and windows under a separate additional works contract does not alter this conclusion.  By the time the installation of the doors and windows was deleted from Leeward's scope of work (April 21, 2009), it had already expended considerable resources on the Project.  Thus, it was entitled to its overhead and profit.  Moreover, Leeward had to competitively bid the additional works contract for the installation of the doors and windows with no guarantee of being awarded the work.  (Dickinson Testimony, March 5, 2012) And, as Lt. Col. Antony acknowledged during cross-examination, he has no idea whether Leeward's bid included overheard and profit at the 18% rate in the Contract or at a significantly lower rate to stay competitive.  (Lt. Col. Antony Testimony, March 7, 2012) .

59.     The AUA also claims that "equity militates against awarding Leeward overhead and profit for the Painting Work" because the AUA did Leeward a favor by deleting the work from Leeward's scope of work thereby allowing Leeward to reach substantial completion sooner.  As Leeward has demonstrated throughout this matter, the delays on the Project were the result of several factors none of which were Leeward's responsibility, including but not limited to the AUA's representatives complete inability to administer the Contract and coordinate the work of various trades on the Project.  The AUA was not doing Leeward a favor by deleting the painting work, it was trying to save money on Preliminaries. (Dickinson Witness Statement, ¶ 78-79; Winwood Witness Statement, ¶ 28-29)  In addition to being a contractual requirement, equity

26

militates that Leeward be awarded overhead and profit on all deleted work and omitted work on the Project.

**h.    The Additional Works Contracts are Subject to Arbitration**

60.    Throughout the course of the Project, Leeward was awarded additional works contracts for work that was deleted from the Contract's scope as well as additional work required for the Project.   These additional works contracts arose out of and related to the Contract. (Dickinson Witness Statement, ¶ 78-90; LC 228-241)

61.    Section 4.6.1 of the General Conditions to the Contract provides that that parties agree to submit to arbitration "[a]ny Claim arising out of or related to the Contract…" (LC 1, p. LC 000036)  The additional works contracts arise out of and related to the Contract in that the additional works were initially part of the Contract, including design documents, specifications, and project schedule, that the AUA subsequently removed from the Contract and given back to Leeward under separate contracts.

62.    In addition, Section 6.1.1 of the General Conditions to the Contract provides that "[t]he Owner reserves the right … to award separate contracts in connection with other portions of the Project or other construction or operations on the site under Conditions of the Contract identical or substantially similar to these [General Conditions]…" (LC 1, p. LC 000038)  While the additional works contracts may not have contained separate arbitration provisions, they are included within Sections 4.6.1 and 6.1.1 of the General Conditions to the Contract and as such, are subject to arbitration herein.

63.    Should the Tribunal decide that the additional works contracts are not subject to arbitration, the claim for the amount due and owing on those contracts is easily removable from Leeward's total claim.  As the Tribunal will note at LCOL ¶ 162-164, Leeward has separated the

27

amount due on the additional works contracts from the other damages demanded herein.  The

Tribunal can easily strike this amount should it decide that the balance due and owing on the

additional works contracts is not subject to arbitration herein.

**i.      If Leeward Prevails in this Arbitration, then it is Entitled Under the Contract to
         Interest on Payments Due and Unpaid Pursuant to the Contract Documents from
         the Date Payment is Due at the Prevailing Legal Rate in Antigua**

68.      In RCOL ¶ 89, n. 9, the AUA complains that Leeward failed to offer any factual

evidence at trial as to the amount of interest due and/or the applicable legal rate and that Leeward

did not raise the applicable interest rate as an issue until the pre-hearing conference on March 1,

2012.  The AUA demands a continuation of the evidentiary hearing and even more litigation to

determine the legal rate of interest in Antigua in the event the Tribunal rules in favor of Leeward.

69.      Although Leeward was prepared to offer documentary evidence as to the

prevailing legal rate of interest in Antigua during the relevant time periods, the parties agreed to

address this issue in their respective post hearing submissions.  A factual hearing is not required

to establish the prevailing legal rate in Antigua because the information is widely and publicly

available on the Internet to anyone who bothers to look.  We respectfully request the Tribunal to

take the equivalent of "judicial notice" of the legal rate of interest in accordance with Antiguan

law, as set forth in the LCOL ¶ 137-145 and Appendix B.

70.      Contrary to the AUA's assertion, Leeward did not wait until the prehearing

conference to raise the issue of the appropriate rate of interest on payments due and owing under

the contract. "Claim Two" in Leeward's Amended Demand for Arbitration is dedicated to the

recovery of interest on the unpaid contract balance at the "legal rate" in Antigua from the date

that the payment is due to the date the payment is made as provided in the Contract.  Leeward

had no obligation to share its research with the AUA as to what constitutes the "legal rate."

28

Dated:  May 4, 2012

LEWIS & GREER, P.C.
510 Haight Avenue, Suite 202
Poughkeepsie, New York  12603
*Counsel for Claimant,*
*Leeward Construction Company, Ltd.*

By: _____
      J. Scott Greer, Esq.
      Veronica A. McMillan, Esq.

29