AMERICAN ARBITRATION ASSOCIATION
CONSTRUCTION INDUSTRY ARBITRATION RULES

| | |
|---|---|
| LEEWARD CONSTRUCTION COMPANY, Ltd.<br><br>Claimant,<br><br>v.<br><br>AMERICAN UNIVERSITY OF ANTIGUA COLLEGE OF MEDICINE C/O GCLR, LLC,<br><br>Respondent. | Case No. 50 110 T 00075 11 |

---

**ANSWERING STATEMENT AND COUNTERCLAIM OF AMERICAN UNIVERSITY IN ANTIGUA ("AUA") TO THE AMENDED DEMAND FOR ARBITRATION SUBMITTED BY LEEWARD CONSTRUCTION COMPANY, LTD. ("LEEWARD")**

---

SILLS CUMMIS & GROSS, P.C.
Mark S. Olinsky, Esq.
Jonathan S. Jemison, Esq.
30 Rockefeller Plaza
New York, New York 10112
(212) 643-7000
*Attorneys for Respondent*

## PRELIMINARY STATEMENT

1.     Leeward and AUA entered into a contract for certain Work (defined below) to be performed in connection with the construction of AUA's Medical School campus in Antigua.  As is common in construction contracts, the scope of that Work changed during the course of the project, with some work being added and other work being altered or deleted.  As the Work changed, the parties jointly measured and reached agreement on the amounts due by adjusting for what had actually been built and what had not.

2.     When Leeward completed its Work in October 2009 and submitted its Draft Final Account, the parties conducted a final measurement of what had actually been constructed and -- with three exceptions -- came to terms as to how much in total Leeward was entitled to be paid for the Work.  The three exceptions amounted to only EC $1,072,083.88 for:  additional preliminaries, time lost for the Whitsuntide Holiday, and a claim for overhead and profit on certain work.  Leeward threatened to bring a timely arbitration on these three claims, but did not.

3.     Fourteen months later, in December 2010, Leeward suddenly claimed to be entitled to EC $13,161,136.88, and then commenced this arbitration in February 2011 for that precise amount.  Last month, under order of the Tribunal to specify its claim, Leeward dropped its EC $13,161,136.88 claim to EC $6,800,572.28.

4.     Now, more than two years after the parties measured what was actually built when the project was complete in October 2009, the only matters genuinely in dispute remain the three that were in dispute back then (though Leeward has more than doubled the amount claimed on those three).  Those three claims are no more valid now than they were then.  But, as set forth at length below, two-thirds of Leeward's current EC $6.8 million claim -- EC $4,282,288.24 --

simply constitutes an effort to be paid for Work that was not in fact performed because of changes to the scope that occurred during the contract period.

## BACKGROUND FACTS

### A.    The Construction Project

5.    In May 2008, AUA began construction of a medical school in Antigua.  The initial project was limited in scope and Leeward had been retained to perform certain of that work.

6.    In the middle of 2008, AUA expanded the scope of the project.  Revised architectural drawings were prepared and AUA reached a preliminary agreement with Leeward to provide the primary construction services for the expanded work.

7.    The revised project ultimately involved the construction of:  (i) a Classroom and Laboratory Building; (ii) a Library Block; (iii) a Service Block; and (iv) an Amphitheater (the "Project").  Leeward was retained to construct the structural works of these four campus buildings as set forth in the Contract Documents (defined herein) (the "Work").

8.    Sundaram Architects (the "Architect") was retained by AUA to prepare the drawings and oversee the construction of the campus.  A.S. Nagesh served as the Architect's representative for the majority of the Project.

9.    From the middle of 2008, Lt. Col. Roche Antony served as AUA's representative on site.  He also signed the Contract Documents on AUA's behalf.  Leeward's primary representatives on site were Neil Dickinson (who also signed the Contract Documents) and Paul Webster.  The Contract Documents are attached hereto as AUA Exhibit 1.

### B.    The Negotiation of the Contract

10.    During the summer of 2008, AUA and Leeward negotiated the terms of their contract governing the Project.  In connection with that effort, the parties retained the services of

Peter McLeod of DHP Associates. Mr. McLeod assisted the parties in drafting the Contract Documents and negotiating their key terms.

11.     The parties negotiated the length of the project and ultimately agreed upon a 52 week construction period, commencing as of May 1, 2008 and ending on April 30, 2009 (the "Contract Time"). While Leeward initially had sought a longer construction schedule, it ultimately agreed that the 52 week schedule was appropriate after AUA removed plumbing and electrical works from the scope of Leeward's work.

12.     Leeward agreed that the time limits in the Contract Documents "are of the essence of the Contract." General Conditions (defined herein) § 8.2.1 (AUA Ex. 1 at AUA 000041)[1]. Further, Leeward agreed that "[b]y executing the Agreement the Contractor confirms that the Contract Time is a reasonable period for performing the Work." *Id.*

13.     If Leeward failed to reach Substantial Completion by the end of the Contract Time, Leeward agreed to pay AUA liquidated damages of US $1,500 per day until the Work was substantially complete. Contract (defined herein) § 3.3.1 (AUA Ex. 1 at AUA 000006).

14.     Part and parcel with determining the length of the Project was determining the amount of money Leeward would be paid to operate the construction site on a weekly basis. These costs, called "Preliminaries," generally refer to the overhead costs incurred in maintaining the work site and managing the project. The parties estimated the amount of Preliminaries that would be expended over the 52 week construction period, but agreed that Preliminaries would be paid based upon actual costs as approved by AUA.

---

[1] Submitted with this Answering Statement is a volume of AUA Exhibits 1 to 13 (the "AUA Exhibits"). The documents contained in the AUA Exhibits are numbered consecutively from AUA 000001 to AUA 000427 (the "AUA Page Number") to facilitate locating each specific reference to the AUA Exhibits. Citation to the AUA Exhibits will identify the AUA Exhibit and, where appropriate, the AUA Page Number.

15.     The scope of the work to be completed by Leeward was set forth in a Bill of Quantities ("BOQs"), which listed specific "measured works," including individualized items of work, that the Architect expected Leeward would perform to construct the campus in accordance with the architectural drawings. *See* AUA Ex. 1 at AUA 000072 to AUA 000103. The BOQs contained the expected quantity of work for each line item and the parties negotiated the unit rates to be paid for each item of "measured work."

16.     This "Measured Works" portion of the contract was based upon the total amount of work set forth in the BOQs in the event that each item listed in the BOQs was performed and the work as-built measured the same as the pre-construction measurements and quantities. However, the actual work performed by Leeward was less than that which was listed in the BOQs and, as explained herein, the Contract Sum became reduced accordingly by the terms of the Contract Documents.

17.     The parties also negotiated an EC $1,000,000 Cash Allowance, from which Leeward could make claims for certain contingent costs, such as overtime, scaffolding charges and craneage costs, should Leeward adequately substantiate the need for such costs. During contract negotiations, Leeward made it clear that it wanted a separate reserve of EC $500,000 for what it called "Non-Productive Overtime," but AUA did not agree and that term requested by Leeward was not included in the Contract Documents executed by the parties.

**C.     The Contract Documents and the Pertinent Provisions**

18.     The parties agreed upon the documents that would comprise the Contract Documents, which were collected together in a Project Manual and executed on September 25, 2009:  (i) AIA Document A101-1997 -- Standard Form of Agreement Between Owner and Contractor where the basis of payment is a STIPULATED SUM (the "Contract"); (ii) AIA

4

Document A201-1997 -- General Conditions for the Contract for Construction (the "General

Conditions"); (iii) the Bill of Quantities; (iv) the Drawings and (v) the Specifications

(collectively, the "Contract Documents").  *See* AUA Exhibit 1.

