rely on any such defect — whether he knows of it or not — then he cannot afterwards set up the defect as a ground for rejecting the goods or documents when it would be unfair and unjust to allow him to do so . . .

---

The following cases were referred to in the judgments:

Alan (W.J.) & Co. v. El Nasr Export & Import Co. Ltd., (C.A.) [1972] 1 Lloyd's Rep. 313; [1972] 2 Q.B. 189;

Bremer Handelsgesellschaft m.b.H. v. Vanden Avenne-Izegem P.V.B.A., (H.L.) [1978] 2 Lloyd's Rep. 109; (C.A.) [1977] 1 Lloyd's Rep. 337; [1977] 1 Lloyd's Rep. 133;

Bunge S.A. v. Kruse, [1979] 1 Lloyd's Rep. 279;

Central London Property Trust Ltd. v. High Trees House, (C.A.) [1947] K.B. 130;

Finagrain S.A. v. Kruse, [1976] 2 Lloyd's Rep. 508;

Intertradex S.A. v. Lesieur Tourteaux S.A.R.L., [C.A.] [1978] 2 Lloyd's Rep. 509;

Panchaud Freres S.A. v. Etablissements General Grain Co., (C.A.) [1970] 1 Lloyd's Rep. 53;

Rickards (Charles) v. Oppenheim, (C.A.) [1950] 1 K.B. 616;

Toepfer (Alfred C.) v. Peter Cremer, (C.A.) [1975] 2 Lloyd's Rep. 416;

Tradax Export S.A. v. André & Cie, S.A., (C.A.) [1976] 1 Lloyd's Rep. 416;

Woodhouse A.C. Israel Cocoa S.A. v. Nigerian Produce Marketing Co. Ltd., (H.L.) [1972] 1 Lloyd's Rep. 439; [1972] A.C. 741.

---

This was an appeal by the sellers, Bremer Handelsgesellschaft m.b.H. from the decision of Mr. Justice Robert Goff ([1977] 2 Lloyd's Rep. 467) given in favour of the buyer C. Mackprang Jr. and holding in effect that the sellers were in default in respect of the balance of the June shipment of 200 tonnes of soya bean meal (the buyers having accepted a shipment on the *Olivia Maersk* of about 20 per cent.).

Mr. Brian Davenport and Mr. P. N. Legh-Jones (instructed by Messrs. Richards Butler & Co.) for the appellant sellers; Mr. Kenneth S. Rokison, Q.C., and Mr. Richard Wood (instructed by Messrs. Thomas Cooper & Stibbard) for the respondent buyers.

The further facts are stated in the judgment of Lord Denning, M.R.

Judgment was reserved.

Wednesday Nov. 15, 1978

---

JUDGMENT

**Lord DENNING, M.R.:** Whenever one of these cases comes before us on GAFTA 100 we get lost in the complications and technicalities which they present. Three years ago in *Toepfer v. Cremer*, [1975] 2 Lloyd's Rep. 118 and *Tradax v. Andre*, [1976] 1 Lloyd's Rep. 416, the trade set us an examination paper with many questions to answer. We did our best, but recently our papers were marked by the House of Lords, see *Bremer Handelsgesellschaft m.b.H. v. Vanden Avenne-Izegem P.V.B.A.*, [1978] 2 Lloyd's Rep. 109. They only gave us about 50 per cent. The House of Lords are fortunate in that there is no one to examine them or mark their papers. If there were, I do not suppose they would get any higher marks than we. At any rate, their answers in *Bremer v. Vanden* mean that we have now to reconsider a number of points.

The Board of Appeal have set out the commercial background to these cases. There is a big trade in soya bean meal. Much of it is produced in the U.S., exported to Europe, and used as food for cattle. The export trade from the U.S. is in the hands of about a dozen big firms. They buy from the producers all the soya bean meal that is produced and store it in their warehouses in bulk. They charter relatively large vessels to carry it to Europe. They load it on to these vessels in large quantities. Always in bulk so there is no difference in parcels. On getting to Europe, it is discharged into lighters. These hold about 200 tonnes each. They are then taken by river for supply to the farmers.

The U.S. shippers sell the soya bean meal long before it is made. They sell quantities of it while still in store or even before they get it. They sell it on c.i.f. terms for shipment in succeeding months. The first buyers resell it or portions of it to second buyers: and so on along a string. There is usually a string of several traders between the shipper and the ultimate c.i.f. receiver. Contracts are invariably on the terms of GAFTA 100.

I am not going to set out the details of our present case. They are all printed very conveniently in the report in [1977] 2 Lloyd's Rep. 467. Sufficient to say that Bremer are intermediate sellers. In October, 1972 they sold 1200 tonnes of soya bean meal to intermediate buyers called Mackprang. The price was $135.25 per tonne c.i.f. Rotterdam. Shipment was to be 200 tonnes each April, May, June, July, August, September, 1973. It incorporated GAFTA 100.

The case is only concerned with the shipment of 200 tonnes agreed to be made in June 1973. This shipment was never made. So the sellers were prima facie liable in damages. The price had risen to $585 a tonne. So the damages were colossal. The sellers, however, claimed to be exempt from liability under cl. 21 and cl. 22 of GAFTA 100: because of an embargo that had been imposed by the U.S. government. All exports of soya bean were prohibited from June 27, 1973 to July 2, 1973, save for two exceptions. On July 2, 1973 the embargo was partially lifted so as to permit shipment of 40 per cent. of existing contracts. On July 19, 1973 the embargo was further lifted in respect of goods en route on June 27, 1973. On Sept. 21, 1973 the embargo was lifted altogether.

At all stages hitherto the buyers have succeeded. The sellers have not satisfied anyone that they are exempted. The sellers appeal to this Court.

### Bremer v. Vanden

Before I consider this particular case, I will summarise the decision in *Bremer v. Vanden*. All the details will be found in the award which is set out in [1977] 1 Lloyd's Rep. at pp. 135 to 146. The important facts are these: The sellers were the shippers under contract to ship 44,000 tonnes of soya bean meal in June, 1973. This included 220 tonnes for these buyers. On June 27, 1973 the sellers had 44,000 tonnes of soya bean meal available to fulfil all their commitments. These 44,000 tonnes were stored in warehouses or were actually in transit to the ports. The sellers intended to ship them in the last three days of June, 1973 (or the next eight days) so as to fulfil their obligation of June shipment. They had chartered four vessels for the purpose. No doubt they would have fulfilled all their obligations but for the embargo. This came down on June 27, 1973. It prevented the sellers from fulfilling their obligations of June shipments. The sellers thus proved, and it was conceded, that they were absolutely prevented from making the shipment. On this account they were held to be exempted from liability by reason of cl. 21 of GAFTA 100. The sellers had also an alternative defence by reason of cl. 22 — the force majeure clause. As soon as the embargo was imposed, they gave a warning notice and an extension notice claiming an extension of time. These notices were defective in some respects, but the buyers waived the defects. So the notices were to be treated as good. The embargo was lifted on July 2, 1973 so as to permit the shipment of 40 per cent. The sellers were ready and willing to ship this 40 per cent. within the extended time given by the force majeure clause. But the buyers refused to accept this 40 per cent., and claimed damages for non-

shipment of the whole of the June, 1973 shipment. They failed: because the sellers had carried out the requirements of the force majeure clause and were protected by it.

### *Clause 21*

Now the present case differs from *Bremer v. Vanden*: because here the sellers were *not* the shippers. It differs, too, because there is no evidence here, that the shippers were prevented by the embargo. There is no evidence whatever to show who were the shippers: nor as to whether there were any goods available for shipment: nor as to whether they were caught by the embargo or not. The absence of evidence raises the crucial point in this case. It is this:

If the seller relied on cl. 21 — claiming that there was a prohibition "preventing fulfilment" — on whom is the burden of proof? Plainly the burden is on the supplier. At common law a party who relies on an exception clause must prove the facts to support his exception. In addition, cl. 21 itself says:

. . . If required, sellers must produce proof to justify their claim for cancellation.

But, in order to discharge their burden, how much has the seller to prove? The seller here says that it is sufficient for him to prove the general embargo which came down on June 27, 1973. If this had been a total embargo on all shipments, that might be sufficient. But this was not a total embargo. There were two exceptions—two "loopholes". The bulletin permitted the export of goods

. . . already on lighters destined for an exporting vessel or for which loading on board an exporting vessel had actually commenced as of 5.00 p.m. on 27th June, 1973.

In view of these two "loopholes", I do not think it is sufficient for the seller to rely on the general prohibition. He must go further and show that the shipper had no goods available within the permitted loopholes. In *Tradax v. Andre*, [1976] 1 Lloyd's Rep. 416 we considered this very point. At p. 423 I said:

In order to prove that shipment was prevented, the seller would have to prove that the shipper had no goods on lighter and none in course of loading, which could be used to fulfil the contract. If the shipper had enough goods on lighters for this contract of 220 tons, he would prima facie be in a position to fulfil this contract: and would not be prevented from fulfilling it . . .

And at p. 426 Lord Justice Browne said:

As to the "lighters" point, it is clear that, if a prohibition of export is subject to exceptions or relaxations (for example by

licensing) the seller must prove that he was not, and could not, by reasonable efforts have brought himself within the exception or relaxation . . . The sellers must therefore prove that they were not within either of these exceptions (of goods on lighters or being loaded). If they had been, the goods could have been shipped in spite of the embargo . . .

These two statements were reinforced by Lord Justice Megaw in *Bremer v. Vanden,* [1977] 2 Lloyd's Rep. at p. 337, where he said:

. . . If there are "loopholes", such as the right to load goods already in lighters . . . the burden of proof is on the sellers to show that these possible exemptions did not avail . . .

All those statements were in turn approved by Lord Wilberforce in [1978] 2 Lloyd's Rep. at p. 114. The only qualification which he made was that if there was an absolute prohibition — without loopholes — which operated on the last days of the shipment period completely preventing fulfilment — then the sellers could rely on the prohibition without more as a frustrating event,

Such being the burden of proof, I am quite clear that the sellers did not discharge it. For aught that appears, it may well be that the shippers had already loaded, on or before June 27, 1973, goods which they could have appropriated to the contract: or, it may be that they had goods on lighters, or in the process of being loaded, which they could have appropriated to the contract. In the absence of proof that the shippers had no such goods available, they have not discharged the burden of proof. They have not proved that they were prevented by the embargo from fulfilling the contract. So they have not brought themselves within the exemption in cl. 21.

Any other view would lead to this extraordinary consequence: Once this embargo, with loopholes, was imposed, the sellers could cancel all their outstanding contracts in which they had not given notices of appropriation. They could cancel all those in which the goods had already been loaded or were already on lighters or in the process of being loaded: but had not been appropriated. And they could resell those goods at the enhanced prices then ruling in the trade. That would be most unjust. It is quite clear to my mind that if the sellers had sufficient goods available to fulfil all their contracts, they ought to have fulfilled them. If they had sufficient goods to fulfil some, but not all, of their contracts, they ought to have appropriated them reasonably among the various contracting parties. If they had done so, they could have relied on cl. 21 for the contracts they could not fulfil: see *Intertradex v. Lesieur-Tourteaux,*

[1978] 2 Lloyd's Rep. 509. It is only if they had no goods available to them — to take advantage of the loopholes — that they can rely on cl.. 21 in respect of all their contracts. They never proved this. So they cannot rely on cl. 21,

I find myself, therefore, in agreement with the Board of Appeal when they found—

. . . There was no prohibition of export by the Government of the country of origin which prevented fulfilment of the contract, and no cancellation of the contract by reason of clause 21 of GAFTA Form 100.

