# EXHIBIT 11

## INDEX OF AUTHORITIES

**CASES**                                                    **PAGES WITHIN EXHIBIT**

1. *Alfa Telecom Turkey Limited v. Cukurova Finance International Limited
   and Cukurova Holdings AS*, HCVAP 2009/001 .................................................................1

2. *Baldwin Spencer v. The Attorney General of Antigua and Barbuda,
   Lester Bryant Bird and Asian Village Antigua Limited
   CIV*.APP.NO.20A of 1997, Antigua and Barburda Court of Appeal ...............................74

3. *Besseler Waechter Glover & Co. v. South Derwent Coal Co.,*
   59 Lloyd's List Law Report 104 (King's Bench 1937) ....................................................101

4. *Bremer Handelsgesellschaft v. C. Mackprang Jr.,*
   1 Lloyd's Law Report 221 (Court of Appeal 1979) ........................................................107

5. *Clearlie Todman-Brown v. Nat'l. Bank of the Virgin Islands, Ltd.,*
   BVIHCV 64/2013 ............................................................................................................118

6. *Fibrosa Societe Anonyme v. Fairbaum Lawson Combe Barbour Ltd.,*
   [1942] UKHL 4, [1943] AC 32.........................................................................................133

7. *Mavis Henry, Attorney for Millicent Ralph v. Tyrone Warner,*
   Claim No. ANUHCV 2000/0277, The Eastern Carribean Supreme Court
   in the High Court of Justice Antigua and Barbuda .........................................................194

8. *Meyer v. Gilmer,*
   18 NZLR 129 (1899) ........................................................................................................207

9. *Motor Oil Hella (Corinth) Refineries SA v. Shipping Corp. of India ("The Kanchenjunga"),*
   1 Lloyd's Rep. 391 (House of Lords 1990) .....................................................................214

10. *Premium Nafta Products, Ltd. And Others v. Fili Shipping Co. Ltd.,*
    2007 UKHL 40 (House of Lords 2007).............................................................................226

11. *Westdeutsche Landesbank Girozentrale v. Islington London Borough Council,*
    [1996] UKHL 12, [1996] AC 669 (House of Lords 1996)...............................................234

**TREATISES**

10. 13 Lord, Williston on Contracts.......................................................................................244

11. Chitty on Contracts ..........................................................................................................246

12. Wilken and Villiers: The Law of Waiver, Variation and Estoppel 2d..................................252

BRTISH VIRGIN ISLANDS
EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
COMMERCIAL DIVISION

CLAIM NO: BVIHC (COM) 2007/072

ALFA TELECOM TURKEY LIMITED

Claimant

and

(1)  CUKUROVA FINANCE INTERNATIONAL LIMITED
(2)  CUKUROVA HOLDINGS AS

Defendants

and

CLAIM NO: BVIHC (COM) 2007/119

(1)  CUKUROVA FINANCE INTERNATIONAL LIMITED
(2)  CUKUROVA HOLDINGS AS

Claimants

and

ALFA TELECOM TURKEY LIMITED

Defendant

**Appearances:**   Mr Stephen Smith Q.C., Mr Robert Levy Q.C., and Mr Oliver Clifton for Alfa
Mr Kenneth MacLean Q.C., Ms Arabella di Iorio and Mr James Nadin for Cukurova

<u>JUDGMENT</u>

[2010: 13, 14, 15, 16, 19, 20, 21, 22, 23, 26, 29, 30 April; 20 May]

(Loan of US$1.352bn made on 25 November 2005 pursuant to Facility Agreement
– secured by equitable mortgage over shares – loan repayable by four equal
annual instalments commencing on 24 November 2008 – lender entitled to
accelerate loan and/or enforce on occurrence of continuing Event of Default –
lender claiming Events of Default continuing as at 16 April 2007 and accelerating
loan – whether continuing Events of Default subsisting when loan accelerated –
equitable mortgage containing power of appropriation under UK Financial
Collateral Arrangements (No 2) Regulations 2003 – lender exercising power of

1

appropriation on 27 April 2007 – whether continuing Event of Default subsisting when power exercised – whether lender able to rely on post – acceleration Events of Default – whether lender acting in bad faith in negotiating and concluding lending arrangements – whether lender acting in bad faith in managing the lending – whether lender exercising the power of appropriation in bad faith and/or for a collateral purpose – whether appropriation to be set aside as a result of lender's bad faith or collateral purpose)

[1]    **Bannister J [ag]:**  In these proceedings the Claimant, Alfa Telecom Turkey Limited ('ATT'), claims against the first and second Defendants, Cukurova Finance International Limited ('CFI') and Cukurova Holdings AS ('CH'), declarations that its purported exercise on 27 April 2007 of a right of appropriation conferred in two separate charges granted to ATT by each of CFI and CH on, respectively, 28 September 2005 and 25 November 2005 (' the CFI English share charge' and 'the CH English share charge', together 'the English share charges') was valid and that thereupon ATT became absolutely entitled to the charged shares.  ATT claims a number of other declarations and ancillary relief, but the substance of the claim is as I have set it out above.  CFI and CH deny that ATT was entitled as at 27 April 2007 to enforce either of the English share charges, because they say, first, that the contractual right to accelerate the lending or enforce the security had not then accrued and secondly, if it had, that the purported exercise of the right of appropriation was bad since it was done in bad faith and otherwise than for the purpose of securing repayment of the indebtedness secured by the English share charges.  If these defences fail, then CFI claims what is described as relief from forfeiture on the grounds that a little under a month after ATT's purported exercise of the remedy of appropriation it tendered the full amount of the secured indebtedness together with interest at the default rate and remains ready, able and willing to pay the full amount claimed by ATT.  It will be obvious from the fact that these proceedings have remained on foot that CFI's Defendants' tender was rejected.

**Factual background**

[2]    I shall have to go into considerably more detail in relation to the separate issues which have arisen in these proceedings, but in order for the underlying nature of the dispute to be understood I think it will be helpful if I first set out the background and key events.

[3]    ATT is a special purpose vehicle ('SPV') incorporated for the purpose of the transactions with which these proceedings are concerned.  It is part of a large Russian conglomerate ('Alfa') with

2

interests in, among other things, telecommunications and in particular the provision of cell phone networks. CFI was also formed as an SPV for the purpose of those transactions. CFI is wholly owned by CH and forms part of a group of companies (I use the term in the broad sense) with extensive interests centered in, but not confined to Turkey ('Cukurova'). Prior to the transactions with which I am concerned, one of those interests was CH's indirect 27% (or thereabouts) shareholding in a Turkish cell phone network provider called Turkcell Iletisim Hizmetleri AS ('Turkcell'), whose shares are traded on the Istanbul and New York exchanges. I do not think that it is disputed that the Turkcell shares have historically been prone to considerable volatility, but when the arrangements which have given rise to these proceedings were in gestation the share price was around US$11.3. At 8 June 2007 Turkcell had a market capitalization of US$13.5 billion. I think that it was common ground that the Turkish cell phone and communications market had, certainly at the time with which these proceedings are concerned, very considerable potential for growth.

[4]     CH's 27% indirect interest in Turkcell to which I have referred above was held, before the arrangements with which I am concerned were concluded, through another Turkish registered company called Turkcell Holding AS ('TCH'), which held and still holds 51% of Turkcell. CH owned a little under 53% of TCH which gave CH the 27% indirect holding in Turkcell. A Finnish telecommunications company, Sonera, held the remaining 47% or so of TCH. Sonera later merged with a Swedish cell phone network company, Telia, to become TeliaSonera Finland OYJ and I shall refer to the Sonera interest as 'TS'. CH also held a 7.43% direct interest in Turkcell and another wholly owned subsidiary of CH, Cukorova Investments NV ('CI'), held a little under 6% of Turkcell directly.

[5]     In 2003 and 2004 Cukurova was under considerable financial pressure. It had, in particular, a liability of some US$3 billion to the Turkish State Savings Deposit Insurance Fund ('SDIF'), repayable over 15 years under an agreement entered into in early 2003. In August 2004 Cukurova negotiated a supplemental agreement under which it was permitted to make payment to SDIF at an accelerated rate of US$15 million per month, rising to US$135 million per month from 28 February 2005. The effect of these accelerated payments, if maintained, would be to discount the total amount of interest payable by some US$1 billion, but if four in total or any two consecutive installments were missed, then the original payment schedule would be reinstated, with the loss of

3

the interest discount.   Unsurprisingly, in 2004 JP Morgan, Cukurova's bankers, were actively seeking interest in Cukorova's Turkcell shares and interests, either by sale or through some sort of joint venture arrangement in order to assist Cukurova to deal with its cash flow pressures.

[6]   There had been informal contact between Alfa and Cukurova in 2003, which bore no immediate fruit.   Further discussions for the acquisition by Alfa of some or all of Cukorova's interest in TCH commenced in the autumn of 2004.   There were two particular legal or regulatory matters which impacted heavily on those negotiations.   First, TS had rights of pre-emption under a shareholders agreement of 21 October 1999 governing the relations of the TCH shareholders, which would require any shares intended to be purchased by Alfa to be first offered to TS; secondly, unless an exemption could be relied upon or a waiver was obtained, any person acquiring more than 25% of Turkcell or TCH would be required by the Turkish Capital Markets Board ('CMB') to make a mandatory offer for the Turkcell shares.   Negotiations between Cukurova and Alpha got under way in earnest in early 2005 and there was a meeting at the Raphael Hotel in Paris towards the end of January.   Present on the Alpha side were Mikhail Fridman ('Mr Fridman'), the effective controller of the Alfa group, Aleksandr Nicholas Tolchinsky ('Mr Tolchinsky'), a director or former director of certain Alfa Group companies on the banking and finance side, and Mr Alex Knaster ('Mr Knaster') who seems to have been a significant investor in Alfa and who was a director of various Alfa companies.   On the Cukurova side were Mehmet Emin Karamehmet ('Mr Karamehmet') Chairman and CEO of CH, and Mr Osman Berkmen ('Mr Berkmen'), a long standing officer of Cukurova and director from time to time of various Cukurova companies.   He is presently a consultant to Cukurova.    At that stage there was already for consideration a suggestion that CH should sell Alfa 50% of its TCH shares and charge the remainder to ATT as security for a loan equivalent to their current market value.   This precise structure proved impossible to achieve because of TS's pre-emption rights in TCH, but it is clear that the basic commercial elements of what turned out to be the deal between Alfa and CH had been established by that time.   Mr Berkmen says that he wanted to persuade Alfa to take a mixture of shares held by CH through TCH and shares held by Cukurova directly, but that Alfa was interested only in the TCH shares which, as Mr Karamehmet pointed out, conferred management control of Turkcell.

[7]   At or around the same time, Cukurova was in discussions with TS.   There was disagreement at CH board level, with Mr Berkmen in favour of an outright disposal of Cukurova's entire holding of TCH

4

shares to TS and Mr Karamehmet in favour of a deal whereby CH retained an interest in (roughly) half of the TCH shares.

[8]     By February 2005 Deutsche Bank ('DB') had become involved on Alfa's behalf.  Indeed there had been a possibility, which did not materialise, that DB would provide funding to Alfa for the transaction.  DB did, however, continue to advise Alfa throughout the course of the lending.   On 25 March 2005 TS issued a press release announcing that an agreement in principle had been reached with Cukurova for the sale by Cukurova to TS of Cukurova's entire indirect 27% stake in Turkcell for US$3.1bn.  Alfa says that it was told by Cukurova that this press release was wrong and that all that had in fact been agreed between Cukurova and TS was a two month exclusivity period.

[9]     By April 2005 Cukurova had paid only $50 million of the March installment due under the SDIF agreements, leaving US$85 outstanding.  It is clear that it was also in difficulties about finding the April installment and thus short of some US$220 Million in total.  Failure to top up the March installment and meet the April installment would mean the loss of some US$1bn in discounted interest.  Cukurova was thus critically short of cash in April 2005.  TS refused to finance the current SDIF payments and so did Cukurova's bankers, JP Morgan.

[10]    On 27 April 2005, Alfa, through an associated company called Mogoton Finance Limited ('Mogoton'), extended facilities of US$220m to Cukurova in order to enable it to meet the shortfall of US$85 Million in the March 2005 SDIF installment and the US$135m due at the end of April.  In fact, Mogoton continued to finance the SDIF payments until the transactions closed in November 2005.

[11]    On 23 May 2005 TS issued another press release.  Its gist was that Cukurova had not signed any agreement for the sale to TS of the 27% indirect interest in Turkcell, but that its failure to do so was in breach of a binding agreement reached between the two sides and that TS would be pursuing legal action against Cukurova to enforce the agreement reached.   Cukurova's position, as disclosed to the CMB and thus to the public, was that the exclusivity period had expired without any binding agreement having been concluded.  Alfa says that it was assured by Cukurova that the only agreement between the parties had been for a two month exclusivity period, which had come to an end on 23 May 2005 without any agreement having been reached.

5

[12]     Negotiations between Alfa and Cukurova resumed.  Alfa was advised by Jones Day and Cukurova by White & Case.  As already mentioned, Alfa was also advised by DB, which in turn retained Slaughter & May to advise it.  With a view of sidestepping the pre-emption provisions in the TCH shareholders agreement, CH, at the request of Alfa, transferred its TCH shares to a newly incorporated BVI registered SPV, Cukurova Telecom Holdings Limited ('CTH') itself wholly owned by the newly incorporated BVI SPV, CFI.  This transfer relied upon the exemption in the TCH shareholders agreement for transfers to affiliates and, unless challenged, cleared the way for Cukurova to deal with its 27% indirect interest in Turkcell free from any interference from TS.

[13]     By 31 May 2005 Alfa and Cukurova were on course to finalizing an agreement under which CFI would sell 49% of its shares in CTH to ATT for roughly US$1.6bn, thus giving Alfa/ATT a 13.22% indirect interest and Cukurova/CFI a 13.76% indirect interest in Turkcell.  CFI's remaining 51% of CTH would be charged to ATT against a loan of US$1.352bn.  In addition, Alfa would make available US$355m by way of unsecured lending, supported by guarantees, including a personal guarantee from Mr Karamehmet.

[14]     A subscription agreement was executed between CH, CFI and ATT on 1 June 2005 ('the Subscription Agreement').  It was subject to a number of conditions precedent dealing with regulatory matters (including the obtaining of a waiver releasing Alfa from any obligation to make a mandatory offer to the other Turkcell shareholders) and to satisfactory completion of due diligence (in the broadest sense).  The Subscription Agreement gave effect to the terms outlined above.  In return for a subscription price of just under US$1.6 billion CFI was to procure CTH to issue ATT with convertible bonds which, when exercised, would give ATT 49% of the issued shares in CTH.  On completion ATT would grant CFI a secured facility in the sum of US$1.352bn, secured by charges over the shares in CTH and CFI held by CFI and CH respectively, and an unsecured facility in the sum of US$355 million (each in an agreed form).  In addition, the Subscription Agreement bound the parties to enter into a shareholders agreement ('the Shareholders Agreement'), again in an agreed form, governing their relationship as members of CTH.

[15]     On 17 June 2005 TS commenced an arbitration against CH in Geneva, claiming (1) specific performance of the agreement which TS asserted, but Cukurova denied, had been reached during the exclusivity period and (2) breach by CH of the TCH shareholders agreement.  The latter

dispute ended up being heard in Vienna as a result of a choice of law provision in the TCH shareholders agreement.

[16] On 21 June 2005 CFI and CH issued a disclosure letter for the purposes of the Subscription Agreement ('the Disclosure Letter').  Section 3 of the Disclosure Letter disclosed that TS had commenced arbitration proceedings in Geneva alleging a breach of a Memorandum of Understanding ('MOU') reached between it and CH relating to CH's 53% holding in TCH;  that it had applied for an injunction in the Swiss courts to restrain the completion of the transactions envisaged by the Subscription Agreement;  and that in the arbitration TS sought an order for specific performance of the agreement for the sale to it by CH of its stake in TCH or damages in lieu.  Alfa's evidence was that it was assured by Cukurova that this claim was misconceived.  In October 2005 TS obtained an order from the Swiss courts, the effect of which was to prevent the parties, while it remained in force, from closing the subscription and related agreements.

