mandatory offer could apply to any purchaser. He backed off from this position a little later in his evidence and accepted that consideration was also being given to the possibility that Altimo might retain the charged shares. He accepted that one did not get to the final box - 'Establishing control over Turkcell' - unless the purchaser is Altimo or a connected party. He did say, however, that no steps were taken in October/November 2006 to prepare for a pre-pack receivership.

[194]   Mr Reznikovich thought that he had approved the materials which I have summarized above before they were put before the board. He was keen to stress that the board did not know at that stage whether or not CFI would pay on 24 November 2006 and that the 'ultimate result' would be to try to get paid. He stressed that these matters required thinking about in case, on CFI's default, Alfa found itself in the position of having to make a multibillion dollar tender offer, but he did not explain why that might be necessary while it was open to ATT to sell the shares in the market or by secondary offer or simply to an interested third party.

[195]   In my judgment these materials cannot be explained away as Mr Musatov and Mr Reznikovich would have it. They are a clear indication that Alfa was preparing to assume direct or indirect ownership of the charged shares and that that was its commercial aim at that time.

[196]   There was another meeting of the Altimo board on 21 December 2006. The Digiturk and ADD matters were noted and discussed, but once again the decision was that no action should be taken. The agenda described this part of the discussion as 'Strategic options for the development of Altimo'. This suggests that the supposed related party Event of Default was being considered in the context of further expansion, possibly through the acquisition of CFI's stake in CTH, by Altimo into the Turkish telecoms market, but Mr Musatov and Mr Reznikovich were having none of that. Mr Musatov said that it was a general discussion of the options open to Alfa. When the suggestion was put to Mr Reznikovich, he first asked for the question to be repeated and then said that he was not sure why the description was used. Both witnesses would have been better off admitting that the possible acquisition of the CTH shares was the focus of this agenda item. There is nothing surprising or sinister about that. It shows neither good nor bad faith – rather, simple commercial planning. What this part of the evidence did reveal, however, was the studied reluctance of the Alfa witnesses ever to accept that Alfa had its eye on the CTH shares.

64

[197]    Some speaking notes were put in evidence during the trial. They are clearly designed to provide someone with a guide as to how to address a press conference on the subject of the acceleration of the loan. They advise keeping well clear of the question whether it was Alfa's intention to acquire the CTH shares. Mr Reznikovich did not deny that he had seen this document, but said that he was doubtful that he would have. I think that the notes must have been prepared for a press conference which Mr Reznikovich gave in Istanbul on 17 April 2007, the day after the loan had been called. They confirm a fixed intention on the part of Alfa never to admit it was interested in acquiring the CTH shares for itself. I shall have to consider later whether that attitude can of itself indicate a lack of good faith on Alfa's part.

[198]    On 23 January 2007 TS issued its press release announcing that the arbitral tribunal in Geneva had awarded TS what amounted to specific performance of the agreement which TS claimed, and Cukurova denied, had been reached on 9 May 2005. Mr Reznikovich said that this event persuaded Alfa that what he described as its 'forgiving' attitude must stop. He said that the relationship with Cukurova had turned sour.

[199]    When Mr Musatov was asked why it took ATT so long to rely upon the related party matter or the Geneva arbitration matter, his response was that Alfa was advised at around the end of January 2007 that it was important to prepare for acceleration of the loan by the end of March. He said that it took Alfa and its external legal advisers (an additional firm of external lawyers was hired for the purpose) some two months to prepare the ground for acceleration. He added that the legal advice received by Alfa was that it was important not to let Cukurova know that Alfa was engaged in identifying potential Events of Default.

[200]    It was put to Mr Musatov and Mr Reznikovich that one explanation for the secrecy might be that Alfa knew that Cukurova was in the process of arranging to refinance the Alfa borrowing and Alfa was anxious that it should not do that before it had thoroughly prepared the ground for acceleration. Cukurova had in fact embarked upon the refinancing process in earnest through JP Morgan early in 2007 and it is clear that Alfa was well aware by the end of February 2007 that this process was taking place, since some time in that month DB gave a presentation to Altimo which included the information that 'Cukurova is understood to be looking for alternatives to ease the financial pressure associated with the terms of the financial package put together by Alfa. In

65

particular, it is looking for alternative methods to raise additional cash in order to retire part or all of the outstanding debt to Alfa.'

[201]    Both Mr Musatov and Mr Reznikovich were reluctant to accept that they any knowledge of Cukurova's refinancing plans, beyond the fact that Cukurova had made clear from the outset that it intended to refinance the Alfa loan. While I accept that they may not have known the details, I find that Alfa is likely to have had a fairly shrewd idea as to the progress of Cukurova's refinancing efforts.  DB clearly had knowledge by February and passed that knowledge on to Alfa.  I find it impossible to believe that Alfa, with its connections in the world of banking and finance, would not have had at least a rough idea of where Cukurova had got to at any given time.  I find that the reason why Alfa kept quiet about its plans to call the loan was because it wished to spring acceleration on it so as to reduce the window within which Cukurova might be able to achieve a refinancing.

[202]    Mr Musatov said that at the end of March 2007 Mr Reznikovich probably told him that Alfa needed to accelerate the loan.  So an Altimo board meeting was convened for 2 April 2007.  At that meeting, which was combined with a meeting of the board of AFH, three Events of Default were identified in the papers prepared for the meeting:  the alleged borrowing in November 2006;  the supposed inability of CH to comply with any order that the Geneva arbitral tribunal might make as to damages;  and the related party matters.  When asked why the sale of the 5.88% had not been included,  Mr Musatov said that it had not yet been identified as a potential Event of Default by the two external legal teams, who continued working on this point into the middle of April.  Two steps were put up for consideration:  (1) to declare a default and obtain legal title to the charged shares;  and (2), in the absence of repayment, to exercise the right of appropriation or implement a pre-pack receivership.  The meeting resolved to call the loan and the call letter was delivered on 16 April 2007 without any prior warning.  At the same time, claim 72 was commenced in this jurisdiction. Alfa's witnesses told me, and I accept, that the reason for that was to establish what they described as a 'neutral' (by which they meant non-Turkish) jurisdiction for any legal proceedings that might be needed to resolve disputes.

[203]    In his witness statement, Mr Reznikovich said that 'his reason' for calling the loan was because he felt that Alfa's position had become too exposed.  It was put to him that Alfa in fact had ample

66

cover, following the repayment of the unsecured borrowing in November 2006, and it would appear to be correct that on a straight look-through valuation the quoted price for the TC shares covered the amount of the loan. But as Mr Palmer pointed out, it does not follow that the realizable value of CFI's holding in CTH was the same. I had no valuation evidence on this topic and it is not possible for me to make any finding as to ATT's financial exposure (if any) at the end of March 2007. In cross examination Mr Reznikovich did not resile from his reliance on financial exposure, but he also said that by 'exposed' he had meant to indicate that Alfa did not feel that Cukurova was a trustworthy partner and an internal conclusion had been reached that the loan relationship should be discontinued. He said that he reached the conclusion from a business perspective that the relationship should not continue. He said that there was no way out on the shareholding -- Alfa and Cukurova were, as he put it, 'partners willy nilly', but he said that his legal advice was that the loan relationship could be brought to an end. He added that exposure was not merely a matter of the value of the security – it was a matter of trustworthiness 'and a lot of related covenants.'

[204]   On the following day, Mr Reznikovich flew to Istanbul and gave a press conference which was reported in a Turkish financial newspaper. It was for this press conference that the speaking notes to which I referred above had been prepared. He is reported as having said, among other things, that Cukurova had been in default sixteen times under the Facility Agreement; that proceedings had been commenced against it in the BVI; that ATT believed that the defaults were deliberate and that before paying the ATT debt Cukurova had obtained a syndicated loan of several hundred million dollars in breach of the Facility Agreement. He also said that the Geneva arbitral award was expected to lead to harsh consequences for Cukurova. Mr Reznikovich accepted that he had said something to that effect. Mr Kenneth MacLean QC suggests that this event was designed to put off persons who might be interested in the refinancing package that was being prepared by JP Morgan. Whatever else, what Mr Reznikovich said on 17 April was hardly likely to inspire confidence in prospective investors and I find that at any rate part of Mr Reznikovich's motive in addressing the press conference as he did was to make it harder for Cukurova to refinance.

[205]   In ATT's disclosure is a JP Morgan Information Memorandum dated 18 April 2007 and intended for circulation to potential investors in Cukurova's refinancing attempt. At page 4 of that document is a transaction timetable, revealing that a management roadshow was to take place in London and New York between 24 and 27 April 2007 and that closing was expected in mid-May. Although this

67

document came from ATT's disclosure, Mr Reznikovich insisted that he did not obtain it until it was sent to him electronically by a vice-president of Altimo called Mustafa Kiral in mid June. Alfa insists that the covering document (which would pin point the date of receipt) is privileged. It is hard to see why anything Mr Kiral may have said would attract legal professional privilege and Mr Kenneth MacLean QC submits, and I agree with him, that a party who relies upon a privileged document in order to establish a matter of fact must, if his evidence is to be accepted, disclose the document upon which he relies, with whatever redactions he may be entitled to make. Quite apart from that, Cukurova's refinancing completed in about mid May and was known to Alfa to have completed in mid May. I find it impossible to accept that a vice president of Altimo would have taken the trouble, a month after Cukurova had completed its refinancing, to send the JP Morgan document to Mr Reznikovich or that, if he had, Mr Reznikovich would have kept it. I find that Mr Reznikovich received the JP Morgan document soon after 18 April 2007 and became aware as a result that Cukurova's refinancing was scheduled to close in mid May.

[206]   Cukurova says that the probability is that Alfa knew that the senior management of Cukurova would be in London and New York between 24 and 27 April 2007 and were thus deliberately taking advantage of their absence. I cannot accept that. ATT served the call letter on 16 April 2007 and will have been well aware of the very limited time which the law allows for a debtor to repay a loan which has become due and payable.

[207]   On 20 April 2007 Alfa received some confused information from DB which it interpreted as meaning that Cukurova was attempting to recover through the banking system the payments totaling some US$574 million which had been made to ATT's DB account on 24 November 2006. Mr Berkmen admitted that the information forwarded to ATT by DB was misleading, apparently as a result of some error on the part of JP Morgan Chase. Mr Reznikovich said that Alfa took it up with DB and instructed them not to make any repayment. The matter was then dropped. Mr Reznikovich said that it had taken half an hour (he later changed this to three hours) to clarify the position. ATT relies upon this incident as justifying a state of jitters on its part. I do not accept that. It seems to me that this is a specious (and wholly unnecessary) attempt on the part of ATT to manufacture a reason justifying or bolstering its attempted resort, on 27 April 2007, to the enforcement remedies under the English charges.

68

[208]    On 30 April 2007 Altimo issued a press release speaking of Cukurova in derogatory terms and accusing it of having attempted to recover US$80m (this seems to have been a garbled reference to the incident which I mentioned in the preceding paragraph).  This press release was clearly calculated to put off anyone who might be thinking of advancing money on the charged shares.  Mr Kenneth MacLean QC relies upon the words 'against that background' which appear to give as a reason for the appropriation CFI's failure to comply with the Facility Agreement, its failure to make any substantive response to the call letter and the supposed attempt to recover the UD$80m as the reason for resorting to the remedy of appropriation as showing that ATT was acting in bad faith. While the press release might have justified proceedings in defamation, it has no connection with the concept of bad faith as I understand it.  The same goes for a further press release which Altimo issued in May 2007.

<u>Conclusion on bad faith in relation to acceleration and appropriation</u>

[209]    Cukurova's complaint in these respects is that Alfa decided in about the end of January 2007 to identify matters which could be deployed as Events of Default and use them to acquire the charged shares.  A subsidiary complaint is that Alfa did all of this without giving Cukurova any warning and that having done it Alfa took steps to prevent or at any rate hinder Cukurova's refinancing.  I shall take these elements of complaint in turn.

[210]    I have already found that Alfa's intention from the outset was to use the power of appropriation (or its ability to procure a pre-pack receivership) in order to acquire the shares.  That involved the exercise of rights which Cukurova had agreed to confer upon ATT.  Although I have held that Alfa was wrong in claiming that it had the right to accelerate the loan and appropriate the shares, its attempts to do so were, with the exception of the press conference of 17 April 2007, no more than unsuccessful attempts to exploit commercial advantages which Cukurova had freely agreed to as a matter of contract and were untainted by bad faith.

