[7] 7

when one is considering the law of failure of consideration and of the quasi-contractual right to recover money on that ground, it is, generally speaking, not the promise which is referred to as the consideration, but the performance of the promise. The money was paid to secure performance and, if performance fails, the inducement which brought about the payment is not fulfilled.

If this were not so, there could never Be any recovery of money, for failure of consideration, by the payer of the money in return for a promise of future performance. Yet there are endless examples which show that money can be recovered, as for a complete failure of consideration, in cases where the promise was given but could not be fulfilled. (See the notes in *Bullen and Leake,* 9th edition, page 263.) In this connection the decision in *Rugg* v. *Minett (*11 East 210) is instructive. There the plaintiff had bought at auction a number of casks of oil; the contents of each cask were to be made up after the auction by the seller to the prescribed quantity so that the property in a cask did not pass to the plaintiff until this had been done. The plaintiff paid in advance a sum of money on account of his purchases generally, but a fire occurred after some of the casks had been filled up, while the others had not. The plaintiff's action was to recover the money he had paid its money received by the defendants to the use of the plaintiffs. The Court of King's Bench ruled that this cause of action succeeded in respect of the casks which at the time of the fire had not been filled up to the prescribed quantity. A simple illustration of the same result is an agreement to buy a horse, the price to be paid down, but the horse not to be delivered and the property not to pass until the horse has been shod. If the horse dies before the shoeing, the price can Unquestionably be recovered as for a total failure of consideration, notwithstanding that the promise to deliver was given. This is the case of a contract *de certo corpore* where the *cerium corpus* perishes after the contract is made; but, as Lord Justice Vaughan Williams' judgment in *Krell* v. *Henry* [1903] 2 K.B. 740 explained, the same doctrine applies " to cases where the event which renders the contract incapable " of performance is the cessation or non-existence of an express " condition or state of things, going to the root of the contract, " and essential to its performance." I can see no valid reason why the right to recover pre-paid money should not equally arise on frustration arising from supervening circumstances as it arises on frustration from destruction of a particular subject-matter.

The conclusion is that the rule in *Chandler v. Webster* is wrong, and that the Appellants can recover their £1,000.

While this result obviates the harshness with which the previous view in some instances treated the party who had made a pre-payment, it cannot be regarded as dealing fairly between the parties in all cases, and must sometimes have the result of leaving the recipient who has to return the money at a grave disadvantage.

He may have incurred expenses, in connection with the partial carrying out of the contract, which are equivalent, or more than equivalent, to the money which he prudently stipulated should be prepaid, but which he now has to return for reasons which are no fault of his. He may have to repay the money, though he has executed almost the whole of the contractual work, which will be left on his hands. These results follow from the fact that the English common law does not undertake to apportion a prepaid sum in such circumstances—contrast the provision, now contained in s. 40 of the Partnership Act, 1894, for apportioning a premium if a partnership is prematurely dissolved. It must be for the legislature to decide whether provision should be made for an equitable apportionment of prepaid monies which have to be returned by the recipient in view of the frustration of the contract in respect of which they were paid.

I move that the Appeal be allowed, and that judgment be entered for the Appellants. The precise provisions with regard to subsidiary matters we might consider after the other Opinions have been delivered.

Lord
Chancellor.

Lord
Atkin.

Lord
Russell of
Killowen.

Lord
Macmillan.

Lord
Wright.

Lord
Roche.

Lord
Porter.

[8]

# FIBROSA SPOLKA AKCYJNA

v.

# FAIRBAIRN LAWSON COMBE BARBOUR, LIMITED.

## Lord Atkin

**MY LORDS,**

For the reasons given by the Lord Chancellor I agree that the
Appellant fails on all his points except that arising out of the frus-
tration of the contract. I have no doubt that the contract in this
case came to an end before the time for complete performance
had arrived by reason of the arising of a state of war which caused
an indefinite delay not contemplated by the parties, and eventu-
ally the legal impossibility of delivering the goods at a port occupied
by the enemy. In other words, to use a short phrase of frequent
occurrence since the beginning of the last war, the commercial
adventure was frustrated. The legal effects of " frustration " are
not in dispute. They were not determined for the first time either
by the cases which arose on the postponement of the coronation
of Edward VII, or by reason of the last war. It is very necessary
to remember that, as pointed out by Vaughan-Williams L.J. in
*Krell v. Henry,* 1903, 2 K.B., at p. 748, the principle of law is the
same whether the performance of the contract becomes impossible
by the cessation of existence of a thing which is the subject of the
contract (an obligation *de certo corpore*) or by the cessation or

**Page 148**

non-existence of an express condition or state of things going to the root of the contract and essential to its performance. And it is well settled that when a contract which is still executory on one or both sides is subject to frustration the law is that when the event happens the parties are excused from further performance, but have to give effect to rights under the contract already accrued before the happening of the event. A. sells a horse to B. for £50, delivery to be made in a month, the price to be paid forthwith, but the property not to pass till delivery, and B. to pay A. each week an agreed sum for keep of the horse during the month. The horse dies in a fortnight. A. is excused from delivery and B. from taking delivery; B. is bound to pay the sum due for the fortnight during which the horse was kept. But what is the position as to the £50, the price paid in advance? This is in simple terms the problem in the present case. The answer that I venture to think would occur to most people, whether laymen or lawyers, would be that the buyer ought to get his money back, having had nothing for it; and the lawyer would support the claim by saying that it is money had and received to the use of the buyer, being money paid on a consideration which has wholly failed. But that is not the answer which was given in similar cases in the coronation cases, and it is those decisions that come up for review in the present case. The question arose in the neatest form in the case of *Chandler* v. *Webster*, 1904, I K.B. 493, where the leading judgment was given in the Court of Appeal by Collins M.R., a master of the common law, whose opinion the profession have always rightly held in the greatest respect. In that case the Plaintiff had hired a room to view the coronation procession on Thursday, June 26, 1902, On June 10 he wrote to the Defendant: ' I beg to confirm my " purchase of the first floor room of the Electric Lighting Board " at 7, Pall Mall to view the procession on Thursday, June 26, for " the sum of £141 15s. 0d., which amount is now due. I shall be " obliged if you will take the room on sale, and I authorise you

[9] 2

" to sell separate seats in the room, for which I will erect a stand."
It became the subject of controversy whether, in view of certain
other terms arranged between the parties, the whole sum became
due before the procession became impossible; but the Courts
decided, as was clearly the case, that it did so become due. It may
be noted that the Defendant had nothing to do under the contract
but allow the Plaintiff the use of the room. On June 19 the Plaintiff
paid the Defendant £100 on account of the price of the room, but
had not paid the balance at the time the procession was abandoned.
The Plaintiff claimed the return of the £100 on a total failure of
consideration; the Defendant counterclaimed for the balance of
£41 15s. 0d. Collins M.R., at p. 499, dealing with the contention
that there had been a total failure of consideration, after stating
that it raised a question of some difficulty, stated that the principle
on which it has been dealt with is that which was applied in *Taylor*
v. *Caldwell, viz.* that where the contract has become impossible
in the circumstances there stated " it remains a perfectly good
" contract up to that point, and everything previously done in
" pursuance of it must be treated as rightly done; but the parties
" are both discharged from further performance of it." So far the
statement is unassailable. But the Master of the Rolls proceeds:
' If the effect were that the contract were wiped out altogether,
" no doubt the result would be that money paid under it would
" have to be repaid as on a failure of consideration. But that is
" not the effect of the doctrine: it only releases the parties from
" further performance of the contract. *Therefore* " (the italics are
mine) " the doctrine of failure of consideration does not apply."
It seems plain that the Master of the Rolls is not repelling the
claim for money had and received on the ground that the doctrine
as to impossibility of performance itself, as part of its content, ex-
cludes the claim. The case of *Taylor* v. *Caldwell* (1863), 3 B. & S.
826, the principle of which he is expressly applying, had nothing
to do with money had and received. The claim was for damages
in costs of advertisements, etc., for concerts for which the
Defendants had agreed to let their hall at the Surrey Gardens, a
contract which it was impossible to perform because the hall was
destroyed by fire after the contract. The Master of the Rolls there
is applying the common law rule as' to money had and received
to a case of a contract where all that had happened was that in
law both parties were released from further performance. And
in those circumstances he seems to say: the doctrine of failure of
consideration only applies where the contract is wiped out
altogether: in this case it is not: the parties are only discharged
from further performance: therefore the claim for money had and
received must fail.

My Lords, the difficulty which this decision causes me is to
understand how this great lawyer came to the conclusion that the
claim for money paid on a consideration which wholly failed could
only be made where the contract was wiped out altogether: and

I have sought for some construction of his words which stopped short of that absolute statement, but I can find none. I know of no authority for the proposition. It is true that where a party is in a position to rescind a contract he may be able to sue for money which he has paid under the contract now rescinded: but there are numerous cases where there has been no question of rescission where such an action has lain. I may refer to *Giles* v. *Edward* (1797), 7 T.R. 181, where a contract to deliver wood was prevented by the Defendant preventing performance by not loading all the wood. *Rugg* v. *Minett* (1809), 11 East 210, where the buyer had paid part or the purchase price on a sale of turpentine in casks, where the property in some casks had passed while in seller's warehouse, but in some had not, and the purchaser was entitled to recover for money had and received the proportion properly

3 [10]

attributable to the casks in which the property had not passed; *Nockels* v. *Crosby* (1825), 3 B. & C. 814; *Wilson v. Church* (1879), 13 Ch.D. i; (1880), 5 A.C. 177; *Johnson* v. *Goslett* (1857) 3 C.B.N.S. 569, and *Ashpitel* v. *Sercombe* (1855), 5 Ex. 147, in all of which the Plaintiff had put up money for an adventure which was eventually abandoned by the promoters, *Devaux* v. *Conolly* (1849), 8 C.B. 640, where there had been an over-payment in respect of goods delivered. In none of these cases was it suggested that the contract was " wiped out altogether "; indeed, in other cases where it is suggested that the contract was " rescinded," all that is meant is that the party was entitled to treat himself as no longer bound to perform and to recover what he himself has paid.

With great respect therefore to the judgment in *Chandler v. Webster,* I do not agree with that part of it which refused to give effect to the Plaintiff's claim for return of the sum which he had paid on the ground of total failure of consideration. Some discussion arose as to the precise meaning of this term. It was pointed out that the consideration for the part payment by the Plaintiffs was the promise by Defendants to deliver the goods c.i.f. at Gdynia; and the promise was always effective until further performance was excused. I personally agree with that statement of what the consideration was, and I do not think it necessary to use the word "consideration" in two meanings. I understand by the phrase that the promise to deliver goods totally failed because no goods were or could be delivered, and that therefore a cause of action accrued to the Plaintiff. I should add that if it was wrong in *Chandler* v. *Webster* to refuse the Plaintiff .relief on his claim, it was also wrong to give the Defendant judgment on his counterclaim. It is true that the right to receive the balance had accrued before frustration: but if the money had been paid it could have been recovered back as the £100 could, and the principles relating to circuity of action would afford a defence to the counterclaim. Lord Dunedin quotes with approval in the law of Scotland the brocard *frustra petis quod mox es restiturus, French Marine* v. *Compagnie Napolitaine,* 1921, 2 A.C., at p. 511, and the expression aptly fits the English law in this respect. It was urged before us that in the case last cited the House of Lords held that *Chandler* v. *Webster* was rightly decided, and that this House is consequently bound to follow it. I cannot agree. The *French Marine* case was a case of a time charter whose hire was paid monthly in advance, and the ship was only redelivered after part of the month had expired. Lord Sumner, at p. 517, draws attention to the fact that there was no total failure of consideration, but a partial failure only, for which in law no *pro rata* repayment could be claimed. It is obvious therefore that the present question did not arise; and in *Cantiare* v. *Clyde Shipbuilding Co.,* 1924, A.C. 226, a case which turned on the Scots law, all their Lordships treated the question of the English law as open in this House. In the case last mentioned it was decided that according to Scots law restitution could be made of sums paid in advance where the con-

tract was frustrated: and it is satisfactory to find that the English and Scots law now agree on this point. It is unnecessary to discuss the interesting suggestion that the Scots law does not in fact entitle the claimant to recover necessarily the whole amount paid, but only so much as can be shown to be an unjust enrichment of the defender: in other words, that the latter may claim an adjustment in respect of the amount by which he is out of pocket for expenses incurred in respect of the contract. There was no decision on this point in the case, though this House affirmed the interlocutor of Lord Hunter, the Lord Ordinary, who had given permission to the defenders to amend their pleas in order, as it appears, to counterclaim for expenses, a proceeding which in any event I do not understand. It may be that such an adjustment was possible

[11] 4

under Roman Law, but there seems no direct authority for it in Scots law, and there is a dictum of great weight against it in the judgment of Lord President Inglis in *Watson v. Shankland* (1871), 10 M., at p. 152.

