S.C.
1899.

MEYER
v.
GILMER.

was due to him. This account, after the maintenance period had expired, was carefully considered by the architect. The clerk of works and the contractor were both present with the architect when the account was considered. Every item was scrutinised and discussed. The architect reduced the account by a considerable amount, and the contractor grumblingly assented to the sum fixed by the architect as being due. The architect fixed £4,170 11s. as the value of the work done, including the contract price, extras, and alterations. He deducted £100 5s. 9d. for work omitted, and £3,725 for moneys paid, thus leaving a balance of £345 5s. 3d. A fresh statement of account, embodying his determination of the amount due, was drawn up. The following is a copy of this account (it is dated October, but the evidence is it was not drawn up till April, 1897):—

Wellington, 6th October, 1896.

S. Gilmer to J. H. Meyer, Builder and Contractor.

|   |   £ | s. | d. |
|---|---:|---:|---:|
| To amount of original contract for additions to Royal Oak Hotel | 3,625 | 0 | 0 |
| To extras agreed upon, as per statements attached  (£ s. d. 169 15 0) | | | |
| To extras not agreed upon, as per statements attached— | | | |
|   My own account .. 269 15 7 | | | |
|   Bricklayers .. 59 1 4 | | | |
|   Paperhangers .. 29 11 0 | | | |
|   Plumbers' account, £77 8s. 1d., less amount included in contract for bathrooms, w.c., &c., £33.. 44 8 1 | | | |
|   | 545 | 11 | 0 |
|   | 4,170 | 11 | 0 |
| Less deductions as per schedule, £61 14s. 9d.; plumbers, £14; bricklayers, £24 11s. | 100 | 5 | 9 |
|   | 4,070 | 5 | 3 |
| Credit by progress-payments | 3,725 | 0 | 0 |
| Balance over.. | £345 | 5 | 3 |

On this statement of account being submitted to the architect, he certified it as follows:—

I CERTIFY this account is correct.

W. C. CHATFIELD, Architect.

3rd April, 1897.

S.C.
1899.

MEYER
v.
GILMER.

Armed with this account and certificate, the contractor waited on the defendant, and the defendant, not without some demur, paid £100 on account, accepting from the plaintiff the following receipt:—

RECEIVED cheque on account, £100.

J. H. MEYER.

3rd April, 1897.

The defendant retained the account.

If credit is to be given against the items appearing first in the account by the payments and deductions, the account would stand thus:—

|   | £ | s. | d. | £ | s. | d. |
|---|---:|---:|---:|---:|---:|---:|
| Original contract sum | .. | .. | .. | 3,625 | 0 | 0 |
| Deductions | .. | .. | .. | 100 | 5 | 9 |
|   |   |   |   | 3,524 | 14 | 3 |
| Agreed extras—that is, including special contracts for cellar, £90; baths, &c., £75 10s.; and skylight, £3 15s. | | | | 168 | 15 | 0 |
|   |   |   |   | 3,693 | 9 | 3 |
| Payments | .. | .. | .. | 3,725 | 0 | 0 |
| Credit | .. | .. | .. | £31 | 10 | 9 |

Then £100 was paid as already referred to. This would give £131 10s. 9d., as against £376 16s., for extras, or a balance unpaid of £245 5s. 3d. It does not appear from the accounts what the proportion of the extras or alterations was in connection with what is termed tender No. 2, and it is impossible from the accounts presented to say what special accounts have been left unpaid.

The questions that were debated were—1. Is the plaintiff entitled to recover for the extras or alterations, there being no order in writing for these produced? 2. Is the certificate in writing and the oral certificate of satisfaction sufficient to entitle the plaintiff to recover? 3. Is the defendant entitled to recover any penalties?

1. It was contended by the defendant's counsel that the works done outside the contract were extras in the meaning of the contract and of the general conditions, and that, as they were not ordered in writing, the plaintiff could not recover. In answer to this contention the plaintiff's counsel submitted (a) That the performance of conditions 11 and 12 had been

waived, and so the jury had found; (b) that the defendant was bound by the final certificate affixed to the statement of account; (c) that the alterations or extras were of such a character as to be outside the contract, and therefore the general conditions did not apply. Dealing with the first point, the finding of the jury is no doubt binding if there was any evidence to submit to the jury. There is practically no dispute as to what occurred. This is not a case where the architect orders alterations: the desire for alterations came not from the architect, but from the proprietor. The proprietor, as the work proceeded, desired from time to time alterations to be made, and alterations of alterations. He conferred with the clerk of the works and the builder, and then sent for the architect. All of these discussed the proposed alterations, and, after consultation together, the architect, at the request of the proprietor, instructed the contractor to make them. This was the usual course adopted. The proprietor was present when the order was given, and no question was raised about it being given in writing. Further, some of the alterations were paid for, for no distinction was made between the alterations and the work under contract—all were treated as one work. When the final statement, with the certificate attached, was presented to the defendant, and the £100 was paid, still no question was raised about orders in writing; and afterwards, when the parties met to discuss the position, the refusal to pay the balance was not based on there being no orders in writing, but on the ground that the fines or penalties would absorb the balance. If, then, there can ever be a waiver of such a condition, the jury had evidence before them that would warrant their finding a waiver. It was contended there could be no waiver unless the defendant knew that he was waiving the condition. The defendant must be presumed to have known the terms of his own contract, and he must have known that no orders had been given in writing. He was present when the architect directed alterations to be made, and he must be presumed to have known that oral directions were not in compliance with the terms of the contract. It has been held that such conditions can be waived: See

*Hudson on Building-contracts*(1). This is not like cases of corporations contracting under seal, or corporations bound by statute to enter into contracts in a particular manner: See *Lamprell* v. *Billericay Union*(2); *Hunt* v. *The Wimbledon Local Board*(3). *Pollock on Contracts*(4) assumes that but for the defendant in *Lamprell* v. *Billericay Union*(2) being a corporation the defendant would have been bound by the waiver.

2. The second point was that it was too late now to raise the question of the orders not being in writing, as the final certificate covered the omission: *Goodyear* v. *The Mayor, &c., of Weymouth and Melcombe Regis*(5); *Murdoch* v. *Lockie*(6). If the certificate is final, this is no doubt a complete answer. In my opinion the certificate is a final certificate in the sense of being a certificate of an amount due; but I shall deal with the effect of the certificate under another head.

3. The third point is that the alterations, at all events in what is termed tender No. 2, were so many and so great as to be outside the contract altogether, and were not such as were contemplated by the contract as extras. The jury have so found, and if there was evidence to support such a finding the Court is bound by it. *Russell* v. *Sa da Bandeira*(7) decides that if the works were outside the contract, then the written orders for extras were not required. Here the evidence was that the whole plans of tender No. 2 were so altered that the work done bore no resemblance to the work contracted for.

The next question is as to the certificates. The written certificate relied on purports to be a certificate. That is of importance, for in all cases where documents have been relied on as certificates and rejected as such they did not purport to be certificates. In *Morgan* v. *Birnie*(8) the document was a letter enclosing the builder's account, and it did not say the account was correct, or certify it in any way. And in *Goodman* v. *Layborn*(9) the document was headed "Estimate of

(1) p. 366.
(2) 3 Ex. 283; 18 L.J. Ex. 282.
(3) 4 C.P.D. 48; 48 L.J. C.P. 207.
(4) 6th ed. 149.
(5) 35 L.J. C.P. 12.
(6) 15 N.Z. L.R. 296.
(7) 18 C.B. N.S. 149; 32 L.J. C.P. 66.
(8) 9 Bing. 672.
(9) *Roscoe's Building Cases*, 3rd ed. 151.

S.C.
1899.
MEYER
v.
GILMER.

"Extras and Deductions," and at the end it had "Balance due "as in conditions, £125," and lower down the architect's signature, but there was no word used showing it was a certificate. Here there is a certificate. And, as was said by Mr. Justice Byles in *Roberts v. Watkins*(1), " certify " means, give information or assurance. What does this certificate do? It certifies the account—that is, the sum claimed—by Mr. Meyer as correct. And it was a sum arrived at by the architect after making deductions, &c., and fixing values. It is true the certificate does not use the words "is due" or "is payable." Condition 18 does not prescribe the use of such words; it only says the money is to be paid on a certificate in writing. Can the certificate mean anything else but that the sum is due — leaving open, no doubt, the question of penalties, which the architect does not seem to have had the power to settle?

