[2007] UKHL 40, 151 Sol Jo 1364, (Transcript)

(b) Any dispute arising under this charter shall be decided by the English courts to whose jurisdiction the parties hereby agree.

(c) Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain the arrest of any maritime property, either party may, by giving written notice of election to the other party, elect to have any such dispute referred . . . to arbitration in London, one arbitrator to be nominated by Owners and the other by Charterers, and in case the arbitrators shall not agree to the decision of an umpire, whose decision shall be final and binding upon both parties. Arbitration shall take place in London in accordance with the London Maritime Association of Arbitrators, in accordance with the provisions of the Arbitration Act 1950, or any statutory modification or re-enactment thereof for the time being in force.

(i) A party shall lose its right to make such an election only if:

(a) it receives from the other party a written notice of dispute which –

(1) states expressly that a dispute has arisen out of this charter;

(2) specifies the nature of the dispute; and

(3) refers expressly to this cl 41(c) and

(b) it fails to give notice of election to have the dispute referred to arbitration not later than 30 days from the date of receipt of such notice of dispute . . . .'

[4] It will be observed that cl 41(b) is a jurisdiction clause in respect of 'any dispute arising under this charter' which is then incorporated by reference (by the words 'any such dispute') in the arbitration clause in 41(c). So the first question is whether cl 41(b) refers the question of whether the charters were procured by bribery to the jurisdiction of the English court. If it does, then a party may elect under cl 41(c) to have that question referred to arbitration. But I shall for the sake of convenience discuss the clause as if it was a simple arbitration clause. The owners say that for two reasons it does not apply. The first is that, as a matter of construction, the question is not a dispute arising under the charter. The second is that the jurisdiction and arbitration clause is liable to be rescinded and therefore not binding upon them.

[5] Both of these defences raise the same fundamental question about the attitude of the courts to arbitration. Arbitration is consensual. It depends upon the intention of the parties as expressed in their agreement. Only the agreement can tell you what kind of disputes they intended to submit to arbitration. But the meaning which parties intended to express by the words which they used will be affected by the commercial background and the reader's understanding of the purpose for which the agreement was made. Businessmen in particular are assumed to have entered into agreements to achieve some rational commercial purpose and an understanding of this purpose will influence the way in which one interprets their language.

[6] In approaching the question of construction, it is therefore necessary to inquire into the purpose of the arbitration clause. As to this, I think there can be no doubt. The parties have entered into a relationship, an agreement or what is alleged to be an agreement or what appears on its face to be an agreement, which may give rise to disputes. They want those disputes decided by a tribunal which they have chosen, commonly on the grounds of such matters as its neutrality, expertise and privacy, the availability of legal services at the seat of the arbitration and the unobtrusive efficiency of its supervisory law. Particularly in the case of international contracts, they want a quick and efficient adjudication and do not want to take the risks of delay and, in too many cases, partiality, in proceedings before a national jurisdiction.

[7] If one accepts that this is the purpose of an arbitration clause, its construction must be influenced by whether the parties, as rational businessmen, were likely to have intended that only some of the questions arising out of their relationship were to be submitted to arbitration and others were to be decided by national courts. Could they have intended that the question of whether the contract was repudiated should be decided by arbitration but the question of whether it was induced by misrepresentation should be decided by a court? If, as appears to be generally accepted, there is no rational basis upon which businessmen would be likely to wish to have questions of the validity or enforceability of the contract decided by one tribunal and questions about its performance decided by another, one would need to find very clear language before deciding that they must have had such an intention.

[8] A proper approach to construction therefore requires the court to give effect, so far as the language used by the parties will permit, to the commercial purpose of the arbitration clause. But the same policy of giving effect to the commercial purpose also drives the approach of the courts (and the legislature) to the second question raised in this ap-

[2007] UKHL 40, 151 Sol Jo 1364, (Transcript)

peal, namely, whether there is any conceptual reason why parties who have agreed to submit the question of the validity of the contract to arbitration should not be allowed to do so.

[9] There was for some time a view that arbitrators could never have jurisdiction to decide whether a contract was valid. If the contract was invalid, so was the arbitration clause. In Overseas Union Insurance Ltd v AA Mutual International Insurance Co Ltd [1988] 2 Lloyd's Rep 63, 66 Evans J said that this rule 'owes as much to logic as it does to authority'. But the logic of the proposition was denied by the Court of Appeal in Harbour Assurance Co (UK) Ltd v Kansa General International Insurance Co Ltd [1993] QB 701, [1993] 3 All ER 897, [1993] 3 WLR 42 and the question was put beyond doubt by s 7 of the Arbitration Act 1996:

'Unless otherwise agreed by the parties, an arbitration agreement which forms or was intended to form part of another agreement (whether or not in writing) shall not be regarded as invalid, non-existent or ineffective because that other agreement is invalid, or did not come into existence or has become ineffective, and it shall for that purpose be treated as a distinct agreement.'

[10] This section shows a recognition by Parliament that, for the reasons I have given in discussing the approach to construction, businessmen frequently do want the question of whether their contract was valid, or came into existence, or has become ineffective, submitted to arbitration and that the law should not place conceptual obstacles in their way.

[11] With that background, I turn to the question of construction. Your Lordships were referred to a number of cases in which various forms of words in arbitration clauses have been considered. Some of them draw a distinction between disputes 'arising under' and 'arising out of' the agreement. In Heyman v Darwins Ltd [1942] AC 356, 399, [1942] 1 All ER 337, 111 LJKB 241 Lord Porter said that the former had a narrower meaning than the latter but in Union of India v E B Aaby's Rederi A/S [1975] AC 797, [1974] 2 All ER 874, [1974] 3 WLR 269 Viscount Dilhorne, at p 814, and Lord Salmon, at p 817, said that they could not see the difference between them. Nevertheless, in Overseas Union Insurance Ltd v AA Mutual International Insurance Co Ltd [1988] 2 Lloyd's Rep 63, 67, Evans J said that there was a broad distinction between clauses which referred 'only those disputes which may arise regarding the rights and obligations which are created by the contract itself' and those which 'show an intention to refer some wider class or classes of disputes'. The former may be said to arise 'under' the contract while the latter would arise 'in relation to' or 'in connection with' the contract. In Fillite (Runcorn) Ltd v Aqua-Lift (1989) 26 Con LR 66, 76 Slade LJ said that the phrase 'under a contract' was not wide enough to include disputes which did not concern obligations created by or incorporated in the contract. Nourse LJ gave a judgment to the same effect. The court does not seem to have been referred to Mackender v Feldia AG [1967] 2 QB 590, [1966] 3 All ER 847, [1967] 2 WLR 119, in which a court which included Lord Denning MR and Diplock LJ decided that a clause in an insurance policy submitting disputes 'arising thereunder' to a foreign jurisdiction was wide enough to cover the question of whether the contract could be avoided for non-disclosure.

[12] I do not propose to analyse these and other such cases any further because in my opinion the distinctions which they make reflect no credit upon English commercial law. It may be a great disappointment to the judges who explained so carefully the effects of the various linguistic nuances if they could learn that the draftsman of so widely used a standard form as Shelltime 4 obviously regarded the expressions 'arising under this charter' in cl 41(b) and 'arisen out of this charter' in cl 41(c)(1)(a)(i) as mutually interchangeable. So I applaud the opinion expressed by Longmore LJ in the Court of Appeal (at para 17) that the time has come to draw a line under the authorities to date and make a fresh start. I think that a fresh start is justified by the developments which have occurred in this branch of the law in recent years and in particular by the adoption of the principle of separability by Parliament in s 7 of the 1996 Act. That section was obviously intended to enable the courts to give effect to the reasonable commercial expectations of the parties about the questions which they intended to be decided by arbitration. But s 7 will not achieve its purpose if the courts adopt an approach to construction which is likely in many cases to defeat those expectations. The approach to construction therefore needs to be re-examined.

[13] In my opinion the construction of an arbitration clause should start from the assumption that the parties, as rational businessmen, are likely to have intended any dispute arising out of the relationship into which they have entered or purported to enter to be decided by the same tribunal. The clause should be construed in accordance with this presumption unless the language makes it clear that certain questions were intended to be excluded from the arbitrator's jurisdiction. As Longmore LJ remarked, at para 17: 'if any businessman did want to exclude disputes about the validity of a contract, it would be comparatively easy to say so'.

[14] This appears to be the approach adopted in Germany: see the Bundesgerichtshof's Decision of 27 February 1970 (1990) Arbitration International, vol 6, No 1, p 79:

[2007] UKHL 40, 151 Sol Jo 1364, (Transcript)

'There is every reason to presume that reasonable parties will wish to have the relationships created by their contract and the claims arising therefrom, irrespective of whether their contract is effective or not, decided by the same tribunal and not by two different tribunals.'

[15] If one adopts this approach, the language of cl 41 of Shelltime 4 contains nothing to exclude disputes about the validity of the contract, whether on the grounds that it was procured by fraud, bribery, misrepresentation or anything else. In my opinion it therefore applies to the present dispute.

[16] The next question is whether, in view of the allegation of bribery, the clause is binding upon the owners. They say that if they are right about the bribery, they were entitled to rescind the whole contract, including the arbitration clause. The arbitrator therefore has no jurisdiction and the dispute should be decided by the court.