      19.    The parties expressly agreed that the Contract Documents as a whole govern the

obligations of AUA and Leeward.  Section 1.2.1 of the General Conditions (AUA Ex. 1 at AUA

000025) provides:

> The intent of the Contract Documents is to include all items
> necessary for the proper execution and completion of the Work by
> the Contractor.  The Contract Documents are complementary, and
> what is required by one shall be as binding as if required by all;
> performance of the Contractor shall be required only to the extent
> consistent with the Contract Documents and reasonably inferable
> from them as being necessary to produce the indicated results.

      20.    Leeward's work under the Contract Documents was to commence on May 1,

2008 and be completed in 364 days thereafter.  Contract §§ 3.1 and 3.3 (AUA Ex. 1 at AUA

000006).  Substantial Completion for each of the four parts of the Project was to be achieved

between January 29, 2009 and April 30, 2009.  Contract § 3.3.

      21.    As noted, because the full potential scope of the work was sufficiently defined,

the parties agreed that the contract would be based upon a Contract Sum, as opposed to Time and

Materials.  However, the Contract Sum was not the equivalent of a guaranteed flat fee to be paid

regardless of what works Leeward actually completed.  Rather, the parties intended and

understood, as contemplated by the specific provisions of the Contract Documents and as

demonstrated by their actions throughout the duration of the contract, that Leeward was only to

be paid for the work actually performed, as measured and verified by the Architect.

      22.    The Contract Sum is a defined term in the Contract Documents.  Section 9.1.1 of

the General Conditions provides that the "Contract Sum . . ., including authorized adjustments, is

the total amount payable by the Owner to the Contractor for performance of the Work under the

Contract Documents." (AUA Ex. 1 at AUA 000041). When the parties executed the Contract Documents, that amount was EC $27,436,824 "subject to additions and deductions as provided in the Contract Documents." Contract, § 4.1 (AUA Ex. 1 at AUA 000006). By its nature, the amount of the Contract Sum is fluid and changes during the life of the Project based upon such "additions and deductions." At the conclusion of the Project, "[f]inal payment, constituting the unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor." Contract § 5.2.1 (AUA Ex. 1 at AUA 000008).

23.      As set forth in the Statement of Contract Sum Collection Page (the "Statement of Contract Sum") included within the Project Manual, the amount of the Contract Sum stated in the Contract Documents was based upon three main components: (i) Preliminaries and Site Setup costs (EC $3,906,146); (ii) the Measured Works (EC $22,530,678); and (iii) the Cash Allowance (EC $1,000,000). *See* AUA Ex. 1 at AUA 000071. The parties understood that these components were subject to change, and they did, in fact, change over the course of the Project.

24.      The first section of the Statement of Contract Sum covers Preliminaries and Site Setup costs. The amounts used to calculate this portion of the original Contract Sum were based upon a set of predicted costs over the 52 week contract period. These assumptions were detailed in the Project Manual. *See* AUA Ex. 1 at AUA 000062 to AUA 000063. Knowing that the actual cost of Preliminaries would change, the Contract provided that "Time related [to] recurring, setup and Management Costs are to be based on actuals provided these are approved one week in advance by the Owner." Contract § 4.3 (AUA Ex. 1 at AUA 000007) and Statement of Contract Sum (AUA Ex. 1 at AUA 000071).

25.      The second section of the Statement of Contract Sum is entitled "Measured Works." The amounts listed in this section were carried over from the BOQs, subject to the

6

items of work actually being performed and the quantities and measurements being verified.

Leeward would not be entitled to payment when items of work listed in the BOQs were omitted

from performance, as recognized by Leeward in its Amended Demand for Arbitration (Leeward

acknowledges a EC $1,948,755.32 reduction in the Contract Sum for works it did not perform

pursuant to the terms of the Contract Documents).

26.     The value of extra work or changes was to be based upon the agreed upon unit

rates in the BOQs.  Contract § 4.3 (AUA Ex. 1 at AUA 000007).

27.     The onus was placed on Leeward to verify the accuracy of the Measured Works

and Leeward was only to be paid for the Work actually performed.  Sections 1.5(E) and (F) of

the Specifications (AUA Ex. 1 at AUA 000114) provide:

> E.     Quantity Surveyors and other staff shall be provided by the
> contractor in connection with the works, in measuring any changes
> and in preparing other records reasonably requested by the
> Architect or Owner.  Contractor is to verify accuracy of quantities
> and any errors/or omissions are subject to adjustment via Change
> Order.

> F.     All changes arising out of the performance of the work and
> any errors and/or omissions in the Bills of Quantities shall be
> measured and valued in accordance with the methods adopted in
> the unit rates.

28.     The third section of the Statement of Contract Sum is for "Cash Allowances."

This consisted of an EC $1,000,000 contingency that was to be expended in accordance with the

Owner's directions.  General Conditions, § 3.8.1 (AUA Ex. 1 at AUA 000029).  Approved

charges for Overtime, Scaffolding and Craneage, as instructed by Change Order, were to be

adjusted against this contingency.  *See* Statement of Contract Sum (AUA Ex. 1 at AUA 000071).

Moreover, the Contract Sum was to be adjusted when the actual costs were more or less than the

Cash Allowance.  General Conditions, § 3.8.2 (as supplemented) (AUA Ex. 1 at AUA 000011).

The Specifications further provided that "Cash Allowances are to be expended only as directed

via written Change Order by the Owner and may be deducted in whole or in part if not required."
Specifications, § 1.2(C) (AUA Ex. 1 at AUA 000111).

29.     The Contract Documents acknowledged that they could be modified after
execution. *See* General Conditions, § 1.1.1 (defining Modifications) (AUA Ex. 1 at AUA
000025). A Modification to the Contract Sum is to be done via Change Order or Change
Directive. While the Contract Documents provide a formal means to issue Change Orders and
Change Directives (General Conditions, Article 7), as demonstrated herein, the parties did not
adhere to the formal requirements of the Contract Documents for making construction changes
that either added, changed or omitted work. Whether changed by formal or informal process, as
is common in the construction industry, the parties agreed and understood that the Contract Sum
could, and probably would, change such that AUA would pay Leeward only for the work
actually performed. Indeed, as will be demonstrated below, prior to making its December 17,
2010 "Claim," Leeward only sought payment for the work it actually performed despite the lack
of formal Change Orders.

30.     Leeward's Amended Demand for Arbitration (the "Amended Demand") concedes
that the Contract Sum was adjusted (both upwards and downwards) without formal Change
Orders for changes that either added or omitted work. For example, Leeward claims it was paid
for approved extra work even though "AUA never issued change orders or change directive for
additional work." Amended Demand, ¶ 25. Similarly, Leeward concedes the Contract Sum was
reduced by work being "removed" from Leeward's scope of work, despite the absence of a
formal Change Order. *Id.*, ¶¶ 23-24.

**D.**     **The Processing of Payments Under the Contract Documents**

31.     Leeward submitted Applications for Payment on a monthly basis ("Payment Applications"). Pursuant to Section 5.1.5 of the Contract, Payment Applications were to "indicate the measured works of each [BOQ] portion of the Work as of the end of the period covered by the Application for Payment." (AUA Ex. 1 at AUA 000007).

32.     Accordingly, Leeward submitted Payment Applications based on actual work and actual costs. Thus, with each Payment Application Leeward sought payment for the measured work it actually performed since the last Payment Application. In so doing, Leeward would submit the BOQs to reflect the amount of Measured Works performed. Each interim version of the BOQs would reflect the pre-contract quantity or measurement, the actual measurement of the work performed, the unit rate, and the amount due for each line item based upon the actual measurements. Leeward would also attach extensive paperwork with the actual measurements. *E.g.*, AUA Exhibit 2. This process was followed up to and including Leeward's final Payment Application, submitted at the completion of the Work. *See* ¶¶ 56 to 61, below and AUA Exhibit 3. By the terms of the Contract Documents, the aggregate modification of Measured Works actually performed served to reduce the Contract Sum.