*Clause 22*

It was open to the sellers also to rely on "force majeure" as a reason for not shipping during June, 1973. But the burden on them would be just the same as when they were relying on cl. 21, Clause 22 says that the buyers must supply "satisfactory evidence justifying the delay or non-fulfilment". Every word I have said as to burden of proof under cl. 21 applies equally to cl. 22. The sellers have not discharged that burden. I find myself, therefore, in agreement with the Board of Appeal, when they found—

There was no "force majeure" which delayed shipment in accordance with clause 22 of GAFTA 100,

*Waiver*

In the telexes which passed between the parties, the sellers claimed the protection of cl. 21 (which did not require any notices) and of cl. 22 (which required warning notices and extension notices, and so forth). The buyers disputed the sellers' claim, but, nevertheless, when the embargo was lifted on July 2, 1973, they asked for the 40 per cent. then permitted by the authorities. The shippers shipped one half of it — that is as to 20 per cent. under a bill of lading dated July 17, 1973 on the *Olivia Maersk.* The sellers appropriated it to the buyers at the contract price — the very low price of $135.25 — and the buyers accepted that shipment. That was clearly a waiver by the buyers of any claim for damages for the 20 per cent.

*The Pegasus*

The shippers loaded the other half — that is, the second 20 per cent. — under a bill of lading dated July 18, 1973, on the *Pegasus.* The sellers gave notice of appropriation of it to the buyers on Aug. 14, 1973. The buyers all down the line accepted it in several telexes saying that they regarded it as part of the 40 per cent. allowed to be exported. On Aug. 15, 1973 the buyers said: "We insist on delivery of min. 40% of the contractual lot", They also claimed delivery of the balance of 60 per cent. to make up the 100

per cent. June. Th contractu

In due 1973 pres to the 20 the docum as to see promptly required. the line o buyer in t passing on cl. 10 of G the next b before 16 received at failure on documents and claim damages i cent. for w ever made.

The sell waived the appropriati and by tre time. On t shipping d ultimate rec They did no might have contract pri buyers. The basis that th

This raise It must be intermediate buyers — in knowledge of who was re string assum was passed o the line rec buyer who d nine days to others to suf so. If the int ultimate rec of appropria when they fi made enquiri string. They as they did shipping doc

it seems to line by their to believe tha good. On the forwarded t

if they had
advantage
on cl., 21
they never
, 21.

ment with
I—
port by the
igin which
ict, and no
reason of

to rely on
ot shipping
n on them
they were
the buyers
justifying
word 1 have
, 21 applies
discharged
erefore, in
, when they

ire'' which
with clause

etween the
rotection of
ties) and of
notices and
The buyers
nevertheless,
uly 2, 1973,
permitted by
ed one half
ider a bill of
the Olivia
d it to the
ery low price
ccepted that
iver by the
or the 20 per

lf — that is,
bill of lading
s. The sellers
to the buyers
lown the line
ng that they
t, allowed to
buyers said:
40% of the
ed delivery of
ke up the 100

per cent. which should have been shipped in June. They said that they reserved all their contractual rights.

In due course the sellers on Sept. 17 and 19, 1973 presented the shipping documents relating to the 20 per cent. on the *Pegasus*. On getting the documents the receivers made enquiries so as to see if the notices had been passed on promptly down the string as the contract required. They found that there was a defect in the line of communication. It was this. One buyer in the string had taken nine days before passing on the notice of appropriation: whereas cl. 10 of GAFTA 100 required it to be sent on to the next buyer on the same day (if received before 16 00 hours) or on the morrow (if received after 16 00 hours). On discovering this failure on Sept. 21, 1973 the buyers rejected the documents for the 20 per cent. on the *Pegasus*: and claimed damages. They also claimed damages in respect of the outstanding 60 per cent. for which no notice of appropriation was ever made.

The sellers claimed that the buyers had waived the defect — by accepting the notice of appropriation on Aug. 14, 1973 without demur: and by treating the shipment as good all the time. On the face of it, the sellers held the shipping documents for the benefit of the ultimate receivers and presented them to them. They did not resell the goods at a profit, as they might have done, but tendered them at the contract price (the low price of $135.25) to the buyers. They thus changed their position on the basis that the notice of appropriation was good.

This raises a nice point on the law of waiver. It must be observed that as between these intermediate sellers and these intermediate buyers — in the long string — no one had any knowledge of the nine day gap except the one who was responsible for it. Everyone in the string assumed that the notice of appropriation was passed down the line of communication in the time required by GAFTA 100. The only buyer who defaulted was the one who allowed nine days to elapse before serving it. Are all the others to suffer on that account? I do not think so. If the intermediate buyers down the line and ultimate receivers sought to challenge the notice of appropriation, they ought to have done so when they first received it. They ought to have made enquiries then of the buyers further up the string. They ought not to have treated it as good as they did — right up to the time when the shipping documents were presented.

It seems to me that the buyers right down the line by their conduct led the intermediate sellers to believe that the notice of appropriation was good. On the face of it the sellers acted. They forwarded the shipping documents for acceptance. The receivers ought, I think, to have accepted them. If they had done so, they would have received the second 20 per cent. at the contract price — which is surely fair to all — just as the first 20 per cent. on the *Olivia Maersk*.

The receivers seek to avoid this result by relying on the telexes in which the contractual rights were reserved. I do not think this was sufficient. If their conduct was such as to constitute a waiver, they cannot by such a formula escape the consequences of it. In any case, as I read the telexes, the reservation was as to the contractual rights in respect of the 60 per cent. which was not delivered. It did not extend to the 40 per cent. which was tendered.

The modern law as to waiver was stated by this Court in *Panchaud Freres*, [1970] 1 Lloyd's Rep. 53 and *W. J. Alan & Co. v. El Nasr Export & Import Co. Ltd.*, [1972] 1 Lloyd's Rep. 313; [1972] 2 Q.B. 189, where I said at pp. 323 and 213:

. . . If one party, by his conduct, leads another to believe that the strict rights arising under the contract will not be insisted upon, intending that the other should act on that belief, and he does act on it, then the first party will not afterwards be allowed to insist on the strict legal rights when it would be inequitable for him to do so . . .

That principle was applied by Mr. Justice Mocatta in two cases on cll. 21 and 22 of GAFTA 100. They were *Finagrain v. Kruse*, [1976] 2 Lloyd's Rep. 508 (at pp. 524 and 529) on Apr. 12, 1976: and *Bremen v. Vanden*, [1977] 1 Lloyd's Rep. 133 (at pp. 164 and 165) on July 13, 1976. Both were reserved judgments by Mr. Justice Mocatta.

In both of those cases the Court of Appeal reversed Mr. Justice Mocatta, but he was well restored by the House of Lords in *Bremer v. Vanden*, [1978] 2 Lloyd's Rep. 109. Lord Wilberforce said significantly at p. 116:

. . . I prefer the judgment of Mr. Justice Mocatta (in favour of waiver) to that of the Court of Appeal . . .

and Lord Salmon (at p. 126) said in effect that the Court of Appeal had gone wrong in the way they interpreted the need for an unequivocal representation. Lord Salmon said:

. . . To make an unequivocal representation or waiver, it is not necessary for the buyers to say — "We hereby waive it". It is quite enough if they behave or write in such a way that reasonable sellers would be led to believe that the buyers were waiving any defect there might be in the notice and were accepting it as effectively extending the date for delivery . . . If the buyers, by their telexes or by their

conduct lead the sellers to believe that they accepted the notice as a good notice, they necessarily waived any defect it might contain, whether they were aware of it or not . . .

Viscount Dilhorne (at p. 120) took the same view, analysing the position in just the same way. Lord Russell of Killowen (at p. 130) agreed with both Lord Wilberforce and Lord Salmon: and Lord Keith of Kinkel (at p. 131) agreed entirely with Lord Wilberforce. The result is that the House unanimously preferred the judgment of Mr. Justice Mocatta to that of the Court of Appeal. So I turn to the judgment of Mr. Justice Mocatta. He held at p. 164 that—

. . . despite the fact that there are on some occasions considerable delays in the passing of notices of appropriation down the string . . .

and despite the fact that telexes down the line were expressly "subject to all reserves"; nevertheless Mr. Justice Mocatta held that the buyers had waived their strict rights both in relation to the form and also to the timing of the notices. They had done this by not questioning in any way the form of the notice and by saying they were prepared to accept 40 per cent.

I regard the decision of the House in *Bremer v. Vanden* as a most important decision on waiver. As Mr. Davenport said, it is the final step in the series of *Central London Property Trust Ltd. v. High Trees House*, [1947] K.B. 130; *Rickards v. Oppenheim*, [1950] 1 K.B. 616; *Panchaud Freres S.A. v. Etablissements General Grain Co.*, [1970] 1 Lloyd's Rep. 53; and *W. J. Alan & Co. v. El Nasr Export & Import Co. Ltd.*, [1972] 1 Lloyd's Rep. 313; [1972] 2 Q.B. 189. Applied to cases of waiver in GAFTA cases, it may be stated thus: If a buyer, who is entitled to reject goods or documents on the ground of a defect in the notices or the timing of them, so conducts himself as to lead the seller reasonably to believe that he is not going to rely on any such defect — whether he knows of it or not — then he cannot afterwards set up the defect as a ground for rejecting the goods or documents when it would be unfair or unjust to allow him to do so. It is unfair and unjust to allow it when the sellers all down the line have acted on the belief that the notices were good and have presented shipping documents accordingly. The sellers here allowed the buyers to have the goods at the very low contract price instead of the higher market price which they might otherwise have obtained. Fair dealing requires that the buyer should take them rather than seize upon some defect to reject them: simply to get more damages.

In my opinion the buyers ought to have taken up the shipping documents for the 20 per cent. on the *Pegasus* at the contract price of $135.25.

Not having done so, they cannot recover any damages in respect of that 20 per cent. They can, however, recover damages in respect of the 60 per cent. which were never delivered: and the damages should be assessed at July 11, 1973 (as decided by the House of Lords). I would allow the appeal in respect of the *Pegasus* shipment, but dismiss it in respect of the outstanding 60 per cent.

**Lord Justice STEPHENSON:** The sellers have sought to excuse their failure to fulfil their contract by providing a June shipment of 200 tonnes of soya bean meal. Their excuse is an embargo by the U.S. Government making fulfilment of that part of their contract impossible. That embargo they claim amounted to a prohibition which prevented them from fulfilling their contract within cl. 21 of GAFTA 100 and to force majeure which delayed the fulfilment beyond the contract period within cl. 22 of GAFTA 100. Arbitrators and the Board of Appeal have rejected that claim of theirs. Mr. Justice Goff did not decide whether that rejection of that claim was right because the House of Lords had not then given its decision in *Bremer Handelsgesellschaft m.b.H. v. Vanden Avenne-Izegem P.V.B.A.*, now reported in [1978] 2 Lloyd's Rep. 109.