[17] On 20 September 2005 ATT, CFI and Holdings executed the Shareholders Agreement.

[18] Under an agreement executed on 28 September 2005 ('the Facility Agreement') the newly incorporated ATT agreed on closure to lend the newly incorporated CFI US$1.32bn, to be secured against CFI's 51% holding in CTH and CH's two shares in CFI (the whole of CFI's issued share capital).  The borrowing was to be repaid in four equal annual installments, the first becoming payable, as matters turned out, on 24 November 2008.  Interest was payable annually at the rate of LIBOR plus 8.  Also on 28 September 2005, ATT agreed to lend CFI US$355m unsecured, at the same rate of interest.  The first installment of interest under each of the facilities became due on 24 November 2006.  The combined amount of interest payable on that date would turn out to be some US$217m.  ATT accepts that it knew from the outset that it was Cukurova's intention to refinance the lending and both the Facility Agreement and the agreement granting the unsecured loan contained express provisions permitting CFI to prepay the whole or part of the lending on five days notice, provided that a rateable proportion of the unsecured lending was repaid simultaneously with any prepayment of secured lending.

[19] Also on 28 September 2006 CFI and ATT executed the CFI English share charge, by which CFI charged its 51% of CTH by way of equitable mortgage as security for the repayment by CFI of the US$1.352bn secured facility to be provided to it by ATT.  The charge contained the usual

provisions disapplying the restrictions contained in the Law of Property Act 1925 regarding the arising and exercise of the power of sale and of the power to appoint receivers and, by Schedule 2, conferred ancillary rights, such as the right to possession and the exercise of ownership rights. Clause 9.3 was in the following terms:

> 'Financial Collateral Arrangement
>
> (a)    To the extent that this Deed constitutes a "financial collateral arrangement" (as defined in the Financial Collateral Arrangements (No.2) Regulations 2003 (the "**Regulations**") the Lender shall have the right (at any time after the Charges become enforceable) to appropriate any Charged Asset which constitutes "financial collateral" (as defined in the Regulations) ("Financial Collateral") in or towards satisfaction of the Liabilities in accordance with the Regulations.
>
> (b)    Financial Collateral shall be valued at its Fair Price.'

The 'Fair Price' mentioned at clause 9.3(b) was defined in an addendum deed of 25 November 2005 in the following terms:

> 'Dear Sirs,
>
> **Share Charge in respect of shares in Cukurova Telecom Holdings Limited dated September 28, 2005 between Cukurova Finance International and Alfa Telecom Turkey (the "Share Charge")**
>
> (1)    We refer to the Share Charge. Capitalised terms used herein have the meaning ascribed to them in the Share Charge unless otherwise stated.
>
> (2)    It is agreed that the definition of "**Fair Price**" is hereby deleted in its entirety and in its stead the following definition shall be deemed incorporated: "**Fair Price**" means the value of the Shares calculated, on a look-through basis, based on the weighted average market value of publicly traded Turkcell shares over the previous 60 day period as reported in the Istanbul Stock Exchange Bulletin (the "Turkcell Look-Through Value"), provided that in the event that the Lender has exercised its right of appropriation pursuant to clause 9.3 of the share charge in

8

> respect of shares in Cukurova Telecom Holdings Limited dated on or about the date of this Deed between the Lender and Cukurova Finance International Limited or has otherwise enforced the charges created thereunder, the Turkcell Look-Through Value shall not be taken into account when calculating the Fair Price.'

[20]   For various reasons which I do not think it is necessary for me to set out in detail, but which resulted partly from the continuing injunction which TS had obtained in Switzerland and partly from the need to satisfy the Turkish regulatory requirements with which the conditions precedent to the Subscription Agreement, had been largely concerned, these transactions did not close until 25 November 2005, shortly after the Swiss injunction had been lifted on 23 November 2005. On 25 November 2005 ATT made the secured and unsecured advances and CH entered into the CH English share charge over its two shares in CFI. Its terms were identical in all material respects to those of the CFI English charge and which I have mentioned above. Blank transfers, together with the relative share certificates, were delivered to ATT by CFI and CH at closing. The Mogoton lending (which by closing had reached US$762m) was repaid from the money advanced by ATT at closing.

[21]   On the same day each of CFI and CH executed charges of, respectively, their CTH and CFI shares under BVI law. The principal material distinction between these two charges and the English share charges was that there was, obviously, no incorporation of the right to appropriate conferred by the UK Financial Collateral Arrangements (No 2) Regulations 2003 ('the Regulations'). It appears that the decision to take charges under both English and BVI law was the result of a disagreement between Alfa's advisers as to the efficacy of the right to appropriate. Since it has been decided in the English Administrative Court that the Regulations are not *ultra vires*[1] and since the Privy Council has decided that the right of appropriation is in principle available to Alfa in the circumstances of this case[2], there is no need for me to say anything more about that.

[22]   Thus, the position on closing was that CFI held 51% of CTH and ATT held the remaining 49%. ATT had paid Cukurova just short of US$1.6 billion for that interest which indirectly gave it 13.22%

[1] [2008] EWHC 2567

[2] [2009] 3 All ER 849

9

of Turkcell. CFI's 51% interest in CTH (amounting, to a 13.67% indirect interest in Turkcell), was charged to ATT to secure the US$1.352bn lent to it by ATT. CH's interest in CFI was also charged to ATT in support of the secured facility. Taking into account the unsecured facility, Alfa's total outlay was therefore some US$3.3bn. TS still held the 47% holding in TCH, which continued to give it an indirect holding in Turkcell of some 24%.

[23]     ATT's sole *de jure* director was a Mr Nazarian, who seems to have been based in Luxembourg. ATT's immediate parent was an Alfa company called Alfa Finance Holdings Limited ('AFH'), which, as its name implies, was concerned with finance and investment rather than telecoms. From the outset, therefore, actual management of ATT was delegated to a company generally referred to at trial as 'Altimo'. Altimo had originally been called Alfa Telecom, and had been formed to hold all the Alfa Group's telecom assets. There was in evidence a draft of this management agreement, which was said to have been formally concluded sometime in the summer of 2006. It is clear that it transferred or delegated the entire day to day management of ATT to Altimo. Mr Nazarian's sole role in relation to ATT was, so far as the evidence discloses, as a signatory to formal documents required to be executed by ATT.

[24]     Although the evidence could have been clearer, it appeared that Altimo, formerly Alfa Telecom, was the name commonly given in the course of Alfa's business to a BVI registered company called Alfa Holdings and Investments Limited ('AHIL'). To add to the confusion, Altimo was often referred to in internal documentation as 'Altimo sub-holding' and it further appeared that there existed an entirely separate Russian company called Altimo LLC. Mr Musatov said that he was employed by Altimo LLC and it may well be that Altimo LLC was used for employment or other administrative purposes, although, with the exception of the evidence of Mr Musatov to which I have referred, there is no further detail about the activities of that company. In this judgment I shall use the expression 'Altimo' to mean Altimo sub-holding/AHIL.

[25]     Altimo has an executive board, meeting every two months or so. It appears that some time in 2007 Altimo's executive board came to be referred to as the Altimo Consulting Board, but I shall refer to the Altimo executive board throughout this judgment as 'the Altimo board'. Altimo's CEO is Alexey Mikhailovich Reznikovich ('Mr Reznikovich'). At times in their evidence Mr Reznikovich and Mr Tolchinsky mentioned another body, which they referred to as the consulting, or advisory board.

As I understood their evidence, this reference was to the beneficial owners of Altimo in their capacity as such, to whom Mr Reznikovich would occasionally refer for advice and whose sanction was, according to Altimo's Chief Legal Officer, Yuri Vladislavovich Musatov ('Mr Musatov'), required for transactions with a value in excess of US$250m. This body is not to be confused with the Altimo board, even though some and possibly most of the members were common to both. I am quite satisfied that the Altimo board, in the sense in which I am using that term in this judgment, was not merely advisory or consultative. On the contrary, it is clear from the documents that it was asked for and made executive decisions, including important decisions about ATT. That was also clear from the evidence of both Mr Reznikovich and Mr Musatov.

[26]    I am also satisfied that, as a result of the arrangements which I have mentioned in paragraph [23] above, it is the Altimo board which is to be treated as the directing mind and will of ATT. It will be seen that it was to the Altimo board that tactical and strategic questions connected with the lending to CFI were referred and it was the Altimo board which had the power to decide whether ATT should bide its time or move to accelerate the lending. Mr Reznikovich could not have done that on his own in his capacity as CEO. Indeed, Mr Musatov made clear that Mr Reznikovich's executive freedom of action was limited to transactions that did not exceed US$25m in value.

[27]    Between about 8 and 22 November 2006 CH and CI each sold, by way of secondary public offering conducted by JP Morgan, Turkcell shares directly held by each of them separately outside the security granted to ATT. The shares sold amounted in aggregate to 5.88% of Turkcell. The total proceeds came to some US$579m. Cukurova used the bulk of this money to pay, on 24 November 2006, not only the aggregate of US$217m payable by way of annual interest on the secured and unsecured borrowing, but also the entirety of the unsecured borrowing (US$355m) and US$2m of the principal amount of the secured loan, leaving US$1.35bn of secured borrowing outstanding.

[28]    Early in January 2007 with the help of JP Morgan Cukurova began in earnest efforts to find alternative investors to enable the ATT borrowing to be paid off.

[29]    On 26 January 2007 TS issued a press release announcing that the ICC arbitral tribunal in Geneva had found that a binding agreement had been concluded between TS and CH in 2005 and had required CH to transfer its TCH shares to TS upon payment of US$3.1bn. Although this

11

announcement came to the attention of Alfa in the ordinary course, Alfa made no effort to contact Cukurova about it.

[30]   On 12 February 2007 ATT, as it was entitled to under the terms of the Facility Agreement, called on CFI to provide it with CFI's financial statements relative to its last preceding financial year.  On 22 February 2007 CFI, by its sole director, Ms Yasemin Cetinalp ('Ms Cetinalp'), supplied such a document.  It consisted only of a balance sheet and accompanying notes.  On its face it showed that CFI had negative net equity as at 31 December 2006 of some US$236m, the  result of liabilities of US$574m 'due to related parties'.  It was a term of the Facility Agreement that CFI should not borrow without ATT's prior written consent.  Breach was an Event of Default.  Balance sheet insolvency was also an Event of Default under the Facility Agreement.  Alfa made no effort to take up either of these matters with Cukurova.

[31]   On 2 April 2007 the boards of AFH and Altimo met (probably by telephone) to consider (a) the CFI balance sheet sent to ATT on 22 February 2007; (b) the effect of the arbitration award obtained by TS in Geneva; and (c) certain transactions between Turkcell and Cukurova-related parties which Alfa considered to be an irremediable breach of the Shareholders Agreement and, thus, to amount to an Event of Default under the Facility Agreement.  At these meetings it was resolved to declare a default under the Facility Agreement; call in the loan (as ATT was entitled to do if an Event of Default had occurred and was continuing); and perfect ATT's title to the CFI and CTH shares mortgaged pursuant to the English charges by obtaining the legal title.  Then, if CFI failed to repay, it was resolved to exercise the right to appropriate conferred upon ATT by the English share charges.  This last part of the decision was not reduced to writing, but the evidence made clear that that is what was decided at the meeting.

[32]   On 16 April 2007 and without any prior intimation that it had concerns about any matter connected with its acquisition of the CTH shares or with the lending it had made, ATT wrote to CFI, with a copy to CH, setting out sixteen alleged Events of Default under the Facility Agreement and demanding immediate repayment of the secured lending ('the acceleration letter').  I shall deal in due course with the separate Events of Default relied upon in the acceleration letter.

[33]   On the same day, 16 April 2007, Mr Christopher Hardman ('Mr Hardman'), a partner in Lovells LLP, personally delivered to the BVI offices of Harneys Corporate Services Limited ('HCS'),  the

12

registered agent of each of CFI and CTH, the transfers handed over by CH and CFI at closing, completed in favour of ATT, together with letters prepared and signed by Walkers, ATT's BVI lawyers, requiring that ATT be registered in the register of members of CFI as the holder of CFI's two issued shares and in the register of members of CTH as the holder of the 51 shares in CTH charged to ATT by CFI.  The response of Mr Parsons of HCS ('Mr Parsons'), who was the individual to whom this request was made, was that he would take instructions from his client of record.  Neither request has yet been complied with.

[34]    Also on 16 April 2007 ATT commenced two sets of proceedings in this Court.  The first, which has become merged in the present consolidated action, was No 72 of 2007 ('claim 72') and claimed declarations that ATT was entitled to call in the indebtedness on 16 April 2007.  The second, which is not before me, was a claim to compel CFI, CTH and HCS to comply with the registration requests.

[35]    On 17 April 2007 CFI wrote to ATT challenging its right to call the lending and promising a detailed response (which never materialized).  CFI's letter also demanded an assurance by later that day that no steps would be taken to enforce the security by selling, transferring or otherwise dealing with the charged shares and indicating that in the absence of such an assurance steps would be taken to protect CFI's position without further notice to ATT.  ATT's response, on the same day, was to refuse to give the assurance sought, but instead to confirm that no steps had yet been taken to enforce the security and that no enforcement would be pursued without first giving CFI two BVI working day's prior notice, such arrangement to be revocable on the same notice period.  ATT's letter referred to the requests for registration made on 16 April 2007 to HCS, stated that those steps were by way of perfection of its security, rather than by way of enforcement and sought CFI's confirmation that the share registers had been amended.

[36]    Also on 17 April 2007 Alfa held a press conference in Istanbul at which it announced that Events of Default had occurred under the Facility Agreement.

[37]    On 25 April 2007 ATT wrote to CFI expressing surprise that it had not heard further and giving notice that the rolling two business day moratorium on enforcement would end at 4 pm on 27 April 2007.  At the same time, ATT offered to extend the moratorium but on terms that CFI undertook to

13

be responsible for any losses suffered by Alfa as a result of delay in enforcement, the undertaking to be fortified by substantial financial security.

[38]   CFI replied on the following day informing ATT that it intended to apply for an injunction restraining enforcement and asking ATT to extend the moratorium until the application could be heard in the normal course rather than requiring CFI to make an emergency application.    Failing such assurance, CFI said that it would be applying for an emergency injunction on 27 April 2007. Although CFI did not offer any security, it did point out to ATT that CTH was holding some US$185 million by way of dividends paid up from Turkcell and that CFI was entitled to the majority of that money.

[39]   On the same day ATT replied by fax (after office hours) that it was not prepared to extend the moratorium, but went on to say that provided ATT was supplied with a draft of CFI's application and complied with six other conditions (including the provision of some US$135 million by way of security and the immediate registration of ATT as transferee of the shares in CFI and CTH) it might be that ATT could agree to an extension pending hearing of CFI's application.  Those terms were rejected by CFI.

[40]   At around 3.50 in the afternoon of 27 April 2007 CFI and CH obtained stop notices under CPR Part 49 and Maples & Calder, the BVI lawyers acting for CFI and CH, told Walkers that they would be applying for an injunction to prevent ATT enforcing its security over the CTH shares.  At about 4.05 pm on the same day Walkers wrote by facsimile to CFI and to CH 'c/o CFI' at its registered agent, HCS, in the following identical terms:

'Dear Sirs,

**ALFA TELECOM TURKEY LIMITED V (1) CUKUROVA FINANCE INTERNATIONAL LIMITED; (2) CUKUROVA HOLDINGS AS**

As you are aware, we act for ATT. We refer to ATT's letter dated 16 April 2007 addressed to Cukurova Finance International Limited ("CFI") and copied to Cukurova Holding AS ("Cukurova") (further copy attached). As stated in that letter, there are currently at least sixteen continuing Events of Default under the Facility Agreement dated 28 September 2005 between ATT, CFI and Cukurova.