[211]    For the same reasons, Alfa was within its rights to look for grounds which would entitle it to call the loan.  It did so without using any underhand methods.  It did not entice CFI into committing any Event of Default or lay traps for CFI.  It is irrelevant whether Alfa thought that the defaults which it purported to have identified were damaging to its interests.  The only question is whether or not

they had occurred as Alfa claimed, and that is something which is to be decided independently of Alfa's state of mind.

[212]   I do not think that the fact that Alfa had never complained to Cukurova about the alleged Events of Default or that it sprung the call letter on CFI without any prior warning means that ATT was acting in bad faith in calling the loan.  It appears to have had no obligation to do either under the Facility Agreement.  The supposed Events of Default, had they been Events of Default, would all have been known to CFI.

[213]   Alfa was clearly anxious, as the speaking notes show, not to convey any suggestion or make any admission that it was accelerating the loan so that it could appropriate the shares. Its legal advisers seem to have been worried that any such admission would justify an attack on the exercise of the remedy. These proceedings are ample proof that such concern was justified. But I cannot see that an understandable caution in this regard has anything to do with bad faith. It is not evidence of bad faith to be reluctant to hand weapons to a potential adversary.

[214]   Mr Reznikovich's press conference of 17 April 2007 stands on a different footing.  When that press conference was given ATT had only just called the loan.  Arguably, Cukurova still had time to come up with payment.  Even though Mr Reznikovich's motives on 17 April 2007 may have been mixed, there can be no doubt that among them was a determination to cast Cukurova in as bad a light as possible and make it difficult for it to raise finance.  In my judgment it would be correct to describe a man who attempts to frustrate performance of a contract to which he is party by means of actions taken outside it as acting in bad faith.  Certainly it seems to me that a mortgagee who takes steps calculated to prevent or hinder the mortgagor from complying with a demand for payment acts in bad faith.

[215]   The question is whether, if my earlier conclusions on the claimed Events of Default should be set aside, this should preclude ATT from relying upon its appropriation.  In my judgment, it should not, because Alfa's behavior on 17 April 2007, reprehensible as it was, was not causative of any prejudice or loss to Cukurova.  There is no general rule that breaches of trust (or, I would add, acts done in bad faith) which have no impact on the outcome of events must be visited with what would amount to an award of bounty to the party technically entitled to complain.  On the contrary, the

70

position is the reverse[13]. At the time of the press conference Cukurova had yet to begin its search for new finance in earnest and, as has been seen, the process was not envisaged to complete until mid May. In the event, Cukurova's refinancing succeeded,, even without the use of the CTH shares as security for the refinancing. The position with regard to the press releases of 30 April and 10 May 2007 is no different.

[216]   The actual exercise of the power of appropriation (as opposed, for example, to selling the shares to a third party or parties) cannot, in my judgment, be attacked on the grounds that it was not done in good faith. This was a right conferred on ATT as a matter of bargain under arrangements freely entered into between parties who enjoyed the highest level of expert legal and financial advice. Mr Kenneth Maclean QC said that it produced an instantaneous windfall for Alfa, but in the absence of any valuation evidence that has not been established. Even if it had been, it would have made no difference to the position. The exercise of the right did not involve the application of any discretion (or latitude) otherwise than as to the time at which it was exercised and it is well established that a mortgagee is entitled to realize his security at the time of his choosing. Appropriation was, in my judgment, nothing more than contractually agreed machinery for closing out the transaction. Assuming, contrary to my decision, that ATT had been entitled to resort to it, it could not have been attacked on grounds of bad faith for having done so. The fact that it wished to acquire the shares does not require the conclusion that it acted in bad faith in attempting to do so.

[217]   Mr Stephen Smith QC urged upon me that it was impossible for ATT to be accused of bad faith because of the rolling two working day moratorium which it voluntarily agreed to between 17 April and 27 April 2007. I do not accept this submission. I would have required a much closer understanding of ATT's state of knowledge as to the ability of Cukurova to repay within such a window before I could be satisfied that this was anything other than artful stage management.

Conclusion on bad faith

[218]   ATT was not guilty of any bad faith in and about the conclusion, management or enforcement of the facility, other than in the matter of the press conference of 17 April 2007 and (less blatantly) in the press releases of 30 April and 10 May 2007. Had I decided the case on Events of Default in

---

[13] Swindle v Harrison [1997] 4 All ER 705

favour of ATT, none of those matters would have provided Cukurova with an answer to ATT's claim.

## Relief in Equity

[219]   These conclusions make it unnecessary for me to consider CFI's claims based upon relief from forfeiture or the principle which permits debtors in certain circumstances upon payment of the debt, interest and costs, to recover pledged or mortgaged property even after seizure by the creditor.

## Conclusion

[220]   For the reasons given in the first section of this judgment, ATT's claim in BVIHC (COM) 72 of 2007 fails.  In claim BVIHC (COM) 119 of 2007, there will be a declaration that upon payment to ATT of the appropriate sum by way of principal and interest CH and CFI are and have since 25 May 2007 been entitled to delivery up and cancellation of the English and BVI share charges and of the instruments of transfer of the charged shares; and to delivery up of the relative CFI and CTH share certificates.  I will hear Counsel on a date to be fixed as to the amount of interest to be paid by CFI to ATT in discharge of the securities; as to the machinery for completing the discharge; as to such ancillary or other orders and directions as may need to be made or given; and as to costs.  All other proceedings in this matter will be stayed until I have given my decision on those issues (and on any other issues which Counsel may wish to ventilate).

[221]   For the purpose of maintaining the status quo until all outstanding issues are determined, CH may not, until further order, dispose of or otherwise deal with the shares or any interest in the shares which it holds in CFI and CFI may not dispose of or otherwise deal with any of the shares or any interest in any of the shares which it holds in CTH.  Until further order, or unless otherwise agreed

72

in writing, neither CFI nor ATT may vote or exercise any other right attaching to any of the shares held by either of them in CTH.   The parties have permission to apply in respect of these injunctions.  The injunction granted by Joseph-Olivetti J on 27 April 2007 will remain in place in the meantime.

**Commercial Court Judge**

20 May 2010

73

ANTIGUA AND BARBUDA

## IN THE COURT OF APPEAL

CIV. APP. NO.20A OF 1997

BETWEEN:

### BALDWIN SPENCER

Appellant

and

### THE ATTORNEY-GENERAL OF ANTIGUA AND BARBUDA

First Respondent

### LESTER BRYANT BIRD

Second Respondent

### ASIAN VILLAGE ANTIGUA LIMITED

Third Respondent

| | | |
|---|---|---|
| Before: | The Hon. Mr. C. M. Dennis Byron | Chief Justice [Ag.] |
| | The Hon. Mr. Satrohan Singh | Justice of Appeal |
| | The Hon. Mr. Albert Redhead | Justice of Appeal |

Appearances:
Dr. Fenton Ramsahoye, Q.C.; Mr. Cosmos Phillips, Q.C.
Mr. Colin Derrick and Mr. Harold Lovell for the Appellant
Mr. David Turner-Samuels, Q.C. and Mr. Anthony Astaphan
for the first Respondent
Mr. Karl Hudson Phillips, Q.C. and Mr. Anthony Astaphan
for the second Respondent
Mr. Donald Halstead for the third Respondent

------------------------------------------------
1998:  March 9; 10;11; 12; 13;
April 8.
------------------------------------------------

*Civil Practice and Procedure* – Administrative law – Challenge by Opposition leader to legality of certain actions/courses taken by the Government – Principles governing summarily striking out actions – **A-G of Duchy of Lancaster v London and North Western Railway Co.** [1892] 3 Ch 279; **Dyson v A-G** [1911] 1 K.B. 410; **Wenlock v Moloney** [1965] 2 AER 871 considered; **Williams and Humbert v W and H Trademarks** [1986] 1 AC 368 applied – Whether a cause of action was disclosed on allegation of constitutional violations, fraud, conspiracy and the commission of various torts of public mischief committed by the government – Cross-appeal on the issue of locus standi and on the failure to award costs – Meaning ascribed to 'discrimination' as used in the constitution – **Nielson v Barker** [1982] 32 WIR 254 applied – Whether the action taken by the Government was for a 'public purpose' – **Hamabai Framjee Petit v Secretary of State for India** [1914] LR P.C. applied – **Clunies-Ross v Commonwealth of Australia** [1985] LRC [Const.] 292; **Williams v Government of St. Lucia** [1969] 14 WIR 177 applied – Whether a public purpose can be achieved through private enterprise at the instance of a private entrepreneur whose sole aim may be to make a

**Page 74**

profit – **Narayan Singh v Bihar** [1978] AIR 136 applied – Whether the issue of whether an acquisition is made for a public purpose is rendered non-justiciable by section 3[1], Land Acquisition Act – Interpretation of the Constitution Order and section 9 of the Constitution – **Wijeyesekera v Festing** [1919] AC 646 P.C., and others referred to – **Windward Properties v Government of St. Vincent** [1996] 1 WLR 279 P.C. applied – Determination of what issues were political, rather than justiciable, and therefore not for the Court's interference – **Kenilores v A-G** [1986] LRC [Const.] 126 applied – Interpretation and contrast of sections 18[1] and 119[1] of the Constitution – Whether, once Parliament had [subsequently] enacted necessary legislation, the agreement in issue could still be considered invalid – On the issue of whether the Opposition leader had locus standi in the proceedings, **Frank v A-G** [Antigua]; **Blake v Byron** [St. Kitts]; **A-G v Lawrence; A-G v Payne; Richard and James v G-G and A-G** [St. Vincent]; **Gordon v Minister of Finance** [St. Lucia] considered.   Appeal dismissed.   Cross-appeal allowed.

## JUDGMENT

### BYRON, C.J. [AG.]

This is an appeal against the decision of Saunders J delivered on 21st November 1997 striking out the Statements of Claim of the appellant in two consolidated actions.

### The Proceedings

The appellant is the leader of the opposition in the House of Representatives in Antigua and Barbuda. He initiated two actions on behalf of himself and all other members of his political party the United Progressive Party.

In the first action which commenced on 23rd September, 1997 he sought a declaration that an agreement, dated 18th February 1997 between the Government of Antigua and Barbuda and Asian Village Antigua Limited for the development of an area on the west coast of Antigua, was unconstitutional, illegal null and void and damages for fraud and conspiracy and misdemeanour in public office and other relief, the said damages to be paid to him for the benefit of the people of Antigua and Barbuda. The defendants to the action were the Attorney General, sued "both officially as representing the Government and personally as a member of the Cabinet"; the Prime Minister sued "as representing himself and all other Cabinet ministers personally and in their official capacity"; and Asian Village.

In the second Action which commenced on 23rd October 1997 he sought declarations that a bill the Asian Village Development Act 1997 was

ultra vires the powers of the Legislature and that the Governor General was not entitled to assent to it and other reliefs.

The defendants applied to have both writs and Statements of Claim struck out as disclosing no cause of action and being frivolous, vexatious and an abuse of the process of the court.

The matters were consolidated and came on for hearing on 5th November 1997.

### The Judgment

In a lengthy and closely reasoned judgment the learned trial Judge considered the statements of claim and concluded that the allegations did not disclose any cause of action under the Constitution, but that the appellant had locus standi to bring the action.

He also concluded that no particulars of the essential ingredients of fraud, conspiracy and misdemeanour in public office were pleaded and consequently the allegations pleaded could not to disclose any cause of action for those torts.

Accordingly he dismissed both cases, but made no order as to costs.

### Background

On 18th February 1997 the Government of Antigua and Barbuda entered into an agreement with Asian Village Antigua Limited (Asian Village) for the development of an area on the west coast of Antigua.   The Government was to acquire Guiana Island and other lands and transfer them to Asian Village for $15.5 million dollars spread over a 10 year period. Asian Village would construct a massive project which would include resort accommodation of approximately 1000 rooms; casino; golf course; retail shops; residential developments; and other resort, commercial and hotel related projects and facilities. The agreement was characterised by promises of very extensive fiscal and other incentives which included exemptions from taxes, privileges, special arrangements for construction of infrastructure and many others.   There was political controversy about it, the appellant's political party opposing the project. The Government introduced a resolution in Parliament to have both houses consider and affirm the agreement and to obtain authorisation for the acquisition of the lands which were the subject matter of the agreement.

4

On 4th July 1997 the House of Representatives approved the agreement and authorised the acquisition of the lands for the public purpose of "the promotion and development of tourism and supporting tourist related activities".   The Appellant and four of his Opposition Parliamentary colleagues absented themselves from the House when the resolution was moved and passed.  On 6th August 1997 a similar resolution was passed in the Senate and the opposition Senators similarly absented themselves.

On the 7th, 21st and 28th August 1997 declarations acquiring the lands identified in the agreement were published in the Gazette in accordance with the provisions of  section 3 of the Land Acquisition Act.