That the result of the law may cause hardship when a contract is automatically stayed during performance and any further right to performance is denied to each party is incontrovertible. One party may have almost completed expensive work: he can get no compensation. The other party may have paid the whole price, and if he has received but a slender part of the consideration he can get no compensation. At present it is plain that if no money has been paid on the contract there is no legal principle by which loss can be made good. What is being now decided is that the application of an old-established principle of the Common Law does enable a man who has paid money and received nothing for it to recover the money so expended. At any rate, it can be said it leaves the man who has received the money and given nothing for it in no worse position than if he had received none. Many commercial contracts provide for various risks: it is always possible to provide for the risk of frustration; but what provision the parties may agree will probably take some time to negotiate. Meanwhile by the application of a general doctrine which is independent of the special contract and only comes into play when further performance of the latter is precluded, the man who pays money in advance on a contract which is frustrated and receives nothing for his payment is entitled to recover it back. I think therefore that the appeal should be allowed.

Lord
Chancellor

Lord Atkin

Lord
Russell of

Killowen

Lord

Macmillan

Lord
Wright

Lord
Roche

Lord
Porter

## FIBROSA SPOLKA AKCYJNA

*v.*

## FAIRBAIRN LAWSON COMBE BARBOUR, LIMITED.

Lord Russell of Killowen

### (READ BY LORD MACMILLAN)

my lords,

That which has been described during the argument of this case, and at other times, as " the rule in *Chandler* v. *Webster* " should, I think, rather be called the rule (to put it shortly) that in cases of frustration loss lies where it falls, or (at greater length) that where a contract is discharged by reason of supervening impossibility of performance, payments previously made and legal rights previously accrued according to the terms of the contract, will not be disturbed, but the parties will be excused from liability further to perform the contract.

I say this because as I read the judgment of the Master of the Rolls in *Chandler* v. *Webster* he does not purport to be framing any new rule, or laying down any new law: he thought that the case which he was deciding was one which, upon its facts, was

governed by a rule already established by the authorities.

In Scotland the consequence of frustration is not that loss lies where it falls. The Scots law derives from the Roman law a different view, founded on the doctrine of *restitutio,* which has no place in English law, and which it is not open to us to import into the law of England. We must examine the rule as it exists in the law of England, and determine whether the Appellants are entitled to be repaid the £1,000. If *Chandler* v. *Webster* was rightly decided, they would clearly not be so entitled.

It is to be observed that the doubt as to the correctness of the rule only arises in cases in which one of the parties to the contract has paid over to the other party the whole or part of the money payable by him as the consideration for what he is to receive as the consideration moving from the other party. If no such money has been paid the rule must apply; for I know no principle of English law which would enable either party to a contract which has been frustrated to receive from the other compensation for any expense, or indemnity from any liability, already incurred in performing the contract. Nor could moneys paid before frustration be recovered if the person making the payment has received some part of the consideration moving from the other party for which the payment was made. In such a case the rule would still apply.

But I am of opinion that this appeal should succeed because of another aspect of the matter.

In the present case the Appellants, before frustration, paid in advance a part of the price of the machines. We heard an elaborate argument as to what was the exact consideration moving from the Respondents for that part of the contract which stipulated for payment of part of the price in advance. I am not aware of any justification for splitting up the consideration in this way, and assigning a consideration for each separate provision of a contract. Under the contract here in question the consideration moving from the Respondents was either the delivery of the machines at Gdynia, or the promise to deliver the machines at Gdynia. I think that the delivery was the consideration; but in whichever way the consideration is viewed, it is clear that no part of the consideration

[13] 2

for which part of the price of the machines was paid ever reached the Appellants. There was a total failure of the consideration for which the money was paid.

In those circumstances, why should the Appellants not be entitled to recover back the money paid, as money had and received to their use, on the ground that it was paid for a consideration which has wholly failed ? I can see no reason why the ordinary law, applicable in such a case, should not apply. In such a case the person who made the payment is entitled to recover the money paid That is a right which in no way depends upon the continued existence of the frustrated contract. It arises from the fact that the impossibility of performance has caused a total failure of the consideration for which the money was paid.

In his judgment in *Chandler* v. *Webster* the Master of the Rolls states that the right to recover moneys paid for a consideration which has failed only arises where the contract is " wiped out " altogether," by which expression I understand him to mean is void *ab initio*. This is clearly a misapprehension on the part of the learned judge. The money was recoverable under the common *indebitatus* count, as money received for the use of the Plaintiff. The right so to recover money paid for a consideration that had failed did not depend on the contract being void *ab initio*. There are many such cases in the books in which the contract has not been void *ab initio,* but the money paid for a consideration which has failed has been held recoverable. Thus, as one example, money paid as a deposit on a contract of sale which has been defeated by the fulfilment of a condition is recoverable *(Wright* v. *Newton, 2* CM. & R. 124).

It was submitted by the Respondents, but without argument, that money paid for a consideration which had failed was recover-able only when the failure was due to the fault of the other party to the contract. But, on the authorities, this submission is clearly ill-founded.

*Chandler v. Webster* was accordingly, in my opinion, wrongly decided. The money paid was recoverable, as having been paid for a consideration which had failed.

The rule that on frustration the loss lies where it falls cannot apply in respect of moneys paid in advance when the consideration moving from the payee for the payment has wholly failed, so as to deprive the payer of his right to recover moneys so paid as moneys received to his use; but as I understand the grounds upon which we are prepared to allow this appeal, the rule will (unless altered by legislation) apply in all other respects.

A7

Lord
Chancellor

Lord

Atkin

Lord

Russell of
Killowen

Lord

Macmillan

Lord
Wright

Lord
Roche

Lord
Porter

## FIBROSA SPOLKA AKCYJNA

### v.

## FAIRBAIRN LAWSON COMBE BARBOUR LIMITED

# Lord Macmillan

## MY LORDS,

Speaking in 1923 of the so-called " Coronation cases " Lord Shaw ventured on prophecy. ' No doubt," he said, " the occasion " will arise when that chapter of the law will have to be considered " in this House," for, as the Earl of Birkenhead had pointedly observed, " none of them " [the " Coronation cases "] " is binding " upon your Lordships." *Cantiare Ban Rocco S.A.* v. *Clyde Ship-building and Engineering Co.* [1924] A.C. 226 at pp. 257-8 and 233. The mills of the law grind slowly. Thirty-eight years have elapsed since the Court of Appeal pronounced judgment in *Chandler* v. *Webster* [1904] 1 K.B. 493, and nineteen years have passed since Lord Shaw used the words which I have quoted, but now at length in the present appeal the occasion foretold has arisen, and I may be permitted to express my gratification that it has

been employed to clear the law of England by the unanimous judgment which the House is to-day pronouncing from the reproach to which it was exposed so long as the law laid down in *Chandler* v. *Webster* held the field.

My Lords, every system of law has had to face the problem of defining the consequences of a contract becoming impossible of fulfilment owing to some external supervening event for which neither of the parties is responsible. That such an eventuality releases both parties from further performance of any of the stipulations of the contract is agreed on all hands. Each must fulfil his contractual obligations up to the moment when impossibility supervenes, for the contract is not avoided by becoming impossible of fulfilment, but the duty of further performance ceases.

Having so declared, must the law stop there ? What if money has been paid, work has been done, or liabilities have been incurred by one or other or both of the parties in pursuance of or in reliance on the fulfilment of the contract which now can never be completed ?

The law may say that the event which has rendered fulfilment of the contract impossible is, so far as the parties are concerned, a mere accident; of mere accident the law takes no cognizance and for its consequences affords no redress; loss or gain must lie where it happens to fall and the parties must be left where they stood when their contract was frustrated.

On the other hand, the law may endeavour to effect an equitable adjustment between the parties, so as to restore each as far as may be to the position which he occupied before he entered into the contract and by a process of give and take to mitigate the consequences of the contract having proved abortive. I find this doctrine of restitution stated in its broadest terms in Pufendorf's celebrated treatise on the *Law of Nature and Nations,* first published in 1672, as follows: ' When the thing at the time of making " the promise or pact appeared possible and afterwards becomes " impossible we must inquire whether this happened by mere " chance or by default and deceit. In the former case the pact is " disannulled if nothing has yet been performed on either side. If " anything have been already done towards it by one of the parties, " the other shall give it back, or pay to the value of it; if neither of

[15] 2

" these can be done he is to use his best endeavours that the man be
" not a loser by him. For in contracts the first regard is had to
" the thing expressly mentioned in the agreement; when this can-
" not be obtained it is sufficient to give an equivalent; but whatever
" happens all imaginable care is to be used that the other party
" suffer no prejudice." (Book III, ch. 7, §3. English Translation,
Oxford, 1703, p. 225.)

It is obvious that neither of these attempted solutions of the
difficulty can be productive of complete justice. To leave matters
as they stood when the contract became impossible of fulfilment
may result in great gain to one of the parties and great loss to the
other and to a grave infringement of the maxim *nemo debet
locupletari aliena jactura*. It is no consolation to the individual
sufferer to be told that on the whole such a rule works less injustice
than any other. It is in truth a confession of impotence in the face
of a problem deemed to be inextricable.

On the other hand to attempt to restore matters in their entirety
is to attempt the impossible. The hands of the clock cannot be
turned back; things cannot be as if they had not been. At best
some sort of equitable accommodation can be achieved which must
inevitably fall short of complete justice. The process is sought to
be rationalised on a theory of quasi-contract. The parties have
made no provision in their contract for the event which has frus-
trated it, so the law implies for them what it assumes they would
have agreed upon if they had had the unforeseen contingency in
contemplation when they entered into their contract. On another
view, restitution is regarded as a separate principle of the law in-
dependent of contract.

Presented with this choice of methods of dealing with the situa-
tion, the law of England has adopted as its general principle the
first of the two alternatives, namely, that each party shall be left
as he stood, despairing of the practicability of conjecturing and
enforcing what the parties might be assumed to have agreed upon
if they had contemplated and provided for the unforeseen contin-
gency. The law of Scotland on the other hand, following in this
respect the Roman law, has accepted the principle of restitution,
though how far it has gone in doing so and with what qualifica-
tions it would be out of place for me to discuss here. It may suffice
to refer to the speeches of Lord Dunedin and Lord Shaw in the
*Cantiare San Rocco* case.

But the law of England has characteristically mitigated the
rigour of its doctrine in one instance, namely, where in pursuance
of a contract money has been paid by one party to the other for a
consideration which has completely failed. The right of a Plaintiff
to recover, under the common *indebitatus* count for money
received, any sum which he has paid for a consideration which has
wholly failed has long been fully recognised in the common law of

England. (See *Bullen and Leake's Precedents of Pleading,* 3rd ed. 1868, pp. 44 *et seq.)* My noble and learned friends whose opinions I have had the privilege of reading in advance have by ample citations fully vouched the law on the subject and the task is more fittingly discharged by them than by me.

How, then, if such be the law of England did *Chandler* v. *Webster* come to be decided as it was, for there never was a clearer case of money paid for a consideration which had entirely failed ? The explanation is to be found in the passage in the judgment of Collins, M.R., where he said that the doctrine of failure of consideration applies only where a contract is " wiped out altogether ' or, as Romer L.J. put it, " rescinded *ab initio,* " and does not apply where the parties are merely released from further performance. I can only say, with all respect, that this is a complete misapprehension. There is no authority for such a distinction and there is ample authority to prove that it does not exist. It has no basis in principle

3 [16]

or precedent. So *Chandler* v. *Webster* and its congeners must be consigned to the limbo of cases disapproved and overruled. They will be unwept save by those to whom for so many years they have furnished a fruitful and enlivening topic of discussion in lecture rooms and periodicals.

Your Lordships being of one mind that the so-called rule in *Chandler v. Webster* is unsound, the way lies clear for the decision of the present case. The Plaintiffs made a payment to the Defendants to account of the price of certain plant which the Defendants were to manufacture and deliver to them. Owing to circumstances arising out of the present hostilities the contract has become impossible of fulfilment according to its terms. Neither party is to blame. In return for their money the Plaintiffs have received nothing whatever from the Defendants by way of fulfilment of any part of the contract. It is thus a typical case of a total failure of consideration. The money paid must be repaid.

I am accordingly in favour of allowing the Appeal.

Lord
Chancellor

Lord
Atkin

Lord

Russell of
Killowen

Lord

Macmillan

Lord
Wright

Lord
Roche

Lord
Porter

[17]

## FIBROSA SPOLKA AKCYJNA

*v.*

## FAIRBAIRN LAWSON COMBE BARBOUR, LIMITED.

Lord Wright

MY LORDS,

The statement of the facts of the case which has been made by my noble and learned friend the Lord Chancellor renders any further recital by me superfluous.

The claim in the action was to recover a prepayment of £1,000 made on account of the price under a contract which had been frustrated. The claim was for money paid for a consideration which had failed.