None of the cases cited dealing with certificates are exactly like this one. In *Harman v. Scott*(2) the words used were, " I hereby certify that         are entitled to         , being " the balance of amount due to them on account of contract." And in another New Zealand case cited, *Official Assignee of Hutson v. The New Zealand Antimony Company (Limited)*(3), the words were, " I certify that Mr. H. has rebuilt the " furnaces, &c. Upon my examining them I found they " were working satisfactorily. Since then they have been " cooled down, and upon examination it was found that " the centre cylinders in two cases had cracked, and that " the joints in the outer cylinders had opened. These H. " assures me can be stopped with a mixture of plumbago, " which will render the furnaces perfectly sound." In the former case it was held that this amounted to a certificate of satisfaction, for the amount could not properly have been certified. In the latter case it was held that the latter part of the clause destroyed the effect of the previous part, and that on the face of the document it was plain the work had not been completed. In *Knox v. Patutahi Road Board*(4)

(1) 14 C.B. N.S. 592, 595; 32 L.J. C.P. 291, 293.
(2) 2 N.Z. C.A. 407.
(3) 10 N.Z. L.R. 148.
(4) 11 N.Z. L R. 496.

it was held that a statement of the Engineer that he had passed the work was not equivalent to a certificate that the work had been completed to his satisfaction. It may have meant that the Engineer had waived the performance of the work to his satisfaction. And it was admitted in that case that, though the work was not done according to the plan and specifications, he thought it was good enough to pass.

S.C.
1899.
MEYER
v.
GILMER.

If the certificate of satisfaction required to be in writing, I have some doubt if this certificate could have fulfilled the requirement, as the certificate may be said not to go as far as the one relied on in *Harman v. Scott*(1). I do not think, however, that another certificate of satisfaction was required. It will be observed that in the 18th condition it is expressly stated that the certificate for payment must be in writing. The other requirement is that " moneys shall be " retained in hand until forty days after the work is satis- " factorily completed and a certificate to that effect has been " granted by the architect." I am asked to read in the words " in writing" after the word " certificate." I do not think I have any authority to do so, and therefore an oral certificate is all that is necessary: *Roberts v. Watkins*(2). If I am right in this view, then there is evidence of the architect having expressed his satisfaction with the completion of the work. His interviews with the defendant and the plaintiff, and the fact that no question was ever raised till the hearing of this action of there being no certificate of satisfaction, all show that it was only the absence of a written certificate that was relied on. Even in the statement of defence in this action no defence is set up that there was no certificate of satisfaction. It is only at the hearing, as I have said, that this defence is raised, and there was no amendment asked for of the statement of defence. There is raised in the statement of defence that there was no certificate of the amount due—that is, a certificate under the first part of section 18; but there is no mention of the architect not having been satisfied, as is stated in the latter part of section 18, and it may be that such a defence cannot now be raised.

(1) 2 N.Z. C.A. 407.
(2) 14 C.B. N.S. 592; 32 L.J. C.P. 291.

S.C.
1899.
MEYER
v.
GILMER

Further, I may notice that, if the payments in the account, and the deductions, are to be applied to the first item in the account, then the full amount of the contract has been paid, and all that is left unpaid is the balance due for alterations and extras; and it may be that for these no such certificate of satisfaction was necessary. Assuming, however, that such a certificate was necessary, I am of opinion that an oral certificate was sufficient.

I am therefore of opinion that the defences raised fail, and that the plaintiff is entitled to judgment for the sum of £245 5s. 3d.

I now come to the counterclaim for penalties. The reading of section 28 is peculiar. It may read that section 28 ends before the introduction of the new clause, which has been inserted in writing, the main clause being printed—namely, at the words "been completed." The addition in writing speaks of clause 28 as if it were not part of that clause. I shall assume, however, that it is one clause, and that the provisions apply to both parts of the clause.

As to tender No. 1, I am of opinion no penalties are recoverable, as it is clear that the independent contract for the construction of the baths, &c., delayed the completion of the new wing. This set the penalties at large. The condition is that "the whole of the works required by "tender No. 1" shall be completed on or before the 11th day of August, 1896. These alterations and new works were not required by tender No. 1. This is not, therefore, like the case of *Jones v. St. John's College*(1), in which the words were, "and that the period or periods "for completing all such alterations or extra works shall "not exceed the period limited by these presents for the "completion of the works hereby contracted for, unless an "extension of time be also allowed by order specifying "the limit of extension, signed by the clerk of the works "and bursar; . . . and no alterations . . . shall "execute . . ." Here the completion of the work that was contemplated was only a completion of the works that

(1) L.R. 6 Q.B. 115.

S.C.
1899.
MEYER
v.
GILMER

were tendered for. It is true that proviso provides for an extension if there is an order in writing, but the work done in connection with the baths, &c., was not such an extra as the proviso contemplated. It was a new contract, made, as the jury has found, between the proprietor and the builder.

As to tender No. 2, the whole works were so altered, as the jury has found, that the work was substantially a new work, and not the work that had to be completed in the time mentioned in the conditions. The cases are numerous to show that, unless, as in *Jones v. St. John's College*(1), the contract expressly declares that alterations are to be completed in the same time as the contract, the penalties are at large. The cases of *Murdoch v. Lockie*(2), *Dodd v. Churton*(3), and *Fuller v. The Queen*(4) need only be cited.

I therefore give judgment for the plaintiff in the counterclaim—that is, I disallow it.

I award costs to the plaintiff according to scale in the statement of claim and in the counterclaim—but not the costs of hearing in the counterclaim, as both were heard together—with witnesses' expenses and disbursements. I allow also fee for extra counsel, £5 5s., and for second day, £15 15s.

*Judgment for the plaintiff.*

Solicitor for the plaintiff: C. W. Tringham (Wellington).
Solicitors for the defendant: Menteath & Beere (Wellington).

(1) L.R. 6 Q.B. 115.
(2) 15 N.Z. L.R. 296.
(3) 66 L.J. Q.B. 477; [1897] 1 Q.B. 562.
(4) 3 N.Z. Jur. N.S. S.C. 125.

HOUSE OF LORDS

Nov. 6, 7, 8, 9, 13, 14, 15 and 16, 1989

MOTOR OIL HELLAS (CORINTH) REFINERIES S.A.

v.

SHIPPING CORPORATION OF INDIA

(THE "KANCHENJUNGA")

Before Lord KEITH OF KINKEL, Lord BRANDON OF OAKBROOK, Lord TEMPLEMAN, Lord GRIFFITHS and Lord GOFF OF CHIEVELEY

Charter-party (Consecutive Voyage) — Nomination of unsafe port — Charterers ordered vessel to load at Kharg Island — Iran-Iraq war — Whether owners elected not to treat Kharg Island as improper nomination — Whether owners waived right — Whether charterers in repudiatory breach.

Under a charter-party dated Aug. 8, 1978 the owners let their vessel *Kanchenjunga* to the charterers for four consecutive voyages with an option (which was exercised) to extend the period to cover four further consecutive voyages. The charter was in the Exxonvoy form and the trading option defined the loading ports as 1/2 safe ports Arabian Gulf excluding Fao and Abadan.

On Aug. 8, 1978 the charterers sub-let the vessel on a back to back basis to Varnima Chartering Compania Naviera S.A. On Nov. 19, 1980 Varnima sub-sub-chartered the vessel to Refineria de Petroleos del Norte S.A. (Petronor) for a single voyage from loading ports defined as 1/2 safe ports Arabian Gulf excluding Iran and Iraq but including Kharg, Lavan and Sirri Islands. The Petronor charter was in the Asbatankvoy form.

Following the making of the Petronor charter the charterers ordered the vessel to load a cargo of crude oil at Kharg Island. The order was given on Nov. 20 and repeated on Nov. 21.

On Nov. 21 the owners instructed the master to proceed to Kharg Island. The vessel arrived on Nov. 23 and gave notice of readiness. By Dec. 1 the vessel had still not berthed and on that day there was an Iraqi raid upon Kharg Island during which bombs were dropped. The master of the vessel promptly weighed anchor and proceeded away from Kharg Island to a point of safety.

On Dec. 2 the owners informed the charterers that Kharg Island had been bombed and that the master had proceeded 25 miles out to sea for safety, and called on the charterers to nominate a safe port. The charterers replied repeating their request that the master proceed to Kharg Island.

There then ensued exchanges between the owners and the charterers under which the owners called upon the charterers to nominate another port which would be safe and the charterers refused to do so insisting that the vessel should load at Kharg Island.

The owners wanted the master to go to Kharg Island and told him to comply with the voyage instructions but the master rejected these instructions.

The dispute was referred to arbitration. The charterers submitted that the owners' conduct between Nov. 21 and Dec. 2 showed that they had elected not to treat Kharg Island as an improper nomination of a loading port under the charter; alternatively if there was not an election there was at least a promissory estoppel which precluded owners from contending that Kharg Island was an unsafe port.