[17] The principle of separability enacted in s 7 means that the invalidity or rescission of the main contract does not necessarily entail the invalidity or rescission of the arbitration agreement. The arbitration agreement must be treated as a 'distinct agreement' and can be void or voidable only on grounds which relate directly to the arbitration agreement. Of course there may be cases in which the ground upon which the main agreement is invalid is identical with the ground upon which the arbitration agreement is invalid. For example, if the main agreement and the arbitration agreement are contained in the same document and one of the parties claims that he never agreed to anything in the document and that his signature was forged, that will be an attack on the validity of the arbitration agreement. But the ground of attack is not that the main agreement was invalid. It is that the signature to the arbitration agreement, as a 'distinct agreement', was forged. Similarly, if a party alleges that someone who purported to sign as agent on his behalf had no authority whatever to conclude any agreement on his behalf, that is an attack on both the main agreement and the arbitration agreement.

[18] On the other hand, if (as in this case) the allegation is that the agent exceeded his authority by entering into a main agreement in terms which were not authorized or for improper reasons, that is not necessarily an attack on the arbitration agreement. It would have to be shown that whatever the terms of the main agreement or the reasons for which the agent concluded it, he would have had no authority to enter into an arbitration agreement. Even if the allegation is that there was no concluded agreement (for example, that terms of the main agreement remained to be agreed) that is not necessarily an attack on the arbitration agreement. If the arbitration clause has been agreed, the parties will be presumed to have intended the question of whether there was a concluded main agreement to be decided by arbitration.

[19] In the present case, it is alleged that the main agreement was in un-commercial terms which, together with other surrounding circumstances, give rise to the inference that an agent acting for the owners was bribed to consent to it. But that does not show that he was bribed to enter into the arbitration agreement. It would have been remarkable for him to enter into any charter without an arbitration agreement, whatever its other terms had been. Mr Butcher QC, who appeared for the owners, said that but for the bribery, the owners would not have entered into any charter with the charterers and therefore would not have entered into an arbitration agreement. But that is in my opinion exactly the kind of argument which s 7 was intended to prevent. It amounts to saying that because the main agreement and the arbitration agreement were bound up with each other, the invalidity of the main agreement should result in the invalidity of the arbitration agreement. The one should fall with the other because they would never have been separately concluded. But s 7 in my opinion means that they must be treated as having been separately concluded and the arbitration agreement can be invalidated only on a ground which relates to the arbitration agreement and is not merely a consequence of the invalidity of the main agreement.

[20] Mr Butcher submitted that the approach to construction and separability adopted by the Court of Appeal infringed the owners' right of access to a court for the resolution of their civil disputes, contrary to art 6 of the European Convention on Human Rights. I do not think there is anything in this point. The European Convention was not intended to destroy arbitration. Arbitration is based upon agreement and the parties can by agreement waive the right to a court. If it appears upon a fair construction of the charter that they have agreed to the arbitration of a particular dispute, there is no infringement of their Convention right.

[21] For these reasons, which are substantially the same as those given by Longmore LJ in the Court of Appeal, I would hold that the charterers are entitled to a stay of the proceedings to rescind the charters and dismiss the appeal.

**JUDGMENTBY-2: LORD HOPE**

**JUDGMENT-2:**

[2007] UKHL 40, 151 Sol Jo 1364, (Transcript)

LORD HOPE:

MY LORDS,

[22] I have had the advantage of reading in draft the speech of my noble and learned friend Lord Hoffmann. I entirely agree with it, and for the reasons he gives I too would dismiss the appeal. I wish to add only a few brief comments.

[23] There are, as my noble and learned friend has said, two issues in this appeal. The first is an issue of construction: whether the Appellants' claims that the charterparties have been validly rescinded are disputes which arise under, or out of, the charterparties within the meaning of cl 41. The second is an issue of separability: whether, assuming that the Appellants have an arguable case that the charterparties have been validly rescinded, they also have an arguable case that the arbitration agreements in cl 41 have been rescinded as well. The Appellants submit that they were entitled to rescind the charterparties, including the arbitration agreements, because the charterparties were induced by bribery. The allegations of bribery are directed to the terms on which the charters were entered into by the Sovcomflot group of companies as owners with Mr Nikitin's chartering companies. They are said to have been un-commercial and unbelievably generous. The bribes are said to impeach not only the charters themselves but also the arbitration clause. The argument is essentially one of causation. It is that the charters would not have been entered into in the absence of these bribes or other benefits, and that but for the agreement to enter into them there would have been no agreement to go to arbitration. Had it not been for the bribes provided by Mr Nikitin to their director-general, Mr Skarga, Sovcomflot would not have done business with Mr Nikitin's companies at all.

[24] On the first issue, the Appellants say that it is highly unlikely that the parties, in agreeing to an arbitration provision, intended it to cover disputes as to whether the contract itself was induced by bribery, as to which it must be assumed one party would be entirely ignorant. The clear trend of recent authorities, they say, is to give a narrow meaning to the words used in the arbitration agreement to identify the disputes that are referred by it. They must be taken to have informed any decision to use the clause which is set out in the Shelltime 4 standard forms. I think that there are two answers to this argument. One is to be found in the wording of cl 41 itself. The other is to be found by considering whether its consequences make sense in the international commercial context within which these standard forms are designed to operate.

[25] As for the wording, contracts negotiated between parties in the international market are commonly based upon standard forms the terms of which are well known. Because they have a well-understood meaning, they enable contracts to be entered into quickly and efficiently. The Shelltime 4 standard form is a good example of this practice. It has been in frequent use since at least 1984, and it is still in use. But it must be appreciated that the various clauses in these forms serve various functions. In some a high degree of precision is necessary. Terms which define the parties' mutual obligations in relation to price and performance lie at the heart of every business transaction. They fall into that category. In others, where the overall purpose is clear, the parties are unlikely to linger over the words which are used to express it.

[26] Clause 41 falls into the latter category. No contract of this kind is complete without a clause which identifies the law to be applied and the methods to be used for the determination of disputes. Its purpose is to avoid the expense and delay of having to argue about these matters later. It is the kind of clause to which ordinary businessmen readily give their agreement so long as its general meaning is clear. They are unlikely to trouble themselves too much about its precise language or to wish to explore the way it has been interpreted in the numerous authorities, not all of which speak with one voice. Of course, the court must do what it can to provide charterers and shipowners with legal certainty at the negotiation stage as to what they are agreeing to. But there is no conflict between that proposition and the guidance which Longmore LJ gave in paras 17 - 19 of the Court of Appeal's judgment about the interpretation of jurisdiction and arbitration clauses in international commercial contracts. The proposition that any jurisdiction or arbitration clause in an international commercial contract should be liberally construed promotes legal certainty. It serves to underline the golden rule that if the parties wish to have issues as to the validity of their contract decided by one tribunal and issues as to its meaning or performance decided by another, they must say so expressly. Otherwise they will be taken to have agreed on a single tribunal for the resolution of all such disputes.

[27] The overall purpose of cl 41 is identified in the two opening paragraphs. These are the choice of law and jurisdiction clauses. There is no sign here - leaving aside the question of arbitration for a moment - that the parties intended that the disputes which were to be determined in accordance with the laws of England and be decided by the English courts were not to include disputes about the charter's validity. The simplicity of the wording is a plain indication to the contrary. The arbitration clause which follows is to be read in that context. It indicates to the reader that he need not trouble himself with fussy distinctions as to what the words 'arising under' and 'arising out of' may mean. Taken overall,

[2007] UKHL 40, 151 Sol Jo 1364, (Transcript)

the wording indicates that arbitration may be chosen as a one-stop method of adjudication for the determination of all disputes. Disputes about validity, after all, are no less appropriate for determination by an arbitrator than any other kind of dispute that may arise. So I do not think that there is anything in the Appellants' point that it must be assumed that when the charters were entered into one party was entirely ignorant that they were induced by bribery. The purpose of the clause is to provide for the determination of disputes of all kinds, whether or not they were foreseen at the time when the contract was entered into.

[28] Then there are consequences that would follow, if the Appellants are right. It is not just that the parties would be deprived of the benefit of having all their disputes decided in one forum. The jurisdiction clause does not say where disputes about the validity of the contract are to be determined, if this is not to be in the forum which is expressly mentioned. The default position is that such claims would have to be brought in the jurisdiction where their opponents were incorporated, wherever and however unreliable that might be, while claims for breach of contract have to be brought in England. But why, it may be asked, would any sensible businessmen have wished to agree to this? As Bingham LJ said in Ashville Investments Ltd v Elmer Contractors Ltd [1989] QB 488, 517, [1988] 2 All ER 577, [1988] 3 WLR 867, one should be slow to attribute to reasonable parties an intention that there should in any foreseeable eventuality be two sets of proceedings. If the parties have confidence in their chosen jurisdiction for one purpose, why should they not have confidence in it for the other? Why, having chosen their jurisdiction for one purpose, should they leave the question which court is to have jurisdiction for the other purpose unspoken, with all the risks that this may give rise to? For them, everything is to be gained by avoiding litigation in two different jurisdictions. The same approach applies to the arbitration clause.

[29] The Court of Appeal said that the time had come for a fresh start to be made, at any rate for cases arising in an international commercial context. It has indeed been clear for many years that the trend of recent authority has risked isolating the approach that English law takes to the wording of such clauses from that which is taken internationally. It makes sense in the context of international commerce for decisions about their effect to be informed by what has been decided elsewhere.