33.     As the Project progressed, the Architect also determined that certain items listed in the BOQs were not necessary (the "Omitted Work"). Essentially, site conditions or changes in the design dictated whether certain items listed in the BOQs were required, and if they were not, the Architect would direct Leeward to not perform those tasks. Because Leeward was only to be paid for works actually done, Leeward properly did not include any of the Omitted Work in its Payment Applications notwithstanding the absence of a formal Change Order. By the terms of the Contract Documents, these omissions served to reduce the Contract Sum.

9

34.     Each Payment Application also included an itemization of other costs, including actual Preliminaries and a list of what Leeward called "Change Orders," for which it sought payment. To the extent the actual Preliminaries and Change Orders exceeded the EC $1,000,000 Cash Allowance, by the terms of the Contract Documents they served to increase the Contract Sum.

35.     Upon receipt of a Payment Application, the Architect and a Leeward representative would check all of the measurements to verify that the Measured Works claimed accurately reflected the quantity of the Measured Works actually performed. The Architect would reach agreement with Leeward as to the revised measurements, and then make revisions to the Payment Application accordingly. The Architect and AUA also reviewed and approved (or rejected) the actual Preliminaries and "Change Orders" sought by Leeward in each Payment Application. Once all parties agreed on the payment amount, either the Architect would certify the marked-up Payment Application or Leeward would submit a new Payment Application consistent with the revisions made, which the Architect would then certify.

36.     The certified Payment Applications were also counter-signed by Col. Antony on behalf of AUA and, in most instances, a representative of Leeward. Once certified, AUA would process the Payment Application and wire the monies to Leeward.

37.     As set forth in Section 5.1.3 of the Contract, once AUA and Leeward reached agreement on a Payment Application and sent it to the Architect, AUA had 15 days to make payment to Leeward. *See* AUA Ex. 1 at AUA 000007. Given the manner in which AUA, Leeward and the Architect would work together to review and verify the accuracy of each Payment Application, the date on which agreement was achieved as between AUA and Leeward was typically the same date the Architect certified the Payment Application.

10

38.     As set forth in Paragraph 138 below, Leeward claims certain payments were not paid by AUA in a timely fashion, but has not alleged either those payments it claims were paid outside the 15 day window or the number of days by which any allegedly late payment exceeded the 15 day period.

39.     Finally, as set forth in Section 5.1.8 of the Contract (AUA Ex. 1 at AUA 000008), AUA retained a portion of each Payment Application as retainage.

### E.     The October 2008 Shutdown

40.     Soon after signing the Contract Documents, disputes arose over the payment of monies. Specifically, Leeward and AUA had a dispute over one of the Payment Applications and a dispute with respect to the payment of Mobilisation advances.

41.     In light of these disputes, Leeward walked-off the construction site in October 2008 for a period of two weeks (the "October 2008 Shutdown"). Leeward returned to the Project after two weeks, on or about November 5, 2009, while the parties worked to resolve the dispute.

42.     On December 15, 2008, Leeward submitted a claim to the Architect relating to the October 2008 Shutdown, both with respect to the disputes that led to the shutdown as well as the losses incurred during the two weeks Leeward was not working. *See* AUA Exhibit 4. Specifically, Leeward claimed:

> 1.     Release of the outstanding balance of Mobilisation Advance Payment, plus compensation in respect of financing costs and lost interest, plus any Extension of Time for completion of the Works deemed to be attributable to non-availability of cash resources to facilitate purchase of materials and/or equipment necessary for the timely execution of said Works; and
>
> 2.     An extension of Time of fourteen days for completion of the Works, plus costs in respect of the shut-down, delay, and start-up of the Works, plus interest subsequent to non-payment by the Owner of monies due with the prescribed timescales.

11

43.     Leeward threatened to commence an arbitration as provided by the Contract Documents if not awarded the relief claimed. *Id.*

44.     On January 13, 2009, AUA and Leeward met and agreed to settle the claims set forth in Leeward's December 15, 2008 claim, and thereby avoid arbitration.  As part of that settlement, AUA agreed that Leeward could extend the Project two weeks, from April 30, 2009 to May 14, 2009, without costs, meaning Leeward would not be paid Preliminaries for those two weeks and AUA would not seek liquidated damages for those two weeks.  AUA also agreed to extend the time in which it would credit monies due Leeward against the prior Mobilisation advances, so as to provide Leeward with greater cash flow for a longer period of time.

**F.      Leeward's Failure to Timely Complete the Works**

45.     Leeward agreed that it would "proceed expeditiously with adequate forces and shall achieve Substantial Completion within the Contract Time."  General Conditions, § 8.2.3 (AUA Ex. 1 at AUA 000041).

46.     Despite this agreement, throughout the duration of the Project, Leeward was behind schedule and failed to take the necessary steps to complete the Project on time.  Leeward made some overtime requests, which were reviewed on a case-by-case basis by AUA, but these were not accepted unless the overtime was productive and allowed for Leeward to get back on schedule.

47.     As the Project neared the expiration of the Contract Time, it was evident that Leeward would not be able to complete its Work on time.  As a result of Leeward's delay in performing the Work, in late April 2009 AUA decided to take certain of the finishing works from Leeward's scope of Work, including fixing doors and windows (the "Doors and Windows Work"), installing the flooring (the "Flooring Work") and painting the buildings (the "Painting Work").  AUA decided to have each of these items performed under separate contracts, whether

12

by Leeward or another contractor, in the hope that this would allow Leeward to reach Substantial Completion as close to on-time as possible.

48.     Leeward was awarded separate contracts to perform the Doors and Windows Work and the Flooring Work. Leeward was paid for this work.

49.     The Painting Work was awarded to another contractor.

50.     Despite the reduction in the scope of Work, on May 11, 2009, three days before the extended deadline for Substantial Completion, Leeward submitted a Claim, pursuant to Article 4 of the General Conditions, to extend the Contract Time by 15 weeks "together with reimbursement of costs expended." *See* AUA Exhibit 5.

51.     The sole basis for Leeward's claim to extend the Contract Time by 15 weeks was its contention that EC $500,000 was set aside for Non-Productive Overtime costs in the Contract Documents "necessary to reduce the construction period by 16 weeks" from 68 weeks to 52 weeks. *Id.* Leeward claimed that by only approving EC $36,511.68 in overtime, or 1.2 weeks of overtime, AUA denied Leeward "the ability to finish the Works on time, and have created a delay to the construction programme in the order of 14.8 weeks." *Id.*

52.     AUA rejected this claim and refused to extend the Contract Time because the Contract Documents did not contain any provision for an EC $500,000 escrow for Non-Productive Overtime. While Leeward specifically requested this set-aside for Non-Productive Overtime as late as one week before the execution of the Contract Documents (*see* AUA Exhibit 6), it was rejected by AUA and was not included in the final version of the Contract Documents signed by the parties. AUA also rejected Leeward's claim for a 15 week extension of time because Leeward's inability to complete the Work within the Contract Time was due to Leeward's own delay. Moreover, the parties specifically negotiated the Contract Time and

agreed, as reflected in the Contract Documents, that 52 weeks was more than sufficient to complete the Work.

53.     Leeward reiterated its Claim for an additional 15 weeks in Contract Time, and raised a number of other claims, on May 29, 2009.  AUA Ex. 7.