I find nothing in the facts found in the case stated by the Board of Appeal or in the speeches of their Lordships in *Bremer v. Vanden* to invalidate the conclusions in par. 40 of the board's case that—

. . . (a) there was no prohibition of export by the Government of the country of origin which prevented fulfilment of the contract and no cancellation of the Contract by reason of Clause 21 of GAFTA 100 [and] (c) there was no "force majeure" which delayed shipment in accordance with Clause 22 of GAFTA 100.

The sellers relying on cll. 21 and 22 had to prove that the embargo prevented fulfilment under cl. 21 and occasioned delay under cl. 22. By the express terms of those clauses the sellers were obliged, "if required" by the buyers "at any time", to "produce proof to justify their claim for cancellation" under cl. 21 and to supply "satisfactory evidence justifying the delay or non-fulfilment" under cl. 22. They could not prove that cancellation or prevention, delay or non-fulfilment was caused by the embargo simply by proving the existence of the embargo. That would make breach of contract too easy. They had to prove what exactly the embargo prevented or prohibited, how absolute it was, what exceptions or loopholes it allowed or what acts it did not permit or prohibit, and that the part of their contract which they did not

ꜱᴏᴠᴇʀ any
ᴇɴt. They
ᴇᴄt of the
d: and the
, 1973 (as
ᴜld allow
shipment,
ᴜstanding

he sellers
fulfil their
ᴇᴎt of 200
ᴄᴜse is an
t making
ᴄontract
amounted
ʜᴇᴍ from
ꜰ GAFTA
ᴇlayed the
iod within
l the Board
of theirs.
ᴇther that
ᴇᴄause the
its decision
n.b.H.   v.
.A.,   now
.

in the case
he speeches
Vanden to
40 of the

ꜰ export by
ꜰ origin
he contract
ᴄt by reason
ᴅ] (c) there
ᴄh delayed
lause 22 of

d 22 had to
ꜰulfilment
ᴜnder cl. 22.
ᴇs the sellers
ᴜ buyers "at
justify their
. 21 and to
stifying the
ᴄl. 22. They
ᴘrevention,
ꜱed by the
ꜱtence of the
ꜰ contract
ᴛ exactly the
ꜱow absolute
ᴇs it allowed
ᴘrohibit, and
ᴛ they did not

fulfil was not fulfilled because of the embargo.
In *Bremer v. Vanden* the House of Lords
decided that the same defendants, who were
then shippers, as well as sellers, did not have to
prove that they had the goods ready to ship
within the contract period and a ship to carry
them in, or that they could not have bought
goods afloat. Mr. Davenport has submitted that
the House also decided that the sellers did not
have to prove that they had no goods on lighters
and none in course of loading, which would be
used to fulfil the June shipment. I disagree.

In *Bremer v. Vanden* the GAFTA Board of
Appeal's award had found that when the
embargo came into force on June 27, 1973 none
of the vessels chartered to load the sellers' soya
bean meal had commenced to load ((par. 8)
quoted by Lord Salmon in [1978] 2 Lloyd's
Rep. at p. 123) and during the period between
June 27 and July 2 when the embargo was
absolute no loading took place or was able to
take place into any vessel which the sellers had
procured (par. 10A): see [1977] 1 Lloyd's Rep.
at p. 138. Those findings show that the sellers'
evidence had stopped the "loopholes" opened
by that exception to the embargo, as this Court
had decided in *Tradax v. Andre*, [1976]
1 Lloyd's Rep. 416 the sellers had to do. Mr.
Justice Mocatta followed that decision on this
point and held that the sellers had done so:
[1977] 1 Lloyd's Rep. at p. 159. And it was
accepted by Counsel that they were not within
the loopholes: see [1977] 2 Lloyd's Rep. at
p. 342 per Lord Justice Browne referring to
par. 10A of the award and disclaiming any
real difference of opinion between himself and
Lord Denning, M.R., in *Tradax v. Andre*.
Hence Lord Wilberforce's statement in [1978]
2 Lloyd's Rep. at p. 112 that—

... This exception, referred to in the case as
"the loophole", was not available to the
sellers [—and the statement of Lord Russell
of Killowen (p. 129) that—] ... the seller had
no soya bean meal within these loopholes ...
[—the exception(s) for soya bean meal on
lighter or in course of loading.]

But though the burden of proving that the
embargo as limited by the exception prevented
fulfilment had been discharged by the sellers on
whom it rested, both the Court of Appeal and
the House of Lords held that the sellers did not
have to prove that they had goods ready to ship
within the contract period and a vessel to ship
them. Once they had proved the total
prohibition of export (as limited by the
exception) it was for the buyers to prove that the
sellers would not have performed the contract
anyway. Lord Justice Megaw in rejecting the
buyers' argument to the contrary on the
causation point stated the burden of proof

(Lord Justice Browne agreeing with him) in this
way, [1977] 2 Lloyd's Rep. at pp. 336-337:

... If a prohibition of export has intervened
and the buyers seek to say that the sellers,
though they could not have complied with the
contract because of that prohibition,
nevertheless cannot rely on it because they
could not or would not have fulfilled the
contract anyway, the burden of proving the
allegation would be on the buyers, not the
sellers. Accordingly, on the peculiarly nicely-
balanced finding, agreed by the parties in
par. 8A of the award, the buyers would fail
on this point. The burden is, of course, on the
sellers to show that the prohibition operated,
so that they could not in accordance with its
terms have shipped the goods in respect of
which they claim prevention. If there are
"loopholes", such as the right to load goods
already in lighters or such as an opportunity
to apply for a licence which, if obtained,
would enable the sellers to perform by the due
date, the burden of proof is on the sellers to
show that these possible exemptions did not
avail. But once the sellers have discharged
that burden, it would, at the best for the
buyers, be for the buyers to show that the
sellers would not have performed the contract
anyway. This is the same principle as the so-
called "self-induced frustration" principle;
where, once a frustrating event is proved, it is
for the other party to show, if he can, that the
party who relies on frustration had himself
brought about the frustration.

Only one authority was referred to in
support of the buyers' proposition. Reference
was made to dicta of Lord Denning, M.R., in
*Tradax Export S.A. v. Andre & Cie S.A.*,
[1976] 1 Lloyd's Rep. 416, at p. 423:

If he relies on cl. 21, he would have to
prove that the shipper, at the head of the
string [in that case the seller was not
himself the shipper] had goods ready to
ship and that shipment was prevented by
the prohibition of export.

It is, I believe, conceded by Mr. Mustill
that that dictum, if taken literally, would be
wider than he would seek to justify. The mere
fact that a seller did not have goods ready to
ship on June 10, if an embargo was suddenly
imposed on that date, could not in itself
prevent him from relying on the prohibition.
But in any event, as was pointed out in the
course of the argument, it appears from the
judgment of Lord Justice Browne at p. 425
that Counsel who appeared for the buyers in
*Tradax v. Andre* conceded

that if there was in force at the end of the
contract period an absolute prohibition of
export from all ports from which the goods

could be shipped under the contract, the sellers would be protected by the clause without further proof . . .

As I understand the speeches in the House of Lords on the causation point, it was only those words of Lord Denning, M.R., in *Tradax v. Andre* on their literal interpretation which were not accepted. Lord Wilberforce approved the judgment of Lord Justice Browne in *Tradax v. Andre* and the judgment of Lord Justice Megaw in the case under appeal was correct in accepting it, on what the sellers had to prove: [1978] 2 Lloyd's Rep. at p. 114. I cannot read into Lord Wilberforce's speech or the other speeches of their Lordships, or extract out of them, any such disapproval of the rest of these judgments on the causation point as Mr. Davenport invites us to find in them. It would, I think, be open to a seller to discharge the burden of proving that he was prohibited by the embargo from fulfilling a particular contract or particular contracts by proving that he had acted reasonably in appropriating the soya bean meal which he had to his other contract or contracts, as suggested by Lord Denning, M.R., in *Tradax v. Andre*, and in the case of *Intertradex v. Lesieur-Tourteaux*, [1978] 2 Lloyd's Rep. 509. But that question does not arise on the facts of this case.

What I understand to have been decided in *Bremer v. Vanden* seems to me to accord with generally accepted principles of the law of contract and their application to clauses like cll. 21 and 22, whether called exemption or exclusion clauses or cancellation or frustration clauses. Applied to this case it does not, in my judgment, assist the sellers. I do not think that Mr. Justice Brandon's decision in *Bunge v. Kruse*, [1979] 1 Lloyd's Rep. 279 throws any doubt on the extent of what the sellers have to prove in this case. If it does, I would respectfully disagree with it. They have not proved all they have to prove to come within cll. 21 and 22, apart from any questions of notice or complying with the contractual procedure there laid down.

Have the buyers then waived their contractual right or rights to have 200 tonnes shipped in June? Or estopped themselves from asserting that right or those rights?

Here we have not got the benefit of an express answer from the Board of Appeal in the case, though a negative answer is to be implied from their answers in par. 40. The question of waiver or estoppel was raised by the buyers' contention in par. 30 and answered by the sellers' contention in par. 36. We have, however, the benefit of the learned Judge's exhaustive review of the relevant telexes with his comments and conclusions: [1977] 2 Lloyd's Rep. 467, at

pp. 477-483. I respectfully agree with his findings that there was no unequivocal representation by the buyers that they would accept, in respect of the June shipment, July bills of lading; no reliance upon any such representation by the sellers; and no such representation by the buyers that they were waiving their right to reject the *Pegasus* shipment or documents. I cannot find that he made any mistake of law or fact in rejecting the sellers' arguments on waiver or estoppel.

The Judge went for guidance to the decision of this Court in *Finagrain S.A. Geneva v. P. Kruse Hamburg*, [1976] 2 Lloyd's Rep. 508 and applied the principles there stated. It is suggested by Mr. Davenport that we should now seek such guidance in *Bremer v. Vanden*, particularly in the speech of Lord Salmon at pp. 126-127 of the report, and will there find a different principle. I agree with Lord Denning, M.R., that that is a most important decision on waiver; but I regret that I cannot interpret it as he does, and I share Lord Wilberforce's view (at p. 116) that the issue of waiver did not raise any question of principle. I did not read anything said in the House in *Bremer v. Vanden* as invalidating the judgments in *Finagrain v. Kruse*, a case cited to their Lordships and referred to by Lord Wilberforce without disapproval (at p. 112), or as qualifying the statement of Lord Hailsham of St. Marylebone in *Woodhouse v. Nigerian Produce Marketing Co. Ltd.*, [1972] 1 Lloyd's Rep. 439; [1972] A.C. 741 at pp. 445 and 755, in which the need for a clear and unequivocal representation is stated. It was, I think, Lord Salmon's opinion that the representation must be unequivocal but that it must also be such as to lead reasonable sellers to believe that the buyers were waiving their contractual rights and accepting goods which were not shipped in accordance with the contract. This is made clear to my mind by the three sentences of which the last has been quoted by Lord Denning, M.R. They read:

. . . I think that any reasonable sellers would rightly have inferred that the buyers were accepting the notice as a valid and effective notice under cl. 22 save that the reference to 500 tonnes should be altered to 280 tonnes. To put it another way, the buyers made an unequivocal representation that they were treating the notice as a valid and effective notice under cl. 22. To make an unequivocal representation or waiver it is not necessary for the buyers to say, "We hereby waive" . . .