14

> Under clause 9.3 of the abovementioned Share Charge, ATT has the right, at any time after the charges have become enforceable, to appropriate the shares covered by the Share Charge pursuant to the Financial Collateral Arrangements (no.2) Regulations 2003 (the "Regulations"). As a result of the Events of Default referred to above, the charges have become enforceable.
>
> On behalf of ATT, we therefore give you notice that ATT is hereby exercising its right to appropriate the shares referred to in the Shares Charge with immediate effect. We are currently undertaking the valuation exercise under clause 9.3 of the Share Charge and will revert to you shortly in that regard.
>
> For the avoidance of doubt, we reserve all of our rights under the Facility Agreement (and under the Security Documents, Transaction Documents and Finance Documents referred to therein).'

[41]   At 4.30 on the afternoon of 27 April 2007 Maples & Calder started an application before Joseph-Olivetti J for an injunction restraining registration of the transfers and enforcement of the security. Such an injunction was granted at around 6.30 pm but expressly without prejudice to ATT's claim to have appropriated the collateral earlier that afternoon.

[42]   On 17 May 2007 CFI, which had by now obtained alternative funding, gave notice to ATT under clause 6.4 of the Facility Agreement of its intention to repay the loan including, without prejudice to its contention that it was not liable to pay it, interest at the default rate under clause 7.3 of the Facility Agreement.  The Altimo board, supported by the board of AFH, resolved on the following day to reject the offer of repayment.  It was noted in an explanatory memorandum produced for consideration by the Altimo board that the charged shares were then worth some US$230 million more than the value to be attributed to them under the 'Fair Price' mechanism contained in the English share charges.

[43]   On 21 May 2007 ATT wrote to CFI rejecting the repayment proposal as being too late.  Four days later CFI tendered payment, which was rejected, and on 25 May 2007 CFI commenced claim No 119 of 2007 ('Claim 119') seeking to compel ATT to accept the tendered repayment.  Claim 119 is merged in the present proceedings as a result of an order for consolidation with claim 72.

15

**The issues**

[44]     With that brief factual background, I can turn to consider the issues that arise for decision.  The first, obviously, is whether ATT was entitled to accelerate the loan on 16 April 2007.  The second, it seems to me, is whether it was entitled to enforce the English share charges on 27 April 2007.  Third, whether the attempted appropriation was ineffective as having been done in bad faith and for a purpose other than the recovery of ATT's lending under the Facility Agreement.  Finally, if ATT's enforcement was valid and effective, whether CFI is entitled to some sort of equitable relief upon tender of the outstanding borrowing.  I shall take these issues in turn.

**Had there occurred and was there continuing as at 16 April 2007 an Event of Default under the Facility Agreement?**

[45]     I shall deal with the alleged Events of Default and the particular terms of the Facility Agreement upon which ATT relies as justifying each allegation of default serially, but first I need to say something about the terms of the Facility Agreement which are relied upon generally by ATT as justifying the acceleration of the loan.  References to clauses in what follows are (unless stated otherwise) references to clauses in the Facility Agreement.

[46]     By clause 1.1 an Event of Default means any event or circumstance identified as such in clause 17.  I shall set out the particular parts of clause 17 when I deal with each separate Event of Default relied upon.

[47]     Clause 17.18 provides for acceleration:

> 'On and at any time after the occurrence of an Event of Default which is continuing the Lender may by notice to the Borrower:
>
> (A) Cancel the Commitment, whereupon it shall immediately be cancelled;
> (B) Declare that all or part of the Loan, together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents be immediately due and payable, whereupon they shall become immediately due and payable; and/or

16

> (C) Declare that all or part of the Loan be payable on demand, whereupon they shall immediately become payable on demand by the Lender.

Clause 1.2(D) provides that an Event of Default is 'continuing if it has not been waived.'

[48]    With that general introduction I can turn to the specific allegations of default contained in the call letter.

Financial Indebtedness

[49]    The first Event of Default relied upon by ATT in the acceleration letter is that CFI had incurred indebtedness without the prior consent of ATT. Clause 17.2(A) of the Facility Agreement provides that it is an Event of Default if the Borrower does not comply with any provision of the Finance Documents. The Facility Agreement is a Finance Document. Clause 16.4(A) of the Facility Agreement provides as follows:

> **'Financial Indebtedness**
>
> (A) The Borrower shall not (and shall ensure that no other member of the Telecom Group will) incur or contract to incur or permit to subsist any Financial Indebtedness with the prior written consent of the Lender
> (B) Paragraph (A) above does not apply to Financial Indebtedness of Turkcell up to an aggregate maximum amount of US$50,000,000.'

'Financial Indebtedness' is defined by clause 1.1 of the Facility Agreement so as to include all manner of exotic methods of obtaining credit. Mr Stephen Smith QC, who appeared together with Mr Robert Levy QC and Mr Oliver Hilton for ATT, argued that more than one of these methods of financing credit was in play, but in my judgment the only part of the definition that is conceivably engaged on the facts is *'indebtedness for or in respect of moneys borrowed'*.

[50]    It will be recalled that on 24 November 2006 Cukurova used US$574m, the greater part of the proceeds of certain TC shares which CH had CI sold between 8 and 21 November 2006, in order to repay the whole of the unsecured borrowing, US$2m of principal of the secured borrowing and the interest then payable on both the secured and unsecured borrowing.

17

[51]    On 22 November 2006 CFI had sent a letter to ATT, signed by Ms Cetinalp, notifying ATT of the
forthcoming payment.  The material parts of the letter for present purposes are the following:

> '*You will be receiving two payments both with value dates November 24,
> 2006 from JP Morgan Chase Bank NA, London, one for USD [489m] and
> the other for USD [84m], each for and on behalf of [CFI].*
> *As per our earlier correspondence on this matter, the foregoing amounts
> you will be receiving from JP Morgan Chase Bank NA London should be
> utilized for the following purposes:*
>
> 1. *For USD [489m], for and on behalf of [CFI]* [there then follow details
>    of the amounts of principal and interest against which that payment
>    was to be applied]
> 2. *For USD [84m], for and on behalf of [CFI]* [there then follow similar
>    details in relation to that payment].'

[52]    The money went from CH's and CI's accounts with JP Morgan Chase (Cukurova's bankers) direct
to ATT's DB bank account.  There is in evidence a copy of a payment instruction from CI to JP
Morgan Chase dated 22 November 2006 directing that US$84m be paid to ATT's account with DB
and although I have not been able to identify a corresponding payment instruction for the
US$489m transferred to ATT by CH, it can be assumed that such a document existed at the time.

[53]    A journal voucher generated by CH and dated 24 November 2006 debits CFI with the sum of
US$489m.  Ali Nejat Yalim ('Mr Yalim') an experienced accountant who acts for Cukurova on a
consultancy basis and who gave evidence for Cukurova at the trial, described this document as
being in the nature of an invoice from CH to CFI.  The 'details' section of the voucher explains the
reason for the debit as 'Transfer to [ATT] on behalf of your company'.  There is no mention of the
funds transfer being by way of loan from CH to CFI.

[54]    A similar, but not identical journal voucher generated by CI and also bearing date 24 November
2006 debits CFI with US$84m and credits JP Morgan's money market account with US$84m.  The
'description' section of the voucher describes the debit as being 'on behalf of CFI to the account of
[ATT]' and 'On behalf of [CFI] trf to [ATT]'.  Again, there is no indication in this document that the
funds transfer was by way of loan.

18

[55]     What appears to be a trial balance for CFI as at 31 December 2006 shows credit balances in favour of CH (US$443m) and CI (US$130m) entered under 'Other current liabilities'. The reason for the reduction in the amount due to CH from US$489m to US$443m and for the corresponding increase in CI's credit balance from US$84m to US$130m was that CFI and CI had subsequently adjusted between themselves their respective net cash entitlements to the proceeds of the TC shares and correspondingly adjusted their credit balances due from CFI. All the book keeping entries recording these arrangements were made either by or on the instructions of Ms Cetinalp. Ms Cetinalp was not called to give evidence at the trial although, as I have said, evidence was given for Cukurova on the accounting records and financial statements by Mr Yalim.

[56]     The subledger account for CFI in the accounting records of CH for the same period shows CFI with a debit balance of US$489m as at 22 November 2006, reduced to US$443m on 24 November 2006. A trial balance for CH as at 31 December 2006 shows the US$443m (converted into Turkish lira) as an 'other receivable' due from CFI.

[57]     A CI subledger account for CFI shows a receivable due from CFI to CI in the sum, first, of US$84m, later adjusted upwards to US$130m. Each entry is dated 24 November 2006. The account code which has been applied to these CI entries is '136.20'. The unchallenged evidence of Mr Andrew Palmer, FCA ('Mr Palmer'), who gave expert evidence on behalf of ATT in this case, was that that code referred to 'receivables from loans' and indeed it is the case that the sum of US$130m figures in CI's trial balance as due from CFI in the section entitled 'receivables from loans'. In cross examination Mr Yalim said that this treatment was decided upon by Ms Cetinalp, although he no longer remembered the reason. His view as stated to the Court was that the liability would have been better included in the following section of the trial balance under 'other various receivables'.

[58]     As I have said, in response to a request from ATT, CFI provided ATT on 22 February 2007 with its financial statements for the year ended 31 December 2006. The financial statements in fact consist only of a balance sheet and some accompanying Notes. These documents were prepared by Mr Yalim. The balance sheet, which contains comparative figures for 31 December 2005, shows the CTH shares as an asset at cost. Liabilities include the ATT indebtedness, which is described as 'Interest bearing loans and borrowings' of US$1.35bn (down from 31 December 2005

19

as a result of the prepayments of principal made on 24 November 2006). Note 5 sets out the terms of the ATT lending, including repayment dates and rates of interest and records the event of prepayment.

[59]  Also included within liabilities in CFI's 2006 financial statements is a figure of US$574m described not as a loan but as 'due to related parties'. Note 6 identifies the amounts 'due' as the sum of US$443m to CH and the sum of US$130m to CI. Note 6 continues: 'Such payables represent the funding provided by related parties to cover [CFI]'s prepayment of loan principals and interest payments in 2005'. It is common ground that '2005' is by mistake for '2006'.

[60]  CH produced an Annual Report for 2006 sometime before its AGM on 2 March 2007. Figures from the accompanying balance sheet for 31 December 2006 include within 'receivables from subsidiaries' the sum of US$443 due from CFI. This annual report was signed off by Ms Cetinalp in her role as one of CH's two statutory auditors.

[61]  The Notes to CI's unaudited financial statements for the year ended 31 December 2006 show the US$130m which had figured in CI's trial balance as due from CFI among a category of asset described as 'Interest–free subordinated loans'. The debt, however, is shown as due not from CFI but from CH. Mr Yalim explained in his evidence that these CI financial statements were finalized after 23 April 2007. The significance of that (subject to a point made by Mr Stephen Smith QC to which I will have to return later) is that 23 April 2007 is the date borne by a series of board resolutions and an entry in CFI's CH sub-ledger, which effected and, in the case of the sub-ledger entry, reflected a novation of the US$130m liability from CFI to CH.   Explanatory narrative in a Note to the CI financial statements states that:  '$[130m] due from CH as of December 31 2006 represented net payments made by [CI] to [CFI]'s creditors on behalf of [CFI] *as instructed by CH*' [emphasis added].

[62]  · Thus, the position by reference to CFI's February 2007 unaudited, CH's statutorily[3] audited and CI's unaudited financial statements for the year ended 31 December 2006, all of which were signed off by Ms Cetinalp, is that CFI's financial statements showed sums 'due to' CH and CI; CH's financial statements showed US$443m as 'due from' CFI; and CI's financial statements showed

---

[3] which I understand to mean internally

20

CH as a debtor to CI in the sum of US$130m which CI had paid to CFI's creditors 'as instructed by CH'.

[63]   Mr Palmer was asked about the effect of the accounting entries and statements which I have summarized above.  He made clear that he could not comment on what was in the mind of the parties to the various transfers, thus acknowledging that borrowing could only be borrowing if the parties to the transaction in question intended that that is what it should be, but he also made the point that he would expect accounting records accurately to reflect the intentions of the parties.  Mr Palmer said that the wording of Note 6 to the CFI balance sheet[4], referring to funding by related parties, did not suggest that the items to which it referred were loans.  He went on to say that the records which he had examined did not suggest an awful lot other than that CFI had a liability to CH and CI.  He said that the only evidence that either of these transfers was intended by way of loan was to be found in the books of CI, but he went on to say that he did not put a lot of store on the fact that in one set of accounting entries the words 'loan' was used but not in the others.  He read the CI entries as doing no more than recording an amount due to it by CFI, while CFI was recording an amount it owed CI.  He said that whether the word 'loan' or 'payable' was used was, from an accounting point of view, academic.  Finally, he said that the highest it could be put was that the accounting entries showed CFI as having incurred liabilities to CH and CI.  Mr Palmer was not asked about the impact of the Note to the CI financial statements[5] which appears to rationalize the debt due from CH to CI in CI's financial statements as the consequence of the fact that CI's payment to CFI was made on the instructions of CH.

[64]   Mr Yalim's evidence was that he did not consider that the liabilities appearing in CFI's financial statements to CH and CI were borrowings; rather, they were related party funding which CFI could not repay and which at some stage would need to be converted to capital.  In his witness statement he says that the Cukurova group has a practice of recording both actual loans and capital contributions in the current accounts of the group company receiving the funding until the nature of the transaction has been formally determined.  Until that happens, the funding will generate a receivable in the paying company's books and a payable in the books of the receiving company.

---

[4] paragraph [59] above

[5] paragraph [61] above

21

He said that if it had been his understanding that the payables were loans, he would have recorded them together with the ATT borrowing under Note 5 in CFI's 2006 financial statements (rather than separately in Note 6). His explanation for the treatment of the funding as a loan in CI's books was that, as a Netherlands Antilles registered company, all its receivables are treated by the tax authorities in that jurisdiction as loans. This evidence did not form part of the contents of Mr Yalim's witness statement.

[65]   Mr Karamehmet gave evidence on this matter. He said without hesitation that the payments made to ATT on CFI's behalf on 24 November 2006 were capital contributions and that Ms Cetinalp had been wrong to record any of it as lending. He said that the intention that the payments should be so treated was his, taken in his capacity as Chairman and CEO of CH. When he was asked what authority he had in relation to CI (of which he is not a director) his response was that he had authority in relation to CI because 'if I say [something] to Cetinalp, she does it'. Ms Cetinalp was a director of CI at the relevant time. Having heard Mr Karamehmet give evidence, I found his blunt description of the decision making process inside the Cukurova group entirely credible. He was also right, in my view, as a matter of practical day to day law. Mr Karamehmet could cause CI to pass whatever resolutions CH demanded of it. If formalities were overlooked, a valid ratifying resolution could be secured within minutes.

[66]   For a contract of loan to be concluded there has to be as a minimum agreement between the parties that one of them will borrow and the other will repay. In a commercial context, that will invariably involve discussion of terms. Mr Kenneth MacLean QC, who appeared together with Ms Arabella di Iorio and Mr James Nadin for Cukurova, submitted that there was no evidence that any such agreement had even been concluded. I agree with him. Indeed, it seems to me that the documentary evidence upon which ATT has relied and which I have attempted to summarise above goes almost entirely the other way. The most important element in that evidence is the deliberate distinction which was made by Mr Yalim when he drew up CFI's financial statements between 'Interest bearing loans and borrowings', into which category he placed the ATT lending, and 'Due to related parties' to which he assigned the payments made on CFI's behalf on 24 November 2006. The matter is concluded by the evidence of Mr Karamehmet, which I have no hesitation in accepting and which finds corroboration in KPMG's audit of CH's 2006 financial statements, which I deal with in paragraphs [78] to [81] below. The treatment of CI's portion of the

22

funding within CI's books is anomalous and may well be explicable by matters which were not gone into at trial.

[67]    ATT's contention that CFI caused an Event of Default to occur by incurring financial indebtedness within the meaning of clauses 16.4(a) and 17 of the Facility Agreement therefore fails.