On 18th September 1997 an order paper was circulated to all members of the House of Representatives in respect of a meeting to be convened on 23rd September.  Item 14(a) was a Motion by the Hon Prime Minister to move the first reading of the Asian Village Development Act, 1997.

On 6th October 1997 the Bill was taken through all its stages in the House of representatives, and was amended at committee stage to be The Asian Village Resort (Incentives) Act. On 20th October the Senate passed the Bill.

At the time of the trial the Governor General had not assented to the Bill and it was not yet enacted.  Since the trial, the Governor assented to the Act on 9th December 1997, and to an amendment thereto on 29th January 1998.


**The Appeal**

The appellant advanced several grounds of appeal.  In effect these challenged the application of the principles of summarily striking out actions, and the conclusion that no cause of action was disclosed on the allegations of constitutional violations and the commission of various torts of public mischief.  The respondent cross appealed on the issue of locus standi and on the failure to award costs.

The third respondent challenged the decision to join him as party but as the whole action had been dismissed this became an academic issue, only relevant to the question of costs.

**The Principles of Striking out Pleadings**

Order 18 rule 19 of the Rules of the Supreme Court empowers the Court to strike out any pleading on the ground that it discloses no reasonable cause of action or is frivolous or vexatious is otherwise an abuse of the process of the court.  The principles upon which this jurisdiction is exercised are well settled and counsel for the appellant indicated that he had no quarrel with the principles which the learned trial Judge enunciated. He argued that they were wrongly applied.  In brief the court is empowered to dismiss an action in a summary way without a trial where the statement of claim discloses no cause of action, or is shown to be frivolous or vexatious or is otherwise an abuse of the process of the court.  This summary procedure should only be used in clear and obvious cases, when it can clearly be seen, on the face of it, that a claim is obviously unsustainable, cannot succeed or in some other way is an abuse of the process of the court. In one of the cases from Canada on which reliance was placed the standard was expressed in terms that the claim should not be struck out if there is even a scintilla of a cause of action (**Operation Dismantle v the Queen** (1986) LRC (Const.) 421.

This was the stringent standard which the learned trial Judge applied to the statements of claim in concluding that they should be summarily struck out and the actions dismissed.

Counsel for the appellant submitted that the test was wrongly applied because the learned trial Judge attempted to assess the appellant's chances of success in the action and that was a task which could only be effectively performed after evidence had been adduced.  He submitted that the circumstance that the argument before the learned trial Judge took five days, and before us lasted about the same length of time demonstrated that there were difficult and important points of law and that it was not a clear and obvious matter.  I must comment, however, that we felt that too much time was spent in arguing this case, and it was out of deference to the learned counsel, who appeared for the appellant and the public nature of and interest in the matter, that we did not guillotine the arguments even when we thought they were irrelevant or unnecessarily prolonged.

A number of cases were cited to us on this as on all aspects of the case.  Counsel for the Appellant relied on **A..G. of Duchy of Lancaster v London and North Western Railway Co.** (1892) 3 Ch 279 to show that the

6

length of argument could be a factor in the decision. In rejecting an application to strike out pleadings for want of jurisdiction, Lindley L.J said:

> "it appears to me that the object of the rule is to stop cases which ought not to be launched – cases which are obviously frivolous or vexatious, or obviously unsustainable; and if it will take a long time, as is suggested, to satisfy the Court by historical research or otherwise that the County Palantine has no jurisdiction, I am clearly of opinion that such a motion as this ought not to be made."

The case of **Dyson v Attorney General** (1911) 1K.B. 410 was relied on to show that the extent and quality of research necessary to determine the matter could also be a factor as Cozens-Hardy M.R. said at 414:

> "(the order) ought not to be applied to an action involving serious investigation of ancient law and questions of general importance, and on this ground alone I think the plaintiff is entitled to have the action proceed to trial in the usual way".

The principle that the summary process should not take the place of a trial was demonstrated in **Wenlock v Moloney** (1965) 2 All E.R.871.  In that case there was statement of claim, defence and 10 affidavits. On hearing to strike out the Master concluded that the case was unlikely to succeed and struck it out.  The Court of Appeal set aside the order and characterised what occurred as a preliminary trial in chambers without full discovery, oral evidence or cross-examination and as an improper exercise of the court's discretion.  Sellers LJ disapproved the practice and declared that it is not the practice in the civil administration of our courts to have a preliminary hearing as in crime.

The appellant also emphasised the well-established point, that it was incumbent on the defendant to show that there was no possibility of a cause of action. (**Goodson v Grierson** (1908) 1K.B.761).

The respondents also referred to a number of references which included the reminder of Lord Edmund-Davies in **Farrell v Secretary of State** (1980) 1 All E.R. 166 at 173 of the essential importance of proper pleadings in civil actions: the necessity to particularise and plead alleged violations of the Constitution (**Operation Dismantle v The Queen**, *supra;* the Guyanese case of **Ameerally v A.G.** (1978) 25 WIR 272.): the necessity to particularise allegations of fraud, malice, negligence or misconduct (**Mariner v Bishop of Bath And Wells** (1893) P 145; **Saunders v Jones** (1887) Ch D 435; **Belmont  Finance v Williams Furniture** (1979) 2 QB 250): the duty of counsel not to enter a plea of fraud unless he has clear

7

evidence to support it (**Assoc Leisure v Assoc Newspapers** (1970) 2 QB 450.

He submitted that the case ought to have been dismissed as an abuse of the process of the court as it had an ulterior political motive, referring to **Windward Properties Limited v Williams**, 1988 (unreported) St.Vincent and the Grenadines Civil Appeal No. 4/88 confirming the dismissal of a constitutional motion as an abuse of process, per Moe J.A. at p.10:

> "the court has an inherent jurisdiction to put an end summarily to proceedings which divert the court from its proper purpose and use it with some ulterior motive:  See **Mitchell v D.P.P** (1987)LRC 127. In my view on the basis of the material before the learned Judge dismissal of the motion in exercise of his power on the ground of Abuse of Process was clearly warranted."

The modern practice, which in my view is not inconsistent with the long standing principles, is explained by Lord Templeman in **Williams & Humbert v W.& H. Trademarks** (1986)1 A..C. 368 at 435:

> "My Lords, if an application to strike out involves a prolonged and serious argument the Judge should, as a general rule, decline to proceed with the argument unless he not only harbours doubts about the soundness of the pleading but, in addition, is satisfied that striking out will obviate the necessity for a trial or will substantially reduce the burden of preparing for a trial or the burden of the trial itself. In the present case, the general rule would seem to require a refusal by the Judge to embark on the problems of international law involved in the present appeal, leaving those problems to be solved at the trial if they became material. If at the trial the appellants were cleared of any impropriety in their management of the affairs of the Rumasa group, then the problems of international law would not arise. Moreover, even if those problems did arise I do not believe that the length of time, namely seven days, occupied by the Judge in deciding to strike out the pleadings would have been added to the time required to decide other issues.  But there are special circumstances which, in my view, made it right for the Judge to proceed and to make the order which he made. If the appellants' pleadings and particulars had not been struck out, the appellants would have proceeded to demand discovery before trial to lead evidence at the trial, harassing to the plaintiffs and embarrassing to the court and designed to support  the allegations and insinuations of oppression and bad faith on the part of the Spanish authorities which appear in the amended defences and particulars. These allegations are irrelevant to the trade marks action and the bank's action and are inadmissible as a matter of law and comity and were rightly disposed of at the first opportunity."

It is clear from any reading of the judgment and from the arguments made before us that the special circumstances which so impressed Lord Templeman are present in the case.  Striking out the cases resulted from the Judge's conviction that they were not viable and effectively obviated the

8

necessity for the trial, with all the attendant costs and other burdens. In his reasons the learned trial Judge categorised the pleading as containing conclusions expressed in the most pejorative terms and unparticularised allegations, or insinuations of fraud or colourable exercise of power, which did not establish any grounds on which a court of law could adjudicate. There is no doubt that the proceedings are political and the risk of harassing discovery was high.  There is also the question of the length and expense of the proceedings to the litigants as well as to the administration of justice.  I would consider that the learned trial Judge exercised his discretion properly in disposing of this matter at the first opportunity.

In determining this appeal, the same principles should guide us. Regardless of the length or difficulty of the argument, which has already been concluded the operative issue for determination must be whether there is "even a scintilla of a cause of action".  If the pleadings disclose any viable issue for trial then we should order the trial to proceed but if there is no cause of action we should be equally resolute in making that declaration and dismissing the appeal.

### The Pleadings

I propose to go through the allegations in the statement of claim seriatim and consider whether there is any allegation which would support judicial intervention.  In this way, all the grounds of appeal will be considered without overlapping.  The first Suit is an attack on the Agreement and the ability of the Executive Branch to make such a contract.

The relevant paragraphs are 10 to 18.  The others are merely formal and give background information.

### Para 10

Alleges that the proposed development is harmful to the ecology and "is contrary to common law principles which protect the environment". This paragraph does not identify the common law principles to which it refers nor were any advanced or particularised by counsel in agreement.  Even learned Counsel Cosmos Phillips Q.C. conceded that he could not identify a cause of action raised in this paragraph.  (See for **example R v Secretary of State for the Environment, ex. Greenpeace** (1994) 4 A.E.R. 352 at 376).  I agree

**Page 81**

9

with the learned trial Judge that there is no scintilla of a cause of action herein.

## Para 11

Alleges that the agreement is a device to give property of the state under the guise of a public purpose to a private developer for his own profit; that the cost to the government of providing the land will exceed the consideration to be paid by Asian Village; that it is contrary to public policy, is illegal, and void, and amounts to a public mischief.

Apart from the use of the words "guise" and "device" which suggest fraudulence no indication of the wrong alleged is indicated. This paragraph offends the rule requiring particularisation, and in particular the allegations did not include the essential ingredients of the tort of misfeasance in public office. The learned trial Judge referred to the cases of **Calveley v Chief Constable of the Merseyside** (1989) 2 WLR 624 and **Dunlop v Woollahra Municipal Council** (1981) 1 AER 1202 and explained that the failure to allege, and give particulars of malice ran foul of Order 18 rule 12(1)(b) of the Rules of the Supreme Court. He concluded that the allegations pleaded could not support a cause of action on the tort referred to. No appeal was made against that finding of the learned trial Judge that there was no cause of action in this paragraph.

## Para 12

Alleges that the agreement is discriminatory against the people of Antigua and Barbuda in that it treats the development and persons concerned with it as a separate class and community by committing the government to grant special exemptions from laws regulating taxation and good government for its own convenience and profit thereby discriminating against the people of Antigua and Barbuda contrary to section 14 of the Constitution.

In effect the learned trial Judge decided that this paragraph did not give rise to a cause of action because the agreement was inchoate in the sense that it did not affect any rights – it merely evidenced the intention of the parties; and in any event no allegation of discrimination was made in the sense in which the Constitution described the term.

It is not necessary to consider the inchoate point at this time, and I will deal with this issue when I come to discuss the effect of section 119(1) of the Constitution in relation to the second Suit.

## No Category of Discrimination Alleged

Counsel for the appellant addressed the issue of discrimination extensively.

In my opinion the matter could summarily resolved as being clear and obvious by any reference to section 14(3) of the Constitution.

It would therefore be instructive to set out the meaning ascribed to discrimination in section 14(3) of the Constitution:

> "In this section, the expression "discriminatory" means affording different treatment to different persons attributable wholly or mainly to their respective descriptions by race, place of origin, political opinions or affiliations, colour, creed, or sex whereby persons of one such description are subjected to disabilities or restrictions to which persons of another such description are not made subject or are accorded privileges or advantages that are not accorded to persons of another such description."

There was no allegation that the different treatment alleged in the Statement of Claim was attributable to race, place of origin, political opinions or affiliations, colour, creed, or sex. In the final analysis the resolution of this issue must be based on the interpretation of the constitutional provision. In my view, the words are clear and unequivocal and there is no difficulty in giving them their plain and ordinary meaning. The idea was well expressed in **Nielson v Barker** (1982) 32 WIR by 254 Massiah J.A. at 280:

> "What I am endeavouring to develop is the notion that it is a misconception to think that the Constitution is panacean in character, capacitated for the eventual solution of all legal problems. This process of magnification has led to attempts being made to fit a variety of rights into the framework of fundamental rights and freedoms, although the former often lacked the attributes essential for such categorisation...
>
> The word "discriminatory" in article 149 does not bear the wide meaning assigned to it in a dictionary. It has a precise and limited connotation.   Although it contains the elemental constituent of favouritism, or differentiation in treatment, its application is confined only to favouritism or differentiation based on "race, place of origin, political opinions, colour or creed". No other kind of favouritism or differentiation is "discriminatory" within the narrow constitutional definition of that word in article 149(2). It is to be profoundly in error to think  that there has been a contravention of a person's fundamental rights under article 149 where the alleged discrimination is based on some ground other than those referred to above, no matter how reprehensible such grounds may appear to be. Such a situation

11

clearly does not come within the purview of the constitutional guarantee, although there may well be other means for its investigation and for securing redress."