It is clear that any civilised system of law is bound to provide remedies for cases of what has been called unjust enrichment or unjust benefit, that is to prevent a man from retaining the money of or some benefit derived from another which it is against conscience that he should keep. Such remedies in English Law are generically different from remedies in contract or in tort, and are now recognised to fall within a third category of the common law

**Page 164**

which has been called quasi-contract or restitution. The root idea was stated by three Lords of Appeal, Lord Shaw, Lord Sumner and Lord Carson, in *Jones* v. *Waring & Gillow,* 1926, A.C. 670, which dealt with a particular species of the category, namely, money paid under a mistake of fact. Lord Sumner at p. 696, referring to *Kelly* v. *Solari,* 9 M. & W." 54, where money had been paid by an insurance company under the mistaken impression that it was due to an executrix under a policy which had in fact been cancelled, said: " There was no real intention on the company's " part to enrich her." Payment under a mistake of fact is only one head of this category of the law. Another class is where, as in this case, there is prepayment on account of money to be paid as consideration for the performance of a contract which in the event becomes abortive and is not performed, so that the money never becomes due. There was in such circumstances no intention to enrich the payee. This is the class of claims for the recovery of money paid for a consideration which has failed. Such causes of action have long been familiar and were assumed to be commonplace by Holt L.C.J. in *Holmes* v. *Hall,* Holt 36, in 1704. Holt L.C.J. was there concerned only about the proper form of action and took the cause of the action as beyond question. He says: " If " A give money to B to pay to C upon C's giving writings, etc., and " C will not do it, *indebit* will lie for A against B for so much money " received to his use. And many such actions have been main- " tained for earnests in bargains, when the bargainor would not " perform, and for premiums for insurance, when the ship, etc., " did not go the voyage." The Chief Justice is there using " earnest" as meaning a prepayment on account of the price, not in the modern sense of an irrevocable payment to bind the bargain. And he is recognising that the *indebitatus assumpsit* had by that time been accepted as the appropriate form of action in place of the procedure which had been used in earlier times to enforce these claims such as debt, account or case.

By 1760 actions for money had and received had increased in number and variety. Lord Mansfield, in a familiar passage in *Moses* v. *Macferlan,* 2 Burr, 1005, sought to rationalise the action for money had and received, and illustrates it by some typical

instances. "It lies," he said (at p. 1012), "for money paid by
" mistake; or upon a consideration which happens to fail; or
" for money got through imposition (express or implied); or extor-
" tion; or oppression; or an undue advantage taken of the
" Plaintiff's situation, contrary to laws made for the protection of
" persons under those circumstances. In one word, the gist of this
" kind of action is that the Defendant upon the circumstances of
" the case is obliged by the ties of natural justice and equity to
" refund the money." Lord Mansfield prefaced this pronouncement
by observations (at p. *1008)* which are to be noted. " If the
" Defendant be under an obligation from the ties of natural justice
" to refund, the law implies a debt and gives this action *[sc. indebi-*
" *tatus assumpsit]* founded in the equity of the Plaintiff's case, as it
" were, upon a contract (' *quasi ex contractu* ' as the Roman law ex-
" presses it)." Lord Mansfield does not say that the law implies a
promise; the law implies a debt or obligation which is a different
thing. In fact he denies that there is a contract; the obligation is as
efficacious as if it were upon a contract. The obligation is a creation
of the law, just as much as an obligation in tort. The obligation
belongs to a third class, distinct from either contract or tort, though
it resembles contract rather than tort

This statement of Lord Mansfield has been the basis of the
modern law of quasi-contract, notwithstanding the criticisms which
have been launched against it. Like all large generalisations, it
has needed and received qualifications in practice. There is, for
instance, the qualification that an action for money had and re-
ceived does not lie for money paid under an erroneous judgment
or for moneys paid under an illegal or excessive distress. The law
has provided other remedies as being more convenient. The
standard of what is against conscience in this context has become
more or less canalised or defined. But in substance the juristic
concept remains as Lord Mansfield left it.

The gist of the action is a debt or obligation implied, or more
accurately imposed, by law, in much the same way as the law
enforces as a debt the obligation to pay a statutory or customary
impost. This is important, because some confusion seems to have
arisen, though perhaps only in recent times when the true nature
of the forms of action have become obscured by want of user. If
I may borrow from another context the elegant phrase of the Lord
Chancellor in the *United Australia* case, 1941 A.C. i, at p. 21, there,
as it seems to me, has sometimes been " a misreading of technical
" rules, now happily swept away." The writ of *indebitatus
assumpsit* involved at least two averments, the debt or obligation
and the *assumpsit.* The former was the basis of the claim and was
the real cause of action. The latter was merely fictitious, and need
not be traversed, but was necessary to enable the convenient and
liberal form of action to be used in such cases. This fictitious
*assumpsit* or promise was wiped out by the Common Law Pro-
cedure Act, 1852. As Bullen & Leake, " Precedents of Pleading,"

3rd Edition, p. 36, point out, this Act, by Section 3, provided that the Plaintiff was no longer required to specify the particular form of action in which he sues, and by Section 49 that *(inter alia)* the statement of promises in *indebitatus* counts which need not be proved were to be omitted; "the action of *indebitatus assumpsit,*" the authors add, " is [that is by 1868] virtually become obsolete." Lord Atkin in [1941] A.C., at p. 29, after instancing the case of the blackmailer, says "the man has my money which I have not " delivered to him with any real intention of passing to him the " property. I sue him because he has the actual property taken." He adds: ' These fantastic resemblances of contracts invented in " order to meet requirements of the law as to forms of action which " have now disappeared should not in these days be allowed to " affect actual rights." Yet the ghosts of the forms of action have

[19] 3

been allowed at. times to intrude in the ways of the living and impede vital functions of the law. Thus in *Sinclair* v. *Brougham,* 1914, A.C. 398, Lord Sumner stated at p. 452 that "all these " causes of action *[sc.* for money had and received] are common " upon a notional or imputed promise to repay." This observation, which was not necessary for the decision of the case, obviously does not mean that there is an actual promise of the party. The phrase " notional or imputed promise " is only a way of describing a debt or obligation arising by construction of law. The claim for money had and received always rested on a debt or obligation which the law implied, or more accurately imposed, whether the procedure actually in vogue at any time was debt or account or case or *indebitatus assumpsit.* Even the fictitious *assumpsit* disappeared after the Act of 1852. I prefer Lord Sumner's explanation of the cause of action in *Jones's* case *(supra).* This agrees with the words of Lord Atkin which I have just quoted. Yet serious legal writers have seemed to say that these words of the great Judge in *Sinclair v. Brougham (supra)* closed the door to any theory of unjust enrichment in English law. I do not understand why or how. It would indeed be a *reductio ad absurdum* of the doctrine of precedents. In fact the Common law still employs the action for money had and received as a practical and useful, if not complete or ideally perfect, instrument to prevent unjust enrichment, aided by the various methods of technical equity which are also available, as they were found to be in *Sinclair* v. *Brougham (supra).*

Must, then, the Court stay its hand in what would otherwise appear to be an ordinary case for the repayment of money paid in advance on account of the purchase price under a contract for the sale of goods merely because the contract has become impossible of performance and the consideration has failed for that reason ? The Defendant has the Plaintiff's money. There was no intention to enrich him in the events which happened. No doubt when money is paid under a contract it can only be claimed back as for failure of consideration where the contract is terminated as to the future. Characteristic instances are where it is dissolved by frustration or impossibility or by the contract becoming abortive for any reason not involving fault on the part of the Plaintiff where the consideration, if entire, has entirely failed, or where, if it is severable, it has entirely failed as to the severable residue, as in *Rugg* v. *Minett,* 11 East 210. The claim for repayment is not based on the contract which is dissolved on the frustration but on the fact that the Defendant has received the money and has on the events which have supervened no right to keep it. The same event which automatically renders performance of the consideration for the payment impossible, not only terminates the contract as to the future, but terminates the right of the payee to retain the money which he has received only on the terms of the contract performance. In *Hirji's* case (1926, A.C. 497, at p. 510) Lord Sumner, who has done so much in his judgments to elucidate the meaning and effect of frustration, contrasts rescission of a contract by one party on the

**Page 168**

ground of breach by the other party, which depends on election by the former, with frustration, which operates automatically apart from either party's election. He finds, however, a similarity in the respect that rights and wrongs which have come already into existence remain, though the contract is ended as regards obligations *de futuro.* But the contract is in neither case wiped out, or avoided *ab initio.* The right in such a case to claim repayment of money paid in advance must in principle, in my judgment, attach at the moment of dissolution; the payment was originally conditional; the condition of retaining it is eventual performance; accordingly when that condition fails the right to retain the money must simultaneously fail. It is not like a claim for damages for breach of the contract, which would generally differ in measure and amount, nor

4 [20]

is it a claim under the contract. It is in theory and is expressed
to be a claim to recover money, paid to the use of the Plaintiff.
This, I think, was the view of Lord Haldane L.C. speaking for
the Judicial Committee in *Royal Bank of Canada* v. *R.,* 1913,
A.C. 283, at p. 296. He said: " It is a well-established principle
" of the English Common Law that when money has been received
" by one person which in justice and equity belongs to another,
" under circumstances which render the receipt of it a receipt by the
" Defendant to the use of the Plaintiff, the latter may recover as for
" money had and received to his use." The principle extends to
cases where the money has been paid for a consideration which has
failed. It applies, as was pointed out By Brett L.J. in *Wilson v.
Church,* 13 Ch.D. 1, at p. 49, when money has been paid to
borrowers in consideration of the undertaking of a scheme to be
carried into effect subsequently to the payment and which has
become abortive. The lender has in this case a right to claim the
return of the money in the hands of the borrowers as being held
to his use. This language of Brett L.J. was used in connection
with the failure of a scheme for the development of a concession
in Bolivia which the Bolivian Government revoked, thus render-
ing the fulfilment of the scheme impossible. The House of Lords
affirmed the judgment of a strong Court of Appeal, and held that
the borrowers were entitled to repayment of their loan, on the
ground that the consideration for the loan had failed *(National
Bolivian Navigation Company* v. *Wilson,* 5 A.C. 176, in particular
per Lord Cairns L.C., at p. 185). Some years earlier a decision,
not dissimilar in principle, was reached in 1850, in *Ashpitel* v.
*Sercombe,* 5 Ex- 147. The Plaintiff had paid a deposit on his
application for shares in a projected railway company but the
scheme had to be abandoned for want of sufficient subscriptions.
The appeal was heard before Patteson, Coleridge, Maule, Cresswell,
Wightman, Erie and Williams JJ., all masters of the Common
Law. The Plaintiff's claim for return of the deposit was upheld.
Patteson J., delivering the judgment of the Court, said (at pp.
161-162): " This was an action for money had and received,
" brought by the Plaintiff, an allottee of shares in a proposed rail-
" way company, which had been abandoned before the commence-
" ment of the action, without any fraud or misconduct, against
" the Defendant, one of the Managing Committee, to recover back
" the Plaintiff's deposit. . . . There seems to be no doubt that
" the Plaintiff, having paid his money for shares in a concern which
" never came into existence, or a scheme which was abandoned
" before it was carried into execution, has paid it on a consideration
" which has failed, and may recover it back as money had and
" received to his use." It was further held that the Defendant
could not deduct money which the directors had expended towards
carrying out the scheme, unless it could be shown that the Plaintiff
had consented to or acquiesced in the application of his money. The
books contain other cases of a similar character, such as *Johnson*
v. *Goslett,* 3 C.B.N.S. 569. These cases were merely special instances
where performance having become impossible, the payers were held

**Page 170**

entitled to recover what they had paid, the contract having come to an end between the time when the money was paid and the date at which the contract was ended. Similar claims have been made for recovery of deposits paid. Such a claim has succeeded even under a contract by deed for the purchase of an estate. Thus in *Greville* v. *Da Costa,* Peake Add. Cas. 113, the vendor was disabled from selling by an order of the Lord Chancellor. Lord Kenyon said that the Defendant held the money against conscience and therefore might be compelled to repay it by an action for money had and received. It is clear that the failure of consideration need not be attributable to breach of contract or misconduct on the part of the Defendant, as the cases I have cited and many others show. Impossibility of performance or frustration is only

[21] 5

a particular type of circumstance in which a party who is disabled
from performing his contract is entitled to say that the contract is
terminated as to the future, and in which repayment of money paid
on account of performance *may* be demanded.