Owners sought to rely on cl. 20(vi)(b) of the charter contending that they were entitled after Dec. 1 to refuse to load at Kharg Island. Clause 20(vi)(b) provided inter alia:

(b) if owing to any war, hostilities warlike operations . . . entry into any such port of loading . . . or the loading . . . of cargo at any such port considered by the master or owners in his or their discretion dangerous or prohibited . . . the charterers shall have the right to order the cargo . . . to be loaded . . . at any other safe port . . .

Since the charterers had not exercised their right, Kharg Island remained the only nominated port and as there was no material change of circumstance the master continued to be entitled to refuse to load at that port and was not at fault in exercising his right to do so.

By their interim award the arbitrators held that it was the charterers who were in repudiatory breach and that the owners were entitled to treat the charter as at an end and recover damages from the charterers. There was an appeal against that award.

————*Held*, by Q.B. (Com. Ct.) (HOBHOUSE, J.), that (1) under a charter it could not be contended that a shipowner when he received an order was under an obligation to check whether it was a proper order to a safe port and to reject it if it was not; proceeding to a nominated port did not deprive shipowners of any of their rights but the duty to mitigate or avoid loss did require that the master should in order to safeguard the vessel refuse to enter the port or if already within it, leave it; the order did not give rise to any obligation upon the owners to elect and mere compliance did not amount to any election;

(2) in the context of what had passed between the parties previously owners' communication to charterers on Nov. 21 was correctly characterized as an acceptance of the order not a mere compliance with the order; the fact that the owners served a notice of readiness indicated that the owners were saying that they were ready and willing to load at Kharg Island; on Nov. 25 the owners were still saying that the vessel was available to load and called upon charterers to arrange priority berthing; there was nothing equivocal about the owners' conduct and they were dealing with the charterers on the basis that the loading port nomi-



nation had been made and that Kharg Island was that port;

(3) on the facts and evidence the owners did waive their right to say that Kharg Island was not the nominated loading port under the charter;

(4) on the promissory estoppel argument the conduct found by the arbitrators did represent that the owners were willing that the vessel should proceed to Kharg Island and load there under the charter;

(5) on the facts found by the arbitrators the master did have the right to refuse to load the cargo at Kharg Island; this gave rise to an option to charterers to nominate another loading port; they chose not to exercise that option and in circumstances where the master was still bona fide entitled to refuse to load at Kharg Island, the charterers terminated the charter; they could not now complain of any breach on the part of the owners; and the submission that the owners had waived their rights to rely on cl. 20(vi)(b) had not been made out.

The owners appealed and the charterers cross-appealed.

——————Held, by C.A. (Fox, Lloyd and Glidewell, L.JJ.), that (1) nowhere in the owners' telex of Nov. 20 or in their two telexes of Nov. 21 did they reserve the right to treat the nomination as non-contractual; and the owners gave notice of readiness after proceeding north of latitude 24 deg. without obtaining the charterers' agreement to pay the additional war risk premium; these two factors showed that the owners' conduct was unequivocal and that the owners were dealing with the charterers on the basis that the loading port nomination had been made and Kharg Island was that port;

(2) it was clear from the arbitrators' findings that the owners knew the facts; if those facts meant that Kharg Island was unsafe then the owners must have known that they were entitled to refuse to accept the nomination; the right to refuse to load at Kharg Island was not specifically stated in the charter but it was implicit as a matter of legal analysis; by accepting the charterers' nomination the owners lost their right to refuse to load at Kharg Island;

(3) the charterers were entitled to insist on the vessel loading at Kharg Island; the owners had by their conduct waived their right to refuse to load at Kharg Island and their claim for damages for repudiation failed;

(4) under cl. 20(vi) the only right expressly given to the owners was the right to discharge cargo at any safe port if the charterers failed to nominate an alternative port of discharge when requested; although the clause gave the owners no express right to sail away in the event of the loading port being considered dangerous or impossible such a right existed by necessary implication;

(5) cl. 20 (vi) conferred a separate and independent discretion on the master of the vessel and nothing the owners did could be construed as a waiver of the master's discretion; the appeal and cross appeal would be dismissed.

The charterers appealed as to the effect of cl. 20(vi) and the owners cross-appealed on the issue of waiver.

——————Held, by H.L. (Lord Keith of Kinkel, Lord Brandon of Oakbrook, Lord Templeman, Lord Griffiths and Lord Goff of Chieveley), that (A) as to the cross-appeal: (1) the situation in which the owners found themselves was one in which they could either have rejected the charterers' nomination of Kharg Island as uncontractual or they could have, nevertheless, elected to accept the order and load at Kharg Island thereby waiving or abandoning their rights to reject nomination but retaining their right to claim damages from the charterers for breach of contract (see p. 400, col. 1);

(2) the master gave notice of readiness on arrival at Kharg Island; thereafter the owners were asserting that the vessel was available to load and they called on the charterers to arrange priority berthing and referred to the fact that laytime was running; in these circumstances the owners were asserting a right inconsistent with their right to reject the charterers' orders; the owners must be taken in law to have elected not to reject the charterers' nomination and the owners' cross-appeal would be dismissed (see p. 393, cols. 1 and 2; p. 400, cols. 1 and 2).

(B) As to the charterers' appeal: the clause expressly referred to the discretion which the owners and master were entitled to exercise in a situation of danger and must impliedly recognize that in the exercise of that discretion they might decline to load or discharge at the relevant port; the clause did not only apply to named ports or ports properly nominated under the charter because in the event of an improper nomination being made by the charterers the owners' acceptance of the nomination would have the effect that all the relevant contractual provisions applied including cl. 20 (vi); and the owners, presented by the charterers with an uncontractual nomination, had to decide whether or not to reject it; they elected not to do so and this election could not have had any effect on cl. 20 (vi); the appeal would be dismissed (see p. 393, cols. 1 and 2; p. 401, col. 1).

———

The following cases were referred to in the judgment of Lord Goff:

Borrowman Phillips & Co. v. Free & Hollis, (1878) 4 Q.B.D. 500;

China National Foreign Trade Transportation Corporation v. Evlogia Shipping Co. S.A. of Panama (The *Mihalios Xilas*), (H.L.) [1979] 2 Lloyd's Rep. 303; [1979] W.L.R. 1018;

Compania Naviera Maropan S/A v. Bowater's Lloyd Pulp and Paper Mills Ltd. (The *Stork*), (C.A.) [1955] 1 Lloyd's Rep. 349; [1955] 2 Q.B. 68; [1954] 2 Lloyd's Rep. 397, [1955] 2 Q.B. 68;

-appealed on the

KEITH OF KINKEL, Lord TEMPLEMAN, F CHIEVELEY), that ) the situation in elves was one in ejected the char- and as uncontrac- heless, elected to arg Island thereby its to reject nomi- to claim damages of contract (see

adiness on arrival wners were assert- to load and they e priority berthing ne was running; in were asserting a to reject the char- be taken in law to charterers' nomi- eal would be dis- p. 400, cols. 1 and

ppeal: the clause retion which the d to exercise in a pliedly recognize retion they might the relevant port; o named ports or der the charter roper nomination e owners' accept- ave the effect that rovisions applied ers, presented by ctual nomination, to reject it; they ion could not have appeal would be 2; p. 401, col. 1).

ferred to in the

Free & Hollis,

Transportation ing Co. S.A. of ), (H.L.) [1979] .L.R. 1018;

'A v. Bowater's td, (The *Stork*), ). 349; [1955] 2 p. 397, [1955] 2

Hughes v. Metropolitan Railway Co., (1877) 2 App.Cas. 439;
Kammins Ballrooms Co. Ltd. v. Zenith Investments (Torquay) Ltd., (H.L.) [1971] A.C. 850;
Kodros Shipping Corporation of Monrovia v. Empresa Cubana de Fletes (The *Evia*), (No. 2), (H.L.) [1982] 2 Lloyd's Rep. 307; [1983] 1 A.C. 736;
Reardon Smith Line Ltd. v. Australian Wheat Board (The *Houston City*), (P.C.) [1956] 1 Lloyd's Rep. 1; [1956] A.C. 266;
Scarf v. Jardine, (H.L.) (1882) 7 App.Cas. 345.

---

This was an appeal by the charterers Motor Oil (Hellas) Corinth Refineries S.A. and a cross-appeal by the owners, Shipping Corporation of India from the decision of the Court of Appeal ([1989] 1 Lloyd's Rep. 354) dismissing the owners' appeal and the charterers' cross-appeal from the decision of Mr. Justice Hobhouse ([1987] 2 Lloyd's Rep. 509) holding inter alia that the owners had waived their right to treat Kharg Island as non-contractual but that the owners were entitled to the protection of cl. 20(vi) of the charter-party.

Mr. Anthony Clarke, Q.C. and Mr. Charles Haddon-Cave (instructed by Horrocks & Co.) for the charterers; Mr. Michael Collins, Q.C. and Mr. David Mildon (instructed by Messrs. Ince & Co.) for the owners.