[30] The Bundesgerichtshof's Decision of 27 February 1970 to which Lord Hoffmann has referred makes two points that are relevant to this issue. The first is that haphazard interpretations should be avoided and a rule of construction established which presumes, in cases of doubt, that reasonable parties will wish to have the claims arising from their contract decided by the same tribunal irrespective of whether their contract is effective or not. The second is that experience shows that as soon as a dispute of any kind arises from a contract, objections are very often also raised against its validity. As the Bundesgerichtshof said, entrusting the assessment of the facts of the case to different tribunals according to the approach that is taken to the issues between them is unlikely to occur to the contracting parties.

[31] In AT & T Technologies Inc v Communications Workers of America, 475 US 643 (1986), 650, the United States Supreme Court said that, in the absence of any express provision excluding a particular grievance from arbitration, only the most forceful evidence of a purpose to exclude the claim from arbitration could prevail. In Threlkeld & Co Inc v Metallgesellschaft Ltd (London), 923 F 2d 245 (2d Cir 1991), the court observed that federal arbitration policy required that any doubts concerning the scope of arbitral issues should be resolved in favour of arbitration and that arbitration clauses should be construed as broadly as possible. In Comandate Marine Corp v Pan Australia Shipping Pty Ltd [2006] FCAFC 192, para 165 the Federal Court of Australia said that a liberal approach to the words chosen by the parties was underpinned by the sensible commercial presumption that the parties did not intend the inconvenience of having possible disputes from their transaction being heard in two places, particularly when they were operating in a truly international market. This approach to the issue of construction is now firmly embedded as part of the law of international commerce. I agree with the Court of Appeal that it must now be accepted as part of our law too.

[32] It is in the light of these observations that the issue of severability should be viewed also. Section 7 of the Arbitration Act 1996 reproduces in English law the principle that was laid down by s 4 of the United States Arbitration Act 1925. That section provides that, on being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration. Section 7 uses slightly different language, but it is to the same effect. The validity, existence or effectiveness of the arbitration agreement is not dependent upon the effectiveness, existence or validity of the underlying substantive contract unless the parties have agreed to this. The purpose of these provisions, as the United States Supreme Court observed in Prima Paint Corpn v Flood & Conklin Mfg Co, 388 US 395 (1967), 404, is that the arbitration procedure, when selected by the parties to a contract, should be speedy and not subject to delay and obstruction in the courts. The statutory language, it said, did not permit the court to consider claims of fraud in the inducement of the contract generally. It could consider only issues relating to the making and performance of the agreement to arbitrate. Dicey, Morris and Collins, The Con-

[2007] UKHL 40, 151 Sol Jo 1364, (Transcript)

flict of Laws, 14th ed (2006), vol 1, para 12-099, acknowledge that there are excellent reasons of policy to support this approach.

[33] The Appellants' case is that, as there was no real consent to the charter parties because they were induced by bribery, there was no real consent to the arbitration clauses. They submit that a line does not have to be drawn between matters which might impeach the arbitration clause and those which affect the main contract. What is needed is an analysis of whether the matters that affect the main contract are also matters which affect the validity of the arbitration clause. As the Respondents point out, this is a causation argument. The Appellants say that no substantive distinction can be drawn between various situations where the complaint is made that there was no real consent to the transaction. It would be contrary to the policy of the law, which is to deter bribery, that acts of the person who is alleged to have been bribed should deprive the innocent party of access to a court for determination of the issue whether the contract was induced by bribery.

[34] But, as Longmore LJ said in para 21 of the Court of Appeal's judgment, this case is different from a dispute as to whether there was ever a contract at all. As everyone knows, an arbitral award possesses no binding force except that which is derived from the joint mandate of the contracting parties. Everything depends on their contract, and if there was no contract to go to arbitration at all an arbitrator's award can have no validity. So, where the arbitration agreement is set out in the same document as the main contract, the issue whether there was an agreement at all may indeed affect all parts of it. Issues as to whether the entire agreement was procured by impersonation or by forgery, for example, are unlikely to be severable from the arbitration clause.

[35] That is not this case, however. The Appellants' argument was not that there was no contract at all, but that they were entitled to rescind the contract including the arbitration agreement because the contract was induced by bribery. Allegations of that kind, if sound, may affect the validity of the main agreement. But they do not undermine the validity of the arbitration agreement as a distinct agreement. The doctrine of separability requires direct impeachment of the arbitration agreement before it can be set aside. This is an exacting test. The argument must be based on facts which are specific to the arbitration agreement. Allegations that are parasitical to a challenge to the validity to the main agreement will not do. That being the situation in this case, the agreement to go to arbitration must be given effect.

**JUDGMENTBY-3: LORD SCOTT**

**JUDGMENT-3:**

    LORD SCOTT:

    MY LORDS,

[36] I have had the advantage of reading in advance the opinion of my noble and learned friend Lord Hoffmann and find myself in complete agreement with the conclusion he has reached and his reasons for that conclusion. I cannot improve upon those reasons and shall not try to do so. I, too, would dismiss this appeal.

**JUDGMENTBY-4: LORD WALKER**

**JUDGMENT-4:**

    LORD WALKER:

    MY LORDS,

[37] I have had the privilege of reading in draft the opinion of my noble and learned friend Lord Hoffmann. I am in full agreement with it. It gives full effect to the legislative purpose of s 7 of the Arbitration Act 1996. It marks a fresh start, leaving behind some fine verbal distinctions (on the language of particular arbitration clauses) which few commercial men would regard as significant. For these reasons I too would dismiss this appeal.

**JUDGMENTBY-5: LORD BROWN**

**JUDGMENT-5:**

    LORD BROWN:

[2007] UKHL 40, 151 Sol Jo 1364, (Transcript)

MY LORDS,

[38] For the reasons given in the speeches prepared by my noble and learned friends, Lord Hoffmann and Lord Hope of Craighead, with which I am in full agreement, I too would dismiss this appeal.

**DISPOSITION:**

Appeal dismissed.

**SOLICITORS:**

Ince & Co; Lax & Co.



Session 1995-1996
Publications on the Internet
*Judgments*

**House of Lords**

# Judgments - Westdeutsche Landesbank Girozentrale v. Islington London Borough Council

**HOUSE OF LORDS**

Lord Goff of Chieveley Lord Browne-Wilkinson Lord Slynn of Hadley Lord Woolf Lord Lloyd of Berwick

**OPINIONS OF THE LORDS OF APPEAL FOR JUDGMENT**

**IN THE CAUSE**

*WESTDEUTSCHE LANDESBANK GIROZENTRALE*

*(APPELLANTS)*

*v.*

*ISLINGTON LONDON BOROUGH COUNCIL*

*(RESPONDENTS)*

**ON 22 MAY 1996**

**LORD GOFF OF CHIEVELEY**

My Lords,

   This appeal is concerned with a transaction known as an interest rate swap. Under such a transaction, one party (the fixed rate payer) agrees to pay the other over a certain period interest at a fixed rate on a notional capital sum; and the other party (the floating rate payer) agrees to pay to the former over the same period interest on the same notional sum at a market rate determined in accordance with a certain formula. Interest rate swaps can fulfil many purposes, ranging from pure speculation to more useful purposes such as the hedging of liabilities. They are in law wagers, but they are not void as such because they are excluded from the regime of the Gaming Acts by section 63 of the Financial Services Act 1986.

**Page 234**

One form of interest rate swap involves what is called an upfront payment, i.e. a capital sum paid by one party to the other, which will be balanced by an adjustment of the parties' respective liabilities. Thus, as in the present case, the fixed rate payer may make an upfront payment to the floating rate payer, and in consequence the rate of interest payable by the fixed rate payer is reduced to a rate lower than the rate which would otherwise have been payable by him. The practical effect is to achieve a form of borrowing by, in this example, the floating rate payer through the medium of the interest rate swap transaction. It appears that it was this feature which, in particular, attracted local authorities to enter into transactions of this kind, since they enabled local authorities subject to rate-capping to obtain upfront payments uninhibited by the relevant statutory controls.

At all events, local authorities began to enter into transactions of this kind soon after they came into use in the early 1980s. At that time, there was thought to be no risk involved in entering into such transactions with local authorities. Financially, they were regarded as secure; and it was assumed that such transactions were within their powers. However, as is well known, in *Hazell v. Hammersmith and Fulham London Borough Council* [1992] 2 A.C. 1 your Lordships' House, restoring the decision of the Divisional Court [1990] 2 Q.B. 697, held that such transactions were ultra vires the local authorities who had entered into them. It is unnecessary for present purposes to examine the basis of that decision; though I wish to record that it caused grave concern among financial institutions, and especially foreign banks, which had entered into such transactions with local authorities in good faith, with no idea that a rule as technical as the ultra vires doctrine might undermine what they saw as a perfectly legitimate commercial transaction. There then followed litigation in which banks and other financial institutions concerned sought to recover from the local authorities with which they had dealt the balance of the money paid by them, together with interest. Out of the many actions so commenced, two were selected as test cases. These were the present case, *Westdeutsche Landesbank Girozentrale v. Islington Borough Council*, and *Kleinwort Benson Ltd. v. Sandwell Borough Council*. Both cases came on for hearing before Hobhouse J. [1994] 4 All E.R. 890. Your Lordships are concerned only with the former case. In a powerful judgment Hobhouse J. held that the plaintiffs ("the bank") were entitled to recover from the defendants ("the council") the net balance outstanding on the transaction between the parties, viz. the difference between the upfront payment of £2.5m. paid by the bank to the council on 18 June 1987, and the total of four semi-annual interest payments totalling £1,354,474.07 paid by the council to the bank between December 1987 and June 1989, leaving a net balance of £1,145,525.93 which the judge ordered the council to pay to the bank. He held the money to be recoverable by the bank either as money had and received by the council to the use of the bank, or as money which in equity the bank was entitled to trace into the hands of the council and have repaid out of the council's assets. He decided that the bank's right to restitution at common law arose from the fact that the payment made by the bank to the council was made under a purported contract which, unknown to both parties, was ultra vires the council and so void, no consideration having been given for the making of the payment. The decision by the judge, which was affirmed by the Court of Appeal [1994] 1 W.L.R. 938, raised important questions in the law of restitution, which are of great interest to lawyers specialising in this field. Yet it is an extraordinary feature of the present appeal to your Lordships' House that the judge's decision on the substantive right of recovery at common law does not fall for consideration by your Lordships' House. The appeal of the council is confined to one point only - the question of interest.