54.     Because it rejected Leeward's claim to extend the Contract Time, AUA refused to pay Preliminaries beyond the 52 week Contract Time set forth in the Contract Documents.  With each Payment Application thereafter, Leeward would attempt to assess additional Preliminaries based upon this additional time, but each time AUA would reject this portion of Leeward's Payment Application.  *E.g.*, AUA Exhibit 8 at AUA 000348.

**G.     The Draft Final Account**

55.     Leeward admits that it did not achieve Substantial Completion until July 31, 2009. Amended Demand, ¶ 11.  Leeward also claims that it "finally completed" the Work governed by the Contract Documents (*i.e.*, excluding the work done under separate contracts) on or about September 18, 2009.  *Id.*

56.     Upon completion of the Work, on October 8, 2009 Leeward submitted a first draft of its Final Account, which it called "Draft Final Account."  AUA Exhibit 3.  Unlike the Payment Applications before it, the Draft Final Account did not specify the period of time covered by the application; it was to be the final Payment Application.

57.     As with the prior Payment Applications, Leeward only sought payment for the work actually performed.  Leeward did not seek payment for Omitted Work (EC $1,430,284 of the original BOQs), Doors and Window Work (EC $191,090 of the original BOQs), Flooring Work (EC $1,762,459 of the original BOQs) or Painting Work (EC $1,844,789 of the original BOQs), resulting in a total reduction of the Contract Sum of EC $ 5,229,277.

14

58.    Moreover, Leeward only sought payment for the Measured Works it did perform based upon actual quantities and measurements of the completed Work. In many instances, the actual measurements were greater than as set forth in the BOQs, and thus Leeward was paid more for each of those items than set forth in the BOQs. In other instances, the measurements were less, and thus Leeward was paid less. In the aggregate, the adjusted measurements resulted in a reduction of the Contract Sum of EC $28,765.63. Combined with the items omitted from the Work, the Measured Works portion of the BOQs was reduced from EC $22,530,678 to EC $17,272,635.37, resulting in a combined reduction to the Contract Sum of EC $5,258,042.63, and not merely the EC $1,948,755.32 reduction claimed in the Amended Demand.

59.    As with the prior Payment Applications, Leeward's Draft Final Account was reviewed for accuracy by the Architect and AUA. Accordingly, the Architect and Leeward verified each item of the Measured Works for accuracy and reached agreement on the requisite alterations.

60.    AUA also scrutinized the Draft Final Account with respect to Leeward's request for additional Preliminaries, "Change Orders" and other claims. The Architect and AUA approved some of these for payment and rejected others.

61.    After the parties exchanges several versions of the Draft Final Account, on October 21, 2009, AUA approved and the Architect certified a revised Collections Page for payment based upon the measurements verified by the Architect and additional expenses approved by AUA. *See* AUA Exhibit 9.[2]

62.    The Collections Page confirmed that AUA agreed to pay Leeward EC $23,603,320 for the Work performed under the Contract Documents as follows:

---

[2]  The Draft Final Account submitted by Leeward in this arbitration differs from both the version it initially sent to AUA and the Architect on October 8, 2009 (AUA Ex. 3) and the amounts certified for payment on October 21, 2009 (AUA Ex. 9).

| | |
|---|---|
| Preliminaries/General Conditions: | EC $ 4,936,303.60 |
| Measured Works:  Classroom and Lab Building | EC $ 3,393,169.12 |
| Measured Works:  Service Block | EC $ 1,197,242.34 |
| Measured Works:  Library Block | EC $12,075,689.50 |
| Measured Works:  Amphitheater | EC $   606,534.41 |
| "Change Orders" | EC $ 1,232,088.91 |
| Claims | EC $   162,372.12 |
| **TOTAL** | **EC $23,603,320.00** |

63.     In calculating how much AUA owed Leeward, AUA took into consideration its prior payments, the amount of retainage it was required to release, and a prior advance it gave Leeward in the amount of EC $500,000.  Those calculations resulted in a payment of EC $104,862,91 (exclusive of ABST).  Leeward was wired payment on October 26, 2009.  *See* AUA Exhibit 10.

64.     AUA kept EC $590,083 from the final EC $23,603,320 earned by Leeward as retainage to be paid in accordance with the Contract Documents, which require, among other things, submission of the documentation set forth in Section 9.10.2 of the General Conditions. (AUA Ex. 1 at AUA 000045).

65.     Neither AUA nor the Architect expected to receive any further invoices from Leeward for the Measured Works performed under the Contract Documents, and Leeward did not submit any.

### H.     Leeward's October 26, 2009 Claim

66.     On October 26, 2009, Leeward reasserted its Claim with respect to three specific items not resolved as of the payment of the Draft Final Account.  Specifically, Leeward sought payment for "Additional Preliminaries" (EC $955,544.08), a claim for time lost for the

Whitsuntide Holiday (EC $19,457.40), and a claim for overhead and profits (EC $97,064.40).

AUA Exhibit 11. Leeward indicated its desire to start the arbitration process "immediately" with

respect to its EC $1,071,994.88 aggregate claim. *Id.*

67.     These claims correspond with specific differences between the Draft Final

Account initially submitted by Leeward, and the Draft Final Account approved by AUA.

Specifically, Leeward sought Preliminaries of EC $5,891,857.68, but AUA only approved and

paid EC $4,936,303.60. The difference between the two is EC $955,455.08. Leeward also

sought EC $278,911.92 in Claims, but AUA only approved and paid EC $162,372.12. The EC

$116,539.80 difference is precisely the aggregate of Leeward's Whitsuntide Holiday claim and

its Overhead and Profits Claim (EC $19,475.40 + EC $97,064.40 = EC $116,539.80).

68.     In November 2009, the parties met in an effort to resolve these three remaining

claims, but were unable to reach an amicable resolution. AUA advised Leeward it would need to

commence an arbitration if it wanted to continue to pursue these three claims.

69.     Despite professing a desire to proceed to arbitration as quickly as possible if the

parties did not settle these three remaining claims, Leeward took no steps to pursue arbitration of

the claims asserted in its October 26, 2009 letter until it filed this arbitration in February 2011.

### I.     Leeward's February 17, 2010 Claim and Its Original Demand for Arbitration

70.     For fourteen months, from October 26, 2009 to December 2010, Leeward never

claimed that it was due any more money, including interest, under the Contract Documents other

than the EC $1,071,994.88 detailed in its October 26, 2009 letter for the three claims described

above. The only monies Leeward sought during this time was a release of the remaining

retainage. Leeward made that request in July 2010, even though it still had not complied with its

obligation under General Conditions § 9.10.2 as a prerequisite to being paid the remaining retainage.

71.     On December 17, 2010, Leeward for the first time submitted a claim for what it called Final Payment under the Contract Documents.  The claim was signed by Leeward's Directors, Andy Green and Eric Linde, and copied Leeward's current counsel, J. Scott Greer, Esq.

72.     This claim for final payment, submitted fourteen months after payment on the Draft Final Account, sought EC $13,161,163.88.  This amount included a claim for payment in full of the amount of the Contract Sum in the Contract Documents (EC $27,436,824), even though a significant portion of that work (EC $5,258,042.63) had been omitted from the scope of work and/or performed by Leeward under a separate contract.

73.     Leeward's December 17, 2010 Claim also included its claim for Additional Preliminaries, although, without explanation, Leeward increased the claimed amount from EC $955,544.08 to EC $1,427,245.73.  Leeward also asserted a variety of other unsubstantiated claims, most of which had not been previously asserted.