I cannot accept the suggestion that Lord Salmon turned his back on what he had there said as he took a final step along the road leading from *High Trees* case.

i with his
inequivocal
they would
ment, July
any such
i no such
they were
te *Pegasus*
ind that he
ejecting the
ipel.

he decision
*neva* v. *P.*
ep. 508 and
ited. It is
we should
*v. Vanden*,
Salmon at
there find a
d Denning,
decision on
iterpret it as
ice's view (at
iot raise any
id anything
*Vanden* v.
*inagrain* v.
dships and
co without
alifying the
Marylebone
*e Marketing*
439; [1972]
ich the need
esentation is
in's opinion
circular but
d reasonable
vere waiving
ipting goods
nce with the
mind by the
st has been
y read:

sellers would
buyers were
ind effective
reference to
280 tonnes.
ers made an
t they were
ind effective
unequivocal
iot necessary
y waive" . . .

that Lord
he had there
ng the road

I do not understand Lord Salmon's reference to the buyers waiving any defect in the notice under cl. 22 "whether aware of it or not" as laying down any principle that there can be waiver or equitable estoppel on the part of someone who does not know that his rights have been infringed or has not, at the least, such infringed that the other party can reasonably assume that the party waiving or estopped is acting with knowledge of their infringement. Lord Salmon was, I think, referring to a patent defect which could only be missed by not reading the notice or not knowing the law. Here again what matters is the conduct of the "waiving" or "estopped" party, these buyers, and its effect on a reasonable seller, or a reasonable person in the position of the other party, these sellers. And if the buyer so acts as to lead a reasonable seller in these sellers' shoes to believe that he was waiving his rights or accepting a non-contractual shipment as a fulfilment of their contract, and the seller does believe it, the buyer cannot be heard to say, "I did not notice the obvious breach of contract on your part which gave me a right to complain or refuse". But this has no application to matters peculiarly within the seller's knowledge or matters of which he can more easily obtain knowledge than can the buyer.

Here the sellers, if they applied their minds at all to the state of the buyers' knowledge and made no unreasonable assumptions, would have appreciated that the buyers would not know what soya bean meal his sellers had or could get, or whether the sellers had soya bean meal in lighters or in course of loading, and would not know that there had been the nine days' delay in an appropriation further along the string until they got the *Pegasus* documents. And I would not think it unreasonable for the buyers to keep the documents two or three days before rejecting them, even if the sellers had proved that they relied and acted upon any contrary representation of acceptance during those few days.

The facts in *Bremer* v. *Vanden* on which the House reversed the decision of the Court of Appeal and restored Mr. Justice Mocatta's finding of waiver were, in my opinion, clearly distinguishable from the facts of the instant case. There the buyers did complain of the notice under cl. 22, but of one particular defect only, namely that it referred to 500 tonnes instead of 280 tonnes, and thereby negatived any other objection to the notice. There the buyers never suggested in any telex before Aug. 3 that the sellers were in default. There the buyers by a telex of July 24 accepted the force majeure extension under cl. 22. Here the buyers stated that the sellers were in default in their telex of July 12. Here the buyers not only reserved their contractual rights but repeatedly claimed that contractual shipment was possible by telexes of July 23 and 27 and Aug. 20. They were not, I respectfully agree with Mr. Justice Goff, merely mouthing a formula, or "blowing hot and cold", but justifiably and effectively preserving their rights to reject or claim damages for breaches of contract when they knew of them.

In my judgment, he was justified in holding that reasonable sellers could not have regarded anything the buyers telexed or did or did not do as a clear and unequivocal representation that they were willing to accept post June bills of lading in respect of the June shipment or were abandoning their contractual right — on the Judge's construction of cl. 10(b), which I accept — to reject the *Pegasus* documents if it should be discovered later that the notices of appropriation were not correctly passed down the line in accordance with the time schedule.

I am accordingly of opinion that the damages should be assessed as at July 11, 1973 both on the 119.50 tonnes and on the 40 tonnes. So I would dismiss the appeal subject to any variation in the amount of damages necessitated by the substitution of July 11 for July 10.

**Lord Justice SHAW:** The primary question to be decided is whether in the circumstances which have been recounted in the judgment of Lord Denning, M.R., the sellers can, under cl. 21 or cl. 22 of their GAFTA 100 contract escape liability for their failure to deliver in 1973 the June shipment contracted for.

Either of those clauses would operate to exempt sellers from such liability if it were the fact that the failure to deliver was a consequence of the embargo imposed on June 27, 1973. On general principles it would be for the defaulting sellers to prove that their non-delivery was caused by the embargo; and this is reinforced by the express terms of GAFTA 100. The concluding words of cl. 21 state that—

. . . if required sellers must produce proof to justify their claim for cancellation [—while cl. 22 ends with the provision that—] Buyers shall have no claim against Sellers for delay or non-shipment . . . provided that the Sellers shall have supplied to Buyers . . . satisfactory evidence justifying the delay or non-shipment.

The practical issue is how much is it incumbent on sellers to prove in order to establish that they are entitled to exoneration from liability by reason of the embargo? The simple answer is that it must be shown that because of the embargo delivery had become impossible. The impossibility being related to

the embargo, it follows that the extent and scope of the embargo must be precisely delineated and delimited. Thus, if goods outside the embargo corresponding to the contract description are or might be available to the seller under an existing contract without the necessity of his going into the market to find them, he does not bring himself within the exemptions of cll. 21 or 22.

The embargo declared on June 27, 1973 was absolute but not fully comprehensive. It did not apply in all situations. Thus soya bean meal on lighters or in the course of loading before a certain time did not fall within it. In *Bremer v. Vanden*, [1978] 2 Lloyd's Rep. 109 the House of Lords upheld the view that the shippers had to establish that they were caught by the embargo within its defined limits. In the present case the sellers are positioned somewhere in a succession of sellers and buyers. The original shippers are unidentified and their situation in regard to the application of the embargo when it was declared on June 27 is unknown. Counsel for the sellers has contended that for the purpose of bringing them within the exemption of cl. 21 or cl. 22, it is incumbent on the sellers to show only that there was, at material times, a general embargo on the export of soya bean meal and that they were not able to make the deliveries they had contracted for because their suppliers had not delivered to them.

This is a proposition which at least accords with the commercial realities of the situation which developed after the embargo had been imposed. The question is whether this is a consideration which should or could affect the legalities of the matter. To demand proof from a helpless seller of matters he may never be able to discover at any rate in time, puts upon him what might seem an unconscionable burden. Nonetheless, if there was a shipper at the head of the string who could have made appropriations of goods outside the embargo — or to use the language adopted in *Bremer v. Vanden* to whom the "loopholes" in the embargo were available, the string seller would have no protection from liability. If this is a harsh view in the commercial sense, it cannot be refuted on a legalistic basis. The practical answer must be that if an intermediate seller subscribes himself to a contract in the form of GAFTA 100 he must be prepared to take the consequences.

I therefore agree with the preceding judgments that the sellers fail in this contention.

The issue of waiver presents more apparent difficulties. What is beyond contention is that waiver of contractual rights is not to be facilely inferred or assumed. On the contrary, in human affairs and more especially in a commercial context the probabilities are against the voluntary sacrifice of vested rights which are or may be of material value. What is said to constitute a waiver must always be scrutinised with this in mind. However there are situations even in a mercantile environment when insistence on full performance may be commercially inexpedient and may prove less profitable than the result of relaxing the right to and the demand for strict performance. Accordingly, so it seems to me, whether the conduct of a contracting party may amount to a waiver must be determined by reference to all the prevailing circumstances. It need not be such as to amount virtually to an express declaration that this or that right is waived or surrendered. If in the prevailing conditions affecting the position of the parties to a contract the conduct of one of them affords a reasonable foundation for the inference that he is prepared to forgo any right or rights he may have in a certain regard and the other contracting party does draw that inference and persists in the residual contractual relationship upon that basis, then whether it be regarded as waiver or estoppel the forgoing of those rights cannot thereafter be gainsaid. This seems to me the effect of the observations of Lord Salmon in *Bremer v. Vanden*, (at pp. 126-127) and it is consonant with other of their Lordships' views expressed in that case. In my judgment, if I may say so with due respect, this is a standpoint which accords with the realities of mercantile activity and which conduces to the vitality of the world of commerce.

In the present case I see no difficulty, on the basis I have indicated, in distilling from the stream of telexes sent by the buyers in the circumstances which then obtained coupled in regard to the *Pegasus* shipment with their delay in rejecting the documents a strong indication that they waived their right to treat the sellers as being in default. The oft repeated statement that they "reserved all their contractual rights" cannot of itself dissipate the inferences to be drawn from their contemporaneous collateral conduct. Their Counsel sought to reinforce his argument against the implication of waiver by laying emphasis on the buyers' ignorance as to whether, on the facts if and when they became known, the sellers could claim to be exonerated from liability for failing to deliver as required by their contract. I see no reason, however, to limit the effect of waiver to rights known to exist. It may be embracing and so intended, as to forgo rights which *might* exist in regard to a particular contract or in a particular context. What the telexes suggest is that, so long as the market made it worthwhile, the buyers were concerned to get the goods contracted for even if the deliveries were not contractual. No

against the
which are or
t is said to
re scrutinised
re situations
ment when
e may be
ly prove less
g the right to
performance.
whether the
amount to a
ference to all
need not be
an express
is waived or
g conditions
to a contract
a reasonable
e is prepared
ay have in a
tracting party
ersists in the
p upon that
as waiver or
rights cannot
ns to me the
rd Salmon in
127) and it is
rdships' views
ment, if I may
a standpoint
of mercantile
vitality of the

ficulty, on the
ling from the
buyers in the
ed coupled in
ith their delay
ong indication
at the sellers as
ated statement
actual rights'
ferences to be
eous collateral
o reinforce his
n of waiver by
ignorance as to
en they became
be exonerated
ver as required
n, however; to
ghts known to
ough, and so
h *might* exist in
r in a particular
is that, so long
alle, the buyers
contracted for
ontractual. No

tinge of ambivalence in this regard is introduced
by such formulae as "without prejudice to our
rights" or "we reserve our contractual rights".
The implication of waiver survives such mild
dilution where the surrounding circumstances
are sufficiently cogent in themselves.

In this aspect of the appeal I find myself in
complete agreement with the views stated in the
judgment of Lord Denning, M.R., and I would
allow the appeal to the extent and in the manner
there indicated.

[*Order: Appeal allowed in part. Appellants to
pay half respondents' costs. Application for
leave to appeal to the House of Lords refused.*]

---

## COURT OF APPEAL

July 20, 21, 24 and 25, 1978

---

WOOLCOTT

v.