<u>Insolvency</u>

[68]    The second Event of Default relied upon by ATT in the acceleration letter is that CFI was insolvent. The CFI financial statements sent to ATT under cover of CFI's letter of 22 February 2007 showed that as at 31 December 2006 CFI had assets with a book value of US$1.707bn.  But they also showed that CFI had total liabilities of US$1.942bn, made up of the outstanding balance of the secured loan, some US$18m of interest accrued since 25 November 2006 and (under 'non-current liabilities') the 'Due to related parties' figure of US$574m whose nature I have just been discussing. The result of including this last figure as a liability in the balance sheet results in an apparent balance sheet deficiency, as at 31 December 2006, of US$236m.  Had it instead been included as capital, the result would have been an excess of assets over liabilities amounting to some US$339m.

[69]    Clause 17.5 of the Facility Agreement provides that an Event of Default will occur if

> '(A)    The Borrower or a member of the Telecom Group is unable or admits inability to pay its debts as they fall due, suspends making payments on any of its debts or, by reason of actual or anticipated financial difficulties, commences negotiations with one or more of its creditors with a view to rescheduling any of its indebtedness.
>
> (B)    The value of the assets of the Borrower or any member of the Telecom Group is less than its liabilities (taking into account contingent and prospective liabilities).
>
> (C)    A moratorium is declared in respect of any indebtedness of the Borrower or any member of the Telecom Group.'

The Telecom Group is defined as CFI, CTH and any subsidiary of CTH.

[70]    ATT contends that CFI is or has been in breach of sub-clause 17.5(A) on the grounds that it is unable to pay its debts as they fall due. When I asked Mr Stephen Smith QC whether he was

23

persisting with this allegation he declined formally to withdraw it.  I need only say that there is no evidence in support of any such contention and I disregard it.

[71]     ATT relies strongly, however, upon its contention that the CFI financial statements sent to ATT on 22 February 2007 show (for the reasons I have summarized above), that as at 31 December 2006 CFI's liabilities exceeded its assets.  Mr Palmer, who was scrupulous throughout his evidence, said that if the references in clause 17.5 of the Facility Agreement are to book value, then CFI was balance sheet insolvent as at 31 December 2006.  It seems to me, therefore, that the first question which I have to resolve is whether clause 17.5(B) is to be read as referring to CFI's assets and liabilities as quantified and described in its financial statements from time to time or as referring to the actual realizable value of its assets and, correspondingly, to the true nature and extent of its actual liabilities.

[72]     No help is given in the definition section of the Facility Agreement.  Clause 17.5 does not specify that the question is to be answered by reference exclusively to figures contained in CFI's financial statements.  On the contrary, the use in clause 17.5(B) of the unqualified word 'value' suggests the contrary.  On consideration of all the terms of the Facility Agreement, the circumstances under which it was entered into and the objective purpose of the transactions of which it forms part, it is plain that the bulk of the stipulations of the Facility Agreement are designed to protect ATT as lender against a deterioration in the financial condition of the borrower, CFI, or its parent, CH.  Mere book values may be an uncertain or even a misleading guide to a company's financial health.  It seems to me that the objective commercial purpose of the provision demands that the references to asset values and liabilities must be to actual realizable values and to liabilities which actually go to reduce the value of CFI.

[73]     I am fortified in this view by the evidence of Mr Palmer, who said that if he was asked to assess a company's balance sheet insolvency, he would want to know what the realizable value of its assets was.  Mr Palmer was not asked what his valuation approach would be to liabilities, but it seems to me that the converse must apply.  In other words, while the starting point is obviously the balance sheet, that is the beginning, rather than the end of the inquiry.

[74]     I have no evidence as to the actual realizable value as at 31 December 2006 or at any other time of CFI's 51% holding of CTH shares.  At various points during Counsel's submissions mention was

24

made of control premiums (because the indirect 13.76% Turkcell holding confers management control of Turkcell) and, conversely, of liquidity discounts (resulting from the potential difficulty of offloading such a sizeable stake on the market) but the fact remains that I have no valuation evidence enabling me to put a figure on the value of the holding at any given time. It seems to me that the burden is on ATT, if it wishes to rely upon clause 17.5(B), to provide the evidence upon which a judgment can be made. It must, in other words show that the realizable value of the CTH shares as at 31 December 2006, when set against liabilities properly to be treated as liabilities of CFI, results in a deficiency of assets.

[75]     So far as liabilities are concerned, the evidence satisfies me that the US$574m appearing in CFI's balance sheet in consequence of the funding which it had received on 24 November 2006, if not technically capital (because the legal formalities of appropriating the payments to capital had not been undertaken) was for all practical purposes to be treated as capital. Mr Karamehmet had control of CH (and therefore of its subsidiary CI) – indeed, it was provided that an Event of Default would occur should he or his heirs cease to control CFI and CH[6]. His clear evidence, which as I say I accept, was that his intention was that the payments made on behalf of CFI in November 2006 should be capital investment. When asked about his reaction to the 16 April 2006 letter calling the loan he said, in relation to the insolvency allegation, that, Cukurova felt there was no insolvency since the payments were intended as capital. Mr Berkmen gave evidence to similar effect.

[76]     It is plain from the evidence which I have summarized that the funding was included within liabilities in the balance sheet on a holding basis and because it had to be included somewhere. During his impressive evidence Mr Palmer referred to the fact that even paid up share capital is properly treated as a form of liability[7]. Mr Yalim seems to have thought that this treatment of the funding payments was the best he could do in the circumstances, but his evidence, which I accept, is to the clear effect that had he thought the money represented a loan he would have included the figures within Note 5.

---

[6] see clause 17.8 of the Facility Agreement

[7] transcript, Tuesday 20 April 2007, page 21

25

[77]     Another way of looking at the matter is to ask what would have happened had ATT raised any query as to CFI's apparent balance sheet insolvency.  I am satisfied, on the evidence to which I have already referred, that the necessary formalities would have been taken immediately to designate it as part of CFI's capital.  Indeed, that is exactly what happened, although with some hiccups, after receipt by CFI of ATT's letter of 16 April 2007.

[78]     Another important item of evidence on the insolvency point, but which also has relevance for the 'borrowing' point, comes from financial statements prepared for CH by KPMG for the year ended 31 December 2006.  As I understand it, the financial statements audited by CH's statutory auditors which had formed part of CH's annual report for the year ended 31 December 2006 to which I have made earlier reference[8] were insufficient for tax and perhaps for regulatory purposes also.  CH therefore needed to have its financial statements audited externally and that task was carried out on this occasion by KPMG.  KPMG signed off a set of financial statements for CH on 24 April 2007.  That date is significant, because it was one day after the series of board resolutions to which I have earlier referred had been passed by CFI, CH and CI, the effect of which was to novate CFI's liability to CI so that it became instead a liability of CH and to make CFI liable to CH in place of CI in respect of the US$130m previously shown as due from CFI to CI.  I have already mentioned that the effect of these transactions had been reflected in CI's 2006 financial statements.

[79]     Mr Stephen Smith QC questioned the validity of the CH board resolution.  Mr Karamehmet was in London on 23 April 2007, attempting to interest potential investors in providing Cukurova with a syndicated loan to replace the ATT funding.  His evidence was that he had been telephoned on 23 April 2007 and asked to approve the CH resolution, which he did orally.  He told me that he signed the minute some time after his return on 27 April 2007 or thereabouts.  Mr Stephen Smith QC says on these grounds that he does not accept that the CH board resolution was effective as at 23 April 2007.  CH's corporate regulations have not been put in evidence and in any case the point would have been relevant only if I was of the opinion (which I am not) that the effective date of the resolution is critical.

---

[8] paragraph [60] above

26

[80]   What is critical is that on the day following KPMG signed off CH's 2006 financial statements.  They showed (Note 17) that as at 31 December 2006 nothing was due to CH from CFI.  On the contrary, Note 8 to the financial statements, explaining a balance sheet entry described as 'Advances for investments', contains the following passage (omitting the references to Turkish lira):

> 'At 31 December 2006 advances for capital contributions to CFI (a fully owned subsidiary of the Company) represented USD [443m] of net payment made by the Company to CFI's creditors, on behalf of CFI, and USD [130m] of net payments made by [CI] (another fully owned subsidiary of the Company) to [CFI]'s creditors on behalf of CFI, as instructed by the Company.'

[81]   Mr Palmer was asked about this treatment in the books of CH.  He said that 'advances for investment' is a term familiar to Turkish accountants and that it was a sort of half way house, since neither KPMG nor CH could at that time treat it is an investment in fact, because at that stage it was not represented by shares issued by CFI.  Asked if CH was justified in not treating the US$574m as a loan to CFI and if KPMG was justified in accepting that treatment, Mr Palmer's answer was that KPMG could not have signed off the Notes to which I have referred unless they were of that view.  While pointing out that he had not seen the management representation letter, the tenor of his evidence was that KPMG could not have and would not have approved this treatment of the money unless they had enough audit evidence to be comfortable about it.

[82]   Mr Palmer pointed out, however, that the CH trial balance for year ended 31 December 2006 included an account for capital advances and that the CFI receivable had not been allocated to that account.  He thought that the fact that the payment had not been so treated told its own story.  He also pointed out that the financial statements annexed to CH's 2006 annual report[9] did not treat it as an advance for investment and he commented generally that it seemed to him that there was a lot of documentation which did not treat the payments as investments or even as advances for investment.

[83]   I take full account of Mr Palmer's reservations, but he had not had the advantage of hearing Mr Yalim's evidence nor of hearing Mr Karamehmet's evidence during cross examination.  I have to

---

[9] paragraph [60] above

27

reconcile the inconsistencies which can be identified in the accounting records and financial statements of the three companies one way or the other and I have no doubt, having heard Mr Yalim and Mr Karamehmet and having considered all the accounting material to which I have been referred, together with the totality of Mr Palmer's evidence, that at no stage from 22 November 2006 onwards was CFI under any enforceable obligation to reimburse CH or CI for the funds which had enabled the payments totaling US$574m to be made to ATT on 24 November 2006.  ATT accordingly fails to establish that CFI's liabilities exceeded its assets, as at 31 December 2006.

[84]   Because much was made of it at trial I must add a postscript to this finding.  Following the passage of the board resolutions of 23 April 2007, Mr Yalim produced a CFI balance sheet as at that date. The recast balance sheet treated the US$574 million as share capital, thus removing any patent deficiency from the balance sheet.  But the comparables for December 2006 still retained the US$574m under non-current liabilities, thus leaving the figures upon which ATT had relied in the acceleration letter unaltered.  A Note to the financial statements says that the US$574m was included in CFI's share capital 'as of April 23 2007'.  This document was never proffered to ATT. Mr Stephen Smith QC relies upon this treatment as showing that whatever may have happened as a result of the 23 April 2007 resolutions, CFI was still shown as firmly insolvent as at 31 December 2006 and at all times down to 23 April 2007.  Mr Yalim's explanation for this was that he understood that if the financial statements were going to show that the US$574m was not due to related parties as at 23 April 2007, the same must follow for 31 December 2006.  With respect to Mr Yalim, this seems a hopeless position to take in the light of the clear indication on the face of the document that the money was due to related parties as at 31 December 2006.

[85]   Mr Yalim had another attempt and produced a second set of financial statements as at 23 April 2007, this time showing the US$574 as a capital contribution reserve both as at 23 April 2007 and also as at 31 December 2006 and thus getting rid of the patent balance sheet insolvency at both dates.

[86]   It follows, however, from the finding that I have made as to the true nature of the transfer of the US$574m, that these internal revisions have no relevance to the issue which I have to decide on this part of the case - although I shall have to come back to these facts in relation to a further alleged Event of Default.

28

[87]   ATT accordingly fails to establish an Event of Default under this head.

Material Adverse Effect

[88]   Clause 17.16 provides that the occurrence of any event or circumstance which in the opinion of ATT has had or is reasonably like to have a Material Adverse Effect is an Event of Default. 'Material Adverse Effect' is defined by clause 1.1 of the Facility Agreement as follows:

> '"**Material Adverse Effect**" means a material adverse effect on:
>
> (A)   The financial condition, assets or business of the Borrower or any member of the Group;
> (B)   The ability of the Borrower or the Company to perform and comply with its obligations under any Finance Document;
> (C)   The validity, legality or enforceability of any Security expressed to be created by or pursuant to, or to be evidenced in, any Security Document or on the priority and ranking of any such Security.'

'Group' is defined by clause 1.1 of the Facility Agreement as meaning CH and its subsidiaries for the time being.

[89]   The acceleration letter refers to the TS press release of 26 January 2007 which I have briefly mentioned at paragraph [29] above, announcing that the arbitral Tribunal sitting in Geneva had issued a preliminary award (a) finding that there had been a binding agreement between CH and TS for the sale by CH to TS of the 51% of TCH then held by CH and presently held by CTH pursuant to the arrangements between Alfa and Cukurova which closed in November 2005 and which I have outlined above and (b) directing specific performance of that agreement.  The acceleration letter goes on to state that the shares had been acquired by CTH on the basis that there was no prior agreement affecting them and expresses the opinion that, since in those circumstances there was no prospect that CH would be able to comply with the award of specific performance, 'a likely consequence' would be its replacement by a significant damages award. The letter proceeds to give it as ATT's opinion that this is likely to have a material adverse effect on the financial condition of CH and/or other members of the Group.  Finally, the acceleration letter states that this constitutes an Event of Default which is continuing.

29

[90]    The existence and nature of the Geneva arbitral proceedings had been disclosed by CH and CFI to ATT in the Disclosure Letter. The disclosure relating to TS appears to have been comprehensive. It covered the Memorandum of Understanding of 24 March 2005 which TS claimed, but CH denied bound CH. It set out that if the Tribunal did not grant specific performance, it was the intention of TS to seek an award of damages and mentioned that TS had made an interim application to the civil Court in Geneva to prohibit CH from initiating or proceeding with contracts for the disposal of the TCH shares, which, if granted, would (and as events proved did, at any rate temporarily) prevent the closing of the various transactions contemplated by the Subscription Agreement. However, numbered paragraph III on the opening page of the Disclosure Letter states that its purpose is to qualify and limit the liabilities of CH and CFI in relation to the warranties given by CH and CFI in Schedule 3 to the Subscription Agreement. It did not operate so as to provide blanket immunity against any other complaint which ATT might be entitled to make in respect of a matter mentioned within it.

[91]    CFI's first defence to this claimed Event of Default is that the January arbitral award has not yet had any effect on the financial position, assets or business of CH or the Group. It seems to me that this point, as put, must be bad: first, because something which happens in relation to a person and which is capable of giving rise to a deleterious contingent or 'knock on' effect must by definition have a present effect, because the condition of the person affected changes from one where he was not exposed to the risk that the contingency will materialize into one where he is presently exposed to that risk; and secondly, and more importantly, because it overlooks the words 'or is reasonably likely to have' in clause 17.16. That still leaves open, of course, the question whether the present, or the reasonably likely future effect is to be treated as materially adverse, but CFI's first line of defence is not an answer to the claim.

[92]    Mr Tolchinsky said that Alfa had been advised before entering into the transactions that the structure was secure and that it could not be unraveled by TS and that Alfa would probably not have done the deal had the advice been different.

[93]    Mr Musatov gave evidence about this issue. I have to say that I found his evidence on this part of the case unpersuasive. He seemed to be loyally attempting to support a position in which he had no personal confidence. Mr Musatov said that when he learnt of the press release he rushed into

Mr Reznikovich's office (which was either adjacent to or very close to that occupied by Mr Musatov) because, as he put it, 'it was quite important news to us.'  When asked why in that case the matter was not immediately taken up with Cukurova, Mr Musatov said that Mr Reznikovich decided that Alfa would deliberately not raise the matter with Cukurova, because that might tip them off and Alfa wanted to take time to consult with outside lawyers to make sure that it understood the issues correctly.  Changing tack somewhat, he said that the reason why Cukurova was not contacted was because whenever Alfa asked Cukurova for information about the progress of the arbitration they were told that confidentiality precluded the sharing of information.  Mr Musatov was of the opinion that the Tribunal would not order specific performance, but he said that there was a concern that the Turkish Court might make some order prejudicial to Alfa's interest – although he said he thought the likelihood of that was closer to 0% than to 100%.