As wide ranging and interesting as counsel's argument was, he was unable to demonstrate any alleged discrimination in the statement of claim that was based on a ground referred to in section 14(3) of the Constitution.

The cases which he presented in support of his arguments did not assist him. **Inze v Austria** (1988) 10 E.H.R.R. 394 a case decided by the European Court of Human Rights, relief was given for discrimination on the ground of illegitimate birth, the brother of the appellant, being a legitimate child, was given precedence under Austrian law of intestacy in the attribution of their mother's farm, contrary to Art. 14 of the European Convention of Human Rights.

The category of discrimination was `sex'. A claim such as this would be arisen under section 14(3) because there is jurisprudence on the issue that discrimination on the ground of sex may arise where the marital status of women affects the rights and status of their children.

**Eldridge v British Columbia** (1997) unreported Canadian Supreme Court case decided on 9th October 1997. It concerned an application by deaf applicants for a declaration that failure to provide sign language interpreters as an insured benefit under the Medicare scheme violates the constitutional guarantees of equal treatment under the law. In that case the constitutional guarantees against discrimination are in section 15(1) of the Canadian Charter as follows:

> "Every individual is equal before and under the law and has the right to the equal protection and equal benefit of the law without discrimination and, in particular, without discrimination based on race, national or ethnic origin, colour, religion, sex, age mental or physical disability."

The Canadian Charter specifically makes "physical disability" a ground upon which discrimination is prohibited. In the Constitution of Antigua and Barbuda "physical disability" seems to lie outside the parametric limitations inherent in section 14(3). Our court is not a super legislature and does not have the power to expand the rights given in the Constitution, making such a claim untenable under section 14 of the Constitution.

**Egan v Canada** (1995) 124 D.L.R.(4th) 609 another Canadian case in which the court dismissed the application of a homosexual couple, who had been living together since 1948, claiming pension and spouses allowance

12

under the Old Age Security Act, basically on the ground that the relationship did not meet the definition of "spouse" which required opposite sex relationships. The constitutional challenge on the ground of discrimination was unsuccessful, but the case concerned a recognised category of discrimination namely "sex".

**Baloro v University of Bophuthatswana**(1996) 1LRC 12, a South African case established that the constitutional guarantees of equality before the law included any "person" and was not limited to citizens.  The ground of discrimination in this case was the "place of origin" which is a category of discrimination recognised in section 14(3) of the Antigua and Barbuda Constitution.

In **Shelley v Kraemer** (1947)334 US 1. the US Supreme Court held that restrictive covenants  denying ownership or occupancy of property on the basis of colour or race violated the constitutional guarantees of equality before the law.  Again the well-established category of discrimination was "race".

The basic and insurmountable hurdle of the appellant in his Statement of Claim was that there was no allegation in the statement of claim of a ground of discrimination that was inherent in section 14(3) of the Constitution. On that basis  alone there could be no cause of action under section 14 of the Constitution.

**Para 13** alleges that the scheme is prejudicial to property, revenue and good government and is the result of a conspiracy between Cabinet, Asian and persons unknown, and of a misdemeanor in public office on the part of the Cabinet and all other persons in public office who support and intend to act in the performance of the obligations of the  government.

**Para 14** alleges that the divestment of publicly owned property without consideration is a fraud on the Government and people by the Cabinet and Asian and persons unknown.

The learned trial Judge found that the Statement of Claim did not allege particulars of the essential ingredients of  the torts mentioned in these paragraphs.  The point is clear and obvious, no serious effort was made by the appellant to have this finding overturned.  In any event, I agree with the learned trial Judge and there was no appeal against this aspect of his decision.

**Para 15**

**The Public Purpose Point**

**Para 15** alleges that the acquisition of property to be divested to Asian is not for public use and is therefore unconstitutional by contravening section 9 of the Constitution.

The Judge ruled that the allegations failed to show any cause of action for these reasons:  first that the stated purpose of "the promotion of and development of tourism and supporting tourist related activities" is a sufficient expression of a public purpose; and secondly that in any event the question as to whether an acquisition is or is not made for a public purpose is non-justiciable, unless there is a viable allegation that the declaration has been made fraudulently.  The appellant challenged these rulings vigorously.

**Public Purpose**

The jurisdiction of the court on the constitutionality of compulsory acquisition is determined by section 9 of the Constitution and also the Land Acquisition Act Cap.233.  For ease of reference I will set out the provisions relevant to our decision.

Section 9(1) of the Constitution provides:

> "No property of any description shall be compulsorily taken possession of, and no interest in or right to or over property of any description shall be compulsorily acquired, except for public use and except in accordance with the provisions of a law applicable to that taking of possession or acquisition and the payment of fair compensation within a reasonable time."

Public use is defined in section 9(6) of the Constitution:

> "For the purposes of this section, "use" is "public" if it is intended to result or results in a benefit or advantage to the public and, without prejudice to its generality, includes any use affecting the physical, economic, social or aesthetic well-being of the public."

The acquisition of land is regulated by the Land Acquisition Act Cap 233, which defines public purpose.  Section 2 states as follows:

> "public purpose" means a purpose determined to be a public purpose in accordance with the provisions of section 3."

And section 3 reads:

> "(1) If the Cabinet considers that any land should be acquired for a public purpose they may, with the approval of the Legislature, cause a declaration to that effect to be made by the Secretary to the Cabinet in the manner provided by this

14

section and the declaration shall be conclusive evidence that the land to which it relates is required for a public purpose."

The meaning and effect of these constitutional and statutory provisions, with all due respect to the lengthy and interesting argument of counsel, is already well settled by highest judicial authority, and cannot be considered a difficult question.

The appellant invested great effort in submitting that section 9 of the Constitution of Antigua was contravened by the fact that the Government intended to acquire property for the purpose of transferring it to a private developer who would use it for his own profit and that could not be a "public purpose" and was an unconstitutional use of the taxpayer's money.

The root decision on the meaning of public purpose can be found in the Privy Council decision of **Hamabai Framjee Petit  v Secretary of State for India** (1914) L.R. Vol. XLII Indian Appeals  44 where Lord Dunedin said at p.47:

> "The argument of the appellants is really rested upon the view that there cannot be a "public purpose" in taking land if that land when taken is not in some way or other made available to the public at large.  Their Lordships do not agree with this view.  They think the true view is well expressed by Batchelor, J. in the first case, when he says:  "General definitions are, I think, rather to be avoided where the avoidance is possible, and I make no attempt to define precisely the extent of the phrase `public purposes' in the least; it is enough to say that, in my opinion, the phrase, whatever else it may mean, must include a purpose, that is, an object or aim, in which the general interest of the community, as opposed to the particular interest of individuals, is directly and vitally concerned."

Counsel for the appellant relied on two old US Supreme Court cases to demonstrate violations of the Constitution by (i) compulsory taking for private benefit as opposed to a public purpose and (ii) contracting for private objects to be paid for by taxes.

**Missouri PAC. RL. CO. v State of Nebraski (**1896) SCR 17 130 at p.135 per Gray J.:

> "The petitioners were merely private individuals voluntarily associated together for their own benefit.  They do not appear to have been incorporated by the state for any public purpose whatever, or to have themselves intended to establish an elevator for the use of the public......
> To require the railroad company to grant to the petitioners a location on its right of way for the erection of an elevator for the specified purpose of storing from time to time the grain of the petitioners and of neighboring farmers, is to compel the railroad company, against its will, to transfer an estate in part of the land which it owns and holds,

**Page 87**

15

under its charter, as its private property and for a public use, to an association of private individuals, for the purpose of erecting and maintaining a building thereon for storing grain for their own benefit, without reserving any control of the use of such land, or of the building to be erected thereon, to the railroad company, for the accommodation of its own business, or for the convenience of the public.

The distinction between the facts is that the land in Missouri was for the private use of the petitioners and no public purpose was alleged or stated, whereas in Asian a public purpose namely the "development of tourism" was the stated purpose. **Cole v City of La Grande** (1884) SCR 5 416  at p.418 per Gray J.:

"The general grant of legislative power in the Constitution of a state does not enable the legislature, in the exercise either of the right of eminent domain or of the right of taxation, to take private property, without the owner's consent, for any but a public object.  Nor can the legislature authorize countries, cities, or towns to contract, for private objects, debts which must be paid by taxes.  It cannot, therefore, authorize them to issue bonds to assist merchants or manufacturers, whether natural persons or corporations, in their private business. These limits of the legislative power are now too firmly established by judicial decisions to require extended argument upon the subject."

Similarly, in this case the factual premise on which the principles were expressed was that the objects were the relief of private objects and debts. No public purpose was alleged; as in the instant case.  Both cases therefore turned on their particular facts.

In the Australian case of **Clunies-Ross v Commonwealth of Australia** (1985) LRC (Const.) 292 more modern American cases were considered.  Passages from the judgment demonstrate that in both Australia and America the courts employ principles of interpretation of which require a broad and generous interpretation the phrase "public purpose". At page 302 per Murphy J.:

"There is no warrant for a gloss on the Australian Act that public purpose is confined to some planned use, application, or preservation of the land or buildings.  Even if "public purpose" should be read as "public use", the U.S. cases show that acquisition for public use extends to spiritual and aesthetic as well as material purposes...[reference to **Berman v Parker** (1954) 348 US 26, a unanimous judgment of the Supreme Court ] ...
It runs against generally accepted principles of interpretation to read narrowly a wide phrase such as "for a public purpose".  Acquisition of land round an airport or a defence installation, not to use, but so that no one may use it, is for a public purpose.  Acquisition of a derelict site, not to use it, but to remove an eyesore or to prevent danger, is

**Page 88**

for a public purpose.  Acquisition of a wilderness area, specifically so no one should use and therefore despoil it, is for a public purpose."

When one applies the principles to the instant case not only is it abundantly clear that the stated purpose of the "development of tourism in Antigua and Barbuda" is a public purpose but the principle has already received judicial approval.

In **Williams  v  Gov't of St Lucia** (1969) 14 W.I.R. 177 at p.180 Sir Garfield Barwick giving the Judgment of the Privy Council said:

"That the promotion of tourism can be a public purpose in the Island of Saint Lucia can scarcely be denied...No doubt, the expression "the development of tourism" has a degree of vagueness but what is called for by the Ordinance is the statement of a public purpose, which necessarily must be in very general terms... The expression "the development of tourism" does state a purpose which is a public purpose."

The other criticism that attaining the proposed tourist development through a private entrepreneur whose motive is personal profit and gain cannot be a public purpose, is not only logically untenable but has also been judicially rejected.

A public purpose may be achieved through private enterprise at the instance of a private entrepreneur whose sole aim may be to make profit. The matter was well expressed in the Indian case of **Narayan Singh v Bihar** (1978) A.I.R. 136 at p.138 by S.K. Jha J.:

"Para 6: ...The objective test applied from case to case, which has since been judicially recognised, is that whatever furthers the general interests of the community as opposed to the particular interests of the individuals must be regarded as a public purpose.  Public purpose may be achieved through private enterprise as well as through any public agency.  There is no provision in the Act precluding the acquisition at the instance of a private agency so long as the purpose for acquisition is a public purpose.  If the acquisition is for a public purpose, the consideration that the State has undertaken the task at the instance of a private entrepreneur or agency or a private institution is not germane.  It is well settled that even though the acquisition of land is for a private concern whose sole aim may be to make profit, if the intended acquisition of land could materially help the national economy or the promotion of public health or the furtherance of general welfare of the community or something of the like, the acquisition will be deemed to be for a public purpose."

**The Non-justiciable Issue**

The main objection to the prolonged argument on this issue is that it is well settled law that the effect of section 3(1) of the Land Acquisition Act Cap233 (*supra*)  makes the determination of the question as to whether an

17

acquisition is made for a public purpose non-justiciable, in the absence of fraud. The issue of fraud is no longer an issue because the learned trial Judge ruled there were no particulars capable of grounding adjudication on that issue and no appeal has been made against that ruling. The rationale of non-justiciability is based on the Constitution Order paragraph 3:

> "the Constitution of Antigua and Barbuda set out in Schedule 1 to this Order shall come into effect in Antigua and Barbuda on 1st November 1981 subject to the transitional provisions set out in Schedule 2 to this Order."