These principles, however, only apply where the payment is
not of such a character that by the express or implied terms of the
contract it is irrecoverable even though the consideration fails. The
contract may exclude the repayment. An illustration of this is
afforded by advance freight which by English law is not recover-
able if the delivery of the goods is prevented by the act of God, perils
of the seas or other excepted cause, which excludes an action of
damages. In *Allison* v. *Bristol Marine Insurance Co.,* 1 A.C. 209,
253, Lord Selborne stated it to be " the peculiar rule of English
" mercantile law that an advance on account of freight to be earned
" is, in the absence of any stipulation to the contrary, an irrevocable
" payment at the risk of the shipper of the goods ". So indeed the
law had been laid down by Sanders L.C.J. in *Anon. 2* Shower 283
in 1682 and has remained ever since. I may also refer to *Byrne v.
Schiller,* L.R. 6 Ex. 319. The irrecoverable nature of the payment
is there determined by custom or law, unless the contract provides
for the contrary. In other cases likewise a particular contract may
effectively make a prepayment irrecoverable. In the present case
the payment is not made irrecoverable by any custom or rule of law
or by any express or implied terms of the contract. It was paid
on account of the price; it was not paid out-and-out for the sign-
ing of the contract. When the sellers were disabled to perform
the contract by the shipment to Gdynia becoming illegal, the
ordinary rules of law and the authorities to which I have referred
show that the sum of £1,000 paid in advance of the price was
recoverable by the Appellants In the present action.

The Court below have held themselves bound to reach the
contrary decision only on the authority of certain cases, generally
known as the Coronation cases, in particular *Blakeley v. Muller,*
reported in a note to *Civil Service Co-operative Society* v. *General
Steam Navigation Company,* 1903, 2 K.B. 756, and *Chandler* v.
*Webster,* 1904, 1 K.B. 493. These cases dealt with agreements
for the hiring of rooms from which to view the procession on the
coronation of King Edward VII. It had been held in *Krell* v.
*Henry,* 1903, 2 K.B. 740, that the mere use of the rooms on the
appointed day was only part of the consideration for the agreed
payment, and that an essential part of the consideration was the
opportunity of viewing the procession. That was the object or
basis of the contract in contemplation of both parties. When
the procession could not take place, the contract, it was held, be-
came abortive or was frustrated. There was no decision in that
case on whether money paid in advance was recoverable. In
*Blakeley* v. *Muller (supra)* the prepayment had fallen due before
the frustration supervened. A Divisional Court held that the hirer,
who had paid in advance, could not recover back the money. They

did not discuss the principles or authorities to which I have referred on the right to recover money paid for a consideration which has failed. I take the *ratio decidendi* from the judgment of Channell J., because in the next case of that type, the *Civil Service Co-operative Society (supra),* Lord Halsbury, sitting in the Court of Appeal, quoted a long passage from it and added that he concurred with every word of it. The reasoning of Channell J., as I understand his judgment, was that the loss must remain where it was at the time of the abandonment, because it was impossible to import into a contract a condition which the parties might have imported but had not, and that under *Taylor* v. *Caldwell,* 3 B. & S. 826, and *Appleby and Myers,* L.R. 2, C.P. 651 (cases of impossibility), all that was said was that the parties were excused from further performance, not that anything that was done under the contract was void.

6 [22]

In the former case, the claim was for damages, in the latter it was on a *quantum meruit* for partial performance of an entire consideration. Each claim failed. Neither was a claim for money had and received. Channell J. instanced the case of advance freight under the charter-party. I have already explained that rule, which in Lord Selborne's view is peculiar. I have also explained my view that the right to repayment of advance payments as money had and received to the Plaintiff's use is not a claim under the contract or for further performance of the contract or for damages, but a claim outside the contract. The ground of the claim is that the contract has been dissolved as to future performance and hence that the consideration has failed. The Court of Appeal, however, dismissed the claim for the money, following *Blakeley* v. *Mutter (supra)*. When shortly afterwards the same question on similar facts again came before a differently constituted Court of Appeal, in *Chandler v. Webster (supra),* Collins M.R. discussed the matter more elaborately, but he still ignored the principles and authorities upon the action for money had and received to which I have referred, though the claim was to recover as on a total failure of consideration; he indeed discusses the case from that point of view *loc. cit.* at p. 499. The hirer was claiming to recover what he had paid in advance and was resisting a counterclaim for the balance which was by the contract payable before the date when the procession became impossible. He ought, in my opinion, to have succeeded on both issues, but by the judgment of the Court of Appeal he failed on both. The reasoning of the Master of the Rolls may, I think, fairly be summarised to be that impossibility through the fault of neither party leaves the parties where they are but relieves them from further performance; that it is only if the contract is wiped out altogether that money paid under it would have to be repaid as on a failure of consideration, but that the only effect of impossibility is to release the parties from further performance; the rule, he said, is arbitrary, but it is really impossible to work or adjust with any exactitude what the rights of the parties in the event should be. I hesitate to criticise the ruling of so great a lawyer as the Master of the Rolls. But I cannot concur in these propositions. I need scarcely repeat my reasons for doing so, which are apparent from what I have already said. The claim for money had and received is not, in my opinion, a claim for further performance of the contract; it is a claim outside the contract. If the parties are left where they are, one feature of the position is that the one who has received the prepayment is left in possession of a sum of money which belongs to the other; the frustration does not change the property in the money; nor is the contract wiped out altogether, but only the future performance. I may add that the difficulty emphasised by the Master of the Rolls that such a claim involves constructing a hypothetical contract by supposing what terms the parties would have arrived at if they, contemplated the future impossibility does not arise. But I do not think that this way of envisaging the matter accords with the true position. In my opinion the contract is automatically

**Page 174**

terminated as to the future because at that date its further per-
formance becomes impossible in fact, under circumstances which
involve no liability for damages for the failure on either party.
When the Court holds a contract to be thus terminated, it is simply
giving appropriate effect to the circumstances of the case, including
the actual contract and its meaning as applied to the event. It is this
view which is involved in Lord Sumner s phrase in *Hirji (supra],* at
p. 510. "It" *[sc.* the doctrine of frustration] "is really a device
" by which the rules as to absolute contracts are reconciled with a
" special exception which justice demands." He combines with
this a reference to what has been generally accepted by English
Law, that the rule is explained in theory as a condition or term
of the contract implied by the law *ab initio.* No one who reads

[23] 7

the reported cases can ignore how inveterate is this theory or explanation in English law. I do not see any objection to this mode of expression so long as it is understood that what is implied is what the Court thinks the parties ought to have agreed on the basis of what is fair and reasonable, not what as individuals they would or might have agreed. " It is," said Lord Sumner, "irrespective of the individuals concerned, their " temperaments and failings, their interest and circumstances". The Court is thus taken to assume the r61e of the reasonable man, and decides what the reasonable man would regard as just on the facts of the case. The hypothetical " reasonable man " is personified by the Court itself. It is the Court which decides. The position is thus somewhat like the position in the cases in which the Court imports a term in a contract on the basis of what is reasonable. As frustration is automatic, so equally the claim for money had and received here follows automatically.

*Chandler* v. *Webster (supra)* has bound subsequent Courts of Appeal. Mr. Holmes has contended that it was accepted by this House as good law in the *French Marine* case, 1921, 2 A.C. 494, and was not open to review by your Lordships. The most obvious and shortest answer to that argument is that in *Cantiare San Rocco* y. *Clyde Shipbuilding Co.,* 1924, A.C. 226, Lord Birkenhead *loc. cit.* at p. 233, observed of *Chandler* v. *Webster (supra]* that none of the relevant authorities on the law of England on this question was binding on the House. Lord Atkinson agreed, and Lord Shaw indicated that the question of English Law was open in this House. The *French Marine* case *(supra)* related to freight under a voyage charter payable on a time basis and the decision may therefore have been affected by the English rule as to advance freight, because it was a claim for repayment of time freight paid in advance for days subsequent to the requisition of the ship which rendered her further use by the charterers impossible. Their Lordships were divided in opinion, and it is not clear that there was any real agreement among the majority as to the *ratio decidendi.* I think the essential ground taken was that the contract provided for certain events in which freight was to cease, but not for the particular event in which the contract terminated. But it was also treated as a case of a partial failure of consideration.

The decision reached in *Chandler's* case *(supra)* is criticised by Williston, Contracts, section 1954, p. 5477 (see too, section 1974. P. 5544), and has not been followed in most of the States of America, Nor is it adopted in the Restatement of the Law of Contract by the American Law Institute, section 468, pages 884 *et seq.* Indeed the law of the United States seems to go beyond the mere remedy of claims for money had and received and to allow the recovery of the value of the benefit of any part performance rendered while performance was possible. Such and similar claims should be recognised in any complete system of law, but it is not clear how far they have been admitted in English law. The Scots Law upheld

**Page 176**

in the *Cantiare* case *(supra)* may seem to be generally like the English Law and to be limited to recovery of money payments. The opinion which I have been stating perhaps brings the two laws into substantial accord, though in the passage quoted by Lord Birkenhead in the *Cantiare* case *(supra)* at p. 237, from Lord President Inglis' judgment in *Watson v. Shankland,* 10 M. 142, that judge seems to accept that the payer who has paid in advance should give credit to the extent that he is *lucratus* by any part performance. I do not wish to discuss how far, if at all, this is open in English Law. That was a case of advance freight, which Scots Law treats as a prepayment on account. But I think it is clear both in English and Scots Law that the failure of consideration which justifies repayment is a failure in the contract performance. What is meant is not consideration in the sense in which

8 [24]

the word is used when it is said that in executory contracts the promise of one party is consideration for the promise of the other. No doubt in some cases the recipient of the payment may be exposed to hardship if he has to return the money though before the frustration he has incurred the bulk of the expense and is then left with things on his hands which become valueless to him when the contract fails, so that he gets nothing and has to return the prepayment. These and many other difficulties show that the English rule of recovering payment the consideration for which has failed works a rough justice. It was adopted in more primitive times and was based on the simple theory that a man who has paid in advance for something which he has never got ought to have his money back. It is further imperfect because it depends on an entire consideration and a total failure. Courts of equity have evolved a fairer method of apportioning an entire consideration in cases where a premium has been paid for a partnership which has been ended before its time (Partnership Act, sec. 40), contrary to the Common law rule laid down in *Whincup v. Hughes,* L.R. 6 C.P. 78. Some day the Legislature may intervene to remedy these defects.

I ought to notice in order to reject an argument of Mr. Holmes that the House should not reverse or depart from a doctrine which has stood since 1904 and has been followed in several cases by the Court of Appeal and acted upon on practical affairs. The doctrine, however, has been severely criticised by writers both in this country and elsewhere and has been treated as open to review by this House as recently as 1923 in the *Cantiare* case *(supra).* If the doctrine is, as I think it clearly is, wrong and unjust, it is the duty of this House, exercising its function of finally declaring the law, to reverse it, unless there are very special circumstances such as were recently considered in the *Valverda,* 1938, A.C. 173. On the other hand, in *Lissenden* v. *Bosch,* 1940, A.C. 412, the House has recently over-ruled a decision which had been acted upon in frequent practice for 27 years.

I may in conclusion add a reference to a very learned article by Professor Buckland, in Harvard Law Review, Vol. XLVI, p. 1281: he concludes by observing that whatever the merits or demerits of *Chandler* v. *Webster (supra)* and other cases which he considers in that article, the Roman Law cannot be made responsible for the rules laid down in them.

In ray judgment the Appeal should be allowed.

[25]

Lord
Chancellor

Lord
Atkin

Lord
Russell of

Killowen

Lord
Macmillan

Lord
Wright.

Lord
Roche.

Lord
Porter

## FIBROSA SPOLKA AKCYJNA

*v.*

## FAIRBAIRN LAWSON COMBE BARBOUR, LIMITED

# Lord Roche

## MY LORDS,

I also am of opinion that this Appeal should be allowed and that judgment should be entered for the Appellants for the amount of their claim in the action.

The contents of the relevant documents and the facts of the case have been so fully set out by the Lord Chancellor that it is unnecessary that I should add anything to his recital. But having regard to the importance of the principles involved I think it right to state concisely the reasons for my conclusion.

I have no doubt that this case is one of frustration of the contract and falls within the doctrine applicable to such cases. An alternative case made by the Appellants that the contract was merely suspended and whilst suspended was repudiated by the Respondents is, I think,

without foundation. The claim of the Appellants, therefore, must be and is a claim to recover the £1,000 in dispute as money had and received to their use as paid upon a consideration which has wholly failed. The Courts below have held themselves bound by authority to decide against this claim. The principal authority for the supposed binding rule of law is the case of *Chandler* v. *Webster* (L.K. 1904 1 K.B. 493) which, it is contended, lays down the rule that on the occurrence of an event which frustrates the performance of the contract the loss lies where it falls and that money paid by one party to the contract to the other party is to be retained by the party in whose hands it is. Taken in their broad and natural sense, the much criticised sentences in the judgment of Collins M.R. in *Chandler* v. *Webster (supra* at p. 499) ending 'Therefore the " doctrine of failure of consideration does not apply " certainly support a conclusion in favour of the rule contended for. Taken in that sense the proposition is, in my judgment, erroneous in law and unsupported by any authority binding upon this House. It is, however, not unimportant to observe the context in which the criticised sentences occur. The learned Master of the Rolls was contrasting the case of contracts avoided *ab initio* where the Courts of England have power to decree restitution and the case of contracts frustrated but subsisting nevertheless up to the moment of frustration. In the latter case it is, I think, true that the law of England, differing in this respect from the civil law and the law of Scotland, does not provide for the exercise of any power by the Courts to decree restitution or repetition on similar or analogous lines to those exercised where contracts are avoided *a b initio*—see *Cantiare San Rocco S.A.* v. *Clyde Shipbuilding and Engineering Coy.* (1924, App. Cas. 226). It is to be observed that whilst the law of England was not directly in question in that case, Lord Birkenhead stated in express terms that the Coronation cases were open to review in this House and were not binding upon your Lordships.