The further facts are stated in the judgment of Lord Goff of Chieveley.

Judgment was reserved.

Thursday Feb. 15, 1990

---

JUDGMENT

Lord KEITH OF KINKEL: My Lords, I agree that this appeal and the cross-appeal should be dismissed for the reasons set out in the speech to be delivered by my noble and learned friend Lord Goff of Chieveley. I also agree with the supplementary observations of my noble and learned friend Lord Brandon of Oakbrook.

Lord BRANDON OF OAKBROOK: My Lords, I have had the advantage of considering in draft the speech prepared by my noble and learned friend, Lord Goff of Chieveley. I agree with it and for the reasons which he gives I would dismiss both the appeal and the cross-appeal.

I think it important to observe that, on my noble and learned friend's analysis of the case, the only right which the owners waived was the right to reject the nomination of Kharg Island as uncontractual; and that, if the ship had loaded there and been lost or damaged in a further air raid, the charterers would, despite that waiver, have been liable to the owners for such loss or damage on the ground of their breach of contract in ordering the ship to load at an unsafe port.

It seems to me to follow from this that the owners might have been able to succeed in their claim against the charterers for loss of freight if they had pleaded and proved that the ship's master, in refusing to load at Kharg Island, had acted reasonably so as to mitigate the damage for which the charterers would have been liable in the eventuality to which I have referred. For what may well have been good reasons, however, no contention of this kind was put forward for the owners at any stage of the proceedings. That being so, your Lordships are not required to deal with such a point in this case.

Lord TEMPLEMAN: My Lords, I agree that the appeal and cross-appeal be dismissed.

Lord GRIFFITHS: My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Goff of Chieveley. I agree with it and would dismiss both the appeal and the cross-appeal.

Lord GOFF OF CHIEVELEY: My Lords, this case is concerned with *Kanchenjunga*, a very large crude carrier of 272,372 tons dead weight. Her owners at all material times were the Shipping Corporation of India of Bombay (whom I shall refer to as "the owners") and she flew the Indian flag. The owners (the shares in which are owned by the Government of India) are a large shipping company, owning a number of other tankers as well as *Kanchenjunga*. The vessel was chartered to Motor Oil (Hellas) Corinth Refineries S.A. of Athens (whom I shall refer to as "the charterers") under a consecutive voyage charter-party dated Aug. 8, 1978, on the Exxonvoy form, for four consecutive voyages with an option for the charterers to extend the period for a further four consecutive voyages. That option was exercised by the charterers, and the present case is concerned with the eighth and last voyage under the charter as so extended. The Exxonvoy standard form of charter contains no safe port warranty in the printed form; however, in completing the form, the loading ports in part I of the charter were agreed to be "1/2 (one/two) safe ports Arabian Gulf excluding Fao and Abadan" in charterers' option. There was a wide range of discharging

ports; these are not material. I shall have later to refer to cl. 20, a substantial printed clause contained in part II of the charter, and in particular to cl. 20 (vi) which is expressed to be concerned with war risks.

On the same date as the above charter, the charterers sub-chartered the vessel on a back-to-back basis to an associated company called Varnima Chartering Compania Naviera S.A. ("Varnima"). Throughout this matter, the charterers and Varnima have been treated as having an identical interest. On Nov. 19, 1980, Varnima sub-sub-chartered the vessel to Refineria de Petroleos del Norte S.A. ("Petronor"). I shall refer to this charter as "the sub-charter", and to the charter between the owners and the charterers as "the head charter". The sub-charter was not on back-to-back terms. It was for a single voyage, on the Asbatankvoy form (for all practical purposes identical to the Exxonvoy form), the loading ports being expressed to be —

... one/two safe [ports] Arabian Gulf excluding Iran and Iraq but including Kharg, Lavan and Sirri Islands.

The rate of freight under the sub-charter was substantially higher than that under the head charter.

The vessel had been waiting at Mina al Fahal in the Arabian Gulf since Oct. 8, 1980 for loading port orders for the final voyage under the head charter. It was following the making of the Petronor fixture, on Nov. 19, that the charterers ordered the vessel to proceed to Kharg Island. The order was given on Nov. 20, and repeated on Nov. 21, on which day the owners instructed the master of the vessel to proceed to Kharg Island. He did so, arriving at Kharg Island on Nov. 23, when notice of readiness was given. On Dec. 1 there occurred an air raid by Iraqi aircraft upon Kharg Island, which caused the master of the vessel to weigh anchor and proceed away from Kharg Island to a place where she could wait in safety. There then followed an exchange of telex messages between the parties which led first to impasse and ultimately to the termination of the charter in early January, 1981.

When the head charter was entered into, in August 1978, Iraq and Iran were not at war. It was not until Sept. 22, 1980 that border hostilities between Iran and Iraq, which had been simmering for some months, erupted into full-scale war. The general position in the vicinity of Kharg Island, and the owners' reaction to it, are described in detail in pars. 7 to 10 of the arbitrators' reasons for their award. It appears that, following the outbreak of war, among the targets for Iraqi air attack were the oil installations at Kharg Island. The natural reaction of shipowners on the eruption of fighting was to keep their vessels out of areas where they might suffer damage. However, at this time India was very short of crude oil and pressure was put on the owners by the Indian authorities (the Oil Co-ordination Committee — "O.C.C.") to load from Iranian ports, including Kharg Island, in spite of the risks which would be incurred. Paragraphs 9 and 10 of the arbitrators' reasons (in which the owners are referred to as "S.C.I.") read as follows:

9. Up to 19 November, Iran admitted that there had been air raids on Kharg Island on the following dates: 24, 27 September, 5, 10, 13, 14, 15 October. These air raids were not of the concentrated type so familiar in the 1939–45 war; indeed, Iraq did not have the bombers to operate such attacks. Rather they appear to have been of a hit and run type operated by one, two or three fighter-bombers. It is possible that air raids in addition to those admitted by Iran took place. In spite of the risks involved, five tankers belonging to S.C.I. loaded at Kharg in the first half of October. To minimise the risks, the vessels anchored about five miles off until they were called in to berth; a strict black-out was enforced by the Iranian authorities and there were restrictions on the use of radio and V.H.F. The S.C.I. vessels observed that oil tanks had been damaged and were on fire; frequent anti-aircraft firing was observed. The raids would appear to have been directed at the oil storage tanks, rather than at the actual loading installations or at ships. However, on 10 October, two bombs fell in the water in close proximity to S.C.I.'s vessel *B. R. Ambedkar* which was waiting to load (this vessel was diverted to Lavan Island to load). Their *Lok Manya Tilak* also reported heavy attacks on 14 and 15 October; as a result of these reports, S.C.I. decided not to send further tankers to Kharg Island until such time as "reasonably safe conditions for loading" were restored.

10. Towards the end of October and the beginning of November, the Iranian Oil suppliers National Iranian Oil Co. ("N.I.O.C.") were pressing O.C.C. to take up cargo from Kharg and on or about 5 November the Government of India agreed to S.C.I. sending the *C. P. Shivaji* to Kharg "subject to ship's captain local assessment of the situation". At the same time, S.C.I. went into the market with a view to chartering a v.l.c.c.

'] Vol. 1
[H.L.

the tar-
illations
of ship-
to keep
 might
dia was
 put on
the Oil
 .") to
Kharg
ould be
ie arbi-
ers are

ted that
land on
:, 5, 10,
ere not
 in the
ave the
ier they
in type
fighter-
aids in
n took
:d, five
: Kharg
lise the
e miles
a strict
n auth-
the use
vessels
amaged
ft firing
near to
: tanks,
llations
er, two
mity to
ch was
rted to
Manya
14 and
eports,
kers to
sonably
ored.
and the
Oil sup-
O.C.")
o from
er the
., send-
iject to
le situ-
nt into
v.l.c.c,

to load at Kharg which it could put in under its contract(s) of affreightment with O.C.C. S.C.I. ordered the *C. P. Shivaji* to Kharg on 6 November and the *Barauni* on 8 November. The *C. P. Shivaji* reported that the situation was dangerous with attempted air raids, although she encountered no difficulties in loading. As a result on 9 November the *Barauni* was ordered to stay at Mina al Ahmadi pending further orders. In the meantime, the negotiations for chartering in a v.l.c.c. had apparently been proceeding and on or about 15 November the *Venus* was fixed to load some 210,000 metric tons. That vessel was expected to berth on 15 or 16 November and on 17 November S.C.I. decided to order the *Barauni* to sail from Mina al Ahmadi at daybreak on 18 November for Kharg so that she could load immediately after the *Venus*. At or shortly after this time, S.C.I. also ordered the *N. S. Bose* and the *Satyamurti* to Kharg to load.