The judge ordered that the council should pay compound interest on the sum awarded against

them, calculated at six-monthly rests from 1 April 1990 to the date of judgment. The Court of Appeal affirmed the judge's decision to award compound interest but, allowing a cross-appeal by the bank, ordered that interest should run from the date of receipt of the upfront payment. Both the judge and the Court of Appeal held that they were entitled to invoke against the council the equitable jurisdiction to award compound interest, on the basis that the bank was entitled to succeed against the council in an equitable proprietary claim. The foundation for the bank's equitable proprietary claim lay in the decision of this House in *Sinclair v. Brougham* [1914] A.C. 398. Since that decision has for long been controversial, the Appellate Committee invited argument on the question whether the House should depart from the decision despite the fact that it has stood for many years.

*The shape of the case*

Once the character of an interest swap transaction has been identified and understood, and it is appreciated that, because the transaction was beyond the powers of the council, it was void ab initio, the basic question is whether the law can restore the parties to the position they were in before they entered into the transaction. That is, of course, the function of the law of restitution. I feel bound to say that, in the present case, there ought to be no difficulty about that at all. This is because the case is concerned solely with money. All that has to be done is to order that each party should pay back the money it has received - or, more sensibly, to strike a balance, and order that the party who has received most should repay the balance; and then to make an appropriate order for interest in respect of that balance. It should be as simple as that. And yet we find ourselves faced with a mass of difficult problems, and struggling to reconcile a number of difficult cases.

I must confess that, like all the judges who have been involved in these cases, I too have found myself struggling in this way. But in the end I have come to realise the importance of keeping my eyes on the simple outline of the case which I have just described; and I have discovered that, if one does that - if one keeps one's eyes open above the thicket of case law in which we can so easily become enclosed - the solution of the problem in the present case becomes much more simple. In saying this, I do not wish in any way to criticise the judges who have been grappling with the case at first instance and in the Court of Appeal, within the confines of the doctrine of precedent by which they are bound. On the contrary, they are entitled to our gratitude and respect. The masterly judgment of Hobhouse J., in particular, has excited widespread admiration. But it is the great advantage of a supreme court that, not only does it have the great benefit of assistance from the judgments of the courts below, but also it has a greater freedom to mould, and remould, the authorities to ensure that practical justice is done within a framework of principle. The present case provides an excellent example of a case in which this House should take full advantage of that freedom.

*The three problems*

There are three reasons why the present case has become so complicated. The first is that, in our law of restitution, there has developed an understanding that money can only be recovered on the ground of failure of consideration if that failure is total. The second is that because, in particular, of the well known but controversial decision of this House in *Sinclair v. Brougham*, it has come to be understood that a trust may be imposed in cases such as the present where the incapacity of one of the parties has the effect that the transaction is void. The third is that our law of interest has developed in a fragmentary and unsatisfactory manner, and in consequence insufficient attention has

**Page 236**

been given to the jurisdiction to award compound interest.

I propose at the outset to devote a little attention to each of these matters.

## (1) *Total failure of consideration*

There has long been a desire among restitution lawyers to escape from the unfortunate effects of the so-called rule that money is only recoverable at common law on the ground of failure of consideration where the failure is total, by reformulating the rule upon a more principled basis; and signs that this will in due course be done are appearing in judgments throughout the common law world, as appropriate cases arise for decision. It is fortunate however that, in the present case, thanks (I have no doubt) to the admirable researches of counsel, a line of authority was discovered which had escaped the attention of the scholars who work in this field. This line of authority was concerned with contracts for annuities which were void if certain statutory formalities were not complied with. They were not therefore concerned with contracts void by reason of the incapacity of one of the parties. Even so, they were concerned with cases in which payments had been made, so to speak, both ways; and the courts had to decide whether they could, in such circumstances, do justice by restoring the parties to their previous positions. They did not hesitate to do so, by ascertaining the balance of the account between the parties, and ordering the repayment of the balance. Moreover the form of action by which this was achieved was the old action for money had and received - what we nowadays call a personal claim in restitution at common law. With this precedent before him, Hobhouse J. felt free to make a similar order in the present case; and in this he was self-evidently right.

The most serious problem which has remained in this connection is the theoretical question whether recovery can here be said to rest upon the ground of *failure* of consideration. Hobhouse J. thought not. He considered that the true ground in these cases, where the contract is void, is to be found in the absence, rather than the failure, of consideration; and in this he was followed by the Court of Appeal. This had the effect that the courts below were not troubled by the question whether there had been a total failure of consideration.

The approach so adopted may have found its origin in the idea, to be derived from a well known passage in the speech of Viscount Simon L.C. in *Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour Ltd.* [1943] A.C. 32, 48, that a failure of consideration only occurs where there has been a failure of performance by the other party of his obligation under a contract which was initially binding. But the concept of failure of consideration need not be so narrowly confined. In particular it appears from the annuity cases themselves that the courts regarded them as cases of failure of consideration; and concern has been expressed by a number of restitution lawyers that the approach of Hobhouse J. is contrary to principle and could, if accepted, lead to undesirable consequences: see Professor Birks, "No Consideration: Restitution after Void Contracts" (1993) 23 W.A.L.R. 195; Mr. W. J. Swadling, "Restitution for No Consideration" [1994] R.L.R. 73 and Professor Burrows, "Swaps and the Friction between Common Law and Equity" [1995] R.L.R. 15. However since there is before your Lordships no appeal from the decision that the bank was entitled to recover the balance of the payments so made in a personal claim in restitution, the precise identification of the ground of recovery was not explored in argument before the Appellate Committee. It would therefore be inappropriate to express any concluded view upon it. Even so, I

**Page 237**

think it right to record that there appears to me to be considerable force in the criticisms which have been expressed; and I shall, when considering the issues on this appeal, bear in mind the possibility that it may be right to regard the ground of recovery as failure of consideration.

## (2) *A proprietary claim in restitution*

I have already stated that restitution in these cases can be achieved by means of a personal claim in restitution. The question has however arisen whether the bank should also have the benefit of an equitable proprietary claim in the form of a resulting trust. The immediate reaction must be - why should it? Take the present case. The parties have entered into a commercial transaction. The transaction has, for technical reasons, been held to be void from the beginning. Each party is entitled to recover its money, with the result that the balance must be repaid. But why should the plaintiff bank be given the additional benefits which flow from a proprietary claim, for example the benefit of achieving priority in the event of the defendant's insolvency? After all, it has entered into a commercial transaction, and so taken the risk of the defendant's insolvency, just like the defendant's other creditors who have contracted with it, not to mention other creditors to whom the defendant may be liable to pay damages in tort.

I feel bound to say that I would not at first sight have thought that an equitable proprietary claim in the form of a trust should be made available to the bank in the present case, but for two things. The first is the decision of this House in *Sinclair v. Brougham* [1914] A.C. 398, which appears to provide authority that a resulting trust may indeed arise in a case such as the present. The second is that on the authorities there is an equitable jurisdiction to award the plaintiff compound interest in cases where the defendant is a trustee. It is the combination of these two factors which has provided the foundation for the principal arguments advanced on behalf of the bank in support of its submission that it was entitled to an award of compound interest. I shall have to consider the question of availability of an equitable proprietary claim, and the effect of *Sinclair v. Brougham*, in some depth in a moment. But first I wish to say a few words on the subject of interest.

## (3) *Interest*

One would expect to find, in any developed system of law, a comprehensive and reasonably simple set of principles by virtue of which the courts have power to award interest. Since there are circumstances in which the interest awarded should take the form of compound interest, those principles should specify the circumstances in which compound interest, as well as simple interest, may be awarded; and the power to award compound interest should be available both at law and in equity. Nowadays, especially since it has been established (see *National Bank of Greece S.A. v. Pinios Shipping Co. No. 1* [1990] 1 A.C. 637) that banks may, by the custom of bankers, charge compound interest upon advances made by them to their customers, one would expect to find that the principal cases in which compound interest may be awarded would be commercial cases.