74.     On February 3, 2011, Leeward filed this arbitration seeking EC $13,161,136.88, which was the exact amount sought in its December 17, 2010 claim.  Leeward's arbitration claim was vague and confusing, and the itemized list of its claims seemed to bear no resemblance to what Leeward claimed to remain at issue in October 2009.  Leeward provided a binder of supporting documents, including a version of the Draft Final Account (before it was certified by the Architect and paid by AUA), and a smattering of other documents, none of which were specifically tied to the items listed in Leeward's claim.

75.     On September 8, 2011, the Tribunal conducted a Preliminary Hearing.  Prior to the Preliminary Hearing, AUA requested that Leeward be required to submit a more detailed and definite statement of its claims and damages because the EC $13,161,137 sought by Leeward in arbitration was so inconsistent with the EC $1,071.944.88 claimed by Leeward in October 2009 and the EC $13,161,137 demand was neither documented nor cogently explained in Leeward's arbitration demand.  Leeward opposed this request, but the Tribunal granted AUA's request and required Leeward to submit a more particularized claim by October 14, 2011.

**J.     The Amended Demand**

76.     Leeward submitted its Amended Demand on October 14, 2011.  Forced to explain the basis for its various claims, Leeward abandoned a number of them, reducing its demand from EC $13,161,137 to EC $6,800,572.88 as detailed in its "Revised Statement of Claim" attached to its Amended Demand.  Among the items in Leeward's February 3, 2011 Claim that were not contained in its Revised Statement of Claim included:  (i) EC $2,087,982.16 for "Overtime Paid per Schedule"; (ii) EC $693,870.95 for "Redundancy Payments per Schedule"; (iii) EC $667,876.19 for "Antigua Unpaid Transaction" and (iv) EC $1,030,783.95 for "Construction Equipment."

77.     Leeward's Revised Statement of Claim starts with a EC $27,436,824 Contract Sum, deletes some, but not all, of the work it did not perform, and then adds all of the work it claims to have billed to AUA (whether performed under the Contract Documents or separate contracts).  From that sum, Leeward subtracts the amount it claims AUA paid.[3]  The difference is Leeward's EC $6,800,573 Claim.

---

[3]   AUA paid Leeward in excess of EC $24 million for all of the work identified in the Revised Statement of Claim, not EC $23,989,679.30.

78.     Thus, we understand Leeward's Amended Demand to make the following claims: (i) payment of the original Contract Sum, less payments made and EC $1,948,755.32 million in deleted work; (ii) overhead and profits on the Doors and Windows Work and the Painting Work; (iii) Additional Preliminaries (increased from EC $1.4 million in the Statement of Claim to EC $1,985,711.68 in the Revised Statement of Claim) and (iv) the various unpaid claims for additional work.

79.     For the reasons set forth in detail below, (i) Leeward was paid for all work it actually performed under the Contract Documents and is not entitled to more; (ii) Leeward is not entitled to overhead and profits for the Doors and Windows Work or the Painting Work; (iii) Leeward is not entitled to any Additional Preliminaries, all of which seek payment for work done beyond the Contract Time; and (iv) Leeward was paid for all the extra work identified, whether pursuant to the Contract Documents or separate contracts, with the exception of its Whitsuntide Holiday claim, for which Leeward is not entitled to payment.

## DEFENSE TO LEEWARD'S CLAIMS

80.     The Contract Documents placed the burden on Leeward to substantiate all Claims, including its Claim for EC $6,800,875.28. General Conditions § 4.3.1. (AUA Ex. 1 at AUA 000034). As demonstrated below, Leeward did not substantiate any portion of its Claim before commencing arbitration and still fails to do so.

### A.     Leeward Was Properly Paid Under the Contract Documents Only for the Work Actually Performed

81.     It is well established that payments under construction contracts – including those that identify a stipulated sum -- are likely to and do change as the scope of the work changes. Consistent with this reality, the Contract Documents used by AUA and Leeward to memorialize

their agreement provided the necessary flexibility to adjust the Work and the Contract Sum to meet the requirements of the Project.

82.     The parties agreed to a Contract Sum based upon a set of assumptions outlined in the Statement of Contract Sum. Those assumptions were estimates. The parties knew that the actual amount billed and paid under the Contract Documents (*i.e.*, the final Contract Sum) would be based upon the actual costs, measurements and authorized contingencies. In other words, the parties did not enter into a flat fee contract, whereby Leeward would absolutely be paid the original Contract Sum, regardless of what work it actually performed. Rather, the Contract Documents expressly provided that the Contract Sum was "subject to additions and deductions." Contract § 4.1. (AUA Ex. 1 at AUA 000006).

83.     Leeward's Amended Demand confirms that Leeward shared this general understanding of how the Contract Documents were designed to operate. As demonstrated in Paragraph 23 of the Amended Demand, Leeward starts with the Contract Sum, deducts for work within that amount that it did not perform, and adds charges for additional work it did perform.

84.     Where Leeward's claim goes awry, however, is that it fails to account for an additional EC $3,309,287 in work within the beginning EC $27,436,824 Contract Sum that Leeward did not perform. Leeward also does not account for changes in the quantities of the Measured Works it performed, even though its Draft Final Account was so limited. Finally, as explained herein, Leeward appears to have accounted for the EC $1 million Cash Allowance twice.

85.     The Contract Documents provide that the Contract Sum is to be adjusted by work added, changed or omitted over the life of the Project. Section 1.1.1 of the General Conditions expressly provides for "Modifications" that can serve to alter the terms of the Contract

21

Documents, including the Contract Sum.  The Contract Documents provided for modifications affecting the amount of the Contract Sum to be to done via written Change Orders or Change Directives, but the Architect, AUA and Leeward made these changes less formally, without the issuance of formal Change Orders.

86.     Despite the absence of formal Change Orders, Leeward sought and received payment for:  (i) work it actually performed that was within the original scope, but the quantity of which exceeded that scope based upon actual measurements; and (ii) additional work it actually performed that was outside the original scope.

87.     Similarly, despite the absence of formal Change Orders, Leeward did not seek payment for work removed, in whole or in part, from the original scope, as evidenced by its Payment Applications and its reduction of the Contract Sum in the Amended Demand.

88.     Accordingly, when Leeward submitted its Draft Final Account at the conclusion of its Work, it only sought payment for the work it actually performed.  AUA and the Architect verified the measurements supplied for accuracy, and AUA paid Leeward based upon the corrected measurements, with the exception of the three items Leeward identified in its October 26, 2009 letter.

89.     The amount of the Contract Sum due when Leeward completed the Work was EC $23,603,320.  Leeward has been paid this entire amount, less EC $590,083 in retainage, as of October 26, 2009.[4]

90.     The Contract Sum changed over the life of the Project from the initial amount of EC $27,439,824 to EC $23,603,320, as set forth below.

---

[4]  The Amended Demand erroneously claims that AUA never paid the Draft Final Account.  Amended Demand ¶ 22.  Documentary evidence proves otherwise.  *See* AUA Exhibits 9 and 10.

### Preliminaries/General Conditions

91.     The Statement of Contract Sum attached to the Contract Documents estimated

Site Setup costs and Preliminaries (based on a 52 week schedule) to equal EC $3,609,146. *See*

AUA Exhibit 1 at AUA 000071.

92.     As confirmed by the Statement of Contract Sum, however, both costs were to be

paid based upon actual costs. *Id.*

93.     The Draft Final Account as approved and paid by AUA included a total of EC

$4,936,303.60 in Preliminaries and Site Setup costs actually incurred by Leeward during the

same 52 week schedule. *See* AUA Exhibit 9.  Accordingly, Leeward was paid an additional EC

$1,030,157.60 for Preliminaries, resulting in an increase in the Contract Sum.