EXCESS INSURANCE CO. LTD.

AND

MILES, SMITH, ANDERSON
AND GAME LTD.

Before Lord Justice MEGAW,
Lord Justice SHAW
and Lord Justice WALLER

Insurance (Fire)—Non-disclosure—Insurance brokers
—Plaintiff did not disclose previous convictions to
insurers—Property destroyed by fire—Whether
non-disclosures material—Whether brokers aware
of plaintiff's criminal record—Whether insurers
could avoid policy—Whether insurers entitled to an
indemnity from brokers.

By an agreement, in writing, dated Feb. 5, 1971,
the defendant insurers authorised the third party
(the brokers) to bind insurance for the defendants'
account in accordance with the terms and
conditions of the agreement.

On Apr. 28, 1974, the brokers effected for the
defendants, insurance with the defendants covering
the plaintiff's house "Greenacres" together with all
risks for a total sum of £32,500, subject to the terms
and conditions of the defendants' household
comprehensive policy.

The property and contents were destroyed by fire
on Aug. 16 and 17, 1974. The defendants, while
admitting the policy, the fire and the resultant loss
from one of the perils insured against, contended
that they were not liable to the plaintiff under the
policy because of the failure by the plaintiff to
disclose his criminal record in his proposal for
insurance.

The plaintiff admitted that he had a serious
criminal record culminating in a sentence of 12
years imprisonment for robbery in April, 1960, and
although he did not contend that he had disclosed
his criminal record or any part of it to the
defendants, he asserted that the brokers, who
issued the policy on behalf of the defendants, knew
that he had some criminal record, certainly at some
time before the peril of fire destroyed his home and
contents.

The defendants issued a third party notice
claiming an indemnity, against the plaintiff's claim,
from the brokers, based on the plaintiff's assertion
that the brokers were aware of his criminal record.
The brokers denied any such knowledge.

——*Held*, by Q.B. (CAULFIELD, J.), that (1)
the plaintiff's criminal past affected the risk and
ought to have been disclosed by him;

EASTERN CARIBBEAN SUPREME COURT
TERRITORY OF THE VIRGIN ISLANDS

IN THE HIGH COURT OF JUSTICE
(CIVIL)

CLAIM NO. BVIHCV 64 of 2013

BETWEEN:

CLEARLIE TODMAN-BROWN

Respondent/Claimant

and

THE NATIONAL BANK OF THE VIRGIN ISLANDS LIMITED

Applicant/Defendant

Appearances:
    Dr. Joseph S Archibald QC for the Respondent/Claimant
    Mr. Paul Dennis QC with him Ms. Akilah Anderson for Applicant/Defendant

-------------------------------------------
2013:   July 30
        August 16
-------------------------------------------

JUDGMENT

Watchwords: – Summary Judgment Rule 15.2 – Striking Out – 26.9(3)
Considerations in exercising the discretion – whether there is a triable issue

1

[1]    **BYER J.:-** By application dated the 23rd day May 2013 the Applicant/Defendant sought the following relief as against the Respondent/Claimant:

> (a) **Summary Judgment be entered in favour of the Defendant under CPR 15.2 (a) on the basis that the Respondent/Claimant Clearlie Todman-Brown (the Claimant) has no real prospect of succeeding on the claim; alternatively**
> (b) **The Claimant's claim be struck out in its entirety pursuant to CPR 26.3 (1) (b) on the basis that it discloses no reasonable grounds for bringing the claim**
> (c) **Costs of this application be granted to the Defendant**
> (d) **Any such further or other order as this Honorable Court sees fit."**

[2]    The essence of the application therefore requires that the case as filed before the Court has to be examined in its totality.

**The Claimant's Case**

[3]    The Respondent/Claimant by her statement of claim filed on the 25th February 2013 stated that in May 2007 she obtained a loan from the Applicant/Defendant Bank to construct a home on her piece of land, Parcel 147. Pursuant to the said agreement with the Applicant/Defendant Bank the Claimant charged by way of mortgage the said parcel 147 to the Bank.  During the course of the construction, the relationship between the Respondent/Claimant and her contractor deteriorated which resulted in the failure of the contractor to complete the home for the Respondent/Claimant on time or at all. Out of those set of circumstances, the Respondent/Claimant filed suit against the Contractor for breach of contract and was successful.

[4]    The Respondent/Claimant as a result of this failure by the contractor fell into major financial issues and by her own admission, she fell into arrears with the Applicant/Defendant Bank. Upon this state of affairs, the Respondent/Claimant attempted to request of the Bank, an extension of the facility to allow her to further finance the construction and to complete the building. This was refused.

[5]    Upon the Applicant/Defendant issuing the statutory notices to exercise its power of sale, the Respondent/Claimant sought to move the court seeking several

2

declarations from the Court based on the allegation of a failure on the part of the Applicant/Defendant Bank in upholding what the Respondent/Claimant says were certain obligations and undertakings due to her and /or a negligence in their dealings with the Respondent/Claimant. The Respondent/Claimant therefore  claimed by paragraph 11 of the Statement of Claim the following:

[6]    *"Particulars of Negligence:*

> *(1)  Undertaking as a bank a duty of care towards the Claimant to inspect the building works during the construction of the house on Parcel 147 and to ensure that money paid out of the Claimant's Loan funds under the Instrument of Charge and according to the Construction Drawdown Schedule, properly matched the stipulated stages of the works set out in the said schedule.*

> *(2)  Breaching or failing or abandoning that duty of care either by lack of due inspections or by careless inspections or by careless reporting of such inspections or by careless assessment of such inspections or by carelessly disbursing the Loan funds direct to the building contractor without first assessing whether the works had reached the stipulated stages relating to the monies which the Bank paid to the building contractor.*

> *(3)  Paying the building contractor 96.73% of the Loan funds for all stages of the works which were in fact 40% incomplete.*

> *(4)  Res ipsa loquitur (i.e. the matter speaks for itself)*

[7]    *Particulars for breach of contract*

> *(1)  The Defendant having undertaken to the Claimant to inspect the works from time to time before paying out any money to the building contractor upon his request at specified stages of the building works, paid out $677,600 of the agreed construction loan funds of $700,500 to the building contractor covering all stages up to completion, leaving only $22,900 retention unpaid in November 2008, in circumstances where the Trial Judge found that the building contractor abandoned the building works with 40% of the building*

3

*incomplete and uninhabitable for any of the purposes for which it was intended, and requiring a further $431,00 as estimated in Trial testimony by the building contractor's expert witness to complete the building works.*

(2) *Failure to inspect the building project properly or to assess the stages of the works in relation to the payments required by the building contractor.*

(3) *Paying to the building contractor 96.73% of the Loan funds for all stages of the works which were in fact 40% incomplete.*

(4) *Res ipsa loquitur (i.e. the matter speaks for itself.)*

[8]     *Particulars of loss and damage*

(1) *Loss of value of the house agreed to be constructed on Parcel 147*

(2) *Loss of expected rents from the rental units designed for the house*

(3) *Loss of the expectation of the Claimant's residence in the house thereby resulting in the Claimant having to incur rents from January 2009 up to the present time*

(4) *Loss of monies incurred for additional bank interest due to inability to meet the bank loan payments brought about by the financial disaster in the Defendant's paying out practically all the Loan funds to the building contractor when the building was 40% incomplete and uninhabitable for any of its intended purposes."*

[9]     The Respondent/Claimant therefore prayed for the following declarations:

(1) *"A Declaration that the intended sale of land Parcel 147 of Black 2438B of the West Central Registration Section in Tortola including the 60% completed house thereon ("Parcel 147"), by the Defendant as Chargee will be unlawful and inequitable*

4

having regard to the facts that the Defendant as Chargee has by letter of 3 September 2012 coupled with a statutory three-months notice also dated 3 September 2012 under Section 72 of the Registered Land Ordinance 1970, Cap 229, addressed to the Claimant, called for US696,156.51 and other monies to avoid sale of Parcel 147, and that up to the present time, after expiry in December 2008 of the said statutory notice, the Defendant has not indicated any market value or the best price available or any upset price to be considered for the purposes of the sale of Parcel 147.

(2) A Declaration that any such sale without first ascertaining the market value or the best price available or any upset price for the sale by the Defendant of Parcel 147 will be unlawful and inequitable if effected by public auction; and will also be unlawful and inequitable if carried out by private treaty without the prior sanction of the Court.

(3) A Declaration that any such sale will be unlawful and inequitable if effected prior to the Defendant's response to the Claimant's letters of 5 November 2012 and 12 December 2012 and email of 9 January 2013 requesting the Defendant to disclose to the Claimant the Defendant's disbursements of the Loan funds under Instrument of Charge No. 1236/2007 together with a full print-out statement of the Loan account from its commencement until 3 September 2012 showing the monthly or other periodic calculation of interest with notation as to whether it is simple or compound interest.

(4) An injunction including urgent interim injunction against the intended sale of Parcel 147 by the Defendant, whether by public auction or private treaty

(5) An injunction including urgent interim injunction to restrain the Defendant from selling Parcel 147 by public auction or private treaty while Parcel 147 is the subject of current appeal

5

*proceedings in the Court of appeal; which Appeal proceedings arise from a BVI High Court Civil action No 195 of 2009 between Clearlie Todman- Brown as Claimant and her building contractor Melvin Rymer d/b/a Melvin Rymer Architect Inc as Defendant in which a High Court judge the Honourable Madam Justice Indra Hariprashad –Charles after Trial gave written judgment in 113 paragraphs dated 11 May 2011 for the Claimant for against the building contractor in the amounts of $409,150 damages,%61,515 prescribed costs  and $5475 expert witness fees plus statutory interest of 5% per annum thereon until payment of the judgment on the ground that the building contractor breached the building contract when he abandoned the project on Parcel 147 in December 2008 after receiving from the Defendant Bank $677,000 of the loan funds and left the building 40% incomplete and uninhabitable for the purposes for which it was intended; and the said judgment debt remains wholly unpaid up to the present time; And the Chief Justice The Honourable Mrs Janice Pereira at a status hearing of the Court of Appeal in Tortola on 15 January 2013 ordered and directed that the appellant Melvin Rymer should expedite the necessary steps of an appellant for hearing of the appeal, which is now expected to be heard in the Virgin islands during the week commencing 6 May 2013 .*

(6) *Damages for loss and damage suffered, as a result of the negligence and/or breach of contract of the Defendant as the Claimant's banker during the period 3 May 2007 to December 2008*

(7) *Interest*

(8) *Further or other relief*

(9) *Costs"*

**The Defendant's Case**

[10]   The Applicant/ Defendant Bank filed a defence on the 27th March 2013. By their defence the Applicant/Defendant Bank admitted that the Respondent/Claimant had entered into a loan agreement with them however it was not only for the construction of the building on Parcel 147 but also was to enable the refinancing of a former loan. The Respondent/Claimant was therefore required and did so

6

**Page 123**

charge, Parcel 147 to the Applicant/Defendant and was further mandated to make regular payments towards the loan.