[94]   Asked why he did not send a memorandum to anyone at Alfa expressing alarm about this turn of events, Mr Musatov had no explanation, although he did volunteer that Alfa 'remained alarmed' until April.  Asked why a presentation made by DB to Altimo sometime in February 2007, on the topic, inter alia, of Cukurova's financial health, made no mention of the supposedly material adverse effect caused by the Geneva award, Mr Musatov's only response was that he had not attended the presentation.  Mr Reznikovich said that he did not refer the information to which Mr Musatov had drawn his attention to the Altimo board (at any rate until the meeting of 2 April 2007).

[95]   As to the supposed materiality of the Geneva award, Mr Musatov said that, together with an unnamed 'outside Counsel', he did a calculation based upon the increase in the underlying Turkcell share price between the date upon which TS was supposed to buy pursuant to the Memorandum of Understanding and February 2007.  That calculation was said to have produced a figure of some US$700m.  When some ancillary damages and a control premium uplift of 20% were factored in, the likely damages were estimated at US$1bn.  When it was pointed out to an uncomfortable Mr Musatov that the Bloomberg print outs which were exhibited to his witness statement in support of this calculation were only downloaded on 4 and 12 February 2010, Mr Musatov said that the calculation to which he had been referring had been done using a calculator and prices downloaded from Yahoo.  In making this calculation, Mr Musatov said he carried in his head the number of Turkcell shares in issue.  Mr Reznikovich said that he, too, made a similar calculation, which he said took him a couple of minutes.

31

[96]     On 16 April 2007 Mr Hardman swore an affidavit in these proceedings in support of ATT's application to serve CH out of the jurisdiction. In the course of that affidavit, Mr Hardman speculated that even if the value of the TCH shares which the Tribunal had held to have been sold to TS was worth only 5% more than the purchase price of US$3.1 billion payable under the Memorandum of Understanding between CH and TS, it would appear likely that a damages award of hundreds of millions of dollars might well be made against CH.   A five per cent uplift produces a figure of US$155m.  When that was put to Mr Musatov, his initial response was the one with which he greeted very many of the questions put to him – he asked Mr Kenneth MacLean QC to repeat it. His answer to the question itself was that in February 2007 Alfa considered that an award in that range would be likely to have a material adverse effect on Cukurova.

[97]     Mr Musatov was referred to some papers presented to and a record of a decision taken at the meeting of the Altimo board held on 2 April 2007, at which he was present for part of the discussions.  One of the papers that had been prepared for consideration was headed 'Turkcell – breach of 28 September 2005 Loan Agreement terms by Cukurova Group'.  I set it out in full:

> **'Turkcell – breach of 28 September 2005 Loan Agreement terms by Cukurova Group**
>
> **Events of default**
> **Loans**
>
> - In November 2006, CFI (the borrower) received a USD 574.4 million loan from Cukurova Group. The loan agreement prohibited CFI from taking out any loans without Alfa's approval. Also, the CFI balance sheet went into the red (liabilities exceeded assets by USD 235 million).
> - **Material adverse effects**
>   Cukurova's inability to comply with the arbitration court ruling against [TS] may cause Cukurova to compensate the losses of [TS], the amount of which may have material adverse effects on the financial status of Cukurova Group.
> - **Reserved matters**
>   Since Alfa's acquisition of a stake in Turkcell in November 2005, Cukurova Group companies concluded several deals with Turkcell, which required prior

32

> coordination between Alfa and Cukurova at the level of
> CTH (Reserved matters).'

[98]     Mr Musatov's attention was drawn to the second bullet point and he was asked why no specifics were provided of this curiously tentative statement.  He said that the figure of US$1bn had not been mentioned in the discussion paper because the practice was to keep presentational material as short as possible and for that reason specifics were not gone into.  Mr Musatov also made clear that no particular range of damages was discussed at the meeting itself.  The Altimo board's decision is recorded thus:

> 'Report on the main results of 2006 and the 1st quarter of 2007, and the main tasks for 2007
>
> In response to the breach by Cukurova Finance International limited (CFI) of the loan agreement with the company Alfa Telecom Turkey Limited (ATT), the Board has recommended that the management notify CFI about its default on the loan, demand repayment of the loan and transfer legal title to Cukurova Telecom Holdings shares pledged in favour of ATT by exercising the pledgee's right.'

It is impossible to tell from this document whether the meeting decided to call the loan on one only or two (and, if so, which) or all three of the defaults mentioned in the presentation paper. There is thus no contemporaneous documentary material evidencing the fact that an opinion on Material Adverse Effect formed any basis for the acceleration of the loan.

[99]     Mr Reznikovich was asked why Alfa did not ask Cukurova for a statement of its financial position in the light of the Geneva arbitration award.  His answer was that there was no point asking, because Cukurova would just have said 'fine'.  He added that Alfa did not seriously consider asking for this kind of information.  Instead, he said, Alfa concentrated on a legal analysis, which, he added, might have taken a month or longer to perform, which I have to say does seem to be a substantial length of time to deal with a short point.  He said, finally, that Altimo formed its material adverse effect opinion after the legal advice and the calculation, which he said was done by himself and Mr Musatov and took couple of minutes.  Mr Reznikovich said that he did not remember if anyone at the meeting asked him to put a figure on the financial consequences of the award.

33

[100]   What I am left with is a party (ATT) which suggests to the Court in an affidavit sworn only a fortnight after the 2 April 2007 meeting that TS might obtain an award in the region of US$155m, apparently oblivious of the fact that its Chief Executive Officer and Chief Legal Officer had already calculated that the likely quantum will be over six times that amount; which can produce no minutes evidencing any discussion at all of the issue at the meeting of 2 April 2007; which admits, by its Chief Legal Officer, that no attempt to quantify the probable amount of any damages award was made in the meeting itself; and which says, by its CEO, that instead of asking Cukurova for information, it concentrated on the legal angle.

[101]   It seems to me that there is no evidence that the Altimo board ever formed an opinion, let alone a fact based and reasoned opinion, that the Geneva arbitration award either had had, or was reasonably likely to have a material adverse effect on the financial condition, assets or business of CH or any other member of the Group as defined, or on the ability of CH or CFI to perform its obligations under the Facility Agreement or any other Finance Document (as defined).

[102]   I do not overlook paragraph 124 of Mr Reznikovich's witness statement in which he says that 'with the assistance of my team at Altimo' he reached the view that, in his opinion, the award would have such material adverse effect.  Whatever Mr Reznikovich may have thought in his own mind, what needs to be proved is an opinion formed and held by the Altimo board.  As to that, there is no evidence at all.

[103]   It may be said, of course, that the relevant directing mind and will for the purpose of establishing what opinions were held by ATT on this issue was not the Altimo board, to whom ATT's management had been delegated, but Mr Nazarian, its sole *de jure* director, sitting on his own in Luxembourg.  It is true, of course, that he signed the acceleration letter, but to allow ATT to rely on that fact as establishing the opinion of a company run and managed exclusively, otherwise than in point of form, by Altimo would be to allow form to triumph over substance.  The fact that this matter was referred to the Altimo board for a decision whether or not to accelerate the loan shows that the Altimo board must be treated as ATT's controlling mind and will for this purpose.  If it were not, there would have been no purpose in asking for its decision.

[104]   ATT accordingly fails to establish this Event of Default.

34

Related party matters

[105]    On 23 December 2005 Turkcell entered into a contract with a company called Digital Platform ve
         Iletisim Hizmetleri AS ('Digiturk'), which was a member of the Cukurova Group, as defined in the
         Shareholders Agreement.  Although the precise terms of the contract were never made entirely
         clear, it seems that it involved the restructuring of Digiturk indebtedness to Turkcell amounting to
         around US$100m.  The consequence, it is alleged by ATT, is that Digiturk was saved from
         impending insolvency and Cukurova was ultimately able to sell off about 46% of Digiturk for
         US$246m.

[106]    On 1 September 2006 Turkcell renewed or extended an agreement between itself and a company
         called ADD Production Medya AS ('ADD').  ADD is also a member of the Cukurova Group for the
         purposes of the Shareholders Agreement.  The renewal was effected by managerial act by two
         directors of Turkcell in reliance upon a signature circular.  The matter was not and did not need to
         be referred to the Turkcell board.

[107]    Clause 4 of the Shareholders Agreement is in the following terms:

         'RESERVED MATTERS

         Each party agrees to use all of the powers at its disposal and
         exercise any and all voting rights it may have to ensure that no
         action is taken or decision made relating to any of the matters
         specified in Schedule 1 (Reserved Matters) (whether by any
         members of the Board, CTH, any other member of the CTH
         Group or any of the officers or managers within the CTH Group)
         unless the [CTH] Board has given its unanimous approval to
         proceed.'

         Paragraph 4.2 of Schedule 1 to the Shareholders Agreement provides as follows:

         'Any transaction or contract proposed to be entered into between
         any member of CTH Group and

         (A) The Alfa Group and/or any Affiliate of Alfa and/or any other
             Person directly or indirectly having a substantial financial
             interest in the Alfa Group or any Affiliate of Alfa; or

35

> (B) The Cukurova Group and/or any Affiliate of Cukurova and/or
> any Person directly or indirectly having a substantial financial
> interest in the Cukurova Group or any Affiliate of Cukurova.'

Turkcell is a member of the CTH Group for the purposes of the Shareholders agreement.  Since each of Digiturk and ADD are members of the Cukurova Group, transactions between Turkcell and either of them potentially fall within clause 4 of the Shareholders Agreement.  Clause 17.10 of the Facility Agreement makes a breach of any Transaction Document an Event of Default unless the breach is capable of remedy and has been remedied within 5 days of ATT giving notice of the breach to CFI.  The Shareholders Agreement is a Transaction Document for the purposes of clause 17.10 of the Facility Agreement.

[108]   ATT pleads that by failing to take any steps to procure the approval of the CTH board to the conclusion of the Digiturk contract or the ADD renewal or to bring these matters to the attention of the CTH board, CFI broke clause 4 (and clause 19.1, which I do not think takes matters any further) of the Shareholders Agreement and thus brought about an irremediable Event of Default under clause 17.10 of the Facility Agreement.

[109]   I pointed out at trial that this manner of pleading the breaches does not reflect the wording of clause 4 of the Shareholders Agreement.  What clause 4 does, in my judgment, is to impose an obligation upon CFI, ATT and CTH to use all powers at the disposal of each of them and exercise all their voting right to ensure (inter alia) that Turkcell does not contract with any Cukurova Group company, such as Digiturk or ADD, unless the CTH board has unanimously approved the transaction.  There is no obligation to procure the approval of the CTH board or to bring the matter to its attention.  There is simply an absolute obligation to do all that can be done to prevent such transactions being entered into unless they have previously been unanimously approved by CTH's board.

[110]   How CFI or CTH was expected to know what potentially infringing transactions the board of, for example, Turkcell, was contemplating entering into at any given time, so that they could move into action to do whatever they could to prevent them happening, is beyond my comprehension, but if parties are prepared to assume duties of this sort they must expect to be required to perform them, however problematic that may prove.  The Shareholders Agreement provides for no exception for

36

want of knowledge or notice of impending transactions.  Mr Kenneth MacLean QC argued that it was for ATT, if it wished to allege this particular Event of Default, to set out what it says that CFI should (or, he would say, could) have done to ensure compliance, but I do not accept that submission.  The obligation is unqualified.

[111]   Given that the ADD renewal was a managerial act not considered by Turkcell's board, there was plainly no power or voting right available to CFI capable of preventing that transaction going ahead. On no conceivable basis did CFI or CTH have any standing to influence, let alone interfere in, mere managerial acts of Turkcell, so that that alleged Event of Default is not made out.

[112]   The Digiturk transaction was approved at a meeting of the Turkcell board held on 16 December 2005.  The Turkcell board at that date consisted of Mr Karamehmet and Mr Burkmen, together with two directors appointed by TS and three independent directors.  Mr Kenneth MacLean QC says that in those circumstances, even if CFI had somehow persuaded the Cukurova appointees to vote against the Digiturk transaction, it would still have been approved by the remainder.  This argument ignores the fact that CFI had a controlling stake in Turkcell.  It seems to me that as a matter of fact CFI could have taken steps to block the Digiturk transaction.  There is no evidence that it *could* not have procured at least some representation on the Turkcell board by 16 December 2005 and voted against all transactions proposed to be entered into between Turkcell and any Cukurova Group entity which had not had the approval of the CTH board.  In those circumstances it seems to me to be impossible to say that there were no efforts which *could* have been made by CFI to comply with this obligation.

[113]   The Digiturk agreement was mentioned in the Disclosure Letter and it appears that there had been discussions between Cukurova and Alfa in which Cukurova had attempted to get Alfa to give advance consent to its being entered into.  What Cukurova actually got, on the very day the transactions closed, was a letter in the following terms (so far as material) addressed to CH only:

'Dear Sirs,

**Subscription Agreement dated June 1, 2005, among Alfa Telecom Turkey Limited ("ATTL") Cukurova Finance**

37

International Limited ("CFI"), and Cukurova Holding A.S. ("Cukurova"), as amended by a letter agreement, dated September 20,2005, among Alfa, CFI and Cukurova, and as further amended by a letter agreement, dated September 20,2005, among Alfa, CFI, Cukurova, and Mehmet Emin Karamehmet (the "Subscription Agreement")

(1)    We refer to the Subscription Agreement.

(2)    We understand that Turkcell Iletisim Hizmetleri A.S. ("Turkcell") is expected to enter into the following transactions.

....

(2.2)    Turkcell will enter into an agreement, a copy of which we have not seen, with Digiturk Digital Platform Iletisim Hizmetleri A.S. ("Digiturk") in relation to the provision of long-term advertising arrangements on terms which are satisfactory to DP Acquisitions BV (which entered into a share purchase agreement with Cukurova Investments NV and Cukurova Holdings A.S. on October 27,2005 for the purchase of shares Digiturk) for a period of 5 years involving marketing spending by Turkcell of at least USD 18,000,000 per annum on advertising services provided by Digiturk.

(2.3)    Turkcell will reschedule the existing indebtedness owed to it by Digiturk by entering into a barter arrangement with Digiturk on terms which are satisfactory to DP Acquisitions BV involving the provision by Digiturk of the advertising services referred to in paragraph 2.2 above in consideration for the discharge in full by Turkcell of the existing indebtedness between Digiturk and Turkcell. Any such arrangement will provide that:

(i)     irrespective of the amount of advertising services used by Turkcell in any year, the higher of the sum of USD 18,000,000 and the actual advertising spending incurred by Turkcell shall be deducted from the amount outstanding between Turkcell and Digiturk each year;

(ii)    all security provided to Turkcell in respect of the existing indebtedness owed to it by Digiturk will be released in full and no new security will be provided to Turkcell in relation to the rescheduled indebtedness; and

38

       (iii)    Digiturk will be permitted to redeem the reschedules indebtedness at Digiturk's option by the provision of advertising services or the payment of cash to Turkcell.

   (3) We confirm that, subject to the above described transactions being on arms' length terms, and subject to their fiduciary obligations, we will ensure that the vote by our representatives on the boards of Cukurova Telecom Holdings Limited and/or Turkcell Holdings A.S. and/or Turkcell to approve and give effect to the transactions described in paragraph 2 above will not be unreasonably withheld.

Yours faithfully


By:_____
For and on behalf of
Alfa Telecom Turkey Limited'

This letter shows that ATT, while giving a strong indication that, other things being equal, it would not oppose the Digiturk transaction, was nevertheless reserving the right to scrutinize a copy of the Digiturk agreement (which it had not yet seen) and to consider the implications of the proposed deal at the board meetings of whatever companies were to be called upon to approve it. The letter did not, in my judgment, amount to *carte blanche* to Turkcell and Cukurova to proceed without further reference to ATT.