The Schedule 2 states in paragraph 9:

> "Nothing in section 9 of the Constitution shall effect the operation of any law in force immediately before 27th February 1967 or any law made after that date that alters a law in force immediately before that date and does not –
>
> [a]   add to the kinds of property that may be taken possession of or the rights over and interests in property that may be acquired;
>
> [b]   make the conditions governing entitlement to compensation or the amount thereof less favourable to any person owning or having an interest in the property; or
>
> [c]   deprive any person of such right as is mentioned in subsection (2) of that section."

The plain fact is that the Land Acquisition Act Cap 233 was in operation before 27th February 1967.  The meaning of the paragraph is plain, clear and unambiguous.  Section 9 of the Constitution shall not effect the operation of the Land Acquisition Act Cap.233.  The principle has been judicially affirmed for over a century in several cases.

Lots of cases were quoted to us which I have perused. However I shall refer briefly to an old Privy Council case from Ceylon which demonstrates that the concept of the non-justiciablity of the executive decision as to what is a public purpose is a long standing one. In **Wijeyesekera v Festing** (1919) A.C. 646 at p.647 Lord Finlay said:

> "This appeal raises a short point upon the construction of the Ceylon Ordinance No.3 of 1876....
> The whole point in the case is whether the decision of the Governor in Council is conclusive on the point that the land is wanted for a public purpose.  It is now contended that it is open to the person whose land is affected to challenge the decision of the Governor in Council upon this point, as embodied in the order directing the Government Agent to take order for the acquisition of the land....
> The whole case is decided, in the opinion of their Lordships, in the last three lines of s.6 of the Ordinance: "And upon the receipt of such report it shall be lawful for the Governor, with the advice of the Executive Council, to direct the Government agent to take order for

18

the acquisition of the land." When you have an enactment of that kind it shows that it was intended that the decision of the Governor in Executive Council on the point should be binding."

There have been a number of recent cases in the Eastern Caribbean which have applied and emphatically settled the point.

There is the Privy Council case of **Blomquist v Attorney General of Dominica** (1987) A.C. 489 applying the principle to similar provisions in the Constitution of Dominica.

There is the Eastern Caribbean Supreme Court decision **Mills v Attorney-General of St. Christopher** (1993) 45 W.I.R. 125. In the leading judgment Liverpool J.A. demonstrated that the principle applied to similar provisions in the Constitution of St.Kitts and Nevis.

The most recent expression of the principle was in the Privy Council case of **Windward Properties v Gov't of St.Vincent** (1996) 1 WLR 279 the principle was applied to similar provisions in the Constitution of St.Vincent and the Grenadines. at p.283 Sir Michael Hardy Boys said:

> "As counsel pointed out, the Court of Appeal did not have its attention drawn to paragraph 11 of the transitional provisions in Schedule 2 which states:
>> "Nothing in section 6 of the Constitution shall affect the operation of any law in force immediately before 27 October 1969 or any law made on or after that date that alters a law in force immediately before that date and that does not – (a) add to the kinds of property that may be taken possession of or the rights over and interests in property that may be acquired; (b) make the conditions governing entitlement to compensation or the amount thereof less favourable to any person owning or having an interest in the property; or (c) deprive any person of any such right as is mentioned in subsection (2) of that section."
> In their Lordships' view, the two categories of law which are excluded by this paragraph from the effect of section 6 of the Constitution are first, any law in force immediately before 27 October 1969 (when the Constitution became operative), and secondly any subsequent amendment that does not do any of the things described in sub-paragraphs (a), (b) and (c). The Land Acquisition Act is within the first category and consequently is not affected by section 6 of the Constitution. Accordingly section 19(a) is to be applied as it stands."

On careful perusal of the wording of the relevant provisions in the Constitution there is no ambiguity, no uncertainty of the meaning of the provisions. In these circumstances the court cannot indulge in rewriting the Constitution, to borrow the words of the learned trial Judge. The effect is that the declaration made by the Secretary of the Cabinet with the approval of the Legislature to the effect that the land was acquired for a public purpose, is

conclusive evidence that the land to which it relates is required for a public purpose.  There is absolutely no basis therefore on which a court could find otherwise.  I therefore conclude that the learned trial Judge was correct in ruling that this paragraph did not disclose any cause of action.

**Para 16 alleges that**

The agreement made provision for extensive fiscal concessions from duties and taxes.   In addition it made provision for the developer to undertake certain works, on terms which would enable the developer to set of the costs incurred from taxes due up to $5,000,000.00, the said sums to be held in a special account for that purpose.   The provision included a requirement that these terms would only come into effect on the passage of enabling legislation.

Despite the substantial argument advanced that this arrangement contravened the Constitution by providing for monies to be paid into a fund other than the consolidated fund, and the managing of Government Revenues by non-public servant.  In my view, however, the specific provision in section 90 of the Constitution which are sufficiently clear and unambiguous to speak for themselves made those arguments untenable:

> "All revenues or other monies raised or received by Antigua and Barbuda (not being revenues or other monies that are payable under any law for time being in force in Antigua and Barbuda, into a specific fund established for a specific purpose) shall be paid into and form part of a consolidated Fund."

In addition, the agreement did not purport to grant any exemptions nor to make any remissions. It evidenced the agreement of the Government to seek passage of legislation giving effect to the proposed concessions and remissions. Legislation of such nature is specifically permitted by the constitution sections 53(2) (a) (iv); 56 (1); 90 and 93.  I agree with the learned trial Judge's conclusion that no cause of action was disclosed in this paragraph of the Statement of Claim.

**Para 17 and 18** complain that the cost to the government and the people of Antigua exceeds the returns from Asian.  In my view these are political rather than justiciable questions which involve a vision of and prophesy for the economic and social future of the State. Many evaluations are required and it is possible that political controversy is inevitable.

The undesirability and reluctance of  the courts to become embroiled in these matters has often been stated. In this case the position is more

20

acute because the case is brought by the leader of the Parliamentary Opposition, who did not participate in the debate on the agreement and the bill in the House but has sought to have the matter become the subject of investigation in the courts. We were referred to cases making the point such as **Bilston Corp. v Wolverhampton Corp.** (1942) 1 Ch 391; **Blackburn v Attorney-General** (1971) 1W.L.R. 1037; **Eastgate v Rozzoli** (1990) 20 NSWR 188. The trial Judge was impressed by the eloquent exposition of Connolly J.A. in the case of **Kenilores v Attorney-General** (1986) LRC (Const) 126 from the Solomon Islands and I could no better than to adopt them:

> "I think, however, it is important the Courts should exert great care to avoid giving any impression that they have become some sort of extension to the floor of Parliament, where politicians may continue to press their opposition to legislation. Any appearance of political involvement is obviously undesirable.........there is clear division between the legislative, executive and judicial under the Solomon Islands Constitution and the Court should be chary indeed of any procedure which may lead to a blurring of those divisions."

I agree that this paragraph did not disclose any cause of action.

### Suit No.2  against the Attorney General

The other action in the consolidated hearing was instituted against the Attorney-General and the Statement of Claim attacked the bill for the Asian Village Development Act. In this Statement of Claim the paragraphs which purported to make allegations against the respondent were paragraphs 5 to 11. The main allegations dealt with discrimination under section 14 and the public purpose under section 9 of the Constitution and the issues and legal solution are identical with the issues under the other Statement of Claim and do not need repetition.

As I mentioned at the beginning of my judgment,  the fact that the Bill has now become law, has removed the necessity of dealing with the submissions of counsel relating to the jurisdiction of the court to make rulings on the constitutionality of legislation before the legislative process has been completed.

### The Substate Point

This leaves me to deal with the submission relating to sections 46, 70 and 71 of the Constitution.

The allegation that the bill by granting privileges, concessions and exemptions was creating a separate or substate seemed illogical. Section 46 of the Constitution reads:

> "Subject to the provisions of this Constitution, Parliament may make laws for the peace, order and good government of Antigua and Barbuda."

This section of the Constitution has been judicially examined in several cases to many of which we were referred. These words do not define the power to legislate. In effect, they establish that Parliament has wide powers. The limitations, necessary to restrain tyranny and preserve democracy do not allow that choices of policy should be justiciable. The matters raised under this argument which in my view do not require detailed attention are based on two divergent theories of economic and social development. The position adopted by the respondent, that is granting incentives is a common feature in the legislation of our times. The respondent referred to an extensive list of legislation, from Antigua and Barbuda and other parts of the Caribbean, based on a similar political theory of stimulating development by granting concessions of various types. It is unnecessary to recite these because they are in fact common throughout our region. In my judgment the questions raised by the appellant under this submission have to do with political choices. I agreed with the learned trial Judge that nothing in the statement of claim came close to raising an issue as to any breach of section 46 of the Constitution.

The allegations of breaches of section 70 and 74 seemed almost facetious. These sections establish the Cabinet and allocation of portfolios to the Ministers. The appellants contended that the granting of exemptions and remissions tended to usurp the powers of the Ministers of Government and vest them in Asian Village.

In my view, I also agree with the learned trial Judge on this issue.

### Section 119 Jurisdiction

The appellant conceded that this action was not brought under section 18(1) and contended that the actions were brought under section 119 of the Constitution:

> "119(1) – Subject to the provisions of sections 25(2), 47(8)(b), 56(4), 65(5), 123(7)(b) and 124 of this Constitution, any person who alleges that any provision of this Constitution (other than a provision of Chapter II) has been or is being contravened may, if he has a relevant interest, apply to the High Court for a declaration and for relief under this section.

The jurisdiction under section 119(1) must be contrasted with the power to institute proceedings under section 18 of the Constitution, to draw attention to two important differences.

> "18(1)-If any person alleges that any of the provisions of sections 3 to 17 (inclusive) of this Constitution has been, is being or is likely to be contravened in relation to him (or, in the case of a person who is detained, if any other person alleges such a contravention in relation to the detained person), then, without prejudice to any other action with respect to the same matter that is lawfully available, that person (or that other person) may apply to the High Court for redress."

The first is that action under section 119 only relates to allegations that any provision "has been or is being contravened". It does not refer to the likelihood of future breaches, whereas actions under section 18(1) can relate to allegations that any provision "has been, or is being or is likely to be contravened" (the inchoate point). The second is that under section 18(1) the only person who can bring an action is a person who can allege that the contravention relates to him (except in the case of a detained person) and under section 119(1) the only person is a person who has a relevant interest (the locus standi point).

**The Inchoate Point**

The appellant challenged the learned trial Judge's conclusion that the Agreement and the Bill were inchoate and that the action was premature because they did no more than evidence an intention to cause future breaches of the Constitution. In my view the definition of completion in the agreement itself which required effective legislation to transfer title and enact the proposed concessions and privileges, licences and permits make the issue rhetorical. It is equally so with regard to a Bill which essentially does not have the force of law.

I think that a necessary consequence of the wording of section 119(1) is that unconstitutionality cannot be based on the entry into an agreement nor a bill prior to the passage of the enabling legislation. There could be no allegation that a provision of the Constitution has been or is being contravened as is required under section 119(1). The allegation would of necessity be that a provision is likely to be contravened. As I have demonstrated, it is only in matters falling under the jurisdiction of section 18 of the Constitution that such an allegation could give rise to a justiciable issue. In the premises, I support the conclusion of the learned trial Judge. Invalidity could only arise if effect was given to the agreement before

**Page 95**

23

Parliament had enacted the necessary legislation. See **New South Wales v Bardolph** (1933-34) 52 C.L.R. 455.

**The Locus Standi Point**

Counsel for the respondent took issue with several implications inherent in the opinion of the learned trial Judge, that the appellant had locus standi in these proceedings and submitted that the court should give a definitive ruling on the matter.

In my opinion however, there is a short point which is decisive and it derives from the finding that the appellant did not have any cause of action under the Constitution, in effect, there was no sustainable allegation that there was any contravention of the Constitution which affected his interests.

The learned trial Judge did refer to this principle during his judgment:

"In my view a litigant invoking the provisions of section 119 should show on the face of the pleadings the nature of the alleged violation or contravention that is being asserted. The allegations grounding this violation must be serious. The trial judge must then assess whether in light of the allegations made and the degree to which they affect the litigant, whether personally or as a mere member of the general public, locus standi should be accorded."

Had he applied this principle his finding that the pleadings did not contain allegations grounding any contravention of the Constitution would have been decisive. But seemingly, he got carried away into considering whether the appellant's interests would have been affected if there were viable allegations.