The question therefore is whether, although the Courts of England have not, as was rightly held in *Chandler* v. *Webster,* a power to decree restitution in the sense above discussed, the matter is concluded against the Appellants. The case made by the Appellants

2 [26]

is that no such doctrine of restitution is necessary to entitle them
to succeed in this action. They contend that they are entitled to be
repaid their money because of the operation of ordinary and
accepted rules of law applicable upon a total failure of considera-
tion. In my opinion that contention is right. The true rule, I
think, is that in cases of frustration the loss does lie where it falls,
but that this means where it falls Raving regard to the terms of
the contract between the parties. If under a contract payments
have been made which have been variously described as absolute
or final or out-and-out payments, then they are not recoverable by
the party who made them. Payments of freight in advance are
payments of this nature. Whatever the origin of the rule as to
advance freight, under decisions now centuries old and long acted
upon in commerce the rule itself that such payments of freight
are final and irrecoverable payments is beyond question. In the
case of *French Marine* v. *Compagnie Napolitaine,* 1921, 2 App.
Cas. 494, the majority judgments in this House applied the same
rule to a payment of hire under a time charter-party by reason
of the terms of the charter-party itself (see per Lord Dunedin, at
p. 513, and per Lord Sumner, at p. 519). It is, I think, not un-
important to observe that in the case of *Chandler* v. *Webster
(supra)* Mathew L.J. based his judgment on this ground of finality
in the payment (see 1904, I K.B., at p. 502), and I am disposed
to think that the Master of the Rolls, at p. 497 of the report, is
presenting a similar view of the facts and I am the more disposed
so to think because he, for one of the judges concerned, was a
supreme master of the common law, and unlikely on another
view of the facts to have expressed himself as he did. Similar
views on the facts are expressed in others of the Coronation cases
by some of the judges (see *Civil Service Co-operative Society* v.
*General Steam Navigation Coy.,* 1903, 2 K.B. 756, at pp. 762 and
764), where the payments in question were said to be comparable
to payments of freight in advance. It is, in my judgment, un-
necessary and unfruitful to consider whether, on this ground, those
cases were or were not rightly decided on the facts and documents
in question, but if the payments under discussion were properly
to be regarded as final or out-and-out payments, then in my judg-
ment the conclusion properly followed that they were not recover-
able. It is not possible to say of such payments that the considera-
tion for their payment has wholly failed.

The converse case remains to be considered. It is, I think, a well
settled rule of English law that, subject always to special provisions
in a contract, payments on account of a purchase price are recover-
able if the consideration for which that price is being paid wholly
fails (see *Ockenden* v. *Henly,* E.B. & E. 485, at p. 492). Looking
at the terms of the contract in the case now under consideration,
I cannot doubt that the sum sued for was of this provisional nature.
It was a part of a lump sum price, and when it was paid it was
no more than a payment on account of the price. Its payment
had advantages for the Respondents in affording some security

that the Appellants would implement their contract and take up the documents and pay the balance of the price, and it may be that it had other advantages in providing finance for the manufacture of the machines. But if no machines or documents of title were delivered to the Appellants, as was the actual case, then in my opinion the consideration for the price, including the payment on account,; wholly failed and the payment so made is recoverable. It was contended by the Respondents' counsel that unless there is to be found some default on the part of the recipient of such a payment as is now in question the consideration cannot be said to have wholly failed merely because the frustration of the contract produced a result which, had it been due to some default, would have amounted to a failure of consideration. I find no

[27] 3

authority to support this contention, which seems appropriate to
an action for damages, but foreign to the action for money had
and received. In the case of *Rugg v. Minett,* n East 210, the
Court seems to have proceeded on a principle contrary to that
contended for when it allowed under this money count payments
on account for unappropriated goods destroyed by accidental fire
(see p. 219 of the Report). There is no suggestion in that Report
of any default on the part of the sellers.

For these reasons I am of opinion that the Appellants arc
entitled to suceed.

My Lords, I only desire to add that I am conscious that a
conclusion relegating parties in cases of frustration to their con-
tracts may not work out a completely just solution in the pecuniary
sense. It happens that in this case it will do so, for the Appel-
lants, who did not get the goods or the documents, will get their
money back, and the Respondents have had the machines, which,
so far as completed, were said by the Respondents themselves
to be realisable without loss. In other cases it might turn out other-
wise, and the application of the rules of the civil law or of Scots
law might work greater justice, but I do not understand that
even those rules would cover the whole ground so as to effect an
ideally just distribution of the burden of loss due to the frustra-
tion of contracts. But at least, or so it seems to me, the rule now
to be laid down by this House is not only more agreeable to the
law of England, but is more consistent with justice than the rule
upon which the Courts below felt impelled to base their decision.
At all events, parties to contracts will know that as the law stands
the contract between them is the matter of crucial or final import-
ance, and that if, as may very well be the case in time of war or
impending war, frustration of their contracts is to be apprehended,
they may make what contracts they think fit to provide in that
event for the adjustment of the position between them.

Lord
Chancellor

Lord
Atkin

Lord
Russell
of Killowen

Lord

Macmillan

Lord
Wright

Lord
Roche

Lord
Porter

[28]

# FIBROSA SPOLKA AKCYJNA

*v.*

# FAIRBAIRN LAWSON COMBE BARBOUR, LIMITED

# Lord Porter

## MY LORDS,

The task imposed on your Lordships is said to be a reconsideration of what has been described as the rule in *Chandler* v. *Webster* (1904) 1 K.B. 493. That rule has been variously stated by saying that in a case where a contract is frustrated (1) the loss lies where it falls, and (2) one who has paid money in advance under a contract which provides for the making of such payment cannot recover that money if the contract is afterwards frustrated. Whether either or both principles are to be found in *Chandler* v. *Webster (supra)* need not be determined for the moment: the vital question is are they in fact accurate statements of the law ? The question has given rise to much controversy, and it has been contended on the one hand that in case of total failure of consideration the sum paid should be recoverable upon the ordinary principles applicable in English Law, and on the other that the law is not so wanting in ingenuity as to be unable to apply the principles which are said to find favour in the Scottish Courts and are discussed in *Cantiare San Rocco S.A.* v. *Clyde Shipbuilding Coy.* (1924) A.C. 226; a decision which is alleged to determine that on

some principle of restitution the payer can get back at least an equitable proportion of the sum which he has paid, though exactly what proportion and upon what principle does not, I think, appear.

It may perhaps be advisable to dispose of the second contention at once. I can find no warranty for its application in English Law. Under that system money had and received to the Plaintiff's use can undoubtedly be recovered in cases where the consideration has wholly failed, but unless the contract is divisible into separate parts it is the whole money, not part of it, which can be recovered. If a divisible part of the contract has wholly failed and part of the consideration can be attributed to that part, that portion of the money so paid can be recovered, but unless this be so there is no room for restitution under a claim in *indebitatus assumpsit.* A partial failure of consideration gives rise to no claim for recovery of £>art of what has been paid.

Indeed the contrary has not been contended. What has been said is that the doctrine of frustration depends upon the implication of an implied term. Reasonable persons, it is said, would not have had in mind the event which befell, but if they had they would have unhesitatingly said, "In that event all further " obligation of performance on either side is at an end." So far and no further it is acknowledged the law of this country has gone. But, it is urged, a system of jurisprudence which is astute enough to devise such a term is capable of adding to it the proviso that in such a case some equitable proportion of any sum paid in advance shall be recoverable when the contract becomes impossible of performance. It might be desirable that the law should make some such provision. Indeed the Law Revision Committee has so recommended. But without an Act of Parliament it is difficult to determine what sum shall be recoverable and upon what principles. This difficulty is envisaged by Collins M.R. in *Chandler* v. *Webster (supra)* at p. 500 and is apparent from a perusal of the Report of the Committee. But however desirable the result, I can see no way by which in accordance with English authority or principle a right to recover some equitable sum can be implied.

[29] 2

The only other suggestion made to your Lordships on behalf of the Appellants, and indeed, as I think, the only argument open to them, is that the money which they have paid is recoverable as on a consideration which has wholly failed. With that aspect proceed to deal, merely prefacing my remarks by observing that whether, one adopts the principle that money so paid is recoverable or irrecoverable one may be found to have treated one side or the other with considerable harshness. A contractor stipulates for payment in advance of the whole price of an article which he is to supply and has done nothing when the contract is frustrated, he keeps the whole, perhaps if he keeps any part of the money paid in advance, the buyer is hardly treated. On the other hand he may have done the whole of the work upon an article useless to anyone except the purchaser, but not delivered it, and if the buyer can recover his advance the whole loss will fall upon the seller, and in that case the seller is as hardly treated as the buyer would be in the other. Moreover, the closely analogous case of a supplier who has obtained no advance but though he has done all the work has not delivered the goods and therefore is not able to demand payment, is left unredressed in England, as indeed it is in Scotland. It is possible to say that the seller in such a case who has been prudent enough to stipulate for a payment in advance should reap the advantage of his foresight, but to do so is to speculate as to the object for which the advance was obtained, not to ascertain what his legal remedies are upon the facts as known. In these circumstances I see nothing for it but to neglect considerations of hardship in individual cases and to consider only abstract principles of law.

The doctrine that money payable in advance, under a contract which is afterwards frustrated, is irrecoverable is not of old standing. It began, I think, with the so-called coronation cases. It is true that in *Appleby* v. *Myers* (1867) L.R. 2 C.P. 651 at p. 659 Blackburn J. says of the destruction of the premises, " it is a mis- " fortune equally affecting both parties; excusing both from further " performance of the contract but giving a cause of action to " neither." But this was said in a case where no question of money paid in advance arose and has reference only to the facts of that case.

Of the other cases quoted to us which were decided about the same period, *Stubbs* v. *Holywell Pty.* (1867) L.R. 2 Exch. 31, *Whincup v. Hughes* (1871) L.R. 6 C'.P. 78 and *Anglo-Egyptian Navigation Coy.* v. *Rennie* (1875) L.R. 10 C.P. 271 are, I think, cases where the consideration was partly performed. In the last-mentioned case, penman J. in delivering the judgment of the Court was careful to point out that the contract was substantially a contract for work and labour: and much work and labour had undoubtedly taken place before further performance of the contract became impossible.

It is true, however, that advance freight by long custom cannot be recovered though the goods shipped are never delivered. *Byrne* v. *Schiller* (1871) L.R. 6 Ex. 319 and *Allison* v. *Bristol Insurance Company* (1875) 1 App. Cas. 209 so declare. The decision was reached with regret. In the former case Cockburn C.J. says he thinks the rule founded on erroneous principle and anything but satisfactory, and Montague Smith J. regards it as the result of an implied term. In the latter Lord Hatherley says, " We must remember that from a very early " period, as long ago, it was said during the argument, as the time " of Charles II.—at all events for a very long time—it has been " settled in our maritime law that prepaid freight cannot be " recovered back ", and all their Lordships seem to have been in-fluenced by the fact that it was the practice for the merchant to insure prepaid freight and indeed of the shipowner to make an allowance for that purpose. This may be the principle applied in *French Marine* v. *Compagnie Napolitaine* (1921) *2* A.C. 494 by the

majority of the House, or it may be that the grounds of that decision
are to be found in the words of Lord Sumner at p. 517, " Here there
" was no total failure of consideration but a partial failure only, for
" which in law no *pro rata* repayment could be claimed." On either
view it is not decisive of the present case.