Meanwhile, in September, October and the first half of November telex exchanges took place between the owners and the charterers about the employment of the vessel on her last voyage under the charter. She completed discharge on her seventh voyage at Brunsbuttel in West Germany, and was ordered by the charterers to proceed at slow speed to the Arabian Gulf for orders. Ultimately, following the fixture with Petronor on Nov. 19, the charterers telexed the owners on Nov. 20 informing them of the fixture and requesting them to instruct the master to proceed to Kharg Island for loading. On Nov. 21, the charterers telexed the owners with detailed voyage instruction, which the owners passed on to the master on the same day, advising him that they were arranging bunkers at Damman on the loaded passage and that, in view of the current situation prevailing in the area, he should proceed with due caution. On the same day the owners consulted with the Government of India as to whether the vessel should go to Kharg Island, pointing out that:

. . . since we have been loading our own as well as inchartered vessels at Kharg Island in recent past and also at this very time our non-compliance [with] the charterers' instructions will lead to breach of charterparty with serious implications.

The response was that the owners should take a commercial view of the situation. The arbitrators understood that to mean that:

. . . the national interest was not concerned and that S.C.I. should weigh against the possible risks of damage to the ship and injury to the crew the possibility of being liable for heavy damages if it were later held that they were not entitled to refuse to order the ship to Kharg Island.

The master was, however, concerned about the order to proceed to Kharg Island, and when he cabled to the owners with his e.t.a. at Kharg Island, he added a protest against ordering the vessel to Kharg Island which "[we] consider dangerous". The owners did not, however, respond to this protest; and when, on the same day, they telexed the charterers confirming that they had instructed the master to comply with the charterers' instructions to proceed to load at Kharg Island, they stated that they had done so without prejudice to their rights in respect of the very substantial delay by the charterers in giving orders for the loading port (a claim which was later to be upheld by the arbitrators), but made no protest about the orders to proceed to Kharg Island.

The vessel anchored off Kharg Island at 18 06 G.M.T. on Nov. 23, and served notice of readiness. Under the charter-party, laytime began to count six hours thereafter, with a total laytime of 72 running hours. Thereafter the owners, referring to the fact that the laytime was running, repeatedly pressed for priority berthing. When the vessel arrived, there were seven other vessels anchored, presumably waiting to load, including the owners' vessel *Barauni*; shortly afterwards *Satyamurti*, also belonging to the owners, arrived for loading. On Nov. 25, the master of *Satyamurti* radioed to the owners reporting "situation generally satisfactory, no cause for alarm", but that a black-out was being strictly observed and that A.A. firing had been observed on the island during the early hours. Because of the reported A.A. fire, the owners instructed their vessels to proceed 25 miles west of Kharg Island and, on Nov. 25, informed the charterers of this, holding the charterers responsible for sending the vessel to Kharg Island. The arbitrators observed that this was the first occasion on which the owners had raised the possible unsafety of Kharg Island with the charterers since receiving orders to proceed there to load. On Nov. 26, the master of *Satyamurti* informed the owners that he had stayed where he was, thinking the anchorage better there than 25 miles west; he reported further sporadic A.A. fire, but thought this was only routine/practice. However, because of the continued delay in berthing, the vessel left Kharg Island on Nov. 26, and proceeded to Mina al Ahmadi for bunkering, returning to Kharg Island early in the morning of Nov. 28. She did not miss her turn by leaving the port for



this short time, and resumed her position as second in turn. On Nov. 28, the owners kept the charterers informed of the vessel's movements. On Nov. 30, the loading berth became free for the vessel; but she was unable to berth because of bad weather, and before she could berth there was an air raid on Kharg Island at 23 15 hours on Dec. 1. The master promptly weighed anchor and proceeded away from Kharg Island until about 03 00 hours on Dec. 2 when the vessel was stopped pending instructions from the owners.

On Dec. 2 the owners telexed the charterers reporting the air raid and the movement of the vessel to the south, and stating that they considered it self-evident that the port was unsafe. They claimed (incorrectly, as the arbitrators held) that they had expressed reservations about the safety of Kharg Island, and that they had agreed to proceed to Kharg Island without prejudice to their right to claim damages. They asked the charterers to nominate soonest a safe port where they proposed to load cargo. There followed an exchange of telex messages, in which the charterers pressed the owners to instruct the vessel to return to Kharg Island for loading, and the owners protested that the port was unsafe. However, on Dec. 3, the owners cabled the master as follows:

> Charterers want vessel to proceed immediately to Kharg. Please comply with our voyage instructions. Acknowledge forthwith.

But the master was unwilling to return to Kharg Island and replied on Dec. 4 to the charterers:

> Received your voyage instructions through owners to proceed to Kharg. As situation in Kharg is dangerous and as we witnessed heavy bombing regret unable to comply with your instructions.

Petronor continued to press upon Varnima that the vessel should return to Kharg Island for loading, pointing out that other vessels were doing so. Attempts by them to obtain alternative cargo elsewhere in the area failed. The owners, on the other hand, continued to press the charterers to nominate an alternative safe port, and Varnima pressed Petronor to do likewise. By mid-December, solicitors had been instructed. No alternative port having been nominated, the owners' solicitors informed the charterers' solicitors on Nov. 5 that the owners treated the charterers as having repudiated the contract; and the charterers' solicitors maintained that it was the owners who had repudiated the charter, and that the charterers had treated the owners as being in repudiation. So the battle lines were drawn.

In the arbitration, where jurisdiction was conferred on the arbitrators to deal with both the dispute as between the owners and the charterers and the dispute as between Varnima and Petronor, the arbitrators first held that, when the vessel was ordered to Kharg Island on Nov. 21, Kharg Island was not a prospectively safe port. They stated in their reasons for their award (par. 29):

> A full-scale war involving Iran and Iraq had been waging for some two months, air attacks had been made on Kharg and it was but a short flying distance from Iraqi bases. On the other hand, ships as such had not been attacked, there had been a pause in the air attacks, war risk insurance was obtainable and ships were loading. However, the risk of further air attacks still obtained as was realised by all concerned and we find that in the context of the head charter Kharg was not a prospectively safe port when nominated on 21 November.

However, they went on to hold that the safety or unsafety of Kharg Island was not changed in any way by the attack on Dec. 1. They stated (par. 31):

> The possibility of such an air raid was the very fact that made Kharg prospectively unsafe under the charter but was one of the matters which would have been in the contemplation of the parties when the sub-charter was made. The raid was of like character to the earlier ones; the only real change since the date of the sub-charter was that instead of the date of the next attack being uncertain it was ascertained. Thereafter, the date of the succeeding attack became equally uncertain.

Faced with the clear safe port warranty in the head charter, the charterers argued before the arbitrators that the owners had waived their right not to comply with the charterers' orders to proceed to Kharg Island. This argument the arbitrators rejected. They considered that waiver only applied where there were just two alternative courses of action available; here there were at least three courses of action open to the owners, and so they held that the defence must fail. This reasoning was, as is now accepted, erroneous in law. The arbitrators also rejected an alternative argument founded on promissory estoppel, stating that the mere acceptance of orders without protest does not amount to the required clear and unequivocal promise required by the doctrine.

Having rejected both waiver and promissory estoppel, they held that the charterers were in



**Left column (partial, torn):**

jrisdiction was
deal with both
rs and the char-
n Varnima and
eld that, when
Island on Nov.
spectively safe
isons for their

Iran and Iraq
vo months, air
iarg and it was
m Iraqi bases.
such had not
l a pause in the
was obtainable
ver, the risk of
ned as was re-
find that in the
harg was not a
nominated on

that the safety
not changed in
1. They stated

ir raid was the
prospectively
was one of the
en in the con-
/hen the sub-
d was of like
; the only real
ub-charter was
he next attack
tained. There-
eeding attack

varranty in the
ued before the
l waived their
arterers' orders
; argument the
nsidered that
were just two
vailable; here
of action open
at the defence
s, as is now
irbitrators also
it founded on
hat the mere
otest does not
d unequivocal

nd promissory
terers were in

breach of contract in ordering the vessel to an unsafe port. On the other hand, Varnima was held liable to Petronor under the sub-charter, having expressly agreed that the vessel would proceed to Kharg Island; and the arbitrators held that Varnima could not derive any protection from cl. 20 (vi) in the sub-charter.

The charterers appealed from the award of the arbitrators with leave of the Court. Mr. Justice Hobhouse [1987] 2 Lloyd's Rep. 509 allowed the appeal on the issue of waiver. He held that the owners had accepted the charterers' orders to proceed to Kharg Island; and that by so doing, and by serving notice of readiness at Kharg Island and thereafter continuing to assert that the vessel was available to load, asking the charterers to arrange priority berthing and referring to the running of laytime, the owners' conduct could not be described as equivocal. He said, at p. 516:

> There is nothing unequivocal about owners' conduct. They were dealing with charterers on the basis that the loading port nomination had been made and that Kharg Island was that port.