Sadly, however, that is not the position in English law. Unfortunately, the power to award compound interest is not available at common law. The power is available in equity; but at present that power is, for historical reasons, exercised only in relation to certain specific classes of claim, in particular proceedings against trustees for an account. An important - I believe the most important - question in the present case is whether that jurisdiction should be developed to apply in a commercial context, as in the present case. **Page 238**

*Equitable proprietary claims*

I now turn to consider the question whether an equitable proprietary claim was available to the bank in the present case.

Ever since the law of restitution began, about the middle of this century, to be studied in depth, the role of equitable proprietary claims in the law of restitution has been found to be a matter of great difficulty. The legitimate ambition of restitution lawyers has been to establish a coherent law of restitution, founded upon the principle of unjust enrichment; and since certain equitable institutions, notably the constructive trust and the resulting trust, have been perceived to have the function of reversing unjust enrichment, they have sought to embrace those institutions within the law of restitution, if necessary moulding them to make them fit for that purpose. Equity lawyers, on the other hand, have displayed anxiety that in this process the equitable principles underlying these institutions may become illegitimately distorted; and though equity lawyers in this country are nowadays much more sympathetic than they have been in the past towards the need to develop a coherent law of restitution, and to identify the proper role of the trust within that rubric of the law, they remain concerned that the trust concept should not be distorted, and also that the practical consequences of its imposition should be fully appreciated. There is therefore some tension between the aims and perceptions of these two groups of lawyers, which has manifested itself in relation to the matters under consideration in the present case.

In the present case, however, it is not the function of your Lordships' House to rewrite the agenda for the law of restitution, nor even to identify the role of equitable proprietary claims in that part of the law. The judicial process is neither designed for, nor properly directed towards, such objectives. The function of your Lordships' House is simply to decide the questions at issue before it in the present case; and the particular question now under consideration is whether, where money has been paid by a party to a contract which is ultra vires the other party and so void ab initio, he has the benefit of an equitable proprietary claim in respect of the money so paid. Moreover the manner in which this question has arisen before this House renders it by no means easy to address. First of all, the point was not debated in any depth in the courts below, because they understood that they were bound by *Sinclair v. Brougham* [1914] A.C. 398 to hold that such a claim was here available. But second, the point has arisen only indirectly in this case, since it is relevant only to the question whether the court here has power to make an award of compound interest. It is a truism that, in deciding a question of law in any particular case, the courts are much influenced by considerations of practical justice, and especially by the results which would flow from the recognition of a particular claim on the facts of the case before the court. Here, however, an award of compound interest provides no such guidance, because it is no more than a consequence which is said to flow, for no more than historical reasons, from the availability of an equitable proprietary claim. It therefore provides no guidance on the question whether such a claim should here be available.

In these circumstances I regard it as particularly desirable that your Lordships should, so far as possible, restrict the inquiry to the actual questions at issue in this appeal, and not be tempted into formulating general principles of a broader nature. If restitution lawyers are hoping to find in your Lordships' speeches broad statements of principle which may definitively establish the future shape of this part of the law, I fear that they may be disappointed. I also regard it as important that your Lordships should, in the traditional manner, pay particular regard to the practical consequences which

**Page 239**

may flow from the decision of the House.

With these observations by way of preamble, I turn to the question of the availability of an equitable proprietary claim in a case such as the present. The argument advanced on behalf of the bank was that the money paid by it under the void contract was received by the council subject to a resulting trust. This approach was consistent with that of Dillon L.J. in the Court of Appeal: see [1994] 1 W.L.R. 938, 947. It is also consistent with the approach of Viscount Haldane L.C. (with whom Lord Atkinson agreed) in *Sinclair v. Brougham* [1914] A.C. 398, 420-421.

I have already expressed the opinion that, at first sight, it is surprising that an equitable proprietary claim should be available in a case such as the present. However, before I examine the question as a matter of principle, I propose first to consider whether *Sinclair v. Brougham* supports the argument now advanced on behalf of the bank.

*Sinclair v. Brougham*

The decision of this House in *Sinclair v. Brougham* has loomed very large in both the judgments in the courts below and in the admirable arguments addressed to the Appellate Committee of this House. It has long been regarded as a controversial decision, and has been the subject of much consideration by scholars, especially those working in the field of restitution. I have however reached the conclusion that it is basically irrelevant to the decision of the present appeal.

It is first necessary to establish what the case was about. The Birkbeck Permanent Benefit Building Society decided to set up a banking business, known as the Birkbeck Bank. The banking business was however held to be ultra vires the objects of the building society; and there followed a spate of litigation concerned with solving the problems consequent upon that decision. *Sinclair v. Brougham* was one of those cases.

The case has been analysed in lucid detail in the speech of my noble and learned friend, Lord Browne-Wilkinson, which I have read (in draft) with great respect. In its bare outline, it was concerned with the distribution of the assets of the society, which was insolvent. There were four classes of claimants. First, there were two classes of shareholders - the A shareholders (entitled to repayment of their investment on maturity) and the B shareholders (whose shares were permanent). Next, there was a numerous class of people who had deposited money at the bank, under contracts which were ultra vires and so void. Finally, there were the ordinary trade creditors of the society. By agreement, the A shareholders and the trade creditors were paid off first, leaving only the claims of the depositors and the B shareholders. There were sufficient assets to pay off the B shareholders, but not the depositors and certainly not both. The question of how to reconcile their competing claims arose for consideration on a summons by the liquidator for directions.

The problem arose from the fact that the contracts under which the depositors deposited their money at the bank were ultra vires and so void. That prevented them from establishing a simple contractual right to be repaid, in which event they would have ranked with the ordinary trade creditors of the society in the liquidation. As it was, they claimed to be entitled to repayment in an action for money had and received - in the same way as the bank claimed repayment in the case now before your Lordships. But the House of Lords held that they were not entitled to claim on this ground. This was in substance because to allow such a claim would permit an indirect enforcement of

the contract which the policy of the law had decreed should be void. In those days, of course, judges still spoke about the common law right to restitution in the language of implied contract, and so we find Lord Sumner saying in a much quoted passage, at p. 452:

"To hold otherwise would be indirectly to sanction an ultra vires borrowing. All these causes of action are common species of the genus assumpsit. All now rest, and long have rested, upon a notional or imputed promise to repay. The law cannot de jure impute promises to repay, whether for money had and received or otherwise, which, if made de facto, it would inexorably avoid."

This conclusion however created a serious problem because, if the depositors had no claim, then, in the words of Lord Dunedin, at p. 436:

"The appalling result in this very case would be that the society's shareholders, having got proceeds of the depositors' money in the form of investments, so that each individual depositor is utterly unable to trace his money, are enriched to the extent of some 500 per cent."

As a matter of practical justice, such a result was obviously unacceptable; and it was to achieve justice that the House had recourse to equity to provide the answer. It is, I think, apparent from the reasoning of the members of the Appellate Committee that they regarded themselves, not as laying down some broad general principle, but as solving a particular practical problem. In this connection it is, in my opinion, significant that there was a considerable variation in the way in which they approached the problem. Viscount Haldane L.C., with whom Lord Atkinson agreed, did so, at p. 421, on the basis that there arose in the circumstances "a resulting trust, not of an active character." Lord Dunedin based his decision upon a broad equity of restitution, drawn from Roman and French law. He asked himself the question, at p. 435: "Is English equity to retire defeated from the task which other systems of equity have conquered?" - a question which he answered in the negative. Lord Parker of Waddington, at pp. 441-442, attempted to reconcile his decision with the established principles of equity by holding that the depositors' money had been received by the directors of the society as fiduciaries, with the effect that the depositors could thereafter follow their money in equity into the assets of the society. Lord Sumner, at p. 458, considered that the case should be decided on equitable principles on which there was no direct authority. He regarded the question as one of administration, in which "the most just distribution of the whole must be directed, so only that no recognised rule of law or equity be disregarded." Setting on one side the opinion of Lord Parker, whose approach I find very difficult to reconcile with the facts of the case, I do not discern in the speeches of the members of the Appellate Committee any intention to impose a trust carrying with it the personal duties of a trustee.

For present purposes, I approach this case in the following way. First, it is clear that the problem which arose in *Sinclair v. Brougham*, viz. that a personal remedy in restitution was excluded on grounds of public policy, does not arise in the present case, which is not of course concerned with a borrowing contract. Second, I regard the decision in *Sinclair v. Brougham* as being a response to that problem in the case of ultra vires borrowing contracts, and as not intended to create a principle of general application. From this it follows, in my opinion, that *Sinclair v. Brougham* is not relevant to the decision in the present case. In particular it cannot be relied upon as a precedent that a trust arises on the facts of the present case, justifying on that basis an award of compound interest against the council.