94.     While Leeward's Draft Final Account sought payment for an additional 8 weeks

of Preliminaries, that claim was rejected by AUA.  AUA adjusted the amount of Preliminaries

charged for the Project back to the amount submitted and approved in Leeward's September

2009 payment application. *See* AUA Exhibit 12 at AUA 000372.  The difference between what

Leeward sought in the Draft Final Account and what AUA paid is EC $955,884.08.  That

amount is approximately EC $1,000,000 less than Leeward now seeks, fourteen months later, in

Additional Preliminaries.

### Measured Works

95.     The Statement of Contract Sum estimated the Measured Works performed by

Leeward would total EC $22,530,678, broken down as follows:  (i) Classroom and Laboratory

Building (EC $5,060,075); (ii) Service Block (EC $1,471,074); (iii) Library Block (EC

$14,975,517) and (iv) Amphitheater (EC $1,024,012).  AUA Ex. 1 at AUA 000071.  The

amounts were based entirely on the BOQs at the time the parties executed the Contract Documents.

96.     During the course of the Project, the Measured Works changed.  First, certain work was removed from the scope of the project entirely because of Leeward's delay.  Leeward concedes that a total of EC $1,948,755.32 was removed from the Measured Works for the Doors and Windows Work and the Painting Work, thereby reducing the Contract Sum by this amount.

97.     In addition to these two items, the Flooring Work was also removed from the Measured Works, resulting in a further reduction of the Contract Sum in the amount of EC $1,762,459.

98.     Similarly, as the Project progressed and designed changed, the Architect determined that certain items listed in the BOQs were not necessary and directed that Leeward not perform those tasks.  These Omitted Works reduced the Contract Sum an additional EC $1,430,284.

99.     Finally, throughout the course of the Project, as contemplated and required by the Contract Documents (see ¶¶ 22 to 30, above), Leeward and the Architect confirmed the precise amount of work performed by Leeward by verifying the measurements of each task listed in the BOQs.  AUA paid Leeward based upon the verified measurements, and not by the quantities listed in the initial BOQs.  In some instances, this resulted in Leeward being paid more for a specific item, and in other instances, it resulted in Leeward being paid less.  In the aggregate, the Contract Sum was reduced by EC $28,765.63 based upon adjustments made to the quantities of the Measured Works.

100.    Leeward acknowledged all of these permanent changes to the Measured Works portion on the Contract Sum when it submitted its Draft Final Account.  The BOQs attached to

Leeward's submission only sought payment for the Measured Works actually performed.  A line by line comparison between the BOQs attached to the Draft Final Account and those in the Contract Documents confirms as much.  *Compare* AUA Ex. 3 at AUA 000267 to AUA 000295 *with* AUA Exhibit 1 at AUA 000072 to AUA 000103.

101.    Accordingly, Leeward sought, the Architect certified, and AUA paid a total of EC $17,727,635.37 in Measured Works, meaning the Contract Sum was reduced by a total of EC $5,258,042.63 for the Measured Works portion of the Contract.

### Cash Allowances/Change Orders/Claims

102.    The Statement of Contract Sum contained an EC $1,000,000 contingency for Cash Allowances, which served as a budgeted amount of expected extra costs, such as for scaffolding, craneage and overtime.

103.    Leeward was only to be paid for approved expenses drawn against the Cash Allowance.  *See* Statement of Contract Sum (AUA Ex. 1 at AUA 000071).

104.    The Draft Final Account did not contain a line item requesting payment for the Cash Allowance.  Rather, the entire Cash Allowance amount was accounted for through "Change Orders" and Preliminaries paid by AUA.

105.    For example, scaffolding and craneage charges were accounted for in the Statement of Contract Sum as a Cash Allowance, but Leeward included those costs in its claim for Preliminaries.  *See* AUA Exhibit 3 at AUA 000261.  Indeed, EC $583,066.62 of the Preliminaries approved for payment in the Draft Final Account were allocated to Scaffolding and Craneage.

106.    Similarly, AUA approved a total of EC $1,232,008.91 in "Change Orders" for additional work performed by Leeward, including Overtime and other contingent costs.  AUA

Exhibit 9. These "Change Orders" served to increase the Contract Sum, though none were accompanied by a formal Change Order in accordance with the terms of the Contract Documents.

107.    Leeward's Draft Final Account also sought EC $278,911.92 in "Claims," which include the seven (7) allegedly "unpaid" claims identified in Leeward's Revised Statement of Claim in its Amended Demand, plus a EC $97,064.40 claim for Overhead Profits on "Deleted Works." *See* AUA Exhibit 3 at AUA 000297 to AUA 000308.

108.    AUA approved and paid EC $162,372.12 in "Claims," which constituted payment for all of the above claims with the exception of the Whitsuntide Holiday and Overhead & Profits claims. The Contract Sum was increased by this amount.

109.    In total, the Contract Sum was changed over the course of the Work as follows:

| | |
|---|---|
| Contract Sum as of September 2008 | EC $ 27,436,824.00 |
| Less Reduced Measured Works | (EC $  5,258,042.63) |
| Plus Additional Preliminaries | EC $  1,030,157.60 |
| Plus "Change Orders" Above EC $1 million | EC $     232,008.91 |
| Plus Claims | EC $     162,372.12 |
| **Total Revised Contract Sum as of October 2009** | **EC $ 23,603,320.00** |

110.    At the time AUA paid Leeward on the Draft Final Account, Leeward did not claim or seek any more monies under the Contract Documents with the exception of three distinct claims, cumulating EC $1,071,994.88, that remained in dispute. Leeward identified these claims in an October 26, 2009 letter and expressed its intention to arbitrate them: (i) EC $955,884.08 in "Additional Preliminaries due to extension of time"; (ii) EC $19,475.40 for

"Whit Monday Public Holiday due to extension of time" and (iii) $97,064.40 in "Loss of OH & P Finishing works." *See* AUA Exhibit 11.

111.    As demonstrated above, Leeward submitted and was paid for additional work (without receiving formal Change Orders) that increased the Contract Sum, and Leeward acknowledges that work removed from the contract served to reduce the Contract Sum. *See* Amended Demand ¶ 23.  Leeward's Amended Demand ignores these payment details and instead seeks a windfall payment for substantial portions of work that it never performed.

**B.    Leeward's "Claim" For Final Payment under the Contract Documents Is Procedurally Barred.**

112.    Putting aside the merits of Leeward's December 17, 2010 claim for a "Final Payment" that serves as the crux of this arbitration, Leeward's assertion is far beyond the strict time limits set forth in the Contract Documents for asserting claims.

113.    "Claim" is a defined term in the Contract Documents.

> A Claim is a demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract.  The term "Claim" also includes other disputes and matters in question between the Owner and Contractor arising out of or relating to the Contract.

114.    The Contract Documents further require that Claims are to be initiated by written notice to the Architect and the Owner.  General Conditions, § 4.3.2.  (AUA Ex. 1 at AUA 000034).

115.    Finally, the Contract Documents provide for strict time limitations on asserting a Claim.  Section 4.3.2 of the General Conditions requires a Claim to be asserted within 21 days "after occurrence of the event giving rise to the Claim." *Id.*

116.    Leeward claims, erroneously, that AUA never paid the Draft Final Account it submitted in October 2009.  Amended Demand, ¶ 22.  Leeward also claims that AUA never

made a final payment. Amended Demand ¶ 20. While it is unclear when Leeward claims this alleged final payment was due, presumably it was no later than when Leeward sought a release of the remaining retainage held by AUA in July 2010.

117.    Nevertheless, Leeward did not initiate a Claim for payment under the Draft Final Account and/or for a final payment until December 17, 2010, far beyond the 21 days time limitation provided in the Contract Documents. Accordingly, this portion of Leeward's claim should be rejected because Leeward failed to initiate it in a timely fashion.