[11]     The Applicant/Defendant further averred that the Respondent/Claimant undertook to make the payments and that on her own admission; she fell into arrears which default triggered the right of the Applicant/Defendant to issue the statutory notices upon the default. Before any further action could be taken this Claim was filed which they aver has sought to fetter the right of the Applicant/Defendant to enforce their statutory rights of enforcement.

[12]     The Applicant/Defendant further averred in their defense that they knew of the agreement that existed between the Respondent/Claimant and her contractor but that they were never a party to that agreement and were not therefore in a position to monitor this agreement on behalf of the Respondent/Claimant. Further the Applicant/Defendant averred and exhibited that all payments that were made to the contractor were made with the express consent and by the authority of the Respondent/Claimant herself and that there was therefore no duty to the Respondent/Claimant by the Applicant/Defendant to act on her behalf and that there was therefore no breach of any implied contract or otherwise or any negligence on their part in their dealings with the Respondent/Claimant.

[13]     The Applicant/Defendant therefore denied each and every allegation indicating that they were not liable to the Respondent/Claimant at all.

**Applicant/Defendant's Submissions**

[14]     The applicants have sought to make their application in the alternative, pursuant to Part 15.2(a) of the CPR 2000 and 26.3(1) (b) of the CPR 2000. However the main thrust of the Applicant/Defendant's submissions was in relation to the operation of Part 15.2(a) of the CPR 2000. The gravamen of the power to be utilized under this Part is whether the Respondent/Claimant has a "***real prospect of succeeding***" in

7

its case. The Applicant /Defendant on that point referred the Court to the case of Alfa Telecom Turkey Limited v Cukurova Finance International Limited and Cukurova Holdings AS[1] and the dicta of Lord Hope in Three Rivers District Council v Bank of England (No.3)[2]  and stated what was the nature of this test that is to be applied for the determination of a summary judgment:

> *"The rule...is designed to deal with cases which are not fit for trial at all: the test of no real prospect of succeeding requires the judge to undertake an exercise of judgment; he must decide the case without a trial and give summary judgment; it is a discretionary power; he must then carry out the necessary exercise of assessing the prospects of success of the relevant party; the judge is making an assessment of the case as whole which must be looked at ; accordingly the criterion which the judge has to apply under [CPR Pt 24] is not one of possibility; it is the absence of reality"*

[15]    The Applicant/Defendant therefore made the submission that in looking at the totality of the Respondent/Claimant's case, that the grounding of the cause of action was based on what they considered a bald unbuttressed assertion of the existence of an obligation or responsibility or duty on the Bank. This was however untenable, they argued in circumstances where no viable basis of duty or obligation had been pleaded or advanced in the evidence put before the court upon which the Respondent/Claimant sought to rely in opposition to the Application as filed.


[16]    The Applicant/Defendant further argued that the essence of the claim was contained and to be found in Paragraph 11 of the Statement of claim which only made bald assertions that the Bank was in default of its obligation to the Respondent/Claimant by failing to monitor and manage the contract the Respondent/Claimant had entered into with the contractor to which the Bank was not a party.

---

[1] HCVAP 2009/001
[2] [2001] 2 All ER 4513

[17]     The Applicant/Defendant in their arguments further advanced on the Court that despite these allegations and nebulous references to "equitable obligations" which they were accused of by the Respondent/Claimant of breaching, they argued that the Respondent/Claimant had failed anywhere in their pleadings to identify the basis of this obligation nor had they identified any agreement to do so. Having failed to do so they have failed to meet the threshold required to defeat the application for summary judgment.

[18]     Further, the Applicant/Defendant in summation argued that the pleadings without more were themselves so deficient that even if the Court refused to make the order pursuant to the Part 15.2 that that it was clear that the pleadings should be struck out under the provisions of Part 26.3 (1)(b) for failing to disclose any reasonable cause of action.

**The Respondent/Claimant's Submissions**

[19]     In response the Respondent/Claimant to the application categorically denies that the pleadings filed on her behalf disclose no viable claims against the Bank.

[20]     The point of contention with the Respondent/Claimant is that there was no need for the contract to be in writing as between the Bank and the Claimant. The pleadings show that the mere fact that there was a contract for the Bank to disburse funds, and did so to the Contractor even when he was in obvious default under his agreement was ipso facto proof that they had failed to protect the Claimant, from the contractor's default, and as such had breached their "equitable obligations" against which the Respondent/Claimant was entitled to claim relief.

[21]     The Respondent/Claimant argued that the claim having been made for substantial reliefs to which the Applicant/Defendant had not answered, made it a matter that could not be dealt with summarily but had to be one that would only have to be assessed by the Trial judge at that stage.

9

[22]    The Respondent/Claimant further sought to rely on a document that was exhibited to the Court on the Affidavit in opposition filed by the Respondent/Claimant that was entitled "the Drawdown schedule". This was presented to the Respondent/Claimant by her contractor for the payment of all sums due under the construction contract, which the Respondent/Claimant contends directed the payments by the Bank despite there being no privity of contract with the Bank to this document. Thus they having sight of this document, the Respondent/Claimant contended, and they having paid monies even without checking actual progress amounted to prima facie negligence for which the Respondent/Claimant is entitled to be heard.

[23]    It would therefore not be equitable on a summary hearing to prevent the Respondent/Claimant from ventilating her issues before a full trial.

[24]    In support thereof the Respondent/Claimant sought to rely on several authorities including an extract from the <u>White Book</u> Volume 1 [2009]; M4 <u>Investments Inc v Clico Holdings ( Barbados) Inc</u>[3]; <u>Three Rivers District Council</u> case [4]; <u>Swain v Hillman and another</u> [5]all of which were entirely helpful.

**The Court's Analysis and Findings:-**

[25]    The application before the court is twofold both under the Part 15.2(a) of the CPR 2000 and in the alternative Part 26.3 (1) (b) CPR 2000. Part 15.2 CPR 2000 states

> *"The Court may give summary judgment in the Claim or on a particular issue if it considers that the –*
> *(a) Claimant has no real prospect of succeeding on the claim or the issue; or*
>
> *(b) Defendant has no real prospect of successfully defending the claim or the issue."*

---

[3] 68 WIR 65
[4] Op cit
[5] [2001] 1All ER 91

10

[26]   In support of this application the Rules provide that the same must be served on the other party to the proceedings with requisite evidence in support thereof[6].

[27]   It is therefore only upon examination of these documents filed together with the case as pleaded that a Court can make the determination of whether the party against whom the complaint is made has "*no real prospect in succeeding on the claim*" [7] In order to do so the Court must be invited to "*[assess] the prospects of success of the relevant party... It is the assessment of the case as a whole which must be looked at accordingly. The criterion which the judge has to apply under CPR 24 is not one of probability it is the absence of reality*"[8]

[28]   It is therefore imperative that the Court in making the requisite assessment that all of the evidence and pleadings as filed must be taken into account. In this instant case this comprises the Statement of Claim and Claim form filed on the 25th February 2013, the Defence filed on the 27th March 2013, the affidavit of Richard Lake in support of the Application filed on the 23rd May 2013 and the exhibits thereto and the Affidavits of the Claimant filed on the 10th July 2013 and the 25th July 2013 and exhibits thereto.

[29]   From these documents the Court understands that the Respondent/ Claimant's case is that the Applicant/Defendant had an obligation to monitor the terms and execution of a contract made between the Respondent/Claimant and her contractor. A contract to which admittedly the Applicant/Defendant was neither a party nor which governed the relationship as between the Applicant/Defendant and the Respondent/Claimant. It was this obligation that the Respondent/Claimant says has been breached.

---

[6] Part 15.4 and 15.5 CPR 2000
[7] Swain v Hillman  Op cit  at 96 per Pill LJ
[8] Three Rivers District Council and ors v Bank of England (no.3)  Op cit

**Page 128**

[30]     The Court also understands that the Applicant/Defendant has said there was no such obligation and that further all and any payments which are alleged to have been paid to the Contractor in breach of these so called obligations were with the express consent and authority of the Respondent/Claimant. These respective cases are buttressed as they are by the further evidence that was filed and the documents that were brought to the Court's attention.

[31]     The Court has made an in-depth assessment of the cases that were pleaded. The Court is in agreement with Counsel for the Applicant/Defendant that the lack of specificity in the pleadings surrounding the nature of the agreement which is alleged to have been breached, or that was so disregarded to amount to negligence on the part of the Applicant/Defendant is a fatal flaw. It is indeed trite law that a contract is binding as between parties need not be in writing but in order to be relied on, any oral agreement must have specifics which must be pleaded to allow the other party against whom it is alleged to know upon what is relied. Thus there would need to be some indication of inter alia when, where in what manner and the subject matter or nature of the agreement in the pleadings.

[32]     The Court has been unable to satisfy itself that anywhere in the Statement of Claim or even in the Affidavit of the Respondent/Claimant herself in opposition are any of these specifics given. Not one officer's name. Not one instance when a conversation was had between a named officer of the Bank and the Claimant. Not one instance of the nature or tenor of any undertaking or agreement is pleaded or even averred to by the Respondent/Claimant. On the basis that this is the gravamen of the Respondents/Claimant case, the next question would have had to be, would this failure result in the entire effective dismissal of the Respondent/Claimant's case at this summary juncture?

[33]      A court must therefore consider that, "*the hearing of an application for summary judgment is not a summary trial. The court at the summary*

12

*judgment application will consider the merits of the respondent's case only to the extent necessary to determine whether it has sufficient merit to proceed to trial....At a trial the criterion to be applied by the Court is probability: victory goes to the party whose case is the more probable (taking into account the burden of proof).This is not true of a summary judgment application...it is the absence of reality"* [9]

[34]   Having been empowered by the Rules and the learning of the cases so helpfully provided by Counsel for the parties, the Court is required to look at the case as a whole. The pleadings have been effectively been closed and there was no attempt even after the filing of the Defense to attempt to make good any highlighted deficiencies in the Statement of Claim.  Without more, the Court is of the opinion that the Respondent/Claimant has failed to provide to the court, any tangible information upon which the Court can rely, to allow this claim to proceed on the basis that the Respondent/Claimant has established a claim with a real prospect of success.

[35]   In making this assessment this Court is of the view that there is simply not enough evidence to raise a real prospect of a contrary case which would facilitate a trial.[10] There is in fact an *"absence of reality".*[11]

[36]   The Claim in this court's opinion, when looking at all the documents before it, including the entire set of signed requests for the "draw downs" on the loan by the Respondent/Claimant further belies the contentions made by the Respondent/Claimant. In the Court's opinion they do not raise a case to which this court should further expend the court's resources to determine what may be considered a  speculative claim

---

[9] White Book [2001] Para 24.2.3
[10] Korea National Insurance Corporation v Alvarez Global Corporate and Specilaty AG [2007] EWCA Civ 1066 reported in Blackstone's Civil Practice 2009 para 34.10
[11] Three Rivers case op cit

[37]    It is recognized that the court in exercising its discretion and making this determination the overriding objective of the rules must be borne in mind, however, "*a judge should not allow a matter to proceed to trial where the [defendant] has produced nothing to persuade the court that there is a realistic prospect that the defendant will succeed in defeating the claim brought by the claimant. In response to an application for a summary judgment a defendant is not entitled without more merely to say in the course of time something might turn up that would render the claimant's case untenable. To proceed in that vein is to invite speculation and does not demonstrate a real prospect of successfully defending the claim*" [12]

[38]    Although this quotation was made in the context of the viability of a defence the words are just as instructive to any challenged claim and in so accepting that, it becomes clear that even with the overriding objective speculative claims should not be fostered or encouraged by the Court.