[114]   Mr Kenneth MacLean QC submits, however, that quite apart from the letter of 25 November 2005, ATT waived compliance with clause 4 of the Shareholders Agreement. He bases this submission, first, on ATT's subsequent knowledge that the Digiturk deal had been closed on 23 December 2005. For example, Turkcell's Annual Report for 2005, published in April 2006, noted the Digiturk agreement in the 'due from related parties' section. One of the two Alfa representatives on the Turkcell board was a Mr Khudyakov (who did not give evidence at the trial) and Mr Reznikovich accepted that Mr Khudyatov would have been aware of this reference. A DB presentation made to Altimo on or around 28 September 2006 referred to 'important transactions with Digiturk'. Mr Reznikovich said that this presentation was attended by Mr Khudyakov and that he was shown DB's presentation document by Mr Khudyakov afterwards. The Digiturk agreement was also mentioned in papers circulated in advance of a Turkcell board meeting held on 8 November 2006

and it was readily accepted by Mr Musatov and Mr Reznikovich that Altimo was aware by 8 November 2006 at the latest that Turkcell had entered into the Digiturk agreement – although there was no evidence that ATT was interested to enquire as to its precise terms until 12 February 2007.

[115]   Mr Kenneth MacLean QC says that in this state of affairs, when on 24 November 2006 ATT accepted the interest due on the secured and unsecured borrowing, together with the prepayment of US$2m under the secured borrowing and the entire US$355m due under the unsecured borrowing, it waived any failure to comply with clause 4 of the Shareholders Agreement. There was some discussion whether when it did so ATT fully comprehended its legal rights under the Transaction Documents, but I do not think that it would lie in the mouth of ATT to claim ignorance or uncertainty as to its legal rights.

[116]   In these circumstances Mr Kenneth MacLean QC submitted that, while acceptance of the interest alone might not have constituted a waiver on the part of ATT, the fact that it accepted the prepayments of principal did. I cannot accept this submission. While it may well be true that acceptance by a lender of payments the effect of which is to affirm a banking relationship (such as interest in advance) may amount, on the facts of any particular case, to a waiver, the acceptance by ATT of prepayments which it was contractually obliged to accept (see clause 6.4 of the Facility Agreement) cannot possibly amount to a waiver on its part.

[117]   Even if I am wrong about that, it must be remembered that the Event of Default relied upon is not a breach of the Facility Agreement. The obligation in question is not an obligation of CFI under the Facility Agreement. While clause 17.10 of the Facility Agreement makes CFI's failure to comply with clause 4 of the Shareholders Agreement an Event of Default under the Facility Agreement, it does not thereby make it a breach of the Facility Agreement. It seems to me that whether or not acceptance by ATT of the sums paid to it by CFI on 24 November 2006 was capable of waiving a prior breach of the Facility Agreement, it was not capable of waiving a breach of a wholly separate (albeit related) agreement. If CFI was indeed in breach of the Shareholders Agreement, therefore, that breach remained an Event of Default by reason of the terms of clause 17.10 of the Facility Agreement.

40

[118]   Mr Stephen Smith QC relied upon clause 25 of the Facility Agreement, which is in the following terms:

> 'REMEDIES AND WAIVERS
>
> No failure to exercise, nor any delay in exercising, on the part of the Lender, any right or remedy under the Finance Documents shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by law.'

He says that despite the fact that the waiver in terms deals only with Finance Documents, as defined, the fact that the Facility Agreement defines Events of Default by reference also to the Transaction Documents means that breaches of Transaction Documents are within the purview of clause 25.  This argument fails because that is not what clause 25 says.  In any case, the provision deals only with waiver on grounds of inactivity or delay.  It does not deal with waiver by affirmation.  For the reasons given above, however, Mr Stephen Smith QC does not need this argument and I deal with it only for completeness.

[119]   I now need to return to ATT's letter to CH of 25 November 2005, to which I referred at paragraph [113] above.  As I read the final paragraph of that letter, ATT was telling CH that it would not stand in the way of the Digiturk agreement subject only to having sight of its full terms and to ATT's representatives being able to consider, at the appropriate board meetings, whether the agreement was at arms' length and whether they could approve it without being in breach of their fiduciary obligations.  ATT was therefore giving its conditional consent to the Digiturk agreement.  In those circumstances it seems to me that (although the letter was not written to or copied to CFI) ATT must be taken by this communication to its 100% parent, CH, to have released CFI from any obligation under clause 4 of the Shareholders Agreement to take all steps in its power, etc, to thwart or block the transaction.  So that while the letter did not sanction Turkcell's entry into the Digiturk transaction without further reference to ATT, it did, in my judgment, mean that in respect of the transactions to which it referred ATT must be understood as not requiring CFI to take any blocking action.  It would have been an act of deliberate commercial vandalism in those circumstances for CFI to have taken steps actively to oppose or prejudice the Digiturk transaction.

41

[120]   Accordingly, this alleged Event of Default is not made out.

<u>Sale of Turkcell Shares</u>

[121]   As mentioned in the factual summary with which I opened this judgment, between about 8 and 21 November 2006 CH and CI sold an aggregate 5.88% holding of Turkcell shares by way of secondary public offering.  The proceeds were used to make the 24 November 2006 payments to ATT.

[122]   ATT alleges that this was a breach of clause 2.1(B) of the Shareholders Agreement.  Clause 2.1 reads as follows:

> 'Each of Alfa and Cukurova will procure that:
>
> (A)  Respectively, no Alfa Group Member and no Cukurova Group Member (other than as set out in Schedule 4) will (directly or indirectly) acquire or hold any interest (minority or otherwise) in any member of the CTH Group; provided that this clause 2.1 (A) shall not prohibit an Alfa Group Member or Cukurova Group Member from acquiring up to fifteen percent of the issued and outstanding equity securities of Turkcell, but no other member of the CTH Group, provided that Turkcell remains listed on an internationally recognized stock exchange and provided further that such acquisition is made only through an internationally recognized stock exchange;
> (B)  Subject to the prior agreement of the Board, and except as otherwise stated herein, if the opportunity arises to acquire any interests in any CTH Group Member, the parties shall procure that such acquisition only be carried out by CTH.'

Schedule 4 simply sets out the then existing holdings of Cukurova Group members of Turkcell shares.  Turkcell is a CTH Group Member.

[123]   Clause 2.1A therefore restricts the size of parties' holdings in (inter alia) Turkcell.  Clause 2.1(B) requires the parties to procure that should an opportunity arise to acquire any interests in, inter alia, Turkcell, the acquisition will be made by CTH.  ATT says that the secondary public offering conducted by JP Morgan in November 2006 represented an opportunity to acquire an interest in a CTH Group Member and that CFI and CTH were obliged to procure that the opportunity 'could be taken up' by CTH.

42

[124]    This is an astonishing contention.  Mr Reznikovich accepted that he knew about the offering on 8 November 2006, because it had been discussed at a Turkcell board meeting on that day which had been attended by Mr Khudyakov in his capacity as board representative of ATT.  Mr Kudyakov actually voted for the resolution approving the blank endorsement of the relative share certificates, although it is true that he abstained on the resolution approving the offering itself.  Mr Reznikovich says that he discussed the offering on Mr Khudyakov's return from the board meeting (which had been held in Istanbul) and may have mentioned the fact to the Altimo board.  As he put it, he may have made a couple of phone calls.  He accepted that Alfa did not complain about the sale, because, as he said, it had not then established that it was an Event of Default.  Mr Musatov was aware of the offering at about the same time.  He, too, said he did not realize at the time that it was a breach of the Shareholders Agreement.  He only found that out in March or April 2007.  Certainly, the supposed breach was not mentioned in the course of the presentation he made to the Altimo board on 2 April 2007.

[125]    Despite being aware of the offering at the time, ATT took no steps to comply with its own mirror image obligations (if that is what they were) under clause 2.1(B).  It took no steps to procure that the opportunity could be taken up by CTH.  Yet it claims that CFI's failure to do the same was an Event of Default as amounting to a breach of a Transaction Document.

[126]    As a matter of construction clause 2.1 of the Shareholders Agreement has no bearing on disposals of Turkcell shares in the market.  The notion that each time a Turkcell share became available on either of the Istanbul or New York Exchanges, ATT, CFI and CTH had to bustle about and 'procure' that it could be purchased only by CTH is absurd.  Clause 2.1(B) is plainly aimed at preventing either Cukurova or Alfa from *obtaining* an additional position within the CTH Group, thus disturbing the 13/76%/13.22% balance which the 2005 Alfa/Cukurova transactions had been designed to achieve.  Cukurova's sale of the 5.88% holding did not affect that balance.

[127]    I do not therefore need to go on to consider waiver.  Had it been necessary for me to do so, I would have decided, for reasons similar to those that I have given in respect of the related party transactions, that no waiver had occurred.

[128]    This Event of Default is not made out.

43

Failure to Notify

[129]   The final Event of Default relied upon in the acceleration letter is CFI's alleged failure promptly to notify ATT of its own alleged defaults and to inform ATT what steps were being taken to remedy them.

[130]   The relevant provision in the Facility Agreement is clause 15.5(A):

> 'The borrower shall notify the Lender of any Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence.'

[131]   Since I have held that none of the other Events of Default alleged in the acceleration letter has been made out, it follows that there cannot have been an Event of Default (or, as the acceleration letter would have it, eight Events of Default) under clause 15.5(A) of the Facility Agreement.

Was the call letter effective to accelerate the loan?

[132]   If ATT is to be confined to Events of Default actually specified in the acceleration letter, then it follows from the findings which I have made above that it was ineffective to accelerate the loan. ATT argues, however, that it is entitled to rely upon any Event of Default subsisting at the date of the acceleration letter, whether or not mentioned in it.  That is challenged by CFI.

[133]   There are two alleged Events of Default which ATT says were subsisting on 16 April 2007, but which were not mentioned in the acceleration letter.  Each is alleged to flow from a breach of clause 17.3 of the Facility Agreement, which is in the following terms:

> 'Misrepresentation
>
> Any representation, warranty or statement made or deemed to be made by the Borrower in the Finance Documents, any Transaction Document or any other document delivered by or on behalf of the Borrower under or in connection with any Finance Document is or proves to have been incorrect or misleading in any material respect when or deemed to be made.'

Clause 17 makes the occurrence of such a circumstance an Event of Default.

44

[134]   The first alleged materially incorrect or misleading statement is said to arise out of the CFI financial statements submitted to ATT on 22 February 2007 and which I have considered between paragraphs [50] and [87] above. In its amended statement of claim ATT says that whereas those financial statements showed the US$574m as a liability due to related parties, Ms Cetinalp and a Mr Martin Hall (neither of whom gave evidence at the trial) have stated in affidavits sworn in these proceedings that they incorrectly recorded the sums due to CH and CI as loans to CFI because in fact they were capital contributions. Although it is not my understanding that the February 2007 financial statements record these payments as loans (and, as I understood him, it was not that of Mr Palmer either), this allegation is admitted in Cukurova's defence. It seems to me, however, that this admission was overtaken by the course which argument took at trial. In any event, CH and CFI deny that the February 2007 financial statements were materially incorrect or misleading.

[135]   There can be no doubt that the February 2007 financial statements showed liabilities where it was subsequently asserted that the reference should have been to capital contributions. Mr Palmer was clear in his evidence that from an accountancy point of view the February 2007 financial statements, if set beside the comparative figures in the April 2007 financial statements and on the assumption that the latter treatment was the correct one, were materially misstated. The question which is required to be answered for the purposes of clause 17.3 of the Facility Agreement, however, is whether the February 2007 financial statements on their own were incorrect or misleading in any material respect and Mr Palmer did not suggest that on their own they were.

[136]   Mr Stephen Smith QC says that a document showing a company to be insolvent when in fact it claims to have been solvent has to come within that category, but that submission assumes what is required to be proved. Mr Kenneth MacLean QC says that because the February 2007 financial statements understated, rather than overstated CFI's position any error giving rise to that effect should in some way be ignored. I cannot accept that submission. Whether or not a statement is materially incorrect or misleading cannot turn upon the question whether it is calculated to cause the recipient to act to his detriment.

[137]   In my judgment, the February 2007 financial statements were not materially incorrect or misleading, although not for the reason given by Mr Kenneth MacLean QC. They correctly showed that the only loan for which CFI was liable was that due to ATT. By Note 6 they described the

45

US$574m as due to related parties in respect of funding introduced.  As Mr Yalim explained, its treatment as a liability was driven by the underlying book keeping entries and the fact that no formal steps had yet been taken to capitalise the funding in CFI's books.  The arithmetical deficiency to which that treatment gave rise should have been obvious to any reader of the financial statements as being the result of the provision of funding, not commercial lending.  It seems to me that the treatment adopted by Mr Yalim of recording an as yet uncapitalised advance as a (technical) liability, when coupled with the explanation in Note 6, was a perfectly fair way of presenting the factual position and was not materially incorrect or misleading.   I accept that anyone receiving these documents who was the slightest bit interested in understanding their full effect might have wished to ask questions about them.  That would certainly not have included ATT.  When ATT wrote to CFI on 12 March 2007 about the financial statements, it was not concerned to seek clarification of their content, still less to protest about any supposed insolvency, but rather to obtain a confirmation from CFI that they fairly represented CFI's financial position and that they had been prepared using IAS.

[138]   The fact that the February 2007 financial statements might have prompted further inquiry does not mean that they were materially incorrect or misleading.  That would be to confuse material error with what is at best opacity.

[139]   It is true that the restated financial statements done in April or May 2007 treated the US$574m differently.  In the first set of financial statements produced by Mr Yalim (which was not shown to ATT) the sum is classified (wrongly) as share capital as at 23 April 2007 (but not as at 31 December 2006).  This seems to me to throw no light on the question whether the February 2007 financial statements were themselves materially inaccurate or misleading.  The same goes for the second set of financial statements prepared by Mr Yalim as at 23 April 2007, where the US$574m is shown both at 23 April 2007 and at 31 December 2006 as capital contribution.  It is true that the three sets of documents are inconsistent with one another, but the question which has to be answered is nothing to do with consistency, but always remains whether the February 2007 financial statements are themselves materially incorrect or misleading for the purposes of clause 17.3 of the Facility Agreement.  It does not assist ATT to refuse to accept that either of the two later documents are accurate and then rely upon the differences to support a submission that the earlier document must be materially incorrect and misleading.  That is a *non sequitur*.

46

[140]   This Event of Default is not made out.

[141]   The second Event of Default alleged to have arisen before 16 April 2006, but which was not referred to in the acceleration letter, arises from CFI's letter of 19 March 2007. In that letter CFI confirmed that the February 2007 financial statements were certified by Ms Cetinalp in her capacity as a director of CFI as fairly representing CFI's financial condition as at 31 December 2006 and that they had been prepared 'using IAS'. These are said to have been materially inaccurate or misleading statements, because (see above) ATT says that the accounts could not be said to be a fair representation of CFI's financial position so long as CFI relied upon the restatements of April 2007 and because IAS require that financial statements be accompanied by a cash flow statement (which CFI's were not) and that they required a declaration to the effect that they were IAS compliant (which CFI's did not). The first adds nothing to what I have dealt with above; the second is *de minimis*. Mr Palmer told the Court that IAS required a cash flow but frankly accepted that, given the simple structure of CFI's balance sheet, the inclusion of a cash flow statement would have added little or nothing to what could be gleaned from the balance sheet. He said that he did not think that the absence of a cash flow statement or the note acknowledging compliance went to the heart of the litigation. I agree with that.

[142]   This Event of Default is therefore not made out.

[143]   That makes it unnecessary for me to decide whether, had these two last Events of Default been established, the fact that ATT had not referred to them in the call letter would have precluded ATT from relying upon them in accelerating the loan.

**The acceleration of the loan**

[144]   It follows from the above that there was no continuing Event of Default available to ATT when it purported to accelerate the loan. It further follows that the attempt to accelerate amounted to a breach of contract on the part of ATT and that CFI's failure to repay the loan in response to the acceleration letter was not an Event of Default.

47

**Further Events of Default**

[145]   On 16 April 2007 Mr Hardman delivered to the Registered Agents for CFI and CTH two letters from Walkers asking CFI and CTH to register ATT as the holder of the charged shares. The completed transfers and relative certificates were handed over to enable that to be done. On the same day, proceedings were issued and served against CFI and CTH asking for orders that their share registers be rectified accordingly.