The approach which our courts have adopted has recognised the principle that in these public law cases, the court first determines the nature of the alleged violation of the Constitution, and only a sustainable allegation of there is such a violation does it consider whether the applicant has a relevant interest.

We were referred to a collection of Eastern Caribbean Supreme Court authorities on locus standi, among many others.

From Antigua and Barbuda there was the case of **Frank v Attorney-General** Civil Appeal No.1 of 1990. In that case the court considered the issue of locus standi as a preliminary issue. In the decision given by Sir Vincent Floissac it was clear that the approach taken by the court was to examine the meritoriousness of the application. In circumstances which were not dissimilar to this case he expressed himself thus:

24

> "This is an admission by the parliamentary and professed juridical representative of the inhabitants of Barbuda that the proprietary rights and interests claimed on behalf of those inhabitants have not yet been legally established. The appellant wishes the Court to prescribe those rights and interests or to grant relief which amounts to legislation in regard to those rights and interests. This is not the function of a Court of law. The Court can only declare and protect legally established rights and interests. Except in the case of a judicial review of the decision or action of a public authority, it is a precondition of such declaration or protection that there was a previous infringement or threatened infringement of or dispute in regard to those established rights and interests. That precondition was not satisfied in this case. The result is that the appellant had no locus standi to claim the relief demanded in the Motion."

From St.Kitts that was the position adopted by Sir Vincent Floissac in **Blake v Byron** where he said at p.10:

> "having elected to decide this appeal on the merits of the application and on the conclusion that the application itself is unmeritorious, it is unnecessary to decide whether the appellant has locus standi either by way of a sufficient interest or by way of a relevant interest in the subject matter of the application."

In **Attorney General v Lawrence** (1983) 31 W.I.R. 176. In that case the decision of the court was given by Sir Neville Peterkin. He adopted the same approach some several years later. He considered the merits of the case and it was only after he concluded that the learned trial Judge was right to in deciding that such deprivations as Lawrence had alleged fell within the purview of section 6 of the constitution that he turned to the question of locus standi. He established the principle:

> "I turn now to the second aspect, namely did Lawrence have a locus standi in the constitutionality of the impugned Act? It is submitted not. To make out a case as alleged, it is incumbent upon Lawrence to establish not merely that the law affects his fundamental rights guaranteed by the Constitution then on, but also that it is beyond the competence of the legislature. No-one but one whose rights are directly affected by a law can raise the question of the constitutionality of that law."

In **Attorney-General v Payne** (1982) 30 WIR 88. Robotham C.J. put it at p.98:

> "Whether or not a person has a relevant interest can only be determined after the facts have been heard, and not as a preliminary issue. On the conclusion, it then becomes a matter for the judge to decide whether a relevant interest has been established or not, in granting or refusing the application."

Dominica

**Page 97**

25

In the Application of  Kareem Abdulgani (1985) LRC(Const) 425 Singh J. adopted the same approach.  He first considered the merits and concluded that the Minister of Home Affairs refusal to register the applicant as a citizen was a contravention of section 100(1) of the constitution. It was only then he considered the issue of relevant interest and concluded in favour of the applicant on the ground that the contravention occurred in his application for to be registered as a citizen.

## St.Vincent

In **Richard and James v Governor-General and Attorney-General** of St. Vincent and the Grenadines Suit no. 484 of 1989 and 570 of 1989 Singh J considered substantial arguments and submissions on locus standi and considered much authorities.

He concluded:

"any person in St.Vincent and  the Grenadines, can invoke the jurisdiction of this Court under S96(1) of the  Constitution provided he alleges a contravention, seeks a declaration or some form of relief and, by admissible evidence, show that the contravention alleged has affected or is affecting his interest. Provided he satisfies these requirements, the Court will accord him standing.  Interest there must mean his personal interest, even though shared by the populace at large and, is not limited t pecuniary interests. It will be a matter for Court in each particular case to say whether the interest allegedly affected in each case falls within the framework and intendment of this provision to the Constitution."

## St.Lucia

In **Gordon v Minister of Finance** (1968) 12 WIR 416 a nominated member of the House of Assembly sought a declaration that the procedure employed in  reading an Appropriation Bill contravened the constitution. In explaining why he ruled against locus standi.  Bishop J. said at p. 420:

"His arguments if I understood them correctly, were confined almost exclusively to the moral concept. They referred to a moral duty and in they meant that members of the House of Assembly; or taxpayers or electors were interested in the sense of being concerned over the events in and the decisions of the legislature.  I do not agree that the moral concept can be applied to the word "interests" in the definition of a person with a relevant interest. In my view the mere thought or expectation of to pay money will not suffice. This is too vague and too unsubstantial. Rather, I am of the view that there ought to be involved a right, or a duty, or a liability which can be established by a court. It may be of the nature of a pecuniary or proprietary interest which affects the applicant himself - not sentimentally, not academically, not remotely."

26

In my view the common premise on which all these decisions seem to have been based was that before any question of locus standi can arise, there must be a sustainable allegation that a provision of the constitution has been or is being contravened, and that the alleged contravention affects the interests of the applicant. . On my reading of section 119(5) it says exactly the same thing. The limitation contained therein effectively makes locus standi a question of statutory interpretation.  In my view it is essential that the two requirements of the alleged contravention of the constitution and a resultant affect on the interest of the applicant must both exist.

In this case the  finding of the learned trial Judge that there was no allegation of any infringement of any provision of the Constitution of which the Court could take cognisance is conclusive.  The appellant therefore failed the test established by section 119(5) of the Constitution.   I therefore conclude, that the learned trial Judge was wrong to find that the appellant had locus standi.

**Costs**

The respondents have appealed against the order of the learned trial Judge not to order costs against the appellant in the court below and have asked to  make an order for costs in their favour in the appeal. Several cases were cited but I do not think it is necessary to refer to them in detail.  It is accepted that the general principle which we have been applying  is not to order costs against a private citizen seeking to enforce his Constitutional rights.

However, this is not such a case.  The appellant has not alleged that any fundamental rights of his were being invaded. The learned trial Judge and our court are ad idem in concluding that there is no scintilla of a cause of action in relation to any breach of any provision of the constitution.   The matters raised related to policy decisions of the executive and legislature. The appellant who is a member of the said legislature did not take part in debates in  the House of Representatives but  instituted these proceedings,

seemingly substituting the court for Parliamentary debate.  In my opinion, therefore, this is not a case of a citizen seeking to enforce his constitutional rights.

The content of the statement of claim includes unparticularised allegations, in pejorative terms of a scandalous nature, namely of fraud, illegality, public mischief and conspiracy. The Prime Minister and the Attorney-General were sued in their personal as well as representative

capacities. The investor Asian Village was made a party to the suit, and included in the pejorative and scandalous allegations, although no particulars of any misconduct were alleged against them. This circumstance by itself warrants the conclusion that the proceedings were an abuse of the process of the Court.

The matter, is taken further because the appellant sued on "behalf of himself and all other members of the Opposition United Progressive Party". There is no doubt that the motivation for the litigation was political. The statement of claim contained the vexatious and frivolous prayer that damages awarded against the Cabinet Ministers "personally and in their official capacity" be paid to the appellant "for the benefit of the Government and people of Antigua and Barbuda". The documents were more in the form of a political document than a judicial pleading, the view that the appellant had an ulterior political motive in bringing these proceedings is irresistible.

Further the undue length of the argument was unnecessary, and embarrassed the court and increased the cost to the respondents. For all these reasons I would order that the appellant pay the costs of the respondents in the court below and in the appeal.

**The Order**

I would therefore dismiss the appeal and allow the cross appeal. I would order that the appellant pay the costs of the respondents in the Court below and in the Court of Appeal.

**DENNIS BYRON**
Chief Justice [Ag.]

I Concur.                    **SATROHAN SINGH**
                             Justice of Appeal

I Concur.                    **ALBERT REDHEAD**
                             Justice of Appeal

104—Vol. 59.]    LLOYD'S LIST LAW REPORTS.    [Dec. 9, 1937.

K.B.]   Bessler, Waechter, Glover & Co., Ltd. v. South Derwent Coal Company, Ltd.   [K.B.

## KING'S BENCH DIVISION.

Nov. 11, 12, 1937.

BESSLER, WAECHTER, GLOVER & CO., LTD. v. SOUTH DERWENT COAL COMPANY, LTD.

Before Mr. Justice GODDARD.

*Contract—Sale of goods—Variation of terms of delivery — Contracts in writing for sale of coal: (1) providing for monthly deliveries from Jan. 1 to June 30, 1936; (2) providing for monthly deliveries from Apr. 1 to Dec. 31, 1936—Deliveries under contracts overlapping — Oral agreement between parties that deliveries under second contract would not begin until deliveries under first contract were finished, the balance undelivered on Dec. 31, 1936, to be delivered after that date—Delivery by sellers under second contract up to end of 1936—Refusal to make further deliveries—Claim by buyers for damages — Enforceability of oral agreement — Arbitration—Award upholding sellers' contention that the oral agreement was unenforceable against them as it was a parol variation of the contract which was required to be in writing—Sale of Goods Act, 1893, Sect. 4.*

*— Held, that the oral agreement was no more than a mere voluntary forbearance by the parties for their mutual benefit to insist on delivery according to the strict terms of the contract and did not amount to a variation; and that therefore Sect. 4 was not an answer to the buyers' claim—Judgment for buyers.*

This was a special case stated by an umpire in an arbitration arising out of a dispute under a coal contract between Messrs. Bessler, Waechter, Glover & Co., Ltd., the claimants, and the South Derwent Coal Co., Ltd., the respondents, both of Newcastle-on-Tyne.

The dispute arose under a contract for the sale of coal, dated Nov. 6, 1935, referred to as contract "C," whereby the claimants bought from respondents 70,000 tons of coal. By that contract the respondents agreed to deliver the coal in about equal monthly quantities from Apr. 1, 1936, to Dec. 31, 1936. Two previous contracts of sale had been entered into between the parties. The first,

which was dated Mar. 19, 1935, referred to as contract "A," was for 48,000 tons of coal, to be delivered in about equal monthly quantities from Apr. 1, 1935, to Dec. 31, 1935, to be mutually arranged; and the second was dated Oct. 10, 1935, referred to as contract "B," and was for 40,000 tons of coal, to be delivered in about equal monthly quantities from Jan. 1, 1936, to June 30, 1936.

The dispute concerned the claimants' allegation that they were entitled to have delivered to them by the respondents 27,966 tons of coal, being the balance outstanding under contract "C"; alternatively, that they were entitled to damages for non-delivery.

The claimants contended (1) that by verbal agreement made in April, 1936, between Mr. A. C. Nicholson, a director of the claimant company, and Mr. E. Cameron, secretary and fitter of the respondent company, it was agreed that delivery under contract "C" should not commence until contracts "A" and "B" had been completed; that delivery should thereafter proceed at the normal monthly rate provided in contract "C"; and that the time of delivery under contract "C" should be extended accordingly; (2) that by reason of the above verbal agreement the claimants had been induced to abstain from requiring deliveries under contract "C" in 1936, more particularly in April, May; June and July, and that the respondents could not therefore hold the claimants to the strict legal interpretation of the contract; and (3) that the terms of contract "C," the conduct of the parties, and the common practice in the trade showed that the time of delivery was not intended to be of the essence of the contract.

The respondents contended (1) that no such verbal agreement had been made and that in any event it had not been reduced to writing as required by law; and (2) that in the circumstances which arose the respondents were not bound to deliver any further quantities of coal to the claimants under contract "C" after Dec. 31, 1936, and that the arrears then outstanding were cancelled.