If I am right in supposing that cases of advance freight form
a class by themselves and that the other cases referred to are
examples of a partial failure of consideration, the doctrine that
money paid in advance in pursuance of the terms of a contract
which is afterwards frustrated cannot be recovered originates, if
it originates at all, with the coronation cases. They were conveni-
ently tabulated by Mr. Holmes in the course of his argument.
*Clark v. Lindsay* and *Griffith* v. *Brymer* (both reported in 19
T.L.R. at pp. 202 and 434 respectively) may be disregarded, since
in each case the contract was entered into under a mistake of
fact as to the state of the King's health at the time when they
were made and therefore both were void *ab initio. Blakeley* v.
*Muller* (1903) 2 K.B. p. 760 (note) and *Lumsden* v. *Barton,* 19
T.L.R. 53 may, I think, be regarded as instances of contracts
partially performed, though the former seems to contain language
applicable to contracts wholly unperformed. *Krell* v. *Henry* (1903)
2 K.B. 740 merely decided that money not due when the frustra-
tion took place was not in law payable, but *Civil Service Co-
operative Society* v. *General Steam Navigation Coy.* (1903) 2 K.B.
756 and *Chandler* v. *Webster* (1904)1 K.B. 493 are authorities
for the general proposition that money paid in advance under
the terms of a frustrated contract cannot be recovered. In *Blakeley*
v. *Muller (supra]* at p. 761 Wills J. founded his decision on *Appleby*
v. *Myers [supra]* and said: " The argument for the Plaintiffs must
" be that the contract was rescinded *ab initio ",* and Channel! J.
relied upon the analogy of advance freight and added: " All that
" can be said is that when the procession was abandoned, the con-
" tract was off, not that anything done under the contract was void.
" The loss must remain where it was at the time of the abandon-
" ment." I quote from his judgment because it was adopted by
Lord Halsbury, sitting in the Court of Appeal, in *Civil Service Co-
operative Society* v. *General Steam Navigation Coy. (supra)* and
is, I think, the foundation of the decision in *Chandler* v. *Webster
(supra).* In the latter case the leading judgment was delivered by
Collins M.R. who, in relying upon *Taylor* v. *Caldwell (supra),* says
" where ", owing to frustration, " the contract can no further be
" performed by either party it remains a perfectly good contract up
" to that point and everything previously done in pursuance of it
"must be treated as rightly done, but the parties are both dis-
" charged from further performance of it. If the effect were that
" the contract were wiped out altogether no doubt the result would

[1] be that money paid under it would have to be repaid as on a
" failure of consideration. But that is not the effect of the doctrine;
" it only releases the parties from further performance of the con-
' tract. Therefore the doctrine of failure of consideration does not

' apply ". To the same effect Romer LJ. says at p. 501: " Except
' in cases where the contract can be treated as rescinded *ab initio,*
' any payment previously made and any legal right previously
'accrued according to the terms of the agreement will not be
' disturbed ".

    The doctrine as so stated appears to be confined to the termina-
tion of contracts by excusable impossibility and to enunciate a
feature peculiar to such cases. I know of no authority other than
the so-called coronation cases and those which have followed them
in which such a doctrine is promulgated, and except the statements
contained in those cases, weighty and formidable though they be, I
can find no principle to support it.

    It is not, I think, accurate to say in general—nor did the
Respondents' advocates seek to support such a statement—that

[31] 4

money had and received can only be recovered as upon a consideration which failed in cases where the contract is void *ab initio.* The true view is, I think, expressed by Brett LJ. (as he then was) in *Wilson v. Church* (1879) 13 Ch.D. 1 at p. 49, a case in which he refused to find fraud. His words are: " The principle of law seems " to me to be identical with what it would be if the money were paid " to the borrowers for a consideration which is to be accomplished " after the payment of the money, and by the most ordinary prin- " ciple of law, where money is paid for a consideration which is " to be performed after the payment, if that consideration wholly " fails, the money becomes money in the hands of the borrowers " held to the use and for the benefit of the lenders, and must be " returned ". The decision in that case was affirmed in your Lordships' House under the title *National Bolivian Navigation Coy.* v. *Wilson* (1880) 5 App. Cas. 176, and the language of Brett L.J. was approved by Lord Haldane L.C. in *Royal Bank of Canada* v. *Rex* (1913) A.C. 283 at p. 296. It may be urged that these were cases of borrowed money and that there was fault though not fraud in the borrower. I do not think that the decision turned upon so narrow a ground, but in truth the principle may be illustrated by the law Which is now codified in Sects. 6 and 7 of the Sale of Goods Act and was formerly illustrated by *Rugg v. Minett* (1809) ii East 210. The two sections deal with two cases of impossibility arising in the cases of the sale of ascertained goods. The first section treats of a case where the goods have perished before the agreement for sale is made and is an example of a contract void *ao initio. Clark* v. *Lindsay* and *Griffith* v. *Brymer (supra)* are illustrations of the same doctrine translated from the sphere where the tangible subject matter of the contract perished to that where supervening impossibility prevented the achievement of the object with which the contract was entered into. The second section, on the other hand, treats of a contract validly made and continuing in existence until the goods perish. It is not void *ab initio,* but further performance is excused after the destruction has taken place. Yet the price is returnable because the consideration for the whole or the part undelivered has wholly failed, as the Section says " without fault on either side ".

This is, I think, the rule generally applicable, but it is not always so. There are cases where the payer pays not for the performance of the receiver's promise but for the promise itself—not for the doing of something but for the chance that it may be done. This, I think, was Mathew L.J.'s view in *Chandler v. Webster,* when he says, at p. 502, " I think the payment of the £100 by the " Plaintiff was intended to be a final payment in pursuance of the " contract, and I do not think such a payment can be recovered " back ".

The Respondents relied upon this statement and maintained that the present, like the Coronation cases, was an instance of a final payment which could not be recovered.

**Page 190**

They also contended that no recovery was possible except in cases where the contractor who has received the money in advance was in fault in some way.

I can find no authority for the second argument, and it is, I think, contrary to the views expressed by the Court of Exchequer in *Knowles* v. *Bovill* (1870), 22 L.T. 70. It is true that in the majority of cases the consideration fails because one party or the other fails to carry out his contract. But it is not the breach but the failure of consideration which enables money paid in advance to be recovered.

The question whether the payment of the £1,000 in advance in the present case was a "final payment" or not depends on no general principle of law but upon the wording of the contract in this particular case.

5 [32]

To my mind, clearly it was not. The contract was for the sale of machines c.i.f. Gdynia. It is true that there was an additional provision for the services of a skilled monteur, but in my view the contract would have been substantially fulfilled by shipping the goods to Gdynia and furnishing the requisite documents against payment of the balance of the price, though a failure to provide a monteur might have given rise to a claim for damages.

The price was a lump sum price to be paid in two portions, viz. one-third with the order, balance against shipping documents. But the sum payable in advance was part of the lump sum price payable for the completed articles. The goods remained the property and at the risk of the sellers until the documents were presented and taken up. The case seems to me to come exactly within the principle of Sect. 7 of the Sale of Goods Act, and had they been destroyed by enemy action I cannot doubt but that the advance portion of the price would have been recoverable.

That the inability of the sellers to implement their contract was due to supervening illegality and not to destruction of the subject matter appears to me to make the Plaintiffs' claim at least no weaker. Whether it strengthens it has not been discussed and is unnecessary to be determined.

Having regard to these considerations, in my view the dicta of Collins M.R. in *Chandler* v. *Webster (supra)* cannot be supported, and I think the decision itself is wrong, unless it can be said that in that, as in some of the other cases, there was some partial performance which I have not been able to discover in the report of the case. The error, as I see it, in the dicta which have been used is in imagining that the statement " the loss lies where it falls " is conclusive of the matter. I think it is true to say that the loss lies where it falls, but that expression only means that the rights of the parties are to be determined at the moment when impossibility of further performance supervenes. If at that moment the party who has advanced money is by the ordinary rules of the Common Law entitled to say that the consideration has now wholly failed, he can, in my view, enforce the rights given by those rules and recover the money.

The other arguments on behalf of the Appellants I need not discuss. I agree with all your Lordships in thinking that they fail.

If I thought that the question had been concluded by any decision in your Lordships' House I would, of course, follow that authority, but it plainly is open to review. In support of this opinion I need only refer to the observations of Lord Birkenhead in *Cantiare San Rocco (supra],* at p. 233.

I would allow the Appeal.

**The Lord Chancellor :**

Mr. Linton Thorp, before I put the Questions from the Wool-sack, the House would like to know whether you have any observations to make on the subject of interest on the *£1,000.* The House notices that your Statement of Claim claimed the £1,000 with interest. The Question which is going to be put from the Woolsack will decide that matter, so we thought it right to ask whether you had anything to say about it.

**Mr. Linton Thorp, K.C.** (Counsel for the Appellants):

I am grateful to your Lordship. May I ask my clients, my Lord ?

**The Lord Chancellor:**

Certainly.

(Counsel conferred with his clients.)

**Mr. Linton Thorp:**

My Lord, we do not ask for interest.

(20330) Wt. 8222—4 215 6/42 D.L. G.338

**BAILII:** Copyright Policy | Disclaimers | Privacy Policy | Feedback | Donate to BAILII
URL: *http://www.bailii.org/uk/cases/UKHL/1942/4.html*

THE EASTERN CARIBBEAN SUPREME COURT

IN THE HIGH COURT OF JUSTICE

ANTIGUA AND BARBUDA

CLAIM NO. ANUHCV 2000/0277

BETWEEN:

MAVIS HENRY
Attorney for MILLICENT RALPH

Applicant/Claimant

-and-

TYRONE WARNER

Respondent/Defendant

APPEARANCES:
Mr. Peighton Knight of Hill & Hill for the       Claimant
Mr. Steadroy Benjamin for the                    Defendant

.................................
2009: May 7
2009: May 25
.................................

DECISION

Striking out Defence – issue estoppel – cause of action estoppel – overriding interests -
s.28 Registered Land Act - Antigua and Barbuda.

1.  **Harris J:** This is an application by the Claimant to strike out the Defence to a claim for
    possession of land as an abuse of process on the basis of *res judicata*[1]. The Defendant

---

[1] See Judgment of Redhead J. in <u>Millicent Ralph</u> v <u>Clarkson Ralph and others</u> 133/1987 Antigua and
Barbuda.
Application is also made for several other Orders flowing from a striking out.

1

denies that the matter is *res judicata* and alleges that he has acquired an equitable and unregistered interest in the land and house thereupon. Further, the Defendant alleges proprietary estoppel.

Background

2.  The High Court of Justice entered judgment on behalf of Millicent Ralph, the Claimant herein and Petitioner on the judgment of June 10 1996 in suit No. 133 of 1987– concerning ancillary proceedings for the establishment of proprietary interests of a spouse, one Millicent Ralph. The Defendant in the instant case was one of the Respondents on the said Petition 133/1987. Prior to the commencement of that action the defendant, Tyrone Warner, procured registration of himself as the proprietor of parcel 70, by mistake. Since the filing of that earlier action in 1987, the Claimant, Millicent Ralph, has died. Further, the Defendant herein, Tyrone Warner and Clarkson Ralph the person through whom Tyrone Warner now claims his interest, were both parties in the earlier 1987 matter and bound by the said Judgment of Redhead J.  Tyrone Walker is also the defendant in this matter now before the court.

3.  The Judgment Order declared that Millicent Ralph is beneficially entitled to 50% share in several properties including parcel 70, the property, the subject of dispute in this present action. The Order read further, that the titles to the said properties be delivered up the Registrar of Titles to be cancelled on the ground that the said registration of the titles that were obtained "*by the mistake on the ground that they were registered on the belief that the documents were property executed by Clarkson Ralph (decd)*" [1]

4.  The Defendant herein claims an unregistered ('overriding') interest in parcel 70. [2]

5.  The background to this claim is that the defendant is resident on the subject parcel of land – parcel 70 - having been put to reside in a chattel house there, by the deceased and one

---

[1] See the Judgment Order; The action and consequent Order related to several parcels of registered land.
[2] Pursuant to the Registered Land Act (RLA), at S.28 (g)

2

of the defendants in the Petition, prior to his death. The Defendant alleges he was subsequently given permission to put his own house on the land and knowingly permitted by the deceased to do additions and modifications to the house and at the same time *giving him the assurance that no one would move him from the said land.*[1]

6.  Acting on these assurances, the Defendant says that he expended huge amounts of time and money to improve the house and land which he occupied.

7.  Sometime prior to the death of Clarkson Ralph (also a defendant in the 1987 matter), the Defendant alleges that the said Clarkson Ralph purported to transfer his interest in the parcel of land to him.

8.  The Defendant alleges that prior to the death of Clarkson Ralph, he, the Defendant, had already acquired an equitable interest in the land; parcel 70; an unregistered interest in the land pursuant to S. 28(g) of the Registered Land Act **("RLA").**

9.  He claims now that the Claimant is estopped from dispossessing him from parcel 70 and the house he built thereon.

10. The Claimant Millicent Ralph was the wife of the deceased. The relationship between the Defendant herein and the deceased is not disclosed on the pleadings or Affidavits in this application. What the defendant does say is that the Clarkson Ralph (decd.) permitted him to come on to the land, build and improve on the house of the defendant and give him the assurance that no one would remove him from the land. This state of affairs, if true, reflects a relationship between the two that goes beyond a mere commercial relationship.. Yet, nothing sufficient is said about the nature of that relationship in this application or indeed the later substantive action.

---

[1] These are facts one would have expected to have been asserted at the earlier 1987 trial by either the deceased or the defendant, Tyrone Walker.

3

11. In the earlier action filed in 1987 - Matrimonial ancillary proceedings - the Claimant then claimed that she contributed to the acquisition of several properties held in the name of her husband at the time, Clarkson Ralph, and also to the construction of the matrimonial home.[1] The judgment of Justice Redhead speaks of an injunction which was granted on the 11th July 1988 against Tyrone Warner restraining him from further erecting or constructing a building on the subject Parcel 70 in which the Petitioner Millicent Ralph (also now deceased) had an interest. This has not been denied by the defendant.