Furthermore, they knew of their right to choose. They knew the facts; they knew what the provisions of the contract were, and what their legal effect was. Therefore both the requirements of waiver, unequivocal conduct and the requisite knowledge, were made out. The Judge did not therefore find it necessary to deal with the alternative argument on promissory estoppel. However he then held that, on a true construction of cl. 20 (vi), the owners were protected from liability to the charterers in damages. The Court of Appeal affirmed the decision of the Judge on both points (see [1981] 1 Lloyd's Rep. 354).

The charterers then obtained leave to appeal to your Lordships' House, and the owners cross-appealed. It was in fact the owners' cross-appeal on the issue of waiver which raised the most substantial issue in the appeal before your Lordships' House, as it had done in the Courts below. To that issue I will first turn.

There is no dispute between the parties as to the nature of their respective rights and obligations under the contract with regard to the charterers' orders to proceed to Kharg Island to load (I put on one side, of course, the effect of cl. 20 (vi), which I will consider later). Since these matters are not in dispute, I can state the position very briefly. The arbitrators' finding that Kharg Island was, at the time of its nomination by the charterers, prospectively an unsafe port was not, and indeed could not be,

challenged. Kharg Island was not therefore a port which, under the terms of the charter, the charterers were entitled to nominate. It followed that the nomination was a tender of performance which did not conform to the terms of the contract; as such, the owners were entitled to reject it. Even so, by their nomination of Kharg Island the charterers impliedly promised that that port was prospectively safe for the vessel to get to, stay at, so far as necessary, and in due course, leave (see *Kodros Shipping Corporation of Monrovia v. Embresa Cubana de Fletes (The Evia)* (No. 2), [1982] 2 Lloyd's Rep. 307 at p. 315; [1983] A.C. 736 at p. 757, per Lord Roskill). Accordingly if the owners, notwithstanding their right to reject the nomination, complied with it and their ship suffered loss or damage in consequence, they would be entitled to recover damages from the charterers for breach of contract, though the ordinary principles of remoteness of damage and causation would apply to any such claim: see *Compania Naviera Maropan S/A v. Bowaters Lloyd Pulp and Paper Mills Ltd. (The Stork)*, [1955] 1 Lloyd's Rep. 349; [1955] 2 Q.B. 68, and *Reardon Smith Line Ltd. v. Australian Wheat Board (The Houston City)*, [1956] 1 Lloyd's Rep. 1; [1956] A.C. 266.

This is not, however, a case in which the owners have complied with an order to proceed to an unsafe port, and their ship has proceeded there and suffered damage in consequence. This is a case in which the owners have complied with the charterers' orders to the extent that the vessel has proceeded to the unsafe port and given notice of readiness there, but then the master, having tasted at first hand the danger inherent in the port's unsafety, has persuaded them not to persist in loading there but to sail away. Here the crucial question is whether, before the vessel sailed away, the owners had, by their words or conduct, precluded themselves from rejecting the charterers' nomination as not complying with the contract. Hence the reliance by the charterers on the principles of waiver and estoppel, unsuccessful before the arbitrators, but successful, so far as waiver is concerned, before the Judge and the Court of Appeal. The question whether the Courts below were correct in their conclusion depends, in my opinion, upon an analysis of these principles, and their proper application to the facts of the present case.

It is a commonplace that the expression "waiver" is one which may, in law, bear different meanings. In particular, it may refer to a forbearance from exercising a right or to an abandonment of a right. Here we are concerned



with waiver in the sense of abandonment of a right which arises by virtue of a party making an election. Election itself is a concept which may be relevant in more that one context. In the present case, we are concerned with an election which may arise in the context of a binding contract, when a state of affairs comes into existence in which one party becomes entitled, either under the terms of the contract or by the general law, to exercise a right, and he has to decide whether or not to do so. His decision, being a matter of choice for him, is called in law an election. Characteristically, this state of affairs arises where the other party has repudiated the contract or has otherwise committed a breach of the contract which entitles the innocent party to bring it to an end, or has made a tender of performance which does not conform to the terms of the contract. But this is not necessarily so. An analogous situation arises where the innocent party becomes entitled to rescind the contract, i.e. to wipe it out altogether, for example because the contract has been induced by a misrepresentation; and one or both parties may become entitled to determine a contract in the event of a wholly extraneous event occurring, as under a war clause in a charter-party. Characteristically, the effect of the new situation is that a party becomes entitled to determine or to rescind the contract, or to reject an uncontractual tender of performance; but, in theory at least, a less drastic course of action might become available to him under the terms of the contract. In all cases, he has in the end to make his election, not as a matter of obligation, but in the sense that, if he does not do so, the time may come when the law takes the decision out of his hands, either by holding him to have elected not to exercise the right which has become available to him, or sometimes by holding him to have elected to exercise it. Instances of this phenomenon are to be found in s. 35 of the Sale of Goods Act, 1979. In particular, where with knowledge of the relevant facts a party has acted in a manner which is consistent only with his having chosen one of the two alternative and inconsistent courses of action then open to him — for example, to determine a contract or alternatively to affirm it — he is held to have made his election accordingly, just as a buyer may be deemed to have accepted uncontractual goods in the circumstances specified in s. 35 of the 1979 Act. This is the aspect of election referred to by Lord Diplock in *Kammins Ballrooms Co. Ltd. v. Zenith Investments (Torquay) Ltd.*, [1971] A.C. 850 at p. 883. But of course an election need not be made in this way. It can be communicated to the other party by words or conduct; though, perhaps because a party who elects not to exercise a right which has become available to him is abandoning that right, he will only be held to have done so if he has so communicated his election to the other party in clear and unequivocal terms (see *Scarf v. Jardine*, (1882) 7 App.Cas. 345 at p. 361, per Lod Blackburn, and *China National Foreign Trade Transportation Corporation v. Evlogia Shipping Co. S.A. of Panama (The Mihalios Xilas)*, [1979] 2 Lloyd's Rep. 303 at p. 307; [1979] 1 W.L.R. 1018 at p. 1024, per Lord Diplock). Once an election is made, however, it is final and binding (see *Scarf v. Jardine*, per Lord Blackburn, at p. 360). Moreover it does not require consideration to support it, and so it is to be distinguished from an express or implied agreement, such as a variation of the relevant contract, which traditionally requires consideration to render it binding in English law.

Generally, however, it is a prerequisite of election that the party making the election must be aware of the facts which have given rise to the existence of his new right. This may not always be so. For example, in the law of sale of goods, where goods have been tendered to the buyer which are not in conformity with the contract, he may, if he has had a reasonable opportunity to examine them, be deemed in certain circumstances to have accepted them, thereby electing not to exercise his right to reject them, even though he has not actually examined the goods and discovered the defect (see s. 34 and 35 of the 1979 Act). This may flow from the fact that he has waived his right to examine them — yet another example of waiver. I add in parenthesis that, for present purposes, it is not necessary for me to consider certain cases in which it has been held that, as a prerequisite of election, the party must be aware not only of the facts giving rise to his rights but also of the rights themselves, because it is not in dispute here that the owners were aware both of the relevant facts and of their relevant rights.

There are numerous examples of the application of this principle of election in English law. Perhaps the most familiar situation is that which arises when one contracting party repudiates the contract. The effect is that the other contracting party then has a choice whether to accept the repudiation (as it is called) and bring the contract to an end; or to affirm the contract, thereby waiving or abandoning his right to terminate it. If, with knowledge of the facts giving rise to the repudiation, the other party to the contract acts (for example) in a manner consistent only with treating that contract as still alive,

the other party
rhaps because
a right which
andoning that
e done so if he
n to the other
rms (see *Scarf*
at p. 361, per
*tional Foreign
on v. Evlogia
(The Mihalios*
303 at p. 307;
per Lord Dip-
however, it is
*dine*, per Lord
r it does not
it, and so it is
ess or implied
f the relevant
ires consider-
sh law.

rerequisite of
election must
given rise to
This may not
law of sale of
ndered to the
with the con-
onable oppor-
ned in certain
them, thereby
o reject them,
examined the
(see s. 34 and
from the fact
mine them —
add in paren-
es, it is not
rtain cases in
rerequisite of
e not only of
ut also of the
ot in dispute
oth of the rel-
ghts.

of the appli-
on in English
tuation is that
g party repu-
that the other
ce whether to
ted) and bring
the contract,
is right to ter-
e facts giving
party to the
anner consist-
t as still alive,

he is taken in law to have exercised his election to affirm the contract.