**Page 241**

But I wish to add this. I do not in any event think that it would be right for your Lordships' House to exercise its power under the *Practice Statement (Judicial Precedent)* [1966] 1 W.L.R. 1234 to depart from *Sinclair v. Brougham*. I say this first because, in my opinion, any decision to do so would not be material to the disposal of the present appeal, and would therefore be obiter. But there is a second reason of substance why, in my opinion, that course should not be taken. I recognise that nowadays cases of incapacity are relatively rare, though the swaps litigation shows that they can still occur. Even so, the question could still arise whether, in the case of a borrowing contract rendered void because it was ultra vires the borrower, it would be contrary to public policy to allow a personal claim in restitution. Such a question has arisen in the past not only in relation to associations such as the Birkbeck Permanent Benefit Building Society, but also in relation to infants' contracts. Moreover there is a respectable body of opinion that, if such a case arose today, it should still be held that public policy would preclude a personal claim in restitution, though not of course by reference to an implied contract. That was the opinion expressed by Leggatt L.J. in the Court of Appeal in the present case [1994] 1 W.L.R. 938, 952E-F, as it had been by Hobhouse J.; and the same view has been expressed by Professor Birks (see *An Introduction to the Law of Restitution* (1985), p. 374). I myself incline to the opinion that a personal claim in restitution would not indirectly enforce the ultra vires contract, for such an action would be unaffected by any of the contractual terms governing the borrowing, and moreover would be subject (where appropriate) to any available restitutionary defences. If my present opinion were to prove to be correct then *Sinclair v. Brougham* will fade into history. If not, then recourse can at least be had to *Sinclair v. Brougham* as authority for the proposition that, in such circumstances, the lender should not be without a remedy. Indeed, I cannot think that English law, or equity, is so impoverished as to be incapable of providing relief in such circumstances. Lord Wright, who wrote in strong terms (" *Sinclair v. Brougham*" (1938) 6 C.L.J. 305) endorsing the just result in *Sinclair v. Brougham*, would turn in his grave at any such suggestion. Of course, it may be necessary to reinterpret the decision in that case to provide a more satisfactory basis for it; indeed one possible suggestion has been proposed by Professor Birks (see *An Introduction to the Law of Restitution*, pp. 396 et seq.). But for the present the case should in my opinion stand, though confined in the manner I have indicated, as an assertion that those who are caught in the trap of advancing money under ultra vires borrowing contracts will not be denied appropriate relief.

*The availability of an equitable proprietary claim in the present case*

Having put *Sinclair v. Brougham* on one side as providing no authority that a resulting trust should be imposed in the facts of the present case, I turn to the question whether, as a matter of principle, such a trust should be imposed, the bank's submission being that such a trust arose at the time when the sum of £2.5m. was received by the council from the bank.

As my noble and learned friend, Lord Browne-Wilkinson, observes, it is plain that the present case falls within neither of the situations which are traditionally regarded as giving rise to a resulting trust, viz. (1) voluntary payments by A to B, or for the purchase of property in the name of B or in his and A's joint names, where there is no presumption of advancement or evidence of intention to make an out-and-out gift; or (2) property transferred to B on an express trust which does not exhaust the whole beneficial interest. The question therefore arises whether resulting trusts should be extended beyond such cases to apply in the present case, which I shall treat as a case where money has been paid for a consideration which fails.

**Page 242**

In a most interesting and challenging paper, "Restitution and Resulting Trusts," published in *Equity: Contemporary Legal Developments* (1992) (ed. Goldstein), p. 335, Professor Birks has argued for a wider role for the resulting trust in the field of restitution, and specifically for its availability in cases of mistake and failure of consideration. His thesis is avowedly experimental, written to test the temperature of the water. I feel bound to respond that the temperature of the water must be regarded as decidedly cold: see, e.g., Professor Burrows, "Swaps and the Friction between Common Law and Equity" [1995] R.L.R. 15, and Mr. W. J. Swadling, "A new role for resulting trusts?" (1996) 16 Legal Studies 133.

In the first place, as Lord Browne-Wilkinson points out, to impose a resulting trust in such cases is inconsistent with the traditional principles of trust law. For on receipt of the money by the payee it is to be presumed that (as in the present case) the identity of the money is immediately lost by mixing with other assets of the payee, and at that time the payee has no knowledge of the facts giving rise to the failure of consideration. By the time that those facts come to light, and the conscience of the payee may thereby be affected, there will therefore be no identifiable fund to which a trust can attach. But there are other difficulties. First, there is no general rule that the property in money paid under a void contract does not pass to the payee; and it is difficult to escape the conclusion that, as a general rule, the beneficial interest in the money likewise passes to the payee.

This must certainly be the case where the consideration for the payment fails after the payment is made, as in cases of frustration or breach of contract; and there appears to be no good reason why the same should not apply in cases where, as in the present case, the contract under which the payment is made is void ab initio and the consideration for the payment therefore fails at the time of p

Williston on Contracts
Database updated May 2011

Richard A. Lord

Chapter
38. Conditions in Contracts, generally
I. In General

References

**§ 38:6. Literal compliance with express conditions**

**West's Key Number Digest**

West's Key Number Digest, Contracts ☞218, 219, 278(.5)

**Forms**

Williston on Contracts 4th—Forms §§ 38F:2, 38F:3

As a general rule, unless the performance is waived, excused,[55] or prevented by the other party, or unless he or she repudiates the contract,[56] conditions which are either express or implied in fact[57] must be literally met or exactly fulfilled or no liability can arise on the promise qualified by such conditions.[58] The reason for this is obvious. The promisor can only be held liable according to the terms of the promise which he or she makes.[59] If he or she promises $5.00, he or she cannot be made to pay $5.01. For the same reason if he or she makes a promise to do an act on condition that he or she receives $5.01, the promisor cannot be required to perform on being paid $5.00. The condition is part of the promise qualifying and limiting it, and the promise, as a matter of plain fact, is not broken until the condition has happened or has been performed.[60] A party to a contract cannot have the benefit of favorable provisions and ignore its conditions which are to be performed by that party or which must occur before its benefits are due.[61]

Thus, it has been recognized that conditions that shipped goods would arrive by a certain day,[62] or that notice of dispatch of the goods would be given by cable[63] must be literally met and will be strictly enforced. In a charter party where there is a provision that if time be lost through such causes as embargoes and the delay extends over a named number of days, the charter party shall become null and void, a late tender of performance will not revive the contract.[64] Similarly, insurance policies,[65] building contracts,[66] contracts of sale,[67] loans,[68] and other contracts frequently contain express conditions which must be literally met or exactly performed in order to create liability on the contract, and the fact that nonperformance of the condition or incomplete performance of it has caused no injury to the promisor is immaterial.[69]

"A reasonable compliance with the conditions of the contract relating to notice is indispensable to fix liability. These conditions are a material and important part of the contract, and should not be set aside as of no moment."[70]

A distinction in law if not in logic must, however, be observed. Logically, there is no distinction among these

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

three cases:
    1. A promise to pay if a house is completed according to plans and specifications.
    2. A promise to pay if the house is completed in every respect exactly according to plans and specifications.
    3. A promise to pay if the house is completed exactly in every respect according to plans and specifications, and
    if it is not so completed it is understood that the promisor is to pay nothing at all.

    Even in the first of these cases, as the promise is conditional on the house being completed according to plans and specifications, there is no undertaking to pay except on this condition. And except for such slight qualification as the principle of *de minimis* may justify, the condition naturally means exact and full completion.[71] "There may be omissions of that which could not afterwards be supplied exactly as called for by the contract without taking down the building to its foundations, and at the same time the omission may not affect the value of the building for use or otherwise, except so slightly as to be hardly appreciable."[72]

    Nevertheless, modern courts not infrequently deal differently with provisions substantially in the forms stated above. If the promise is in the first form, many courts are disposed to allow recovery where there has been merely substantial performance.[73] If the promise is in the last form suggested, most courts seem indisposed to set any limits to the defense of the promisor in spite of the forfeiture which may be involved.

    Doubtless, the rule that an instrument is to be interpreted most strongly against the maker, and that a fair and reasonable interpretation will be preferred to a harsh one,[74] will often justify a recovery where at first sight there seems a failure of condition. Especially in insurance cases, courts have gone far in this direction.[75] Moreover, if a promise is in the last of the three forms suggested, it is evident that the minds of the parties were addressed to the particular contingency of substantial performance marred by a slight failure, while in the second form, and still more clearly in the first, the possible effect of their words may not have occurred to them.

    Express conditions precedent define the satisfaction of a necessary antecedent to a party's performance under a contract and are subject to the rule of strict compliance, and are distinctly different from, although analogous to, constructive conditions of exchange, which regulate the parties' course of performance, and are subject to the rule of substantial performance.[76]

## CUMULATIVE SUPPLEMENT

**Cases:**

    Courts generally demand strict compliance with requirement that a condition precedent be satisfied. In re Krueger, 192 F.3d 733 (7th Cir. 1999).
    Where a party's promise is expressly made dependent on the existence of a stated condition, unless "waived, excused, or prevented by the other party" such a condition must generally be "literally met or exactly fulfilled" before any binding contractual liability can arise. McGough v. Broadwing Communications, Inc., 177 F. Supp. 2d 289 (D.N.J. 2001) (citing text).
    Before a party can enforce conditional contract obligations, the party must perform those requisite conditions for which the party is responsible. Wachter v. Gratech Co., Ltd., 2000 ND 62, 608 N.W.2d 279 (N.D. 2000).