### C.    Leeward Is Not Entitled to Overhead and Profits on Deleted Works.

118.    Leeward claims that it is entitled to EC $350,775.96 in Overhead and Profits on the Doors and Windows Work and the Painting Work, calculated to be 18% of the amounts set forth in the original BOQs for these items. Leeward relies upon Section 14.4.3 of the General Conditions, which allows for an award of Overhead and Profits when the Owner terminates the Contract for convenience. *See* AUA Ex. 1 at AUA 000054. For several reasons, Leeward's claim for Overhead and Profits lacks merit.

119.    First, the contractual right to Overhead and Profits cited by Leeward only applies if AUA terminates the entire Contract at its convenience, which would result in Leeward ceasing its operations on the Project. General Conditions § 14.4.1 (AUA Ex. 1 at AUA 000054).

120.    Article 14.4.3 provides:

> In the case of such termination for the Owner's convenience, the Contractor shall be entitled to receive payment for Work executed, and costs incurred by reason of such termination, along with reasonable overhead and profit on the Work not executed.

121.    The General Conditions do not provide for profits and overhead when the Contract is terminated or suspended for any reason other than Owner's convenience. *See* General Conditions, Article 14 (AUA Ex. 1 at AUA 000052 to AUA 000054). Here, the

28

Contract was not "terminated" and the works at issue were not removed from the scope of work for AUA's convenience. They were removed because Leeward was severely behind on its schedule as a result of its own delay. Indeed, even after these works were removed from Leeward's scope of work under the Contract Documents, Leeward failed to meet the Substantial Completion deadline by 10 weeks.

122.    AUA's claim for Overhead and Profits with respect to the Doors and Windows Work fails for a separate and independent reason. Leeward was awarded that work under a separate contract and paid for performing it. Indeed, Leeward claims it was paid more under its separate contract (EC $419,932) than it was due to earn under the Contract Documents (EC $191,090) for this same work. Having been paid for this work, Leeward is not entitled to recover its Overhead and Profits on the basis that it was removed from the Work to be performed under the Contract Documents.

123.    Finally, how Leeward calculates its claim for Overhead and Profits is a mystery. When Leeward originally initiated this claim on May 12, 2009 (within 21 days of learning AUA was removing these works from Leeward's Work), it sought EC $297,267.76 and attached the same list of deleted items that are attached to Leeward's Amended Demand. AUA Exhibit 13. However, Leeward's Overhead & Profit claim was reduced to EC $97,064.40 in its Draft Final Account, and Leeward confirmed as much when it sent its October 26, 2009 claim. In Leeward's December 17, 2010 claim and February 3, 2011 Demand for Arbitration, it no longer asserted a claim for Overhead and Profits. Now, Leeward seeks EC $350,775.96. The Contract Documents obligated Leeward to substantiate its claim, but it has failed to do so.

C.    **Leeward Is Not Entitled to Additional Preliminaries.**

124.    On May 11, 2009, three days before the extended Substantial Completion deadline, Leeward initiated with the Architect a "Claim For Extension of Time for Completion

of the Works due to restriction of working hours." AUA Exhibit 5.  Leeward sought a fifteen

(15) week extension of time plus costs expended, *i.e.*, additional preliminaries.

125.    The sole basis for its claim was Leeward's contention that the Contract

Documents contained a Cash Allowance of EC $500,000 in the Contract Sum dedicated for non-

productive overtime necessary to reduce the Contract Time from 68 to 52 weeks.  *Id.*  AUA's

failure to approve such overtime, Leeward claims, prevented Leeward from completing its work

within the Contract Time.

126.    Leeward's claim is not supported by the Contract Documents, which expressly

provide for a 52 week schedule and contain Leeward's written agreement that this time frame is

reasonable.  While the Contract Sum contains a Cash Allowance, and while claims for

productive overtime, if approved, can be drawn against that allowance, AUA specifically

rejected dedicating a sum of EC $500,000 for Non-Productive Overtime ("NPO").  Such a set-

aside was not included in the Contract Documents, notwithstanding Leeward's written demand

that it be included.  *See* AUA Exhibit 6.

127.    Aside from failing to provide a legitimate reason to extend the Contract Time, the

reality is that Leeward was behind schedule because it failed to efficiently manage the Work.

Leeward was required to "proceed expeditiously with adequate forces and shall achieve

Substantial Completion within the Contract Time."  General Conditions, § 8.2.3 (AUA Ex. 1 at

AUA 000041).  AUA properly rejected Leeward's attempt to pass the blame onto AUA for its

own delay in performing its Work and to collect Additional Preliminaries based upon such delay.

128.    Even if Leeward were entitled to Additional Preliminaries, at most it would be

limited to the period between the end of the Contract Time (May 14, 2009) and the date of

Substantial Completion (July 31, 2009), which is a period of 10 weeks.  Once Leeward reached

Substantial Completion, meaning the Work "is sufficiently complete…so that the Owner can occupy or utilize the Work for its intended use," General Conditions § 9.8.1 (AUA Ex. 1 at AUA 000044), it did not need to maintain or manage a construction site as contemplated by the Preliminaries.

129.    The factual basis for Leeward's claim for Additional Preliminaries is unknown. In its Draft Final Account, submitted at the conclusion of the Work, Leeward sought EC $955,884.08 for Additional Preliminaries based upon managing the site beyond the May 14, 2009. *See* Paragraph 94, above. This claim increased to EC $1,427,245.73 in Leeward's December 17, 2010 Claim, apparently based on "19 weeks pro rata contract." Leeward's claim for Additional Preliminaries increased even further in the Amended Demand, and now stands at EC $1,985,711.68. The Contract Documents obligated Leeward to substantiate its Claim, but it has failed to do so.

**D.      AUA Has Paid All Claims For "Additional Work" Except Leeward's Claim for the Whitsuntide Holiday, Which Was Properly Rejected.**

130.    The Revised Statement of Claim in Leeward's Amended Demand contains an itemized list of: (i) "Approved Extra Work – Paid;" (ii) "Approved Extra Work – Unpaid" and (iii) "Additional Work." *See* Leeward's Revised Statement of Claim.

131.    The "Approved Extra Work – Paid" is Leeward's so-called "Change Orders." Based on the Draft Final Account Collections Page (AUA Exhibit 9), AUA paid EC $1,232,008.91 of this amount. Leeward never claimed it was owed anything more on its "Change Orders" after receiving payment on its Draft Final Account.

132.    The "Approved Extra Work – Unpaid" is Leeward's "Claims" on its Draft Final Account, with the exception of its Overhead and Profits Claim. As shown above, all but the

31

Whitsuntide Holiday claim was paid.  The Whitsuntide Holiday at issue was in June 2009, after the deadline for Substantial Completion.  AUA, therefore, properly rejected Leeward's claim.

133.   The "Additional Work" refers to the eight Separate Contracts awarded to Leeward for work performed outside of the Contract Documents.  AUA paid Leeward in full for all of this work and Leeward does not claim otherwise.

### E.   Leeward Failed Timely to Commence Arbitration on Its Claims for Overhead and Profits, Additional Preliminaries and the Whitsuntide Holiday.

134.   As best we can tell, Leeward initiated its Claim for Overhead and Profits on May 12, 2009, its claim for Additional Preliminaries on May 11, 2009, and its claim for the Whitsuntide Holiday at some point during the Summer of 2009.  Leeward reiterated its Claims for these three items in its Payment Applications and Draft Final Account.  Leeward also reiterated these claims on October 26, 2009. *See* AUA Exhibit 11.