[39]    I therefore find that the application for Summary Judgment in favor of the Applicant/Defendant is granted.

**Striking out Application**

[40]    The court having found on the application with regard to summary judgment I find no reason to determine the alternative prayer of the Applicant/Defendant.

[41]    I wish to state on the record the Court's gratitude to the submissions and authorities provided by Counsel for the parties in this matter.

---

[12] Per Sunders CJ(Ag) in <u>Bank of Bermuda Ltd v Pentium</u> Civ App no 14 of 2003 BVI at paragraph 18

[42]    Order

    i.  The Application for Summary Judgment is granted in favour of the Applicant/Defendant

    ii.  Costs   are awarded to the Applicant/Defendant   in the sum of $2,500.00

..........................
Nicola Byer
High Court Judge



[Home] [Databases] [World Law] [Multidatabase Search] [Help]
[Feedback]

# United Kingdom House of Lords Decisions



---

**You are here:** BAILII >> Databases >> United Kingdom House of Lords Decisions >> Fibrosa Societe Anonyme v Fairbairn
Lawson Combe Barbour Ltd [1942] UKHL 4 (15 June 1942)
URL: *http://www.bailii.org/uk/cases/UKHL/1942/4.html*
Cite as: [1942] UKHL 4, [1943] AC 32

---

[New search] [Help]

---

JISCBAILII_CASE_CONTRACT

## Die Lunae, 15° Junii, 1942.

Parliamentary Archives,

HL/PO/JU/4/3/971

Lord
Chancellor

Lord
Atkin

Lord
Russell of
Killowen

Lord

Macmillan

Lord
Wright

Lord
Roche

Lord
Porter

## FIBROSA SPOLKA AKCYJNA

*v.*

## FAIRBAIRN LAWSON COMBE BARBOUR, LIMITED.

# The Lord Chancellor

MY LORDS,

This is the appeal of a Polish Company who were Plaintiffs in the action against the decision of the Court of Appeal composed of Lord Justice MacKinnon, Lord Justice Luxmoore, and Mr. Justice Stable, confirming the judgment of Mr. Justice Tucker at the trial in favour of the Respondents. After the Court of Appeal's judgment and before the appeal came to be argued at your Lord-ships' bar, the town of Vilna, where the Appellant Company had carried on its business, and indeed the whole of Poland, under the laws of which State the Appellant Company was incorporated, were occupied by our enemy Germany. The question might, therefore, arise whether the Appellant Company should now be debarred from prosecuting its appeal. (See the judgment of the Court of Appeal delivered by Lord Reading C.J. in *Porter* v. *Freudenberg* [1915] I K.B. 857, especially at pages 868 and 884; see also *Rodriguez* v. *Speyer Bros.* [1919] A.C. 59.) In order to obviate any difficulty on this head, the Plaintiff Company, at the suggestion of the House, applied to the Board of Trade, and the Department gave to the Appellants' solicitors a licence to proceed with the appeal, notwithstanding that their clients might be in the position of an alien enemy. The House was content to let the case proceed on this basis. It is not, therefore, necessary to con-

**Page 134**

sider, in dealing with the present appeal, whether the recent de-
cision of the Court of Appeal in re *an Arbitration between N. V.*
*Gebr. van Udens Scheepvaart en Agentuur Maatschappij and*
*Sovfracht* [1941] 3 All E.R. 419, should be approved. If, as the
result of the decision of the House, any payment becomes due to
the Appellants, and if they were in the position of alien enemies
within the meaning of the Trading with the Enemy Act, 1939, the
payment would be regulated by that Act.

The Respondents are a limited company carrying on at Leeds
the business of manufacturing textile machinery, and by a con-
tract in writing dated the 12th July, 1939, the Respondents agreed
to supply the Appellants with certain flax-hackling machines as
therein specified and described, at a lump-sum price of £4,800.
The machines were of a special kind, and there is no suggestion
that the Respondents were not to manufacture them themselves.
By the terms of the contract, delivery was to be in three to four
months from the settlement of final details. The machines were
to be packed and delivered by the Respondents c.i.f. Gdynia;
the services of a skilled monteur to superintend erection were to
be provided by the Respondents and included in the price; and
payment was to be made by cheque on London, one-third of the
price (£1,600) with the order and the balance (£3,200) against
shipping documents.

On July 18th, 1939, the Appellants paid to the Respondents
£1,000 on account of the initial payment of £1,600 due under the
contract. On September 1st, 1939, Germany invaded Poland and
on the 3rd September Great Britain declared war on Germany.
On September 7th, the Appellants' agents in this country wrote to
the Respondents: " Owing to the outbreak of hostilities it is now
" quite evident that the delivery of the machines on order for
" Poland cannot take place. Under the circumstances we shall
" be obliged if you will kindly arrange to return our initial pay-
" ment of ,£1,000 at your early convenience." To this request,
the Respondents replied on the next day refusing to return the
sum and stating that " considerable work has been done upon these
"machines and we cannot consent to the return of this payment.
"After the war the matter can be reconsidered."

On September 23rd, by Order in Council made under the provisions of the Trading with the Enemy Act, 1939, it was declared that Poland (including that part in which the port of Gdynia is situated) was enemy territory.

There was further correspondence between the parties or their agents which failed to produce agreement, and on May 1st, 1940, the Appellant Company issued a writ and by its statement of *claim* alleged "that the Respondents had broken the contract by refusing to deliver the machines, while the Appellants " are and have at all " material times been ready and willing to take delivery and pay " for the machines." The prayer of the claim was *(a)* for damages for breach of contract, *(b)* for specific performance—an obviously hopeless claim—or, alternatively, return of the £1,000 with interest, and *(c)* for further or other relief. The substantial defence of the Respondents was that the contract had been frustrated by the German occupation of Gdynia on the 23rd September, 1939, and that in these circumstances the Appellants had no right to the return of the £1,000.

Before passing to the main question involved in the appeal, I must mention another contention of the Appellants which was based on Clause 7 of the conditions of sale attached to the contract. This Clause contained the provision that " should despatch be " hindered or delayed by ... any cause beyond our reasonable " control including . . . war ... a reasonable extension of time " shall be granted." The Appellants argued that there could be no frustration by reason of the war which broke out during the currency of the contract because this contingency was expressly provided for in Condition 7 and, therefore, there was no room for an implied term such as has often been regarded as a suitable way in which to express and apply the doctrine of frustration. I entirely agree with the Court of Appeal that in the circumstances of the present case this is a bad point. The ambit of the express condition is limited to delay in respect of which " a reasonable extension of time " might be granted. That might mean a minor delay as distinguished from a prolonged and indefinite interruption of prompt contractual performance which the present war manifestly and inevitably brings about. A similar argument was unsuccessfully urged in *Bank Line v. Capel* [1919] A.C. 435 and in other cases, a recent instance of which is *Tatem* v. *Gamboa* [1939] 1 K.B. 132. The principle is that where supervening events, not due to the default of either party, render the performance of a contract indefinitely impossible, and there is no undertaking to be bound in any event, frustration ensues, even though the parties may have expressly provided for the case of a limited interruption. As Lord Justice MacKinnon points out, the unsoundness of the contrary view is implicit in *Jackson v. Union Marine Insurance Co., Ltd.,* L.R. 10 C.P. 125, for the charter-party in that case contained an exception of perils of the sea (see L.R. 8 C.P. at p. 584), but none the less the contract was held to have been terminated

and the adventure to have been frustrated By the long delay due to the stranding of the ship. The situation arising from the outbreak of the present war, so far as this country, Germany and Poland are concerned, makes applicable Mr. Justice Lush's well-known observation in *Geipel v. Smith,* L.R. 7 Q.B. 404 at p. 414, " a state of war " (in that case the Franco-German war of 1870) " must be presumed to be likely to continue so long and so to " disturb the commerce of merchants as to defeat and destroy the " object of a commercial adventure like this."

There is a further reason for saying that this subsidiary contention of the Appellants must fail, viz., that while this country is at war with Germany and Germany is occupying Gdynia, a British subject such as the Respondents could not lawfully make arrangements to deliver c.i.f. Gdynia, and therefore the contract could not be further performed because of supervening illegality. A provision providing for a reasonable extension of time if despatch is delayed by war cannot have any application when the circumstances of the war make despatch illegal. *(Ertel Bieber & Co. v. Rio Tinto Co., Ltd.* [1918] A.C. 260.)

[3] 3

Mr. Linton Thorp, in conducting the argument for the Appellants before us, admitted that if the point with which I have already dealt was decided against him, the only other issue to be determined was whether, when this contract became frustrated, the Appellants could, in the circumstances of the present case, claim back from the Respondents the £1,000 which they have paid when placing the order. As to this, Lord Justice MacKinnon, in delivering the judgment of the Court of Appeal, said: " Mr. Justice

"Tucker held that, having regard to the principle laid down in
" *Chandler* v. *Webster* [1904] 1 K.B. 493 and other like cases, this
" claim must fail. We think he was right, and, further, that that
" principle must equally bind this court to reject the claim. Whether
" the principle can be overruled is a matter that can only concern
" the House of Lords."

This alleged principle is to the effect that where a contract has been frustrated by such a supervening event as releases from further performance, " the loss lies where it falls ", with the result that sums paid or rights accrued before that event are not to be surrendered, but that all obligations falling due for performance after that event are discharged. This proposition, whether right or wrong, does not first appear in *Chandler* v. *Webster,* but in *Blakeley* v. *Mutter & Co.,* decided in January, 1903, by a Divisional Court [1903] 2 K.B. 760, note, which was also a case arising out of the abandonment of the coronation procession owing to King Edward VII's sudden illness. In that case, Mr. Justice Channell said, " If the
" money was payable on some day subsequent to the abandonment
" of the procession, I do not think it could have been sued for.
" If, however, it was payable prior to the abandonment of the pro-
" cession, the position would be the same as if it had been actually
" paid and could not be recovered back, and it could be sued
" for. . . . It is impossible to import a condition into a contract
" which the parties could have imported and have not done so.
" All that can be said is that when the procession was abandoned
" the contract was off, not that anything done under the contract
" was void. The loss must remain where it was at the time of the
" abandonment. It is like the case of a charter party where the
" freight is payable in advance and the voyage is not completed,
" and the freight, therefore, not earned. Where the non-completion
" arose through impossibility of performance, the freight could not
" be recovered back." In *Civil Service Co-Operative Society, Ltd.*
v. *General Steam Navigation Co.,* which was decided in the Court of Appeal in October, 1903 [1903] 2 K.B. 756, Lord Halsbury L.C. expressed entire concurrence with this passage in the judgment of Mr. Justice Channell. Lord Alverstone C.J., who was a party to both these decisions, took the same view.