[146]   ATT pleads that CFI committed a further Event or Events of Default by refusing or failing to comply with the requests made to it on 16 April 2007 to perfect ATT's security over the charged shares was perfected and in obtaining the stop notices and injunction restraining registration of the transfers and enforcement of the security. ATT relies principally upon clause 4.4 of the English share charges granted by CFI and CH, but it is necessary for me to set out the whole of the scattered battery of separate provisions under the Facility Agreement upon which ATT relies in order to establish these Events of Default. Clause 4.4 of the English share charges reads as follows:

> 'Further Assurance
>
> The Chargor shall promptly do whatever the Lender requires:
>
> (a) To perfect or protect the Charges or the priority of the Charges; or
> (b) To facilitate the realization of the Charged Assets or the exercise of any rights vested in the Lender or any Delegate, including executing any transfer, charge, assignment or assurance of the Charged Assets (whether to the Lender or its nominees or otherwise), making any registration and giving any notice, order or direction.

Clause 17.1(A) of the Facility Agreement made non-compliance with any provision of a Finance Document an Event of Default. The English share charges were Finance Documents.

Clauses 16.10 (C) and (D) of the Facility Agreement provide:

48

(C) The borrower shall take all such action as the Lender may reasonably request for the purpose of perfecting any such Security.

(D) The Borrower shall, if the Lender lawfully exercises any power (whether of sale or other disposal or otherwise) or right with respect to the Charged Shares, do everything within its power to permit the exercise of such power or right.

Clause 17.12 of the Facility Agreement provides that it is an Event of Default if

'The Borrower, any member of the Telecom Group or any other person takes any corporate action, legal proceedings or other procedure or step in relation to termination, revocation, suspension, cancellation or invalidation of the whole or any part of the Finance Documents and/or the Transaction Documents or takes any corporate action, legal proceedings or other procedure or step that is or reasonably likely to be prejudicial to the Lender's right under the Finance Documents and/or the Transaction Documents.'

[147]   Mr Kenneth MacLean QC raises a number of intricate defences in answer to these claimed defaults. Some of them, taken in isolation from the background facts, are technically good.

[148]   For example, Mr Kenneth MacLean QC points out that Walkers' letter of 16 April 2006 which Mr Hardman delivered to CFI asked CFI to enter ATT's name in its register of members. In terms, CFI was being asked to perfect the security granted to ATT by CH. Failure or refusal on the part of CFI to do that could not involve a breach of clause 4.4 of the CFI English share charge, since CFI's only obligation under clause 4.4 of the charge was to perfect the charge which it had granted over its shares in CTH.

[149]   Next, he says that Walkers' request to CTH was in terms a request to CTH to perfect the charge granted to ATT by CFI. But CTH owed no obligation to do that, nor could its failure to do so constitute an Event of Default under the Facility Agreement, to which it was not party. It is true that a breach by CTH, as a member of the Telecom Group, of any Transaction document might, if unremedied, give rise to an Event of Default under clause 17.10 of the Facility Agreement, but it was not a requirement of any Transaction Document (as defined) that CTH should take any steps by way of perfecting, or assisting in the perfection of the CFI English share charge.

49

[150]   CFI did have an obligation under clause 16.10(C) of the Facility Agreement to take all such steps as ATT might reasonably request for the purpose of perfecting any security created by CFI, but Walkers letter of 16 April 2007 was not a request to CFI to perfect any security created by CFI, so that no Event of Default under clause 16.10(C) can have arisen as a result of any failure or refusal on the part of CFI to comply with that request.

[151]   Mr Kenneth MacLean QC says that the issue by ATT of Claim 73, in which ATT sought rectification of the relevant share registers, and which ATT claims amounted to a request by ATT to CFI to bring about the required rectifications, was not a request at all.   I agree with him.   The commencement of proceedings is indeed a request, but it is a request to the Court for judgment in the terms sought.   It cannot be treated as a request to CFI for the purposes of the provisions of the Facility Agreement. ATT also pleads that by letter dated 17 April 2007 it informed CFI that it had approached the registered agent for registration of the transfers and stated that it was waiting for confirmation from the registered agent that the requests had been complied with.   ATT pleads that that is to be read as a request to CFI, but in my judgment it is no such thing.

[152]   While these defences (I have not dealt with them all) work as far as they go, they all ignore the rather obvious fact that Mr Parsons forwarded the requests made by Walkers to Ms Cetinalp on the same day and asked for instructions as to how to proceed.   No documentary response has been disclosed, but Cukurova (I deliberately use the broad designation) must have understood as a group what was being asked of it.   Any confusion between perfection and enforcement would have been dispelled by Walkers' letter of 17 April 2007, which made the distinction (for what it is worth) plain.   In my judgment each of the relevant Cukurova entities must be taken to have known and understood, by close of business on 17 April 2007 at the latest, what was being required of it by ATT.   It seems to me that the absence of any response must be taken as a refusal by the group and each of its constituent parts to take any steps to comply.   I do not think that that blanket refusal can be surgically analysed by reference to individual parts of the Finance Documents and chopped so fine that it can be made to disappear.

[153]   Mr Kenneth Maclean QC submits that what ATT was up to in making its requests for registration was not perfection of its security but (I hope that I do the submission justice) perfection as part of the process of enforcement.   I cannot accept this argument.   Even though ATT may have been

intent on following through with enforcement at time of its choosing and although that time might have been (indeed was) imminent, it is not possible, in my judgment, to treat a specific and legally discrete process as if it was a different one.

[154]  I am therefore satisfied that an Event of Default within the meaning of to the provisions of any rate Clause 4.4 of the CFI English share charge (taken together with clause 17.1(A) of the Facility Agreement) and of clause 16.10(C) of the Facility Agreement arose out of the failure to CFI to take any steps to comply with ATT's request to perfect the security which it had granted.

[155]  As I have earlier recorded, at around 3.50 in the afternoon of 27 April 2007 CFI and CH obtained stop notices under CPR Part 49.  The effect of those notices was that ATT could not achieve registration of the transfers until a further fourteen days had elapsed.  On the previous day Maples & Calder had told Walkers that they would be applying for an injunction to prevent ATT enforcing its security over the CTH shares.  I have already set out above how, at about 4.05 pm on the 27 April 2007 Walkers purported to appropriate the charged shares and how, at about 6.30 on the same day, Joseph-Olivetti J granted an injunction, without prejudice to ATT's claim already to have appropriated, restraining (a) registration of the transfers of the CFI and CTH shares and (b) restraining enforcement of the English share charges.

[156]  Mr Stephen Smith QC was inclined to accept that an interim injunction preventing enforcement could not be prayed in aid as an Event of Default.  But, he contended, the obtaining of the stop notices and that part of the injunction which restrained registration amounted to Events of Default under clauses 16.10(D) and/or 17.12 of the Facility Agreement.  On any footing, he submits, ATT had a rock solid entitlement in equity and under the English share charges to be registered as the holder of the charged shares.  No right of CFI or CH could possibly be damaged or infringed as a result.  Therefore the obstruction by way of stop notices and the obtaining of that part of the injunction which restrained registration (ignoring the fact that the latter relief was not obtained until after the purported appropriations had taken place) must be an available Event of Default.

[157]  I agree with Mr Stephen Smith QC that the obtaining of the stop notices and of the injunction restraining registration amounted, as a matter of contractual analysis, to Events of Default on the part of CFI under the provisions to which I have referred.   Where I part company with him is in being unable to see any difference in kind between the obtaining of the injunction against

51

enforcement (which he says is not to be relied upon as an Event of Default) and the obtaining of the stop notices and the injunction restraining registration (which he says is). If ATT can rely upon the failure to effect registration and/or the obtaining of (a) the stop notices and (b) the injunction restraining registration, then there would seem to be no reason in principle and nothing in the English share charges to preclude it from relying upon those Events of Default as entitling it to appropriate. If ATT was entitled to appropriate, then the obtaining of the injunctions against enforcement was a clear Event of Default under clause 17.12. If the failure to procure (and the positive obstruction of) registration were not Events of Default, then the obtaining of the injunction against enforcement cannot have been, either. In other words, the outcome on the contractual documents must always be that there were either two Events of Default[10], or none – which does not fit in with Mr Stephen Smith QC's submissions.

[158]   I think that what this analysis reveals is that the real question, for the purposes of the post-16 April part of the case, is not whether Events of Default can be identified by an application to the facts of specific provisions of the Finance Documents, but whether in all the circumstances ATT was entitled to rely, when it purported to appropriate, upon any of the facts which happened.

[159]   The attempt to accelerate the loan on 16 April 2007 was a major breach of contract, which not only ruptured the lender/borrower relationship but also menaced the CTH shares in the most obvious and potentially irreversible manner.

[160]   The stop notices and injunction restraining registration were obtained after ATT had announced, on 25 April 2007, that it was terminating its rolling two business day moratorium on enforcement with effect from 4 pm on 27 April 2007. Cukurova's request for time to mount an injunction application that could be heard *inter partes* after evidence had been exchanged had been rejected. Further, it must be remembered that at that time there was no certainty whether a right of appropriation over shares could be exercised unless the chargee had legal title to them. Later, the experts who gave evidence before Joseph-Olivetti J - Lord Millett and Professor (now Mr Justice) Cranston - were divided upon the point, which was finally disposed of only when the matter reached the Privy Council. Nor was there any clear idea what would constitute the exercise of the right of

---

[10] treating the registration matters for this purpose as giving rise to a single Event of Default

appropriation: in his evidence before Joseph-Olivetti J, Lord Millett said that it was sufficient for the chargee merely to 'determine' to exercise the right. So that as at 27 April 2007 there was – or would have been had the relevant individuals then been present - very considerable uncertainty at the highest level about the precise incidents and properties of the novel right of appropriation and the manner of its exercise. It is safe to assume that Cukurova and its advisers laboured und similar uncertainty in the days after delivery of the acceleration letter.

[161]    In my judgment ATT cannot rely upon any of the post–16 April 2007 Events of Default as entitling it to enforce the security. It was ATT which had put itself in breach of contract when it served the acceleration letter. It went on the following day to indicate that it had in contemplation what was, on the facts as they then stood, an unlawful appropriation of the shares. On 25 April 2007 it announced a settled intention to appropriate. ATT cannot pick over the bundle of measures which CFI unsurprisingly took to protect itself from a wrongful seizure of the CTH shares in order to isolate one element which, if it had stood alone and unaffected by a serious breach on the part of ATT, would have constituted an available Event of Default and then use that to justify the appropriation. ATT cannot rely upon events which were entirely provoked by, and a proportionate reaction to, its own serious breach of contract in order to justify what it would otherwise have had no entitlement to do. In assessing ATT's entitlement to rely upon any of the post – 16 April events,, the distinction between perfection and enforcement thus becomes academic.

## Conclusion on Events of Default

[162]    In my judgment none of the Events of Default relied upon in the acceleration letter, nor those which had preceded it chronologically but which were not identified until later, has been made out. The failure to pay was not an Event of Default. ATT is not entitled to rely upon any of the Events of Default which happened after 16 April 2007. It follows that ATT had no right to appropriate the security on 27 April 2007 and that it committed a further breach when on 21 May 2007 it rejected CFI's offer of tender.

[163]    While that is sufficient to dispose of ATT's case, a large portion of the hearing was taken up with the issues of bad faith/collateral purpose. For that reason and because, if this case should go further, a higher Court may need to have my findings of fact on the bad faith and collateral purpose arguments, I shall proceed to find the facts as they emerged at trial and on which Cukurova relied

53

as establishing that ATT had acted in bad faith throughout.  The process will inevitably involve some repetition of material which has already been mentioned in different contexts.

**Bad faith/collateral purpose**

[164]  Left to myself I would have found it difficult to see what bad faith or collateral purpose has to do with the right to appropriate created by the Regulations.  Regulations 17 and 18 are in the following terms:

> **'No requirement to apply to court to appropriate financial collateral under a security financial collateral arrangement**
>
> Where a legal or equitable mortgage is the security interest created or rising under a security financial collateral arrangement on terms that include a power for the collateral-taker to appropriate the collateral, the collateral-taker may exercise that power in accordance with the terms of the security financial collateral arrangement, without any order for foreclosure from the courts.
>
> **Duty to value collateral and account for any difference in value on appropriation**
>
> (1)   Where a collateral-taker exercises a power contained in a security financial appropriated differs from the amount of the relevant financial obligations, then as the case may be, either-
>
> (a)   the collateral-taker must account to the collateral-provider for the amount by which the value of the financial collateral exceeds the relevant financial obligations; or
>
> (b)   the collateral-provider will remain liable to the collateral-taker for any amount whereby the values of the financial collateral is less than the relevant financial obligations.'

[165]  Although these Regulations refer to appropriation as a 'power', it does not seem to me to have any of the characteristics of a power such as a trustee's power of appointment, or a mortgagees' power

54

of sale or other powers which give the donee discretion (or latitude) as to the manner of their exercise.  Appropriation seems more like a right, such as a right of set off or a right of pre-emption, where there is not much room for any discretion (or latitude) except in the decision whether or not to exercise the right.   It was pointed out to me that Lord Walker of Gestingthorpe uses the word 'power' in setting out the advice of the Board his judgment in the Privy Council[11], but I doubt that he was doing more than tracking the language of the Regulations and in any case he was not considering the issue of bad faith or collateral purpose.   As I see it, the collateral taker is either entitled to appropriate or he is not.  If he is and decides to appropriate, the thing operates by way of a self executing method of payment.  I can see how a collateral taker could purport to appropriate when he had no right to (as in this case), but the vice in that is his lack of entitlement, not his state of mind.

[166]   None the less, both parties insist that because, in reliance upon the joint expert evidence of Lord Millett and Professor Cranston, Joseph-Olivetti J unsurprisingly held in the preliminary issue proceedings that the remedy of appropriation must be exercised in good faith and for a proper purpose, it is *res judicata* before me.  So I must proceed on the footing that good faith is an issue.

[167]   Mr Kenneth MacLean QC's case on bad faith goes far wider than the mere exercise of the remedy of appropriation.  He submits that ATT entered into the whole transaction in bad faith, conducted itself throughout in bad faith and appropriated the shares in bad faith.  I may not be doing justice to his excellent submissions if I say that the thrust of them was that from the outset ATT's aim was to use the lending arrangements to acquire the 51% of CTH that CH, through CFI, retained subject to ATT's security and that the security was little more than cover to enable that end to be attained.  He would also say, I think, that ATT's behaviour as lender was geared towards putting itself in a position where it could exercise its security rights and either sell the shares to an associated entity through the mechanism of a pre-pack receivership or simply appropriate them.  He says that, if established, such conduct amounts to bad faith and is evidence of a collateral purpose and is sufficient to vitiate the exercise of the remedy of appropriation.  I shall attempt to deal with the bad faith arguments in relation to the various stages in the history.

---

[11] [2009] UKPC 19 at paras 32, 33

The negotiation and conclusion of the arrangement

[168]   Mr Tolchinsky gave evidence for ATT about the negotiation and conclusion of the deal.  He gave his evidence frankly and without any suggestion that he had either an axe to grind or something to hide.  He had been associated with Alfa since about 1998 and has a small indirect stake in Altimo. He had been a board member of Alfa Bank and AFH.  He left Alfa Bank's service in 2004, but stayed on as a director of Alfa Bank and Alfa Finance until the summer of 2006.  Although Mr Tolchinsky was not formally a member of the Altimo board, he was invited to its meetings out of courtesy when he was in Moscow.  Mr Tolchinsky is an associate of Mr Knaster, who is a director of Alfa Finance Holdings and Alfa Bank.  Mr Knaster owns a hedge fund or similar financial institution called Pamplona.