According to the case stated by the umpire, Mr. W. F. Mitcalfe, the claimants from time to time purchased quantities of " West Stanley Unscreened Coking Coals" from the respondents for the purpose of supplying the Ford Motor Company's requirements at Dagenham, Essex. The respondents owned two pits, both situated in County Durham, and coals supplied

1935, referred to
for 48,000 tons of
in about equal
Apr. 1, 1935, to
ally arranged; and
. 10, 1935, referred
was for 40,000 tons
l in about equal
Jan. 1, 1936, to

d the claimants'
e entitled to have
the respondents
g the balance out-
ct "C"; alter-
vere entitled to
.

ded (1) that by
in April, 1936,
lson, a director of
, and Mr. E.
fitter of the re-
was agreed that
"C" should not
s "A" and "B"
t delivery should
normal monthly
t "C"; and that
ler contract "O"
rdingly; (2) that
rbal agreement the
ed to abstain from
er contract "O"
ly in April, May,
t the respondents
l the claimants to
tation of the con-
terms of contract
e parties, and the
trade showed that
not intended to be
ract.

nded (1) that no
ad been made and
not been reduced
by law; and (2)
s which arose the
nd to deliver any
l to the claimants
ter Dec. 31, 1936,
outstanding were

stated by the um-
lfe, the claimants
ased quantities of
ed Coking Coals"
r the purpose of
Motor Company's
nam, Essex. The
pits, both situ-
and coals supplied

from either pit came within the terms of
the contracts. No specific dates of delivery
were mentioned in Messrs. Ford's con-
tracts with the claimants, as the coals were
sold "f.a.s. Dagenham," delivery "as
arranged" or "as scheduled." The pro-
cedure was that Messrs. Ford informed the
claimants of their requirements for the
following month about a month in advance
and the claimants then asked the respon-
dents for stems under the terms of their
contracts and sent them stemming notes
which indicated the quantities of coal re-
quired, the name of the ship and the
approximate date of her readiness to load.
The respondents arranged stems accord-
ingly if agreed upon. The coals purchased
by the claimants from the respondents
under contracts "A," "B" and "O"
were allocated by the former entirely
against their contracts with Messrs. Ford.
The respondents knew that their coal was
destined for Messrs. Ford, but the umpire
found that they did not undertake to be
bound in any respect by Messrs. Ford's
requirements as distinct from the terms of
their contracts with the claimants.

Mr. Nicholson was accustomed to discuss
business matters with Mr. Cameron on fre-
quent occasions at the Exchange, Newcastle-
on-Tyne, and in the middle of October, 1935,
Mr. Nicholson told Mr. Cameron that
Messrs. Ford would like to have deliveries
expedited if possible. The position was
discussed and Mr. Cameron indicated that
it was possible that his company would be
able to expedite deliveries under contracts
"A" and "B" so that the quantity of
coal contracted for under contract "B"
would be completely delivered by about the
end of March, 1936, instead of according to
the contract terms on June 30, 1936; but
the umpire found nevertheless that no
undertaking was given by Mr. Cameron
that the deliveries would, in fact, be ex-
pedited. He (the umpire) also found that
in the expectation that contract "B"
would be completed by the end of March,
1936, Mr. Nicholson on behalf of the
claimants on Nov. 6, 1935, entered into con-
tract "C."

In April, 1936, Mr. Nicholson discussed
with Mr. Cameron on the Newcastle Ex-
change the position which had arisen owing
to the fact that deliveries under contracts
"A" and "B" had not been expedited
as hoped, as it then appeared that deli-
veries under the two contracts "B" and
"O" would overlap during April, May
and June, 1936, so that about 14,444 tons
per month would be due for delivery under

both contracts. The umpire found as a
fact that as a result of that conversation
it was verbally agreed between the
claimants and respondents that notwith-
standing the terms of contract "O" deli-
veries under that contract should not com-
mence until deliveries to the claimants
under contract "B" had finished; that
deliveries should then begin in accordance
with the terms of contract "O"; and
that the coal undelivered under contract
"O" on Dec. 31, 1936, should thereafter
be delivered by the respondents to the
claimants. No definite arrangement was
made as to the date on which these
anticipated arrears under contract "O"
should be delivered to the claimants after
Dec. 31, 1936. He also found as a fact
that that agreement at the time it was
made was to the mutual advantage of both
claimants and respondents and was so
considered by the contracting parties.

The respondents were at that time con-
sidering the advisability of closing their
West Stanley Pit (which was in fact shut
down in May, 1936, owing to economic
reasons) and they would not have been
able to supply the claimants with the
quantities due under contracts "B" and
"O" in April, May and June, 1936, un-
less they had kept the West Stanley Pit in
operation. On the other hand, the
claimants did not wish to take delivery
of as much as 14,444 tons of coal monthly
during April, May and June, 1936, because
Messrs. Ford did not require that amount
and because Messrs. Ford had very little
storage accommodation.

The verbal agreement referred to above
was not communicated by Mr. Cameron to
his directors, but he (the umpire) found
that it was within the scope of his
authority to enter into such an agreement
on behalf of the respondents.

During the year 1936 the claimants also
purchased about 28,000 tons of coal from
other collieries which they delivered to
Messrs. Ford, including 6500 tons of coal
during the months of May and June, 1936.
No information, however, was produced to
the umpire of the prices at which such
other coal was purchased, and he found
that the respondents were not informed by
the claimants that those other purchases
were being made.

In May, 1936, the claimants cancelled
a stem for 2800 tons of coal for Messrs.
Ford's account which they had arranged
with the respondents, on account of
Messrs. Ford's lack of storage capacity.

K.B.]   Bessler, Waechter, Glover & Co., Ltd. v. South Derwent Coal Company, Ltd.   [K.B

The umpire further found that in pursuance of the above verbal agreement the claimants did not ask the respondents to deliver any coals to them in April, May, June and July, 1936, under contract " C " until deliveries under contract " B " had been completed on July 10, 1936, and that no communications passed between the respondents and claimants regarding the fact that deliveries were not asked for during this period. After July 10, 1936, the claimants asked for and obtained from the respondents monthly deliveries of coal under contract " C." In July, 1936, the claimants contracted with Messrs. Ford to deliver to them further quantities of West Stanley Unscreened Coking Coal, and in that connection they assumed that about 30,000 tons of coal would be delivered to them by the respondents under contract " C " during the early months of 1937. The respondents were not, however, aware of that fact.

On Dec. 1, 1936, Mr. Cameron wrote on behalf of the respondents to the claimants stating that there were considerable arrears under contract " C " and that they would be compelled to cancel them at the end of the year. That letter was returned by Mr. Nicholson to the respondents, and he stated verbally that the claimants refused to be bound by its terms.

The umpire found that the respondents repudiated any further liability to deliver coals under contract " C " after Dec. 31, 1936, although the claimants called for further deliveries in January, February and March, 1937; and that under the circumstances the quantity of coal remaining undelivered under contract " C " on Dec. 31, 1936, was 27,966 tons.

No evidence was submitted to the umpire in regard to any customary practice of the coal trade that time of delivery was not intended to be of the essence of the contract in construing contracts such as " C," and the only other evidence submitted by the claimants in that connection was that arrears of coal under an earlier contract for delivery from July 1, 1934, to June 30, 1935, had by mutual agreement been delivered to the claimants by the respondents over a considerable period beyond the contract dates, but that the respondents had finally refused delivery of the balance outstanding thereunder at the end of 1936.

Subject to the opinion of the Court, the umpire held that the time of delivery stated in contract " C " was of the essence

of the contract; further, that there was no any sufficient memorandum in writing of the above parol agreement varying the terms of contract " C," and that consequently such parol agreement was unenforceable at law; and further, that the claimants' contention that by reason of the above verbal agreement they had been induced to abstain from requiring deliveries under contract " C " in 1936 more particularly in April, May, June and July, 1936, and that the respondents could not therefore hold the claimants to the strict legal interpretation of the contract, was not correct.

The umpire awarded (*inter alia*) as follows:—

24. Subject to the opinion of the Court I award and determine that the claimants are not entitled to specific performance of the contract and to have delivered to them by the respondents the said 27,966 tons of coal.

25. Subject to the opinion of the Court I further award and determine that the respondents are not liable to the claimants in damages in respect of non-delivery of the said 27,966 tons of coal.

26. The question for the opinion of the Court is whether on the facts found by me my award and determination as set out in Clauses 24 and 25 hereof is correct in law.

31. If the Court be of opinion that my award is incorrect in Clause 25 hereof then I award and determine that the respondents do pay to the claimants the sum of £4194 18s. as damages for non-delivery of the said 27,966 tons of coal.

Mr. A. T. Miller, K.C., and Mr. R. E. Gething (instructed by Messrs. Bentleys, Stokes & Lowless, agents for Messrs. Bramwell, Clayton & Clayton, of Newcastle-on-Tyne) appeared for claimants; Mr. J. V. Naisby (instructed by Messrs. King, Wigg & Brightman, agents for Messrs. Wilkinson & Marshall, of Newcastle-on-Tyne) represented respondents.

### JUDGMENT.

Mr. Justice GODDARD, in giving judgment, said: The arbitration in which this award in the form of a special case is stated arises out of a contract between the claimants as buyers and the respondents as sellers of 70,000 tons of coal, made in

c. 9, 1937.]     [Dec. 9, 1937.]    LLOYD'S LIST LAW REPORTS.    [Vol. 59.—107

td.   [K.B.     [K.B.]   Bessler, Waechter, Glover & Co., Ltd. v. South Derwent Coal Company, Ltd.    [K.B.

November, 1935. The only question that has to be decided is one under Sect. 4 of the Sale of Goods Act, 1893, and for this purpose the facts can be very shortly stated.

On Oct. 10, 1935, the respondents sold to the claimants 40,000 tons of coal to be delivered in equal monthly quantities from Jan. 1 to June 30, 1936. Soon after this contract was made, the claimants' representative asked that deliveries if possible should be expedited, and the respondents' representative, while giving no undertaking, promised to do this if it were possible. Then on Nov. 6 the contract in question was made, providing for equal monthly deliveries between Apr. 1 and Dec. 31, 1936. In April, 1936, while deliveries under the October contract were still being made, and deliveries under the subsequent contract were due to begin, the representatives of the parties met and discussed the situation. Deliveries under the October contract had not been expedited, so that from April to June, 1936, deliveries under both contracts would be due to be made and received.

The representatives came to what the arbitrator refers to as a verbal agreement that deliveries under the later contract should not be begun till the deliveries under the former had finished, and that the deliveries should proceed and the coal undelivered under the later contract on Dec. 31 should thereafter be delivered to the claimants under the later contract. But he does not find that the balance should be delivered in monthly or any instalments, finding, as I understand the case, that there was no agreement on this point. This agreement he finds was for the mutual convenience of the parties, and was so considered by them; convenient for the buyers as their customers had no great amount of storage room, and for the sellers because they were considering closing down one of their pits, in which case it would have been difficult for them to keep up double deliveries, and accordingly no deliveries were made under the later contract till July.

But on Dec. 1, 1936, the sellers wrote to the effect that as the buyers had not taken delivery in accordance with the terms of the contract of Nov. 6, 1935, they declined to deliver any coal after Dec. 31. The buyers claim damages for non-delivery, and the arbitrator has found that as the agreement come to in April, 1936, for postponing delivery was not in writing,

Sect. 4 of the Sale of Goods Act is an answer to this claim, and has awarded, subject to this, that nothing is due by way of damages. He has also awarded that the buyers cannot claim specific performance of the contract; and that finding is not challenged, as of course coal could have been bought elsewhere, though at a higher price.

Mr. Miller, for the claimants, the buyers, took three points: firstly, that on the findings of what took place in April, 1936, there was not a new contract, but only a postponement of delivery, and that the contract remained in operation subject to a modification as to delivery. Secondly, that if there was a new contract it was not one for sale of goods, but for the delivery of goods already sold. Thirdly, that alternatively, if there was a new contract in April, it had been partly performed by the deliveries that were made between July, 1936—when deliveries of the 70,000 tons began—and December, 1936, and therefore the provisions of Sect. 4 are satisfied.

The first two contentions can, I think, be dealt with together, and on this part of the case a large number of cases were cited by either side, those most discussed being Stead v. Dawber, 10 Ad. & E. 57; Tyers and Others v. Rosedale & Ferryhill Iron Company, L.R. 8 Ex. 305 (reversed, L.R. 10 Ex. 195); the Leather-Cloth Company v. Hieronimus, L.R. 10 Q.B. 140; Hickman v. Haynes, L.R. 10 C.P. 598; Plevins v. Downing, 1 C.P.D. 220; and Morris v. Baron, [1918] A.C. 1.

It often happens when either the 4th or the 17th section of the Statute of Frauds, now replaced by Sect. 4 of the Sale of Goods Act, has to be considered, that the cases are found to be somewhat difficult of reconciliation, and this case is no exception. In Stead v. Dawber the Court found it difficult to reconcile the case of Goss v. Lord Nugent, 5 B. & Ad. 58, with Cuff v. Penn, 1 M. & S. 21, and Stead v. Dawber, though the facts were very similar, had in turn to be distinguished by the Court in Hickman v. Haynes.

Mr. Miller relied strongly on Baron Martin's judgment in Tyers v. Rosedale, which was upheld when that case went to the Exchequer Chamber. In that case the plaintiffs had requested the defendants to forbear from delivering certain instalments, and accordingly only partial deliveries were made, and then at the end of the contract period the buyers

108—Vol. 59.] LLOYD'S LIST LAW REPORTS. [Dec. 9, 1937.