12. In the end the court held in favor of the Petitioner, Millicent, reversing the process of registration of Tyrone Warner as registered proprietor of parcel 70. No where in the judgment of Justice A. Redhead is any reference made to a defense by Tyrone Warner (also a Defendant in that 1987 action) of the nature and extent he now raises as a defendant in the instant action. Neither is it suggested, by the content of the said judgment, that such a defence was raised in the matter. Very importantly, the defendant in the instant matter does, neither by his pleadings nor his affidavit nor by his counsel in argument, suggest that the present defence was raised in the earlier matter. Counsel for the defendant , Mr. S. Benjamin, in fact, at the hearing of this application, suggested that the defence was not raised in the earlier case because his client felt confident  then of his right of ownership and saw no need to defend it in that action.

13. The injunction order of 1988 and the Judgment Order of June 1996 by Justice A. Redhead are both flash points in the history of this matter neither of which, it appears from the record, moved Tyrone Warner at that time(s) to lawfully and diligently defend his alleged interest in the disputed property with the arguments he now raises on this application.[2]

Claimants Submission

14. The Claimant submits that Tyrone cannot in the present action raise the Defense that (i) He is the lawful owner of the parcel 70 or (ii) That he has an equitable interest in the said

---

[1] This matter was filed in 1987 and apparently for several reasons including the death of Mr. Clarkson Ralph, judgment was delivered in **1996.**
[2] This substantive action was filed in **1987.**

4

parcel 70 on the grounds that; the issue as to ownership of the parcel 70 has already been determined by the court in 1996. The court held that the Claimant has a 50% interest in the said property. This interest was an equitable interest. Having regarded to the history of this matter since it was filed in 1987 nothing has transpired to alter the Claimant's interest.

15. Counsel for the Claimant contends that all issues relating to or forming the basis for the present action and/or Defence were determined in the earlier case and if any issue now raised by the Defendant was not then raised when it could have been raised, then, they are estopped from now raising it, as *an abuse of process*.

Defendant's Submission

16. The Defendant contends that he does not claim a registered interest in the property. That notwithstanding the present registered property interests in parcel 70, he has an unregistered and overriding interest in parcel 70 which is protected by S. 28 (g) of the R.L.A. This section he says, protects the rights of a person in actual occupation of land registered under the R.L.A.

17. The Defendant contends that his interest predates the death of Mr. Clarkson and the Claimant is estopped from dispossessing him on the grounds of Proprietary Estoppel attributable to Mr. Clarkson (decd.). The defendant does not provide the date from which his interest accrued. Counsel for the defendants submits that the defendant does not however claim prescriptive rights. In any event, neither the defendant's pleadings nor his affidavit in defence of this application disclose the basis for the acquisition of prescriptive rights.

Findings

18. The law with respect to the elements of proprietary estoppel is well established. Counsel for the Respondent/Defendant, Mr. Steadroy Benjamin, submitted: an excerpt of Snell's Principles of Equity 27th edit pp 564 – 569; the cases of, Inwards and Others v Baker

5

[1965] 1 ALL ER and; <u>Sir J. W Ramsden, Bart</u> v <u>Lee Dyson and Joseph Thornton</u> (1865) L.R. Vol 1 129; as authorities on the nature of proprietary estoppel. I accept as the prevailing Law on point, that which is set out in those authorities.

19. There is also much authority on the Law with respect to *res Judicata* and more specifically the related "*cause of Action estoppel*" and "*issue estoppel*". However, I believe there is perhaps no single better authority on the point than the case of <u>Arnold</u> v <u>Nat West Bank PLC</u> (H.L. (E))[1]

20. The application before the court is to strike out the Defence as an abuse of process. The abuse of the process arises from the contention that the issues required to be resolved in this matter or, the cause of Action/Defence, have been litigated already, resolved and disposed of by the High Court of Antigua and Barbuda – giving rise to *res Judicata*. There is an important distinction between cause of action estoppel and issue estoppel. They represent two species of estoppel *per rem judicatam*[2]. The case for issue estoppel is the stronger case for the claimant in this application.

21. In <u>Arnold and others</u> v <u>National Westminster Bank PLC</u> ("**Nat West**")[3]  Lord Keith of Kinkel distinguished the two estoppels thus*: "It is appropriate to commence by noticing the distinction between cause of action estoppel and issue estoppel. **Cause of action estoppel** arises where the cause of action in the later proceedings is identical to that in the earlier proceedings, the latter having been between the same parties or their privies and having involved the same subject matter. In such a case the bar is absolute in relation to all points decided unless fraud or collusion is alleged, such as to justify setting aside the earlier judgment. The discovery of new factual matter that could not have been found out by reasonable diligence for use in the earlier proceedings does not, according to the Law of England, permit the latter to be reopened....<u>Cause of action estoppel extends also to points which might have been but were not raised and decided in the earlier proceedings</u>*

---

[1] [1991] 2 A.C. 93
[2] See Diplock L.J. in Thoday v Thoday [1964] P. 181 (197 – 198)
[3] At pp 104 D – G, foot note 1

6

*for the purpose of establishing or negativing the existence of a cause of action."(emphasis mine)*

22. Lord Keith of Kinkel refined the distinction between *cause of action* and *issue* estoppel by reference to the case of Thoday v Thoday [1964] pp181 at 198, where Diplock L.J. defined **issue estoppel** thus:" *The second species, which I will call 'issue estoppel,' is an extension of the same rule of public policy. There are many causes of action which can only be established that proving that two or more different conditions are fulfilled. Such causes of action involve as many separate issues between the parties as there are conditions to be fulfilled by the plaintiff in order to establish his cause of action; and there may be cases where the fulfillment of an identical condition is a requirement to two or more causes of action. If in litigation upon one such cause of action any of such separate issues as to whether a particular condition has been fulfilled is determined by a court of competent jurisdiction, either upon evidence or upon a party to the litigation, neither party can, in subsequent litigation between one another upon any cause of action which depends upon the fulfillment of the identical condition, assert that the condition was fulfilled if the court has in the first litigation determined that it was not, or deny that it was fulfilled if the court in the first litigation determined that it was."* [1]

23. The Cause of Action in the instant substantive matter is for; *inter alia,* possession of parcel 70, from a trespasser in the person of the Defendant Tyrone Warner. The cause of action in the earlier suit No. 133/1987 was a claim to establish an interest/share in the same property by way of either a resulting trust or a constructive trust/Common intention by the Claimant/Petitioner[2]. It appears the cause of action in the two matters may not be the same; the present claim assuming an existing interest/right of the claimant in the same property that was the subject of the earlier action and seeking possession of same. However, it appears to me that the question as to who owns the land (whether in law or in equity) in the circumstances of both cases must be decided in both cases in order for the

---

[1] See also the *Nat West case* at pp105(g) for reference to this quote;
[2] In any event it was a claim for an equitable interest – see the Judgment of Redhead J.

court to disposes of the matters. Although trespass - as in the latter case - can be against an occupier as opposed to an owner, the facts do disclose the claimant as an owner.

24. But if I were wrong on the existence of a cause of action estoppel, I turn to the question of Issue Estoppel that arises in this matter. Issue estoppel is described by lord Keith of Kinkel at pp 105 E of the **Nat West Case** thus: *"Issue estoppel may arise where a particular issue forming a necessary ingredient in a cause of action has been litigated and decided and in subsequent proceedings between the same parties involving a different cause of action to which the same issue is relevant one of the parties seek to re-open that issue"*[1]

25. In my view, all issues relating to competing interests in the property had to be litigated and decided in the earlier case. The Defendant in the present action was a defendant in the earlier action. The earlier action concerned the ownership and the interest, legal or equitable, in the parcel 70 .Indeed, the Claimants interest in the disputed land in the earlier action was an equitable interest. The issue as to whether the Defendant had acquired an interest in what is now known as parcel 70 could have been raised and should have been raised in that earlier action. The defendant was, it appears, in occupation of the said lands at the time of the filing of the earlier action and now claims that his interest predated the filing of that earlier action.

26. It was incumbent on the Defendant to have raised the issues he presently raises, for the purpose of establishing or negativing the existence of a cause of action in the earlier 1987 proceedings especially when the person through whom he now alleges he obtained his interest in parcel 70 - Clarkson Ralph - was alive and a co-defendant in the same 1987 action.[2]

27. Like Cause of Action estoppel, issue estoppel is extended *"to cover not only the case where a particular point has been raised and specifically determined in the earlier proceeding, but also that where in the subsequent proceedings it is sought to raise a point*

---

[1] See also Diplock L.J. in Mills v Cooper [1967] 2Q.B. 459 at 468 F.
[2] Apparently, Clarkson Ralph died in 1990 – shortly after the 1987 action was filed; see the Judgment of Redhead J.

8

**Page 201**

*which might have been but was not raised in the earlier".* (See <u>Fidelities Shipping Co. Ltd.</u> v <u>v/o Exportschleb</u> [1966] 1. Q.B. 630, 642 per Piplock L.J.)

28. Sir James Wigran V – C in <u>Henderson</u> v <u>Henderson</u> (1843) 3 Hare 100 114 – 115 expressed the defendant's obligation to put his case forward in the earlier action thus: *"In trying this question, I believe I state the rule of the court correctly, when I say, that where a given matter becomes the subject of litigation in, and of adjudication by, a court of competent jurisdiction, the court requires that the parties to that litigation to bring forward their whole case, and will not (except under special circumstances) permit the same parties to open the subject of litigation in respect of matter which might have been brought forward as part of the subject in contest , but which was not brought forward , only because they have , from negligence, inadvertence, or even accident, omitted part of their case. <u>The plea of res judicata applies, except in special cases , not only to points upon which the court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time.</u>"* **(emphasis mine)**

29. Suffice it to say, the issues that are required now to be determined are issues and points that *properly belonged* to the earlier litigation and which the earlier court would have of necessity had to resolve in the earlier case had it been raised. Key witnesses to the facts in this matter such as the claimant, Millicent Ralph along with the Defendant in the earlier matter, her husband Clarkson Ralph, are now both deceased. The defendant failed to exercise *reasonable diligence* to have his claim for an interest in the subject property brought before the earlier court so that that court could have had the benefit of the first hand evidence of the key witnesses somewhat contemporaneously with the happening of the events.  If the Defendant had established his interest in the earlier case, the court could not have made the order it did. Put another way still, the court could not have awarded a 50% interest in parcel 70 to the claimant/petitioner if the Defendant had a

9

greater and earlier interest/claim to the said parcel 70 and had established that interest/claim.

30. The authorities establish somewhat, that there are exceptions to issue estoppel in special circumstances. These circumstances extend to include; where earlier proceedings have resulted in default judgment[1]; where there is a subsequent change in the law indicating the earlier decision was wrong [2] where fresh materials which could not with reasonable diligence been adduced in the earlier proceedings is now available.[3]

31. I am not satisfied on all the material before me of the existence in the instant case of any one of the special circumstances referred to above.[4] The authorities provide however, that the court ought not to take an inflexible approach in applying the special circumstances rule (see the **Carl Zeiss Case** at pp 947; see pg 10 hereof at foot note 2). Adopting and applying this approach to the instant case, I am still unable to glean circumstances that would prevent the application of issue estoppel (if not cause of action estoppel) to the facts and law of this case.

32. Finally, the Defendant alleges that his interest in the subject property predates the death of Mr. Clarkson Ralph. No allegation is made in the Defendant's Defence or for that matter, is any reference made in the earlier judgment of Justice A. Redhead, of the Defendant's interest far less one that predates the marriage of the Ralph Clarkson and the Claimant, or the date on which the Claimant vacated the matrimonial home or made her last contribution towards the acquisition of the property. Indeed, having regard to the nature of the Defence, it surprisingly lacks particularity with respect to dates. At para 5 of the defendant's Affidavit in Reply on this application, he merely states that he obtained an

---

[1] New Brunswick Railway Co. v British and French Trist Corporation Ltd [1939] AC 1 (28,21,38)

[2] This is subject to certain limiting conditions; The authorities are not entirely clear on the existence and/or application of this exception.

[3] See **Carl Zeis** Sifting v Rayner & Keeler Ltd (No. 2) [1967] 1 AC 853 (947) Lord UpJohn.
[4] Fraud or collusion is not disclosed in this matter either.

10

overriding interest in the property prior to the death of Clarkson Ralph[1]. If the defendant did raise these issues at that trial, then the court found against him and in favor of the claimant's interest. All the evidence the defendant would have required to establish his case would have been available to him then. There is now nothing new raised by the defendant, neither does the nature of his defence and pleadings admit of any fresh evidence or facts accruing after the death of the deceased. The defendant does not allege either in the application to strike out or in his defence to the substantive matter, that any new facts have arisen in relation to his interest claimed. In any event, he claims now that his interest – an equitable interest - arose and crystallized before Mr. Ralph died in 1990.[2]

33. Be that as it may, the effect of the earlier order by the court declaring the interest of the claimant in the subject property vest her rights certainly well prior to Mr. Ralphs death if not at the date of their marriage; both points in time prior to the Defendant entering upon the property [3].