The present case is concerned not so much with repudiation as with an uncontractual tender of performance. Even so, the same principles apply. The other party is entitled to reject the tender of performance as uncontractual; and, subject to the terms of the contract, he can then, if he wishes, call for a fresh tender of performance in its place. But if, with knowledge of the facts giving rise to his right to reject, he nevertheless unequivocally elects not to do so, his election will be final and binding upon him and he will have waived his right to reject the tender as uncontractual.

We can see these principles at work in the law of sale of goods. If goods are tendered which are not in conformity with the contract, the buyer is entitled to reject them. However, as is recognized by s. 11(2) of the 1979 Act, where a contract of sale is subject to a condition to be fulfilled by the seller, the buyer may —

... *elect* to treat the breach of the condition as a breach of warranty . . .

Of course, if the buyer rejects the goods as not conforming with the contract, and the time for delivery has expired, the buyer can without more sue the seller for damages for non-delivery. If the time for delivery has not yet expired, the seller is still entitled to make a fresh tender which conforms with the contract, in which event the buyer is bound to accept the goods so tendered: see *Borrowman Phillips & Co. v. Free & Hollis*, (1878) 4 Q.B.D. 500. If the buyer elects to accept non-contractual goods, he is bound by his election and is limited to his right of action for damages for breach of warranty, the exercise of that right being consistent with his having waived his right to reject the goods: see s. 11(4) of the 1979 Act. However, as Mr. Justice Devlin pointed out in *The Stork*, [1954] 2 Lloyd's Rep. 397 at p. 414, col. 1;[1955] 2 Q.B. 68 at pp. 76–77, the principle of election is applicable in every class of contract. He said:

... There *is* a difference between a contractor who does not discharge his obligation at all and one who does so imperfectly. In the latter case, the contract gives the other party the right to elect to treat the imperfect performance as if it were a fulfilment of the contract (even if he knows that in fact it is not), and to claim damages if any result from the imperfection. This is a right which is, I think, common to every class of contract. The general principle is that the other party is entitled to proceed just as he would have done if the contract had been properly fulfilled, and the risk of any damage that flows from that must be borne by the wrongdoer.

Mr. Justice Devlin was there speaking in the context of the nomination of an unsafe port under a charter-party, and there can be no doubt that the principle of election applies in such circumstances, as it does in other cases.

Election is to be contrasted with equitable estoppel, a principle associated with the leading case of *Hughes v. Metropolitan Railway Co.*, (1877) 2 App.Cas. 439. Equitable estoppel occurs where a person, having legal rights against another, unequivocally represents (by words or conduct) that he does not intend to enforce those legal rights; if in such circumstances the other party acts, or desists from acting, in reliance upon that representation, with the effect that it would be inequitable for the representor thereafter to enforce his legal rights inconsistently with his representation, he will to that extent be precluded from doing so.

There is an important similarity between the two principles, election and equitable estoppel, in that each requires an unequivocal representation, perhaps because each may involve a loss, permanent or temporary, of the relevant party's rights. But there are important differences as well. In the context of a contract, the principle of election applies when a state of affairs comes into existence in which one party becomes entitled to exercise a right, and has to choose whether to exercise the right or not. His election has generally to be an informed choice, made with knowledge of the facts giving rise to the right. His election once made is final; it is not dependent upon reliance on it by the other party. On the other hand, equitable estoppel requires an unequivocal representation by one party that he will not insist upon his legal rights against the other party, and such reliance by the representee as will render it inequitable for the representor to go back upon his representation. No question arises of any particular knowledge on the part of the representor, and the estoppel may be suspensory only. Furthermore, the representation itself is different in character in the two cases. The party making his election is communicating his choice whether or not to exercise a right which has become available to him. The party to an equitable estoppel is representing that he will not in future enforce his legal rights. His representation is therefore in the nature of a promise which, though unsupported by consideration, can have legal consequences; hence it is sometimes referred to as promissory estoppel.

These are the principles which fall to be con-



sidered in the present case. Here, as I have already indicated, the situation in which the owners found themselves was one in which they could either reject the charterers' nomination of Kharg Island as uncontractual, or could nevertheless elect to accept the order and load at Kharg Island, thereby waiving or abandoning their right to reject the nomination but retaining their right to claim damages from the charterers for breach of contract. Since the owners were in this situation, it is logical first to consider the question of election before considering (if necessary) equitable estoppel.

The arbitrators addressed themselves to the possibility of election, but unfortunately their rejection of it was founded upon a mistaken appreciation of the law. The Judge and the Court of Appeal, however, both held that the owners had elected to waive their right to reject the nomination. In my opinion they were right to reach this conclusion.

Because the arbitrators did not approach the issue of election correctly, they failed to consider the correct questions. In particular, they did not ask themselves whether there had been the necessary unequivocal representation by the owners. It is true that they did ask themselve whether there had been the necessary "clear and unequivocal promise" when considering the alternative principle of equitable estoppel; they held that there was not, on the basis that the mere acceptance of orders without protest does not amount to such a promise. As a general proposition, this is no doubt correct; and it would equally be true if made with reference to the question whether there had been an unequivocal representation by the owners that they were waiving their right to reject the nomination as uncontractual. Moreover, if the relevant evidence had related only to the communications passing between the parties before the vessel arrived at Kharg Island, the question would have arisen whether, on these communications (set of course in their factual context), there had been such an unequivocal representation. But the matter does not stop there, because on arrival at Kharg Island the master proceeded to serve notice of readiness. Thereafter, as the Judge pointed out, the owners were asserting that the vessel was available to load; they were also calling upon the charterers to arrange priority berthing, and referring to the fact that laytime was running. In these circumstances, the owners were asserting a right inconsistent with their right to reject the charterers' orders. The right which they were asserting was that laytime had started to run against the charterers at Kharg Island, with the effect that the charterers had become bound to load the cargo there within the laytime fixed by the charter and, if they failed to do so, to pay demurrage to the owners at the contractual rate. In these circumstances, on the principle stated by Lord Diplock in the *Kammins Ballrooms* case [1971] A.C. 850, at pp. 882–883, the owners must be taken in law to have thereby elected not to reject the charterers' nomination, and so to have waived their right to do so or to call for another nomination. Accordingly, in my opinion, Mr. Justice Hobhouse and the Court of Appeal were fully entitled in these circumstances to substitute their view of the case on this point for that of the arbitrators. There was no question of their reversing the arbitrators on an issue of fact; they were deciding, and in my opinion rightly deciding, that the arbitrators had failed to draw an inference of law which on their findings of fact they were bound to draw.

No doubt the master was entitled to refuse to endanger his ship and crew in the circumstances in which he found himself; but that did not excuse the owners from their breach of contract, after they had elected not to reject the charterers' nomination of Kharg Island in the knowledge of the facts rendering it prospectively unsafe. Furthermore this is not a case in which a new situation had developed at Kharg Island, or some other danger already existed there. If the known danger had become significantly different; or if a new and different danger had developed; or if some other danger, hitherto unknown, already existed at the port — in such circumstances as these, other questions might have arisen. But your Lordships are not troubled with any such questions in the present case. The arbitrators found as a fact that the safety or unsafety of Kharg Island was not changed in any way by the attack on Dec. 1. This was a finding which they were fully entitled to make, and which cannot be challenged.

For these reasons, I would dismiss the owners' cross-appeal on this issue. It follows that it is unnecessary for the purposes of the cross-appeal to consider the alternative question of equitable estoppel.

I turn then to the charterers' appeal which related to the effect of cl. 20 (vi) of the charter. Clause 20 (vi) reads, so far as relevant, as follows:

> WAR RISKS (a) If any port of loading or of discharge named in this charterparty or to which the vessel may properly be ordered pursuant to the terms of the bills of lading be blockaded, or (b) if owing to any war, hostilities, warlike operations . . . entry to any such port of loading or of discharge or the loading

:ome bound
lytime fixed
lo so, to pay
contractual
le principle
nmins Ball.
:82–883, the
lve thereby
lomination,
do so or to
ingly, in my
l the Court
ese circum-
the case on
. There was
bitrators on
, and in my
arbitrators
w which on
d to draw.
to refuse to
cumstances
lat did not
ich of con-
) reject the
land in the
it prospect-
ot a case in
:d at Kharg
ady existed
ome signifi-
d different
her danger,
at the port
other ques-
irdships are
ions in the
d as a fact
Island was
: on Dec. 1,
illy entitled
nged.
lismiss the
It follows
oses of the
ative ques-

·peal which
:he charter,
·ant, as fol-

: loading or
:party or to
be ordered
of lading be
var, hostili-
to any such
the loading

or discharge of cargo at any such port be considered by the master or owners in his or their discretion dangerous or prohibited . . . the charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the charterparty (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the master's or owner's discretion dangerous or prohibited) . . .