**[END OF SUPPLEMENT]**

---

    [FN55] As to waiver or excuse, generally, see Ch 39.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

THE COMMON LAW LIBRARY

# CHITTY
# ON
# CONTRACTS

## THIRTIETH EDITION

### VOLUME I

### GENERAL PRINCIPLES

NEW YORK LAW INSTITUTE
LIBRARY

JAN — 9 2009

120 BROADWAY - N.Y.C.



SWEET & MAXWELL          THOMSON REUTERS



*Paragon Finance Plc*[157] it was held that a lender's entitlement to vary interest rates was not completely unfettered. The court implied a term into the agreement to the effect that the rates of interest would not be set dishonestly, for an improper purpose, capriciously or arbitrarily, or in a way in which no reasonable mortgagee, acting reasonably, would do.[158] The legislature has also intervened to control clauses such as those which purport to entitle a lender unilaterally and in its absolute discretion to vary the rate of interest subject to notice to the debtor. Where such a provision is contained in a contract concluded between a seller or supplier and a consumer and that contract has not been individually negotiated, it may fall within the scope of the Unfair Terms in Consumer Contracts Regulations 1999.[159] Thus a contract term which enables the seller or supplier to alter the terms of the contract unilaterally without a valid reason which is specified in the contract,[160] or enables the seller or supplier to alter unilaterally without a valid reason any characteristics of the product or service to be provided,[161] or which provides for the price of the goods to be determined at the time of delivery, or allows a seller of goods or supplier of services to increase their price without in both cases giving the consumer the corresponding right to cancel the contract if the final price is too high in relation to the price agreed when the contract was concluded,[162] may constitute an unfair term which will not be binding upon the consumer.

## 6. WAIVER[163]

**Waiver or forbearance.** Where one party voluntarily accedes to a request by the other that he should forbear to insist on the mode of performance fixed by the contract, the court may hold that he has *waived* his right to require that the contract be performed in this respect according to its original tenor.[164] Waiver (in the sense of "waiver by estoppel" rather than "waiver by election")[165] may also

22–040

---

[157] [2001] EWCA Civ 1466; [2002] 1 W.L.R. 685. The Court of Appeal declined to follow dicta of Staughton L.J. in *Lombard Tricity Finance Ltd v Paton* [1989] 1 All E.R. 918, 923.

[158] On the facts of the case, it was held that the borrowers had no real prospect of successfully establishing a breach of the implied term. The reason for the increase in interest rates was that the creditors were in financial difficulties and so had to increase their interest rates in order to protect their own financial position. It could not be said that they had acted dishonestly, capriciously, arbitrarily or wholly unreasonably in acting as they did. See also *Paragon Finance Plc v Pender* [2005] EWCA Civ 760; [2005] 1 All E.R. (D) 307 (Jun).

[159] SI 1999/2083. See further above, Ch.15, where the scope of the Regulations and the definition of terms such as "seller or supplier", etc. is discussed in more detail.

[160] See Sch.2 to the 1999 Regulations para.1(j), (set out at para.15–103) although note the restricted applicability of this provision to the supply of financial services (para.2(b)).

[161] See Sch.2 to the 1999 Regulations para.1(k).

[162] See Sch.2 to the 1999 Regulations para.1(l), although note the restricted applicability of this provision to financial services (para.2(c)) and that it does not apply to "price indexation clauses, where lawful, provided that the method by which prices vary is explicitly described" (para.2(d)).

[163] See generally Wilken and Villiers, *The Law of Waiver, Variation and Estoppel*, 2nd edn (2002), Chs 3–5.

[164] See above, para.3–081.

[165] The distinction between these two types of waiver is discussed below, para.24–007. See also *Motor Oil Hellas (Corinth) Refineries SA v Shipping Corp. of India* [1990] 1 Lloyd's Rep. 391, 397–399.

[1469]

**22–040** CHAP. 22—DISCHARGE BY AGREEMENT

be held to have occurred if, without any request, one party represents to the other that he will forbear to enforce or rely on a term of the contract to be performed or observed by the other party, and the other party acts in reliance on that representation.[166]

**22–041** **Form of waiver.** A waiver may be oral or written or inferred from conduct[167] even though the provision waived is found in a contract required to be made in or evidenced by writing. It has been noted that any variation of a contract required to be made in or evidenced by writing must itself be made in or evidenced by writing.[168] If it is merely oral, it is of no effect. An oral forbearance or concession made by one party to the other does not require to be so evidenced, even if made at the latter's request.[169] Thus, what is ineffective as a variation may possibly have effect as a waiver. The formal requirements, in relation to such a contract, of rescission, variation and waiver were thus described by Goddard J. in *Besseler Waechter Glover & Co v South Derwent Coal Co*[170]:

> "If the parties agree to rescind their original contract and to substitute for it a new one, the latter must be evidenced by writing; so, too, if as a matter of contract the parties agree that the terms of the original agreement shall be varied, the variation must be in writing. But if what happens is a mere voluntary forbearance to insist on delivery or acceptance according to the strict terms of the written contract, the original contract remains unaffected, and the obligation to deliver and accept the full contract quantity still continues. . . . It does not appear to me to matter whether the request comes from one side or the other, or whether it is a matter which is convenient to one party or to both. What is of importance is whether it is a mere forbearance or a matter of contract."

The distinction between variation and waiver is, however, a difficult one to apply in practice,[171] particularly since a waiver may be consensual and be just as far reaching in its effect as a variation of the agreement. Fortunately, in respect of formal requirements,[172] it has become much less important since the almost total repeal of the Statute of Frauds by the Law Reform (Enforcement of Contracts) Act 1954.[173]

**22–042** **Effect on party forbearing.** The party who forbears will be bound by the waiver and cannot set up the original terms of the agreement. If, by words or conduct, he has agreed, or led the other party to believe that he will accept performance at a later date than or in a different manner from that provided in the

---

[166] See above, 3–081, 3–085.

[167] *Bruner v Moore* [1904] 1 Ch. 305; *Bremer Handelsgesellschaft mbH v Vanden Avenne-Izegem P.V.B.A.* [1978] 2 Lloyd's Rep. 109.

[168] See above, para.22–033.

[169] *Msas Global Logistics v Power Packaging Inc* [2003] EWHC 1393 (Ch), [2003] All E.R. (D) 211 (Jun).

[170] [1938] 1 K.B. 408, 416, 417; *Msas Global Logistics v Power Packaging Inc* [2003] EWHC 1393 (Ch), [2003] All E.R. (D) 211 (Jun).

[171] See *Besseler Waechter Glover & Co v South Derwent Coal Co* [1938] 1 K.B. 408; *Watson v Healy Lands* [1965] N.Z.L.R. 511; Dugdale and Yates (1976) 39 M.L.R. 680.

[172] See Ch.4.

[173] See above, para.4–009.

contract, he will not be able to refuse that performance when tendered.[174] However, in cases of postponement of performance, if the period of postponement is specified in the waiver, then, if time was originally of the essence, it will remain so in respect of the new date.[175] If the period of postponement is not specified in the waiver, the party forbearing is entitled, upon reasonable notice, to impose a new time-limit, which may then become of the essence of the contract.[176] Similarly, in other cases of forbearance, he may be entitled, upon reasonable notice, to require the other party to comply with the original mode of performance,[177] unless in the meantime circumstances have so changed as to render it impossible[178] or inequitable[179] so to do. He cannot treat the waiver as entirely without effect. If a seller of goods withholds delivery of the goods at the purchaser's request (i.e. if the seller waives the obligation of the purchaser to accept the goods within a certain time), he will still be under a duty to deliver within a reasonable time if so requested by the purchaser.[180]

**Effect on party to whom forbearance is extended.** Where one party has   22–043
induced the other party to accede to his request, the party seeking the forbearance will not be permitted to repudiate the waiver and to rely on the letter of the agreement.[181] Thus in *Levey & Co v Goldberg*[182] the defendant agreed in writing to buy from the plaintiffs certain pieces of cloth over the value of £10[183] to be delivered within a certain period. At the oral request of the defendant, the plaintiffs voluntarily withheld delivery during that period. The defendant subsequently refused to accept delivery, and, when sued, contended that the plaintiffs themselves were in breach, as the oral agreement was insufficient to vary the terms of a contract which was required by law to be evidenced by writing. It was held that the forbearance by the plaintiffs at the request of the defendant did not constitute a variation but a waiver, and the plaintiffs were entitled to maintain their action.

[174] *Leather Cloth Co v Hieronimus* (1875) L.R. 10 Q.B. 140; *Bruner v Moore* [1904] 1 Ch. 305; *Panoutsos v Raymond Hadley Corp of New York* [1917] 2 K.B. 473; *Hartley v Hymans* [1920] 2 K.B. 475; *Besseler Waechter Glover & Co v South Derwent Coal Co* [1938] 1 K.B. 408; *Tankexpress A/S v Compagnie Financière Belges des Pétroles SA* [1949] A.C. 76; *Plasticmoda Società per Azioni v Davidsons (Manchester) Ltd* [1952] 1 Lloyd's Rep. 527; *Enrico Fürst & Co v W.E. Fischer* [1960] 2 Lloyd's Rep. 340; *W.J. Alan & Co Ltd v El Nasr Export and Import Co* [1972] 2 Q.B. 189, 213.
[175] *Luck v White* (1973) 26 P. & C.R. 89; *Buckland v Farmar & Moody* [1979] 1 W.L.R. 221; *Nichimen Corp v Gatoil Overseas Inc* [1987] 2 Lloyd's Rep. 46.
[176] *Hartley v Hymans* [1920] 2 K.B. 475; *Charles Rickards Ltd v Oppenhaim* [1950] 1 K.B. 616; *Jacobson van den Berg & Co (UK) Ltd v Biba Ltd* (1977) 121 S.J. 333; *State Trading Corp of India Ltd v Compagnie Française d'Importation et de Distribution* [1983] 2 Lloyd's Rep. 679. See also *Ficom SA v Sociedad Cadex Ltda* [1980] 2 Lloyd's Rep. 118, 131.
[177] *Panoutsos v Raymond Hadley Corp of New York* [1917] 2 K.B. 473.
[178] *Leather Cloth Co v Hieronimus* (1875) L.R. 10 Q.B. 140.
[179] *Toepfer v Warinco AG* [1978] 2 Lloyd's Rep. 569, 576. See also above, para.3–083.
[180] *Tyers v Rosedale Ferryhill Iron Co* (1875) L.R. 10 Ex. 195.
[181] *Ogle v Earl Vane* (1868) L.R. 3 Q.B. 272; *Hickman v Haynes* (1875) L.R. 10 C.P. 598.
[182] [1922] 1 K.B. 688.
[183] Statute of Frauds s.17 (re-enacted as s.4 of the Sale of Goods Act 1893) required such a contract to be evidenced by writing. Both provisions have now been repealed by the Law Reform (Enforcement of Contracts) Act 1954.