135.   Pursuant to the Contract Documents, a Claim is to be initiated in writing with the Architect, who is supposed to adjudicate the Claim in writing within 10 days.  General Conditions, § 4.4.1 (AUA Ex. 1 at AUA 000035).  If the Architect rejects the Claim or fails to respond within 30 days, the Claimant can proceed to Arbitration.  General Conditions, § 4.6.1 (AUA Ex. 1 at AUA 000036).  Unless otherwise provided, a demand for arbitration shall be made "within a reasonable time after the Claim has arisen."  General Conditions, §4.6.3 (AUA Ex. 1 at AUA 000036).

136.   For each of the above claims, Leeward waited over a year and a half to file a demand for arbitration.  While the Contract Documents do not define what amount of time is "reasonable," given that Leeward reached Substantial Completion on July 31, 2009 and was paid its Draft Final Account on October 26, 2009, it is inherently unreasonable for Leeward to have

waited until February 2011 to arbitrate these claims, long after the individuals involved with the Project left Antigua.

137.    Therefore, even if any of the above claims had merit, the arbitration demand should be dismissed as untimely.

**F.    Leeward Has Failed to Demonstrate Any Right to Interest**

138.    In Count Two of the Amended Demand, Leeward claims it is entitled to interest for late payments, including interim payments, mobilization payments and the final payment of EC $6.8 million allegedly due.

139.    As an initial matter, Leeward is not entitled to interest on late payments allegedly made prior to January 13, 2009.  As set forth in Paragraph 42, above, on December 15, 2008 Leeward initiated a Claim for a variety of items, including interest for late mobilization payment and late interim payments.  AUA Exhibit 4.  Those claims were settled, and thus Leeward is precluded from re-asserting them again here.

140.    Between settling its December 15, 2008 claim and serving its December 17, 2010 claim for final payment, Leeward did not once seek to recover interest on any allegedly late payments.  Leeward did not make any such claim in its Draft Final Account or include unpaid interest within the three remaining payment issues set forth in Leeward's October 26, 2009 Letter.  Leeward should not now be permitted to pursue interest payments it did not seek at the time AUA allegedly failed to make a timely payment due under the Contract Documents.

141.    In any event, Leeward must do more than simply claim AUA paid certain invoices late.  Leeward is obligated to substantiate it claims, meaning it is required to identify each payment that was allegedly paid late, set forth the facts upon which it relies to establish when such payment was due to be paid, and state the number of days such payment was late. Without this information, AUA is unable to provide a precise response.

33

142.   To the extent Leeward seeks interest on its unpaid retainage, it is not entitled to claim interest because the retainage is not yet due.  Leeward was obligated to provide the information set forth in Section 9.10.2 of the General Conditions before this money was released. Leeward has failed to do so.

143.   Likewise, to the extent Leeward establishes in this arbitration that it is entitled to some portion of its claim for final payment, Leeward is not entitled to interest because any such monies would not be due to be paid until Leeward completed its obligations under Section 9.10.2 of the General Conditions.

**G.   Leeward is Not Entitled to Recover its Legal Fees and Expenses.**

144.   In Count Three of its Amended Demand, Leeward claims it is entitled to recover its legal fees and expenses in the event it prevails in this arbitration "in accordance with the laws of Antigua."  Leeward does not specify the legal basis for its claim for legal fees.

145.   In any event, because the claims asserted in Leeward's Amended Demand lack merit, it is not entitled to an award of legal fees and expenses.

146.   On the contrary, if and to the extent legal fees and expenses are to be awarded to the prevailing party, they should be awarded to AUA for having to undergo the time and expense to defend Leeward's baseless claim.

**COUNTERCLAIMS/SETOFF**

147.   AUA incorporates as if fully set forth herein the statements set forth in Paragraphs 1 to 146.

**A.   AUA is Entitled to Delay Damages.**

148.   The Contract provides AUA with the right to Liquidated Damages in the amount of US $1,500 per day from the Contract Time deadline until Substantial Completion is achieved. Contract, § 3.3.1.  (AUA Ex. 1 at AUA 000006).

149.    Leeward failed to complete its Work within the Contract Time, and did not achieve Substantial Completion until 10 weeks later.  AUA is entitled to US $117,000 in Liquidated Damages based upon a July 31, 2009 date of Substantial Completion (US $1,500 x 78 days).

150.    Alternatively, AUA is entitled to its actual damages.  Leeward did not reach Substantial Completion of the structural works until July 31, 2011 and did not complete its Work until at least September 2009.  Due to Leeward's failure to keep to the construction schedule, AUA was forced to have some of the finishing works performed under separate contracts, including the Painting Work and the Flooring Work, and those items were not completed in time for AUA to open the campus for the Fall of 2009.

151.    As a result, AUA was forced to operate its Medical School at an alternate site, which resulted in increased expenses.  Among other things, AUA incurred rental and operational overhead expenses that it would have avoided had Leeward completed its Work within the Contract Time.

**B.      AUA Is Entitled To Recover the Legal Fees and Expenses Incurred Defending Leeward's Baseless Claims**

152.    As set forth in Paragraph 146, above, if and to the extent legal fees and expenses are to be recovered by the prevailing party, AUA is entitled to such a recovery.

153.    Despite being required by the Tribunal to submit a more particularized claim, Leeward's Amended Demand remains short on detail substantiating its Claim.  As a result, AUA was required to spend an inordinate amount of time and expense just to make sense of Leeward's Amended Demand and prepare this defense.  Should this dispute proceed to an arbitration hearing, AUA will incur even more legal costs defending Leeward's attempt to get paid for work it never performed.

## CONCLUSION

154.   In sum, Leeward is not entitled to any portion of its EC $6,800,572.28 Claim:

| Claim | Amount | Summary of Defense |
|---|---|---|
| Overhead and Profits | EC $350,577.96/ US $129,854.07[5] | Contract not terminated for Owner's Convenience, thus no contractual right to Overhead & Profits under General Conditions §14.4.3, as claimed by Leeward. Tasks were removed because of Leeward's inability to complete the Work timely. Leeward was paid for Doors and Window Works under separate contract, so claim for overhead and profits on this work would result in double payment. |
| Additional Work – Unpaid Claims | EC $181,547.52/ US $67,245.20 | All but Whitsuntide Holiday claim (EC $19,475.40) was paid. Whitsuntide Holiday fell after expiration of Contract Time, and was properly rejected. |
| Additional Preliminaries | EC $1,985,711.68/ US $ 735,507 | Contract Documents did not include EC $500,000 for Non-Productive Overtime, which was the basis asserted by Leeward for this claim. Leeward agreed it could complete the Work within the Contract Time and is responsible for its own delay. Preliminaries not needed after Substantial Completion. Leeward has not substantiated increase in claim from EC $995,884.08 asserted in October 2009. |
| Balance of Claim | EC $4,282,288.24/ US $1,586,159.40 | Leeward failed to properly account for changes to the Contract Sum arising from changes, additions and deductions in the Work. Leeward is not entitled to payment for work it did not perform. |
| TOTAL | EC $6,800,572.28/ US $ 2,518,931.97 | |

---

[5]   For the sake of convenience, AUA used the same conversion rate (.3704) used by Leeward in its Amended Demand.  AUA does not concede this rate is appropriate and reserves the right to apply a different conversion rate.

155.   Leeward is also not entitled to interest or legal fees.

156.   AUA, on the other hand, is entitled to delay damages of not less than US $117,000 and an award of its legal fees.

Dated:  November 30, 2011

SILLS CUMMIS & GROSS, P.C.
30 Rockefeller Plaza
New York, New York 10112
(212) 643-7000
*Attorneys for Respondent*

By: _____
        Mark S. Olinsky
        Jonathan S. Jemison

37