If we are to approach this problem anew, it must be premised that the first matter to be considered is always the terms of the particular contract. If, for example, the contract is " divisible "

in the sense that a sum is to be paid over in respect of completion of a denned portion of the work, it may well be that the sum is not returnable if completion of the whole work is frustrated. If the contract itself on its true construction stipulates for a particular result which is to follow in regard to money already paid, should frustration afterwards occur, this governs the matter. The ancient and firmly established rule that freight paid in advance is not returned if the completion of the voyage is frustrated *(Byrne* v. *Schiller* (1871) L.R. 6 Ex. 319) should, I think, be regarded as a stipulation introduced into such contracts by custom, and not as the result of applying some abstract principle. And so, *a fortiori,* if there is a stipulation that the prepayment is " out and out." To take an example, not from commerce, but from sport, the cricket spectator who pays for admission to see a match cannot recover the entrance money on the ground that rain has prevented play if, expressly or by proper implication, the bargain with him is that no money will be returned. Inasmuch as the effect of frustration may be explained as arising from an implied term (see *Joseph Constantine S.S. Line, Ld.* v. *Imperial Smelling Co.* [1942] A.C. 154

20330 A2

4 [4]

at p. 163), it is tempting to speculate whether a further term could be implied as to what was to happen, in the event of frustration, to money. already paid. But if the parties were assumed to have discussed the point when entering into the contract, they could not be supposed to have agreed on a simple formula which would be fair in all circumstances, and all that could be said is that, in the absence of such agreement, the law must decide. The question now to be determined is whether, in the absence of a term in the contract dealing with the matter, the rule which is commonly called the rule in *Chandler v. Webster* should be affirmed.

This supposed rule has been constantly applied in a great variety of cases which have since arisen—and necessarily so, because the rule had been laid down in plain terms by the Court of Appeal in England in 1904, and the present appeal provides the first occasion on which it can be effectively challenged. A very different rule prevails in Scotland, as was made plain by the decision of this House in *Cantiare San Rocco* v. *Clyde Shipbuilding and Engineering Co.* [1924] A.C. 226. In that case the Earl of Birkenhead (at p. 233) was careful to reserve the question whether *Chandler* v. *Webster* and the other English cases on the point were rightly decided, saying, " the question is as to " the law of Scotland, and I desire to say nothing which may in " any way fetter opinion if those authorities hereafter come to " be reviewed by this House, for none of them is binding upon " your Lordships." Similarly, in the same case, Viscount Finlay (at p. 241) observed that it would be out of place on that occasion to enter into the question dealt with in *Chandler v. Webster,* adding, "the principle of English law was re-stated with great " clearness by Lord Parmoor in the case of *French Marine* v. " *Compagnie Napolitaine d'Eclairage et Chauffage par le Gaz* (27 " Com. Cas. 69 at p. 94).. This statement forms no part of the " judgment of the House of Lords in that case, but there is no " doubt that the principle has been repeatedly acted on in the " Court of Appeal." Lord Dunedin in the *Cantiare San Rocco* case (at p. 240) referred to the different angle of approach from which an English or a Scottish Judge would look at the question, and thought that the cause was to be found in the reluctance of the English law to order the repayment of money once paid. But he added, " I do not enlarge on the topic, for I am not at all con- " cerned to criticise English law.. . . . For the purpose of this " case, it is sufficient to say, as I unhesitatingly do, that *Chandler* " v. *Webster,* if it had been tried in Scotland, would have been " decided the other way." Lord Dunedin's restraint was not imitated by Lord Shaw, whose pronouncement included a vigorous denunciation (at p. 259) of the proposition that the loss lies where it falls as amounting to a maxim which " works well enough among " tricksters, gamblers and thieves." The learned Lord asserted that this was part of the law of England (presumably meaning that it had been so laid down by the English Court of Appeal), but

**Page 140**

patriotically rejoiced that it had never been part of the law of Scotland.

Mr. Valentine Holmes, in his able argument for the Respondents, asked us to consider whether this House would be justified in disturbing a view of the law which has prevailed for nearly forty years, which has been so frequently affirmed, which has been constantly applied in working out the rights of the parties to commercial contracts, and which, moreover, at any rate furnishes a simple rule against the effect of which the parties to a contract can, if they so desire, expressly provide. These are weighty considerations, but I do not think they ought to prevail in the circumstances of this case over our primary duty of doing our utmost to secure that the law on this important matter is correctly expounded and applied. If the view which has hitherto prevailed in this matter is found to be based on a misapprehension of legal principles, it is of great importance that these principles should be correctly defined, for, if not, there is a danger that the error may spread

[5] 5

in other directions, and a portion of our law be erected on a false foundation. Moreover, though the so-called rule in *Chandler* v. *Webster* is nearly forty years old, it has not escaped much unfavourable criticism. My noble and learned friend Lord Atkin when sitting in the court of appeal as Justice Atkin in *Russcoe v. Stirk* [1922] 10 Ll.L.Rep. 212, at p. 217, doubted whether any two business people in the world would ever make a contract which embodied such a doctrine as *Chandler* v. *Webster* laid down; and in the present case the Court of Appeal, while bound by previous authority, hinted a hope that this House might be able to substitute a " more civilised rule." I think, therefore, that we ought to regard ourselves as at liberty to examine the challenged proposition freely, and to lay down what we regard as the true doctrine in English law without being hampered by a course of practice based on previous decisions in the Court of Appeal.

The *locus classicus* for the view which has hitherto prevailed is to be found in Sir Richard Collins' judgment in *Chandler* v. *Webster*. It was not a considered judgment, but it is hardly necessary to say that I approach this pronouncement of the then Master of the Rolls with all the respect due to so distinguished a common lawyer. When his judgment is studied, however, one cannot but be impressed by the circumstance that he regarded the proposition that money in such cases could not be recovered back as flowing from the decision in *Taylor v. Caldwell* [1863] 3 B. & S. 826. *Taylor v. Caldwell,* however, was not a case in which any question arose as to whether money could be recovered back, for there had been no payment in advance, and there is nothing in the judgment of Mr. Justice Blackburn which, at any rate in terms, affirms the general proposition that " the loss lies where it falls ". Sir Richard Collins' application of *Taylor* v. *Caldwell to* the actual problem with which he had to deal in *Chandler* v. *Webster* deserves close examination. He said at p. 499 of [1904] 1 K.B.: —

" The Plaintiff contends that he is entitled to recover the
" money which he has paid on the ground that there has been
" a total failure of consideration. He says that the condition
" on which he paid the money was that the procession should
" take place, and that, as it did not take place, there has been
" a total failure of consideration. That contention does no
" doubt raise a question of some difficulty, and one which has
" perplexed the Courts to a considerable extent in several cases.
" The principle on which it has been dealt with is that which
" was applied in *Taylor* v. *Caldwell*—namely, that where, from
" causes outside the volition of the parties, something which
" was the basis of, or essential to the fulfilment of, the contract
" has become impossible, so that, from the time when the fact
" of that impossibility has been ascertained, the contract can
" no further be performed by either party, it remains a per-
" fectly good contract up to that point, and everything pre-

" viously done in pursuance of it must be treated as rightly
" done, but the parties are both discharged from further per-
" formance of it. If the effect were that the contract were
" wiped out altogether, no doubt the result would be that money
" paid under it would have to be repaid as on a failure of
" consideration. But that is not the effect of the doctrine;
" it only releases the parties from further performance of the
" contract. Therefore the doctrine of failure of consideration
" does not apply."

It appears to me that the reasoning in this crucial passage is
open to two criticisms: —

*(a)* The claim of a party who has paid money under a contract
to get the money back, on the ground that the consideration for
which he paid it has totally failed, is not based upon any provision
contained in the contract, but arises because, in the circumstances
that have happened, the law gives a remedy in quasi-contract to
the party who has not got that for which he bargained. It is a claim
to recover money to which the defendant has no further right

20330 A 3

6 [6]

because in the circumstances that have happened the money must
be regarded as received to the plaintiff's use. It is true that the
effect of frustration is that, while the contract can no further be
performed, " it remains a perfectly good contract up to that point,
" and everything previously, done in pursuance of it must be treated
" as rightly done." But it by no means follows that the situation
existing at the moment of frustration is one which leaves the party
that has paid money and has not received the stipulated considera-
tion without any remedy. To claim the return of money paid on the
ground of total failure of consideration is not to vary the terms
of the contract in any way. The claim arises not because the right
to be repaid is one of the stipulated conditions of the contract, but
because, in the circumstances that have happened, the law gives
the remedy. It is the failure to distinguish between (1) the action
of *assumpsit* for money had and received in a case where the con-
sideration has wholly failed, and (2) an action on the contract
itself, which explains the mistake which I think has been made
in applying English law to this subject-matter. Thus, in *Blakeley*
v. *Mutter & Co.* (cited above), Lord Alverstone C.J. said, " I agree
" that *Taylor* v. *Caldwell* applies, but the consequence of that
" decision is that neither party here could have sued on the con-
" tract in respect of anything which was to be done under it after
" the procession had been abandoned." That is true enough, but
it does not follow that because the plaintiff cannot sue " on the
" contract" he cannot sue *dehors* the contract for the recovery
of a payment in respect of which consideration has failed. In the
same case, Mr. Justice Wills relied on *Appleby* v. *Myers,* L.R.
2 C.P. 651, where a contract was made for the erection by A. of
machinery upon the premises of B., to be paid for upon completion.
There was no pre-payment, and in the course of the work the
premises were destroyed by fire. It was held that both parties were
excused from further performance, and that no liability accrued
on either side. But the liability referred to was liability under
the contract, and the learned Judge seems to have thought that
no action to recover money in such circumstances as the present
could be conceived of unless there was a term of the contract,
express or implied, which so provided. Once it is realised that
the action to recover money for a consideration that has wholly
failed rests not upon a contractual bargain between the parties,
but (as Lord Sumner said in *Sinclair* v. *Brougham* [1914] A.C.
398. at p. 452) " upon a notional or imputed promise to repay ",
or (if it is preferred to omit reference to a fictitious promise) upon
an obligation to repay arising from the circumstances, the difficulty
in the way of holding that a pre-payment made under a contract
which has been frustrated can be recovered back appears to me
to disappear.

(6) There is, no doubt, a distinction between cases in which
a contract is " wiped out altogether ", e.g., because it is void as
being illegal from the start, or as being due to fraud which the
innocent party has elected to treat as avoiding the contract, and

cases in which intervening impossibility " only releases the parties " from further performance of the contract". But does the distinction between these two classes of case justify the deduction of Sir Richard Collins that " the doctrine of failure of consideration " does not apply " where the contract remains a perfectly good contract up to the date of frustration ? This conclusion seems to be derived from the view that, if the contract remains good and valid up to the moment of frustration, money which has already been paid under it cannot be regarded as having been paid for a consideration which has wholly failed. The party that has paid the money has had the advantage, whatever it may be worth, of the promise of the other party. That is true, but it is necessary to draw a distinction. In English law, an enforceable contract may be formed by an exchange of a promise for a promise, or by the exchange of a promise for an act—I am excluding contracts under seal—and thus, in the law relating to the formation of contract, the promise to do a thing may often be the consideration. But