[169]   Mr Tolchinsky explained how in 2003 he had had discussions with Mr Fridman, the controller of the Alfa Group, about the possibility of making an investment in Turkey.  By summer 2004 both Mr Tolchinsky and Mr Knaster were living in London.  Mr Fridman asked them to use their banking connections to talk to banks and other financial institutions about the prospects for investing in Turkey.  At that stage, Turkcell was not on the agenda as a specific target.  It was merely one of a number of possibilities.   Both Mr Tolchinsky and Mr Knaster were aware by about October/November 2004 that JP Morgan was raising finance for Cukurova by making realizations of Turkcell shares and they knew that Cukurova was under financial pressure.  It seems to have been at about this time that Alfa started to concentrate upon Turkcell as a specific target.  Mr Tolchinsky explained that investment in a Turkish cellphone company was attractive to Alfa, because of the geographical closeness of the two countries and the fact that Turkey is a popular holiday destination for Russians.  Mr Tolchinsky said that Alfa was interested in buying a controlling interest in Turkcell, if it was for sale, but strongly denied that Alfa's aim was only and all along to acquire the whole of Cukurova's interest in TCH.  Mr Tolchinsky told me that it suited Alfa to go into foreign investments together with a local partner.  In that way, Alfa would get the benefit of local knowledge and access to the appropriate governmental authorities and regulatory bodies.

[170]   It is clear from the documents and Mr Tolchinsky confirmed that early in January 2005  the basis had been hammered out of a deal whereby Alfa would acquire 50% of Cukurova's holding in TCH and make a loan to Cukurova secured on the other 50%.  As I have already said earlier, this had to

56

be carefully constructed so as to avoid infringing the TS pre-emption rights under the TCH shareholders agreement and it was that necessity which resulted in the change to 51% to Cukurova, in order to take advantage of the 'affiliate' exception in the TCH shareholders agreement. A meeting took place on 25 January 2005 in Paris to discuss the proposals, attended by Mr Tolchinsky, Mr Fridman, Mr Knaster, Mr Karamehmet and Mr Berkmen. Mr Tolchinsky accepted that at the Paris meeting there would probably have been some discussion of the possibility of Alfa acquiring a majority interest, but Mr Karamehmet was seriously opposed to letting Alfa have any more than 49%. In this, he was in disagreement with Mr Berkmen, who favoured a disposal of the whole of Cukurova's interest in TCH to TS, but it was Mr Karamehmet's view which prevailed.

[171]   Significantly, however, when he was asked why Alfa did not simply buy some of Cukurova's TC shares held outside the TCH structure, Mr Tolchinsky said that that was not attractive to Alfa because they gave no control. The only way in which Alfa could acquire management control of TC would be by acquiring, directly or indirectly, more than 50% of Cukurova's holding in TCH. Under the arrangement which evolved, Alfa was only to have outright ownership of 49%. This strongly suggests that Alfa's intention from the outset was to exploit its chargee interest in the shares retained by Cukurova – otherwise its aim to achieve control could not be realized by entering into any transaction with Cukurova to which Mr Karamehmet was not opposed.

[172]   Mr Tolchinsky said that Alfa knew that Cukurova was in financial straits. By March of 2005 those difficulties had become acute. As described above, when TS turned down Cukurova's request for assistance in meeting the SDIF instalment payments, Alfa supplied finance through Mogoton. It appeared from Mr Berkmen's evidence that Cukurova unsuccessfully approached TS for interim finance again in November of 2005. Over 31 May and 1 June 2005 a gruelling meeting, during which the lawyers acting for the parties went without sleep, took place in London. It was attended for Cukurova by Mr Karamehmet and Mr Berkmen and for Alfa by Mr Knaster and Mr Tolchinsky. Cukurova needed, but did not have readily available, US$135 million with which to pay the May installment to SDIF by 2.30 pm London time on 31 May. Although failure to pay would not have caused the withdrawal of the prepayment arrangement between Cukurova and SFIF, Mr Karamehmet explained that he was extremely anxious not to default, with the adverse publicity that that would inevitably produce. Both Mr Karamehmet and Mr Berkmen said that they had gone to

57

the London meeting expecting that Alfa would arrange for Mogoton to fund at any rate the May installment without question, but that the Alfa representatives refused to do so until the Subscription Agreement, was executed on the following day, 1 June.  They say that in order to ensure that the payment was made on time a promise was given to the Alfa representatives by Cukurova's lawyers (which I find surprising) that the subscription agreement would be executed by that time.  Mogoton, under an amended and restated finance agreement which raised the facility from the US$220 million advanced on 27 April 2005 to US$760 million, thereupon paid the May installment in time on 31 May 2005.  This incident appears to be relied upon by Cukurova's witnesses as evidence of the exercise by Alfa of some sort of illicit pressure on Cukurova to sign, but duress is not pleaded and I shall have to consider later what, if any, weight I give to this evidence.  Mogoton continued to finance the SDIF installments (in an overall amount of US$762 million) until the transaction closed in late November 2005.

[173]   When on 25 March 2005 TS announced that it had reached agreement in principle for the acquisition of the whole of CH's 27% interest in TCH for a price of US$3.1bn, Mr Fridman wrote to Mr Karamehmet on the same day offering to beat TS's offer by US$100m and expressing an interest in matching, or at least considering, any upward revisions on the part of TS.  Mr Fridman's letter offered to 'provide for immediate cash proceeds upon signing definitive documentation' and to 'take the potential legal risks of the transaction not closing'.  There was some debate about the precise meaning of these expressions, but since Mr Fridman did not give evidence and since Mr Reznikovich disclaimed all knowledge of the offer, I do not think speculation as to the proper construction of Mr Fridman's language is likely to be very profitable.  What is clear is that, certainly in March 2005, Mr Fridman was interested in an acquisition of the entire TCH holding.  That bid failed as a result of Mr Karamehmet's refusal to sell the holding outright.

[174]   On 21 September 2005 Reuters issued a press release in which it reported Mr Reznikovich as saying that Alfa was to acquire 13.2% of TCH and that the stake would shortly increase to 27%.  Following this press release, Mr Reznikovich was immediately contacted by the CMB and asked to explain his intentions.  There is among the papers a draft of a letter from Mr Reznikovich to the CMB explaining that he had been misquoted and Mr Reznikovich said that he was pretty sure that the letter had been sent.  In cross examination Mr Reznikovich did not deny that the 27% figure had been alluded to, but he claimed that he 'may have been referring' to a possible joint venture

58

with Cukurova which would have produced a combined 27% and insisted that he was not referring to possible exercise by Alfa of security rights under the English share charges.  I cannot accept this explanation, since there is no suggestion anywhere in the documentary or oral evidence of any proposal for any sort of joint venture between Alfa and Cukurova involving the TCH shares. Further, it is difficult to see where Reuters would have got the 27% figure from unless Mr Reznikovich had mentioned it in connection with the intended acquisition.  I find that Mr Reznikovich was alluding to the exercise by Alfa of the security which it was to be granted under the arrangements once they closed and that Alfa was fairly confident, before it entered into the transaction, that Cukurova would not be able to fund the installment of interest that would fall due on the first anniversary of closing.

[175]   Mr Tolchinsky gave some evidence about the inclusion in the English share charges of the right of appropriation.  It seems that DB (advised by Slaughter & May) had had misgivings about the effectiveness of the remedy.  Alfa, however, wanted the English charges as well as the BVI charges because it was advised by Jones Day that in that way the full spectrum of available options, including appropriation, would be available to Alfa.

[176]   Based upon this evidence I find as a fact that when the transaction closed it was the expectation and aim of Alfa that Cukurova would default in November 2006 and that its remaining stake in TCH would fall into Alfa's lap.

[177]   Does that mean that Alfa entered into the transaction in bad faith and, if it does, does that mean that Alfa was in some way disabled from resorting to the remedy of appropriation?

[178]   I was referred to some authority on the question of bad faith, but none on the topic of concluding a contract in bad faith.  There is in fact an interesting discussion in Chitty which makes clear that the concept has no place in English law so far as concerns the negotiation and conclusion of contracts[12].  Without authority, however, I have no doubt that in entering into the transaction Alfa did not act in bad faith.  No criticism is to be made of a party who negotiates and enters into a contract with a properly advised counterparty, even if one consequence may be to confer benefits on the first party which are highly unwelcome to the counterparty but which suit the first party's

---

[12] Chitty on Contracts, 30th Ed, paras 1-022 to 1-034

commercial objects very well.  The insistence on the conclusion of a binding agreement before extending interim finance seems to me to have been perfectly acceptable commercial behaviour. Cukurova did not need warning that if CFI committed an Event of Default the shares might be appropriated or sold.   It makes no difference if the contract is a mortgage.  Cukurova's argument comes close to suggesting that Alfa had a duty not to enter into the transaction, simply because it hoped and expected that the outcome would result in its obtaining the whole 27% stake in CTH. That seems to me to be untenable.

Non-payment of dividends

[179]   I now turn to the second group of allegations of bad faith, which centre around a claim that Alfa attempted to engineer a default by starving CFI of dividends from CTH and thus preventing CFI from paying the interest that fell due on 24 November 2006.

[180]   It is clear that Cukurova considered that it was entitled to be paid all of the dividends declared by TCH for the years 2003 and 2004, on the grounds that they were referable to the period before Alfa obtained its interest.  Whether that was agreed or not, the transaction documents failed to make any such provision.  There remained something of a mystery at trial as to whether TCH had paid up the 2003 dividends to CTH, but it was common ground that it had done so for the 2004 year. These dividends amounted to some US$40m.  By February 2006 Jones Day had prepared resolutions for the distribution of the proceeds of the 2004 dividend that had been paid up by TCH to be distributed in CTH.  A dispute as to whether these dividends should be paid to CFI alone or rateably to CFI and ATT then took hold and there was a meeting in London in March 2006 between Mr Knaster and Mr Tolchinsky for ATT and Mr Karamehmet for Cukurova to try and resolve the issue.  Mr Karamehmet says that he was told that the matter would be put to Mr Fridman for resolution.

[181]   There was a meeting between Mr Karamehmet and Mr Berkman on the one hand and Mr Fridman on the other in the South of France in July 2006 which did not settle matters and on 7 September 2006 Mr Karamehmet wrote to Mr Fridman, telling him that the issue needed to be resolved urgently.  Mr Fridman's response was to say that while ATT believed it was entitled to 49% of the dividend, it was open to proposals for resolving the issue.  ATT rejected a suggestion that CFI be paid what on any footing was its 51% share, leaving the other 49% undistributed, on the grounds

60

that partial distribution of a dividend is unlawful.  That is correct at one level, but not at the level at which the proposal was being discussed.

[182]   Mr Karamehmet then suggested that the disputed 49% be paid into an escrow account.  In cross examination Mr Reznikovich belittled this idea on the grounds that escrow agreements were irksome to negotiate and troublesome in practice.  By October 2006 CTH was sitting on dividends distributed up by TCH for the years 2001, 2005 and 2006.  In a letter dated 24 October 2006, Alfa took the point that on a strict construction of the Shareholders Agreement none of this money (irrespective of the dispute over the entitlement to the 2004 dividend) could be distributed until after CTH's financial statements for the year ending 31 December 2006 had been prepared.  There is some support for this contention in the wording of the Shareholders Agreement, but there was no good reason why the parties could not have agreed to pay an interim dividend at any stage.  ATT also took the point that CFI had yet to open an account, charged to ATT, into which dividends could be paid, as stipulated for in the Facility Agreement.  This point had more substance, since the opening of such an account for the receipt of dividends was an important part of ATT's security.  Nevertheless, the letter went on to offer immediate payment of all dividends as soon as the charged account was opened, with ATT receiving 49% of the 2004 dividend on its undertaking to reimburse CFI should CFI establish an entitlement to 100%.  The charged account was opened on 31 October 2006.

[183]   Cukurova replied on 3 November 2006, in essence accepting ATT's offer and inviting ATT's countersignature.

[184]   There was a board meeting of CTH held by teleconference call on 7 November 2006 (some seventeen days before the first instalment of interest fell due).  Mr Reznikovich claimed that the Alfa representatives had not had time to consider Cukurova's letter of 3 November because of a public holiday in Russia.  Although Mr Reznikovich agreed that the absence of a charged account no longer remained an obstacle to distribution, the Alfa representatives attending the board meeting voted against distribution of any of the dividend money until after audited financial statements as at 31 December 2006 had been produced for CTH.  Given that distributions required unanimous agreement, the effect was to block any payment of dividends until well after the US$217 Million installment of interest became due on 24 November 2006.  When asked if this was

61

not a rather ungenerous stance on the part of ATT, Mr Reznikovich's response was to say that it was no part of ATT's job to babysit Cukurova. He further justified the stance taken by saying that on 8 November 2006 ATTs' representative on the Turkcell board found out about the related party transactions and there was also disquiet about Cukurova's failure to arrange for the appointment of an independent CEO to Turkcell to replace the temporary CEO, who was a Cukurova employee.

[185]   I have no doubt that this conduct on the part of ATT was designed to starve CFI of funds in the hope that that would cause or help to cause CFI to default on the interest payments. Although ATT had been aware since at the latest 12 October 2006 that Cukurova was attempting to fund the payments by realizing the 5.88% Turkcell holding which it finally managed to achieve by 21 November 2006, that does not alter my conclusion that Alfa was withholding distributions in the hope of provoking a default. If Cukurova sold the holding, then the interest would be paid. If it did not, retention of the distributions in CTH would be likely to provoke an Event of Default, which I find to have been the intention behind Alfa's obstruction of the distributions.

[186]   This conduct cannot, in my judgment, be seen as amounting to bad faith on the part of ATT in its capacity as lender and mortgagee. In any case, it was within ATT's rights as a shareholder of CTH to insist on the 2006 financial statements before voting for a distribution.

Bad faith in accelerating the loan or in exercising the remedy of appropriation

[187]   At about the end of September 2006, DB had made a presentation to Altimo. Two issues were dealt with, one of which was the position of Cukurova. DB prepared materials for this presentation. From these materials it is possible to see that Altimo was being advised by DB that while the Cukurova Group retained some attractive and high growth businesses, it would be misleading to conclude that they would enable it to service the entirety of the Group's outstanding debt. Various possible options available to Cukurova are then discussed, none of which carries any implication that ATT had by then decided to call time on the lending relationship. One of the possibilities considered, for example, was a rollover of the lending. The tone changes, however, in the later sections of the document. For example, Altimo is advised by DB to start a 'dialogue' with the Turkish Government and other market players, so as to create a perception of 'presence' and 'convince of long-term interest'. The final page of the document says that '[DB] will continue to facilitate and introduce Altimo to the decision makers at every important stage of the contemplated

62

process in the coming months.'  There then follows a list of Turkish Governmental or quasi-Governmental organizations, including the CMB and the Competition Authority.  Finally, this section of the document states that DB will ensure that each step is prepared in an acceptable manner.

[188]    The last section of the document is a basic guide to the CMB rules relating to mandatory public calls/tender offers and exemptions, followed by some case studies.

[189]    When Mr Reznikovich was asked about this document he said that he thought that getting paid was uppermost in Altimo's mind at that point.    He refused to accept that the 'contemplated process' involved a change of control at TCH and said he found it difficult to see why the presentation materials included materials on Turkish public call mechanics.  He did concede, however, that Altimo had not ruled out the possibility that CFI would default on 24 November 2006 and that, on enforcing the security, ATT might be obliged to make a tender offer.  Obviously, ATT would only ever be so obliged if it either retained the shares on an appropriation or sold them to an associated company via the mechanism of a pre-pack receivership.

[190]    In my judgment, the DB presentation provides the clearest indication that by the end of September 2006 Altimo was contemplating and actively investigating the consequences of becoming, either by itself or though an associated company, the owner of the whole 27% stake in CTH.

[191]    On 12 October 2006 there was a meeting of the Altimo board.  Included in the papers for the board's consideration was a flowchart setting out 'Actions in the event of a Cukurova default.'  It proceeds through various steps, starting with selling the collateral via a pre-pack receivership and moving on to filing in the United States;  obtaining Competition Authority and Television Authority permits;  tendering for the acquisition of the TCH and Turkcell shares and, finally, 'Establishing control over Turkcell' with consequential appointments of Altimo representatives to the boards of CTH, TCH and Turkcell.

[192]    The decision of the Altimo board on this occasion was to 'take the information into consideration', which, it was confirmed, was the equivalent of 'noted'.

[193]    Mr Musatov's initial evidence about all this was that the Altimo board was merely looking at selling the collateral from what he described as a 'legal theoretical' point of view.  He said that whoever sole the charged shares would have had to file in the United States and the obligation to make a

63