K.B.] Bessler, Waechter, Glover & Co., Ltd. v. South Derwent Coal Company, Ltd. [K.B.

demanded delivery of the residue. Baron Martin in a dissenting judgment held that the original contract had not been terminated, and dealt with the objection that the plaintiffs' right to recover was barred by Sect. 17 as not being in writing, by saying (L.R. 8 Ex. at p. 319):

It [that is the variation] was not a contract for the sale of goods, which is the contract provided for by the section, but a contract respecting the delivery of goods already sold, which is not within the section at all.

However, when that case went to the Exchequer Chamber, Counsel for the defendants abandoned this point, because, as I understand the case, if writing were required there was enough to supply a memorandum, and I feel a difficulty in holding that the approval which the Exchequer Chamber gave to the judgment of Baron Martin, who had differed from the rest of the Court below on the question as to whether the original contract was rescinded, necessarily extended to this part of his judgment.

With all respect to the high authority of the learned Baron, it seems to me that a term as to delivery is a term of the sale, and if that term be altered it is an alteration of the terms of the contract of sale, and this was, I think, the ground of the decision in Stead v. Dawber, which Mr. Naisby contended was conclusive in his favour. Stead v. Dawber was, however, as I have said, distinguished in Hickman v. Haynes, another case of a verbal request to allow instalments to stand over, where it was held that the statute was no answer; and in the following year, in Plevins v. Downing, 1 C.P.D. 220, a very similar case, it was decided that it was.

One must therefore try to find the underlying principle which will explain the different results in cases which at first sight appear to be so alike in point of fact. From these two last-cited cases I think it is possible to extract a principle, and it seems to me to be this. If the parties agree to rescind their original contract and to substitute for it a new one, the latter must be evidenced by writing; so, too, if as a matter of contract the parties agree that the terms of the original agreement shall be varied, the variation must be in writing. But if what happens is a mere voluntary forbearance to insist on delivery or acceptance according to the strict terms of the written contract, the original contract remains unaffected, and the obligation to deliver and to accept the full contract quantity still continues.

This view is supported by the speech of Lord Atkinson in Morris v. Baron, sup., at p. 30, where he said:

In Maddison v. Alderson, 8 App. Cas. 467, at p. 488, Lord Blackburn said: "I think it is now finally settled that the true construction of the Statute of Frauds, both the 4th and the 17th sections, is not to render the contracts within them void, still less illegal, but is to render the kind of evidence required indispensable when it is sought to enforce the contract." I do not find that it was ever seriously questioned that this was the true state of the law as to the 4th section of the Statute of Frauds. The doubt was as to whether the same rule applied to the 17th section, or whether contracts within it not in writing where none of the particular matters specified had been done were not absolutely void. There is nothing in all this inconsistent with the well established rule that a contract which the law requires to be evidenced by writing cannot be varied by parol.

He then cites certain cases, and goes on:

The foundation, I think, on which that rule rests is that after the agreed variation the contract of the parties is not the original contract which had been reduced into writing, but that contract as varied, that of this latter in its entirety there is no written evidence, and it therefore cannot in its entirety be enforced. There is a clear distinction, however, between cases such as these and cases like Ogle v. Earl Vane, L.R. 2 Q.B. 275; L.R. 3 Q.B. 272, where one party at the request of and for the convenience of the other forbears to perform the contract in some particular respect strictly according to its letter. As, for instance, where one party, bound to deliver goods sold upon a certain day, at the request of and for the convenience of the other postpones delivery to a later day. In such a case the contract is not varied at all, but the mode and manner of its performance is, for the reasons mentioned, altered.

It does not appear to me to matter whether the request comes from one side or the other, or whether it is a matter which is convenient to one party or to both.

K.B.]   Bessler, Waechter, Glover & Co., Ltd. v. South Derwent Coal Company, Ltd.   [K.B.

What is of importance is whether it is a mere forbearance or a matter of contract. This, I think, is made clear by Plevins v. Downing, *sup.*, where Mr. Justice Brett emphasises the distinction between the situation where the party suing was always ready and willing to perform his contract and merely abstained at the request of the other party, and where, if he sued for non-acceptance or non-delivery, he would be driven to rely on the assent of the other party to allow him to vary the terms of the original contract.

If, however, one party asks the other if he would refrain from delivering, and the other party says it would suit him very well to do so, both parties being able and willing to perform their obligations, I think we get the same position as is envisaged by Hickman v. Haynes, *sup.*, and by Lord Atkinson in the passage to which I have referred.

It then has to be determined on which side of the line the instant case falls. Mr. Naisby relies on the fact that the arbitrator has found that there was a verbal agreement; but I do not think the use of those words concludes the matter. Whether it be a forbearance or a matter of contract, there is none the less an agreement; there is an agreement between parties, though for want of consideration or because of the provisions of an Act of Parliament their agreement must be regarded as *nudum pactum* or as void. One must have regard to the facts found by the arbitrator, and when one finds that what happened was a conversation which arose, as it seems to me, because one party had not been able to expedite deliveries under an earlier contract which he had promised, but not undertaken, to do if he could, when one finds that neither party thought the matter worth confirming in writing, and that the vendors' representative did not even inform his directors of the matter, and no inquiry was made or pressure applied during the contract period, I think one is driven to the conclusion that this was no more than a mere forbearance, and voluntary in the sense that either party could have resiled and called upon the other to make or take delivery in accordance with the terms of the written contract. Accordingly, I hold that the statute is not an answer to the buyers' claim.

This in effect disposes of the case, but I think I ought to deal with Mr. Miller's contention as to part delivery, particularly as I am afraid he thought I did not pay enough attention to it in argument, though in fact it seemed to me an interesting point. He contends that, as deliveries were made after the parties had agreed to the modification, he is entitled to prove the actual contract and rely on the part delivery as taking the case out of Sect. 4.

But the difficulty in the way of accepting this argument to my mind is this. Morris v. Baron has decided that there is a real distinction between varying an existing contract and rescinding a contract and substituting for it a new agreement. If the arbitrator had found, or if the facts had shown, that the parties had rescinded their contract of Nov. 6 and substituted for it a fresh one under which deliveries were not to begin till July, in my opinion Mr. Miller's contention would have been right. But the arbitrator has not found this, and it is, I think, clear that nothing of the sort happened. I think the parties would have been very surprised if they had been told that they had rescinded the contract of Nov. 6, 1935, by the conversation in the following April. Therefore it was under that contract that the part deliveries were made, and if evidence were given that the parties had agreed as a matter of contract that the deliveries should be altered from April/December to July/April, it would have been open to the objection that it was inconsistent with the terms of the written document. Had it been a matter of adding a term, so that the agreement was partly written and partly oral, and part deliveries were made thereunder, it would have been different, but it seems to me that what has been found, if it be a matter of contract, contradicts or at least is inconsistent with the document. I do not think, therefore, that part delivery would be an answer to the statute, if it applied.

Accordingly, I answer the questions propounded in par. 28 of the award as follows. The award contained in par. 24, which deals only with specific performance, is correct. The award contained in par. 25 is incorrect. I uphold the award contained in par. 31.

I may just add that I understand that award to be based on the difference between the contract price and the price prevailing immediately after Dec. 31, 1936, and the buyers have not suggested that they are entitled to any other measure of damage. The buyers will have the costs of this arbitration.

## COURT OF APPEAL

Oct. 27, 30, 31, Nov. 1 and 2, 1978

BREMER HANDELSGESELLSCHAFT
M.B.H.
v.
C. MACKPRANG JR.

Before Lord DENNING, M.R.,
Lord Justice STEPHENSON
and Lord Justice SHAW

Sale of goods (c.i.f.) — Prohibition of export — Force majeure — U.S. soya bean meal sold c.i.f. Rotterdam — Shipment to be made monthly April/September, 1973 — Embargo on shipment of U.S. soya bean meal imposed by U.S. Department of Commerce — Whether buyer had waived rights to performance under June bills of lading — GAFTA 100.

By a contract dated Oct. 30, 1972, the sellers sold to the buyer 1200 tonnes of U.S. solvent extracted toasted soya bean meal c.i.f. Rotterdam. Shipment was to be at the rate of 200 tonnes per month from April to September, 1973, at a price of U.S. $135.25 per tonne. The contract incorporated the GAFTA 100 form which contained cl. 10 (an appropriation clause), cl. 21 (a prohibition clause) and cl. 22 (a force majeure clause).

A partial embargo on the export of soya bean meal was imposed by the U.S. Department of Commerce in the summer of 1973, beginning with a warning notice dated June 13, 1973. The embargo ended on Oct. 1, 1973. A dispute arose between the parties as to the June shipment in so far as 159.5 tonnes were concerned. Bills of lading dated July 18 showed that 40 tonnes had been shipped on the vessel Pegasus.

The dispute was referred to arbitration. The buyer contended that there was a default by the sellers as regards the full 159.5 tonnes. The sellers maintained that (i) the buyer had waived his right to have performance under June bills of lading, and (ii) if there was no waiver in respect of the full 159.5 tonnes, there was waiver at least in respect of the Pegasus shipment. The Board of Appeal of the Grain and Feed Trade Association made an award in the form of a special case in favour of the buyer holding that the sellers were in default in respect of the full 159.5 tonnes and that damages were to be calculated on the difference between the contract price and the market price on July 10 (i.e. $635) making a total of $80,029.125.

———Held, by Q.B. (Com. Ct.) (ROBERT GOFF, J.), that (1) on the evidence, there had been no waiver by the buyer of his right to have performance under June bills of lading in respect of the full 159.5 tonnes;

(2) there had been no waiver in respect of the Pegasus shipment;

(3) damages should be assessed on the basis that the date of default was July 10.

Award upheld.

On appeal by the sellers:

———Held, by C.A. (Lord DENNING, M.R., STEPHENSON and SHAW, L.JJ.), that (1) it was not sufficient for the sellers to prove the general embargo which came into effect on June 27, 1973 since it was not a total embargo in that the bulletin permitted the export of goods already on lighters destined for an exporting vessel or for which loading on board an exporting vessel had actually commenced (see p. 223, col. 2; p. 226, col. 1; p. 229, col. 2; p. 230, col. 1); the sellers had to show that the shippers had no goods available within the permitted loopholes (see p. 223, col. 2; p. 229, col. 1; p. 230, col. 1); and the sellers had failed to discharge the burden of proof and had not brought themselves within cl. 21 (see p. 224, cols. 1 and 2; p. 228, col. 1; p. 230, col. 1);

(2) although it was open to the sellers to rely on force majeure in cl. 22 as a reason for not shipping during June 1973, the burden on them was the same as when they were relying on cl. 21 and the sellers had not discharged that burden (see p. 224, col. 2; p. 230, col. 1);

(3) (STEPHENSON, L.J. dissenting): whether the conduct of a party amounted to waiver had to be determined by reference to all the prevailing circumstances (see p. 230, col. 2); in the present case, there was no difficulty in distilling from the telexes sent by the buyer in the circumstances which then obtained coupled in regard to the Pegasus shipment with the delay in rejecting the documents, a strong indication that (the buyers) had waived their right to treat the sellers as being in default (see p. 225, col. 1; p. 230, col. 2);

(4) the buyer could not rely on the telexes in which their contractual rights were reserved since the reservation was as to the contractual rights in respect of the 60 per cent. which was not delivered and did not extend to the 40 per cent. which was tendered (see p. 225, col. 2);

(5) the buyers could not recover any damages in respect of the shipment on the Pegasus which they ought to have taken up in that their conduct in accepting the notice of appropriation on Aug. 14, 1973, without demur had led the sellers to believe that that notice was good and to forward the shipping documents for acceptance (see p. 225, col. 1; p. 226, col. 1); however they could recover damages in respect of the 60 per cent. which was never delivered (see p. 226, col. 2; p. 231, col. 1);

(6) (STEPHENSON, L.J., concurring): the damages would be assessed as at July 11, 1973 (see p. 226, col. 2; p.229, col. 2; p. 231, col. 1).

———Bremer Handelsgesellschaft m.b.H. v. Vanden Avenne-Izegem P.V.B.A., [1978] 2 Lloyd's Rep. 109, applied.

Appeal allowed in part.

Per Lord DENNING, M.R. (at p. 226): . . . If a buyer who is entitled to reject goods or documents on the ground of a defect in the notices or the timing of them, so conducts himself as to lead the seller reasonably to believe that he is not going to

ole of the
outh and
he matter
course of
relevance
port to the

there exist
physically
enter it or
at it has a

on to these
ance in the
ent, as my
of the case
uments in
w, and on
from the
. Justice
ons which
given, that
ion which
er a port
o frustrate
oo, would
dicated by

and before
red "No";
ppeal to the