34. Further, the Defendant claims an overriding interest under S. 28 (g) of the R.L.A. But this section, as I understand it, does not create or confer substantive rights on the Defendant. Rather, section 28 protects existing rights or the right to assert ones existing rights, if you have one.

35. So, whatever rights the Defendant has acquired or in any event has, he is entitled to establish while he is still in occupation of the lands. For the reasons provided above I am of the view that he would not have acquired any rights adverse to that of the Claimant and in any event and most importantly, even if he had done so prior to the filing of the earlier action as he has alleged, having failed to raise them before the court on the earlier 1987 action, he is estopped from doing so now.

---

[1] Justice Redhead at pp 5 of the Judgment of 1996 exhibited to the claimants affidavit in the instant application,, referred to Mr. Ralphs date of death as December 1990, some three years after that earlier matter was filed.
[2] He is also claiming an **overriding interest** pursuant to **S.28 (g) of the RLA**.
[3] The defendant does not contend that his entry or cause of action arose earlier than that date; also the chronology of the claimant's acts of contribution towards the acquisition of her interest in the property as set out in the Judgment of Justice Redhead suggests her acquisition of her interest well before the death of Mr. Clarkson. ,

11

36. I note that the evidence before the court suggests that the Defendant disregarded both the 1988 injunction and the subsequent Judgment Order of the court in relation to several particulars.[1].

37. Further still, the Judgment Order of June 1988 remains without compliance. This present application, in addition to being one for the striking out of the Defence, concerns what is essentially an action for an enforcement order in relation to the judgment order of Justice Redhead, in No. Suit 133/1987.

38. The recent action to which the instant application relates, concerns giving effect to the long out - standing judgment of suit 133/1987.

39. For the reason provided above the application of the Claimant/Applicant is allowed and :

**IT IS HEREBY ORDERED** that:-

1. The Defence of the Defendant is struck out as *res judicata* and an abuse of the process of the Court.
2. A date for the trial of this matter within the next 14 days be fixed by the court office forthwith.
3. Evidence in chief be given at trial viva voce.
4. The Claimant to serve a copy of this Order on the Defendant forthwith.

**David C. Harris**

**High Court Judge**

**Antigua and Barbuda**

---

[1] The evidence before the court includes the judgment exhibited to the affidavit of the claimant.

12

13

S.C.
In Chambers.
Wellington.
1899.
Sept. 29.
Stout, C.J.

## In re FENTON, DECEASED.

*Probate—Insufficient Attestation Clause—Witnesses out of Jurisdiction.*

Probate in common form was granted where the attestation clause was insufficient and the attesting witnesses out of the jurisdiction, the estate being small, and the probate required merely for a family arrangement.

MOTION for probate in common form.

The will had been executed in Australia, and the attestation clause was insufficient. The estate was under £100 under the only asset being the surrender value of a policy assuring a sum of over £200 upon the life of the testator's son. This policy had been assigned by the son to his mother, and the executor (the husband of the deceased) swore that he applied for probate only for the purpose of reassigning the policy to the son, in pursuance of a wish expressed by the testatrix. The executor swore also that he was present, and saw the will duly executed in the presence of the attesting witnesses.

*T. F. Martin* moved for probate.

Stout, C.J., granted probate, referring to *In the Goods of Rees*(1) and *In the Goods of Johnson*(2), and stating that the attestation clause was not in accordance with the statute, but if the witnesses had even been sworn, and forgotten what occurred, a Court might still apply the maxim, *Omnia præsumuntur rite essa acta.* Here the witnesses were out of the jurisdiction, and the estate small—one policy of insurance, not yet due—and it was proposed to settle it for the interests of the son. The husband had also sworn as to what took place at the time of signing the will. Considering all these circumstances, probate would be granted.

Solicitors for the executor: *Martin & Richmond* (Wellington).

(1) 34 L.J. P.D. & A. 56.   (2) 2 Curteis, 341.

S.C.
Hearing
Wellington.
1899.
Aug. 3, 7, 15.
Stout, C.J.

## MEYER v. GILMER.

*Building-contract — Extras — Waiver of Orders in Writing — Alterations not contemplated as Extras—Certificate of Amount due—Sufficiency—Certificate of Satisfaction — Oral Certificate — Penalties — Delay caused by New Independent Contract.*

Where extras were ordered at the instance of the employer personally, and the employer was present when the orders for such extras were orally given by the architect to the contractor, and part of the amount claimed for extras was afterwards paid for by the employer upon a certificate of the architect showing that part of the amount certified for was for extras, and the employer, in subsequently refusing to pay a final balance claimed to be due, based his refusal not on the want of orders in writing, but on the ground that there were fines or penalties which would absorb the balance,—

Held, That the jury were justified in finding that the employer had waived his right under the contract to refuse payment for extras unless ordered in writing.

Held, also, That written orders for alterations and extras were not required where these were so many and so great as to be outside the contract altogether, and were not such as were contemplated by the contract as extras. *Russell v. Sa da Bandeira*(1) followed.

A building-contract provided that payments should be made upon certificates in writing under the hand of the architect, and that a final balance of 25 per cent. should be retained in hand until forty days after the work had been satisfactorily completed, and a certificate to that effect had been granted by the architect. After the work was finished, the contractor furnished an account to the architect of the sum he alleged was due to him. The architect considered the account, and reduced it, and a fresh account was drawn up by the contractor in accordance with the alterations made by the architect. At the foot of this account the architect wrote and signed the words, "I certify this account is correct."

Held,—

(1) That this was a sufficient certificate in writing within the first part of the above provision.

(2) That it was doubtful whether it was a sufficient certificate, within the second part of the provision, that the work had been satisfactorily completed; but

(3) That a certificate within the second part of the provision did not require to be in writing, and that it was enough that there was evidence, and that the jury had found, that the architect had orally expressed his satisfaction with the completion of the work.

S.C.
1899.

MEYER
v.
GILMER.

If the payments made, and the deductions, were applied to the first item in the account, then the full amount of the contract price had been paid, and the balance claimed was for alterations and extras only; and *quære,* whether under the above circumstances any certificate of satisfaction was necessary in respect of the alterations and extras.

Where completion of the work originally contracted for was delayed by reason of an independent contract entered into for the construction of an additional work, which was not such an extra as was contemplated by a provision for extension of time,—

*Held,* That this set at large the penalties which the contract provided for in case of delay in completion.

THIS was an action upon a building-contract, which was tried at Wellington before Stout, C.J., and a special jury of four, on the 3rd and 7th of August, 1899. The facts of the case and the findings of the jury will be found fully set out in the judgment.

*Skerrett* and *Tringham* for the plaintiff.

*Menteath* for the defendant.                    *Cur. adv. vult.*

STOUT, C.J.:—

This is an action for the recovery of £245 5s. 3d., being balance due for buildings erected and alterations made by the plaintiff for the defendant at the Royal Oak Hotel. The defendant has pleaded—(a) That included in this amount are extras to the contract not ordered in writing; (b) payment in full of all money due; (c) no certificate certifying that the plaintiff is entitled to payment. The defendant has also counterclaimed for an amount of £495 for penalties incurred in terms of the contract between the parties. At the hearing of the action—the claim and counterclaim being heard together—it was agreed to submit certain issues to the jury, to leave the other facts in dispute to the Court, and also to leave the counterclaim to the Court on the evidence given. The defendant moved for a nonsuit, contending that there was no evidence to submit to a jury or to entitle the plaintiff to recover, and it was agreed that all questions of law should be dealt with on the case being further considered.

The issues submitted to the jury, and their answers, were as follows :—

S.C.
1899.

MEYER
v.
GILMER.

1. Did the architect certify that the works included in the contract had been satisfactorily completed ?—Yes, but not in writing, apart from Account No. 9.

2. Did the architect certify that the sum of £345 5s. 3d. was payable by the defendant to the plaintiff for balance due on contract and for extra work?—Yes, by certifying to Account No. 9.

3. Did the defendant, independently of the said written contracts, agree with the plaintiff—

(a.) To pay the sum of £90 for the construction of a cellar ?
—Yes.

(b.) To pay £75 10s. for shifting bedrooms ?—Yes.

(c.) To pay £3 5s. for shifting skylight ?—Yes.

(d.) To pay the fair value of the rest of the extra works ?
—Yes, by verbal agreement between the proprietor, architect, and builder.

4. Did the defendant waive the necessity for a written order being given by the architect for the extra works, alterations and additions to the said contract ?—Yes.

5. Were the extra works ordered of such a character as not to be within the contemplation of the parties at the time of entering into the said contract, and so as to make the special provisions of the contract relating thereto inapplicable ?—Yes, in regard to No. 2 contract.

It is necessary to state briefly the history of the contract. The defendant invited tenders for two separate works—one for the alteration of the then-existing building of the Royal Oak Hotel; and the other for the addition of a new wing to the hotel. The plaintiff tendered for both works—tender No. 1 for the new wing, and tender No. 2 for the alterations of the old building. Both tenders were accepted. There was one contract or agreement drawn up and signed, and one sum named as the price for both works—namely, £3,625. There were incorporated in the memorandum of agreement general conditions of contract. The conditions of importance in the case between the parties are 11, 12, 18, and 28. They are as follows :—

11. That architect shall be at liberty, if he shall think

SUPREME COURT.          [VOL. XVIII.

"fit to do so, to make any alterations in, or additions to, or "omissions from the works contracted for, or the finishing "thereof; and no such alterations, additions, or omissions "shall vitiate the contract, but the value of the same shall be "ascertained by the architect and added to or deducted from "the amount payable, or that may become payable, to the con-"tractor, as the case may require." [Then follows an arbitra-tion clause if either party is dissatisfied with the decision of the architect under this clause.]

12. "No day work, extra work, or alterations or additions "of any kind shall be allowed and paid for under any cir-"cumstances unless a written order for the same shall have "been given by the architect to the contractor, which order "must be produced at the completion of the works performed as a "voucher and authority for the works performed."

18. "Subject to the provisions of these conditions, the "moneys to become due to the contractor in respect of the "said works shall be paid at such times and in such propor-"tions as the architect shall deem expedient, upon certificates "in writing under his hand, at such rate as he may think fit, "not exceeding £70 per centum of the estimated value of the "work done and the materials on the ground; a sum equal to "£5 per centum shall be retained subject to the provisions of "clause 13, and the balance of £25 per centum of the said "moneys shall be retained in hand until forty days after the "work is satisfactorily completed, and a certificate to that "effect has been granted by the architect." [Then follow provisions as to liens under the Workmen's Act.] "No "certificate shall be for any less sum than £25."

28. "The contractor shall complete the whole of the works "required by tender No. 1 (except such works as the architect "may in writing direct the contractor to delay) on or before "the 11th day of August, 1896; and in case of default the "contractor shall pay to the proprietor, as and by way of "ascertained and liquidated damages for breach of contract, "and not by way of penalty, the sum of £3 for every day "thereafter, excluding Sundays, until the whole of the said "works shall have been completed. And for tender No. 2

VOL. XVIII.]          SUPREME COURT.          133

"the date of completion shall be the 11th day of May, 1896, "under said conditions as to liquidation and ascertained "damages of £3 per day required under tender No. 1. Pro-"vided nevertheless that, in any of the events following—"namely, (a) in the event of the execution by the contractor of "alterations in or additions to the works by the written order "of the architect; (b) in the event of the progress of the "works being delayed by inclement weather; (c) in the event "of combination of workmen, &c.—the contractor shall not be "liable for payment of the said sum of £3 per day during "such time as the architect shall, upon the completion of "the works, certify in writing that the completion of the "said works was reasonably delayed." [Then follows a pro-vision that the decision of the architect shall be final and conclusive as to what allowance of time should be made.]

The plaintiff began the performance of his works, but he had no sooner begun than alterations were proposed and ordered in what was called tender, or contract, No. 2—that is, in the alteration of the old building. It was not denied that during the course of the work so many and extensive were the alterations made that the plans were entirely altered. Looking at the plans and at the works as finished, there was no resemblance between them. There were also considerable and important alterations made in the plans of the new wing. The main alteration in the new wing was in the bathrooms and accessories. A separate contract in writing was made for the construction of a cellar. Payments were made as the works proceeded, the architect giving certificates for progress-payments. None of the certificates were produced. They had been lost or burned in the fire that some time afterwards destroyed the hotel. In the certificates no distinction was made as to the works under contract—alterations, extras, cellar contract, &c. The whole work was treated as if it were one work, and certificates given accordingly. The alterations in the old part were finished on the 7th of August, and the new wing finished in the end of November.

Some time after the work was finished the contractor furnished an account to the architect of the sum he alleged