Both the Judge and the Court of Appeal held that this clause was effective to protect the owners from liability in damages, though it did not render the charterers liable in damages in the events which had happend. With this conclusion I agree; I shall therefore deal with the point briefly.

Three arguments were advanced on behalf of the charterers. The first was that, on its true construction, all that the clause did was to confer an option on them. It was simply a charterers' option clause, which conferred no rights or protection on the owners in the events specified in the clause. This argument was rejected both by the Judge and by the Court of Appeal, on the basis that it would deprive the clause of all meaning and effect if it were held that it did not protect the owners in the event of their deciding, in their discretion, that the port was dangerous or prohibited and that they would not therefore load or discharge cargo there, as the case might be. With this conclusion I agree. The clause expressly refers to the discretion which the owners and master are entitled to exercise in a situation of danger and must, in my opinion, impliedly recognize that in the exercise of that discretion they may decline to load or discharge at the relevant port. This is precisely what happened in the present case. It was next argued that, on its true construction, the clause only applied to named ports or ports properly nominated under the charter-party. This cannot be right because, in the event of an improper nomination being made by the charterers, owners' acceptance of the nomination would have the effect that all the relevant contractual provisions applied, including cl. 20 (vi). Finally, it was suggested that the owners, by waiving their right to reject the charterers' nomination as uncontractual, thereby also waived their right to rely upon cl. 20 (vi). Again, I cannot agree. The owners, presented by the charterers with an uncontractual nomination, had in the end to decide whether or not to reject it, and they elected not to do so. I cannot see that this election had any effect upon cl. 20 (vi), and indeed in the course of argument the charterers virtually abandoned the point.

For these reasons, which are substantially the same reasons as those given by the Judge and by the Court of Appeal, I would dismiss both the appeal and the cross-appeal.

Finally, I find it necessary to refer to the fact that my noble and learned friend, Lord Brandon of Oakbrook, has suggested that the owners might have been able to succeed in their claim against the charterers for loss of freight if they had pleaded and proved that the master, in refusing to load at Kharg Island, had acted reasonably so as to mitigate the damage for which the charterers would have been liable if the ship had entered the port and been lost or damaged in a further air raid. This point was not raised in argument, either by Counsel for the owners or indeed by the tribunal, before any of the four tribunals (including your Lordship's House) before which the case has been argued. Having heard no argument on the point, I can express no concluded opinion upon it. Even so, out of fairness to Counsel for the owners, I feel compelled to make the following observations:

(1) The owners, with knowledge of the relevant facts, waived their right to reject the charterers' nomination of Kharg Island as uncontractual, and the arbitrators have found as a fact that there was no material change in the nature of the danger at Kharg Island between the date of the nomination and the date when the owners ultimately refused to load there. In these circumstances, although no doubt the mster was entitled to act as he did for the safety of his ship and crew, I find it difficult to see how the owners could, in the absence of any change of circumstances or any hitherto unknown circumstances coming to light which significantly increased the danger of loading at Kharg Island, escape from their contractual obligation to load there by invoking the principle of mitigation of damage.

(2) If it were right that the owners' refusal to load at Kharg Island constituted a reasonable step taken in mitigation of damage, it would follow that, had the ship instead entered Kharg Island and suffered bomb damage while loading there, the charterers could have escaped all liability for such damage on the ground that the owners had failed to mitigate their damage by refusing to enter the port. I have great difficulty in seeing how any tribunal could reach such a conclusion.



(3) In any event, since the owners, while waiving their right not to treat the charterers' nomination as uncontractual, did not waive their rights under cl. 20 (vi), that clause legislated for the circumstances which arose.

For these reasons, quite apart from others which might have been advanced if the point had been argued, as at present advised it seems to me very understandable that Counsel for the owners should not have raised the point.

---

QUEEN'S BENCH DIVISION
(ADMIRALTY COURT)

Dec. 13, 14, 15, 18 and 19, 1989

THE "MONTANA"

Before Mr. Justice SHEEN

Carriage by sea — Short delivery — Title to sue — Bulk cargo of barley discharged at Singapore bagged and reloaded for shipment to Jeddah — Plaintiff consignee alleged short delivery — Whether defendants liable in damages for failing to deliver all cargo loaded in Singapore — Whether plaintiff had title to sue.

Bunge (Australia) Pty. Ltd. of Melbourne chartered *Montana* from the disponent owners by a charter-party dated Dec. 14, 1983 at Melbourne. Under the terms of the charter the receivers' stevedores were to be employed at the port of discharge.

A cargo of barley in bulk was carried in *Montana* from the port of shipment, Geelong, to Singapore. At Singapore the cargo was discharged. It was then bagged and reloaded. It was agreed that *Montana* sailed from Singapore laden with 27,500 tonnes of barley in 550,000 bags. Each bag and its contents weighed 50 kgs.

The bill of lading stated that the cargo was to be delivered in the like apparent good order and condition at Jeddah unto the order of the Saudi Cairo Bank or their assigns. The bills of lading incorporated the provisions of the charter-party.

The letter of credit was opened by the Saudi Cairo Bank on Dec. 20, 1983 for the account of Mr. S.H.A. Sharbatly of Jeddah. The beneficiaries were named as Bunge (Australia) Pty. Ltd. of Melbourne and was for about U.S.$10,200,000 (10 per cent. more or less). There was no evidence that that letter of credit referred to the shipment of barley.

*Montana* arrived in Jeddah on Feb. 28, 1984. Discharging commenced at 07 00 hours on Feb. 29 and was completed on Mar. 13. The master sent a telex message to the owners' London agents stating inter alia that 27,464 tonnes had been discharged and only a quantity of about 15 tonnes remained in the holds in bulk from bags torn by the stevedores in the course of discharging. The stevedores refused to discharge this cargo.

On Apr. 28, 1984 a document headed summary of vessel's outturn was issued indicating a shortage of 1108 bags. On Apr. 20, 1984 the Jeddah customs issued a shortage certificate which stated that 550,000 bags were loaded in Montana but only 548,892 bags were discharged.

The plaintiff claimed damages on the ground that 1108 bags of barley were not delivered to him and that 4000 bags were delivered partly empty. After the contents of those 4000 bags were rebagged it was found that they filled only 3442 bags and that there was a further shortage of 558 bags. The total

Page 1



1 of 1 DOCUMENT

Premium Nafta Products Ltd and others v Fili Shipping Co Ltd and others

HOUSE OF LORDS

*[2007] UKHL 40, 151 Sol Jo 1364, (Transcript)*

HEARING-DATES: 30, 31 JULY, 17 OCTOBER 2007

17 OCTOBER 2007

**CATCHWORDS:**

Shipping - Charterparty - Arbitration clause - Construction - Shelltime form - Owners purporting to rescind charterparty for fraud and bribery - Whether dispute arising under charterparty - Whether arbitration clause surviving rescission of charterparty - Arbitration Act 1996, s 7

**COUNSEL:**

C Butcher QC and P Jones QC for the Appellants; N Hamblen QC and V Flynn fort the Respondents.

**PANEL:** LORDS, HOFFMANN, HOPE, SCOTT, WALKER, BROWN

**JUDGMENTBY-1:** LORD HOFFMANN

**JUDGMENT-1:**

LORD HOFFMANN:

MY LORDS,

[1] This appeal concerns the scope and effect of arbitration clauses in eight charterparties in Shelltime 4 form made between eight companies forming part of the Sovcomflot group of companies (which is owned by the Russian state) and eight charterers. It is alleged by the owners that the charters were procured by the bribery of senior officers of the Sovcomflot group by a Mr Nikitin, who controlled or was associated with the charterer companies. It is unnecessary to set out the details of these allegations because it is not disputed that the owners have an arguable case. They have purported to rescind the charters on this ground and the question is whether the issue of whether they were entitled to do so should be determined by arbitration or by a court. The owners have commenced court proceedings for a declaration that the charters have been validly rescinded and the charterers have applied for a stay under s 9 of the Arbitration Act 1996. Morison J [2007] 1 All ER (Comm) 81 refused a stay but the Court of Appeal (Tuckey, Arden and Longmore LJJ) [2007] Bus LR 686 allowed the appeal and granted it.

[2] The case has been argued on the basis that there are two issues: first, whether, as a matter of construction, the arbitration clause is apt to cover the question of whether the contract was procured by bribery and secondly, whether it is possible for a party to be bound by submission to arbitration when he alleges that, but for the bribery, he would never have entered into the contract containing the arbitration clause. It seems to me, however, that for the reasons I shall explain, these questions are very closely connected.

[3] I start by setting out the arbitration clause in the Shelltime 4 form:

'41(a) This charter shall be construed and the relations between the parties determined in accordance with the laws of England.