[1471]



22–044                     CHAP. 22—DISCHARGE BY AGREEMENT

**22–044**     **Consideration for waiver.** A waiver is also distinguishable from a variation of a contract in that there is no consideration for the forbearance moving from the party to whom it is given.[184] It may therefore be more satisfactory to regard this form of waiver, that is "waiver by estoppel", as analogous to, or even identical with, equitable forbearance or "promissory" estoppel.[185] Although consideration need not be proved, certain other requirements must be satisfied for such an estoppel to be effective: first, it must be clear and unequivocal; secondly, the other party must have altered his position in reliance on it, or at least acted on it.[186]

**22–045**     **Contracting out of waiver.** It would appear that there is no general principle of law that parties to a contract cannot restrict the operation of the doctrine of waiver by the terms of their contract.[187] In *State Securities Plc v Initial Industry Ltd*[188] Jonathan Gaunt Q.C., sitting as a Deputy Judge of the High Court, stated:

> "I can, however, see no reason in principle why the parties to an equipment lease . . . or other commercial contract, should not be free to stipulate that a particular act, such as payment of a rental instalment should not be taken to waive a right to terminate for an earlier breach. After all, such a provision may be very convenient and operate to the benefit of both parties. The finance company may want to encourage the lessee to correct the breach but not want him to fall behind with his payments while he does so. It may be in the interests of the lessee that the finance company should not have to take an early decision whether to terminate."[189]

However it cannot be assumed that the courts in all cases will give effect to a term of the contract which purports to exclude or limit the operation of the doctrine of waiver; in some circumstances the term of the contract may not

[184] *W.J. Alan & Co Ltd v El Nasr Export and Import Co* [1972] 2 Q.B. 189, 193. See also above, para.3–081.
[185] See above, para.3–085.
[186] *Woodhouse A.C. Israel Cocoa Ltd SA v Nigerian Produce Marketing Co Ltd* [1972] A.C. 741, 755, 758, 761, 762, 767–768, 781; *W.J. Alan & Co Ltd v El Nasr Export & Import Ltd* [1972] 2 Q.B. 189, 212–214, 215, 217; *Finagrain SA v P. Kruse* [1976] 2 Lloyd's Rep. 508, 534–535, 540, 546; *Bremer Handelsgesellschaft mbH v Vanden Avenne-Izegem P.V.B.A.* [1978] 2 Lloyd's Rep. 109, 127; *Bunge SA v Schleswig-Holsteinische Landwirtschaftliche Hauptgenossenschaft Eingetr GmbH* [1978] 1 Lloyd's Rep. 480, 490; *Bremer Handelsgesellschaft mbH v C. Mackprang* [1979] 1 Lloyd's Rep. 220, 225–226, 228, 230; *Avimex SA v Dewulf & Cie* [1979] 2 Lloyd's Rep. 57, 67–68; *Bremer Handelsgesellschaft mbH v Westzucker* [1981] 1 Lloyd's Rep. 207, 213; *Cremer v Granaria B.V.* [1981] 2 Lloyd's Rep. 583, 587; *Cerealmangimi Spk v Toepfer* [1981] 3 All E.R. 533; *Cook Industries Inc v Meunerie Liegeois SA* [1981] 1 Lloyd's Rep. 359, 368; *Société Italo-Belge pour le Commerce et l'Industrie v Palm and Vegetable Oils (Malaysia) Sdn Bhd* [1981] 2 Lloyd's Rep. 695, 700–702; *Bremer Handelsgesellschaft mbH v Finagrain Compagnie Commerciale, etc. SA* [1981] 2 Lloyd's Rep. 259, 263, 266; *Bremer Handelsgesellschaft mbH v Raiffeisen Hauptgenossenschaft EG* [1982] 1 Lloyd's Rep. 599; *Bremer Handelsgesellschaft mbH v Deutsche Conti-Handelsgesellschaft mbH* [1983] 2 Lloyd's Rep. 45; *Allied Marine Transport Ltd v Vale do Rio Doce Navegacao SA* [1985] 1 W.L.R. 925; *Motor Oil Hellas (Corinth) Refineries SA v Shipping Corp of India* [1990] 1 Lloyd's Rep. 391. cf. *Scandinavian Trading Tanker Co AB v Flota Petrolera Ecuatoriana* [1983] 2 Q.B. 529, [1983] 2 A.C. 694. See above, para. 3–081; below, paras 24–007—24–009.
[187] *State Securities Plc v Initial Industry Ltd* [2004] All E.R. (D) 317 (Jan).
[188] [2004] All E.R. (D) 317 (Jan).
[189] [2004] All E.R. (D) 317 (Jan) at [57].

[1472]



suffice to deny effect to a clear and unequivocal representation made by one party to the contract.[190]

**Waiver of condition for benefit of one party.** Where the terms of a contract    22–046
include a provision which has been inserted solely for the benefit of one party, he
may, without the assent of the other party, waive compliance with that provision
and enforce the contract as if the provision had been omitted.[191] He will not be
permitted to do so where the provision has been inserted for the benefit of both
parties[192] or where there is, in reality, no concluded agreement.[193]

**Waiver of breach.** One party may waive his right to terminate a contract    22–047
consequent upon a repudiation of the contract by the other party.[194] It is,
however, important to distinguish between the case in which a party waives his
right to treat the contract as repudiated but does not abandon his right to claim
damages for the loss suffered as a result of the breach[195] and the case where the
innocent party waives not only his right to terminate performance of the contract
but also his claim for damages for the breach.[196] The former is an example of
waiver by election,[197] whereas the latter is more properly classified as a species
of waiver by estoppel.[198]

## 7. PROVISION FOR DISCHARGE IN THE CONTRACT ITSELF

**Express provision.** The parties may expressly provide in their contract that    22–048
either or one of them is to have an option to terminate the contract.[199] This right

[190] I-Way Ltd v World Online Telecom Ltd [2002] EWCA Civ 413 (Court of Appeal refused to give summary judgment in a case in which the court was asked, in effect, to enforce a term of the contract which provided that "no addition, amendment or modification of this Agreement shall be effective unless it is in writing and signed by or on behalf of both parties").

[191] Bennett v Fowler (1840) 2 Beav. 302; Hawksley v Outram [1892] 3 Ch. 359; Morrell v Studd and Millington [1913] 2 Ch. 648; E.E. Napier v Dexters Ltd (1926) 26 Ll. L. R. 62, 63–64, 184; 187–188. See also North v Loomes [1919] 1 Ch. 378 and Sale of Goods Act 1979 s.11(2). Once he has waived the condition, either expressly or by conduct, he cannot then rely on it to deny his own liability: Barrett Bros (Taxis) Ltd v Davies [1966] 1 W.L.R. 1334.

[192] Lloyd v Nowell [1895] 2 Ch. 744; Burgess v Cox [1951] Ch. 383; Heron Garage Properties Ltd v Moss [1974] 1 W.L.R. 148; Gregory v Wallace [1998] I.R.L.R. 387; Wessex Reserve Forces and Cadets Association v White [2005] EWHC 983 (QB); [2005] All E.R. (D) 310 (May).

[193] Allsopp v Orchard [1923] 1 Ch. 323.

[194] See below, para.24–007.

[195] Motor Oil Hellas (Corinth) Refineries SA v Shipping Corp of India [1990] 1 Lloyd's Rep. 391, 397–398.

[196] This is sometimes known as "total waiver": see Sale of Goods Act 1979 s.11(2); Benjamin's Sale of Goods, 7th edn (2006), paras 12–034—12–036; Treitel, The Law of Contract, 12th edn by Peel (2007), para.18–076 and below, para.24–007.

[197] See below, para.24–007. There are important differences between the two types of waiver; see below, para.24–008 and Treitel at paras 18–074—18–080.

[198] In Aktieselskabet Dampskibsselskabet Svendborg v Mobil North Sea Ltd [2001] 2 Lloyd's Rep. 127, 130 David Steel J. said that he saw no reason to accord the word "terminated" in a termination clause anything other than "its ordinary meaning of coming, or being brought, to an end, however that result may have occurred". Thus he held that a repudiatory breach by either party accepted by the other constituted a "termination" within the meaning of the clause.

# WILKEN AND VILLIERS
# THE LAW OF WAIVER, VARIATION AND ESTOPPEL

SEAN WILKEN
*BA (Oxon); Dip Law;*
*Barrister of the Middle Temple*

# OXFORD
UNIVERSITY PRESS